APPEAL,CLOSED,OPEN_MJ,PROSE

# US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: <u>2:25–cv–00674–DAK</u>

Velasquez v. Amazon.com Services
Assigned to: Judge Dale A. Kimball
Demand: $12,000,000
 Case in other court:  Tenth, 25–04145
                            Tenth, 26–04000
Cause: 28:1331 Fed. Question

Date Filed: 08/12/2025
Date Terminated: 11/14/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

| **Carlos Velasquez** | represented by | **Carlos Velasquez** |
| | | PO BOX 581365 |
| | | SALT LAKE CITY, UT 84158 |
| | | (801)671–0361 |
| | | Email: cfv1983@gmail.com |
| | | PRO SE |
| | | *Bar Number:* |
| | | *Bar Status:* |

V.

**Defendant**

| **Amazon.com Services** | represented by | **Brian D. Tuttle** |
| *Inc.* | | LITTLER MENDELSON |
| | | 222 MAIN ST 5TH FL |
| | | SALT LAKE CITY, UT 84101 |
| | | 801–401–8312 |
| | | Email: btuttle@littler.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Number: 16974* |
| | | *Bar Status: Active* |
| | | |
| | | **Ethan D. Thomas** |
| | | LITTLER MENDELSON PC |
| | | 8474 ROZITA LEE AVE STE 200 |
| | | LAS VEGAS, NV 89113 |
| | | 702–862–8800 |
| | | Email: edthomas@littler.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Number: 15751* |
| | | *Bar Status: Active* |

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 08/12/2025 | 1 | COMPLAINT against Amazon.com Services (**Originally received by the court on 08/12/2025).** (Fee Status: IFP Pending) filed by Carlos Velasquez. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 30, # 3 Affidavit Plaintiff's Unsworn Affidavit of Victimhood) Assigned to Magistrate Judge Cecilia M. Romero (mdj) (Entered: 08/12/2025) |
|---|---|---|
| 08/12/2025 | 2 | NOTICE of Email Filing and Notification Form by Carlos Velasquez. (mdj) (Entered: 08/12/2025) |
| 08/12/2025 | 3 | **\*\*SEALED DOCUMENT\*\*** MOTION for Leave to Proceed in forma pauperis. Assigned to Magistrate Judge Cecilia M. Romero for review, case file forwarded to Magistrate Judge. (**Received by the court on: 08/12/2025)** filed by Plaintiff Carlos Velasquez. (mdj) (Entered: 08/12/2025) |
| 08/12/2025 | 4 | NOTICE OF PRESIDING MAGISTRATE JUDGE ASSIGNMENT – This case is assigned to a magistrate judge. Under 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and DUCivR 72–3, you are hereby notified that a magistrate judge for the District of Utah may conduct any or all proceedings in this case, including a jury or bench trial and entry of a final judgment. Exercise of this jurisdiction by the magistrate judge is permitted only if all parties voluntarily sign and return the form. To consent, return the Consent Form to the clerk's office within 21 days via email at consents@utd.uscourts.gov or mail to the address on the form. **Please do not efile the Consent Form in the case.** Notice emailed or mailed to Plaintiff Carlos Velasquez. Form due by 9/2/2025. (mh) (Entered: 08/12/2025) |
| 08/12/2025 | 5 | EXHIBITS filed by Carlos Velasquez re 1 Complaint,. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 6, # 5 Exhibit 7, # 6 Exhibit 8, # 7 Exhibit 9, # 8 Exhibit 10, # 9 Exhibit 11, # 10 Exhibit 12, # 11 Exhibit 13, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 18, # 17 Exhibit 19, # 18 Exhibit 20, # 19 Exhibit 21, # 20 Exhibit 22, # 21 Exhibit 23, # 22 Exhibit 24, # 23 Exhibit 25, # 24 Exhibit 26, # 25 Exhibit 27, # 26 Exhibit 28, # 27 Exhibit 29, # 28 Exhibit 31, # 29 Exhibit 32, # 30 Exhibit 33)(mh) (Entered: 08/13/2025) |
| 08/14/2025 | 6 | DOCKET TEXT ORDER FOR CASE TO BE REASSIGNED. Based upon the procedural posture of this case, the undersigned orders that this case be reassigned to a district judge through random reassignment. No attached document. Signed by Magistrate Judge Cecilia M. Romero on 8/14/2025. (jed) (Entered: 08/14/2025) |
| 08/14/2025 | 7 | Case randomly assigned to Judge Dale A. Kimball per 6 Docket Text Order. Magistrate Judge Cecilia M. Romero is automatically referred under 28 U.S.C. 636(b)(1)(B). Magistrate Judge Cecilia M. Romero no longer assigned as the presiding judge to the case. Motions referred to Cecilia M. Romero.(mh) (Entered: 08/14/2025) |
| 08/14/2025 | 8 | REPORT AND RECOMMENDATIONS Denying 3 Motion for Leave to Proceed in Forma Pauperis. Based upon the foregoing, IT IS HEREBY RECOMMENDED that Plaintiffs Motion be DENIED without prejudice (ECF 3). IT IS FURTHER RECOMMENDED that Plaintiff prepay the full filing fee of $405 within 30 days for this action to proceed. IT IS ADDITIONALLY RECOMMENDED that Plaintiff be cautioned that failure to fully pay the filing fee within 30 days after this Report and Recommendation will result in dismissal of this action without prejudice. Signed by Magistrate Judge Cecilia M. Romero on 08/14/2025. (sg) (Entered: 08/14/2025) |
| 08/15/2025 | 9 | Full Filing fee: $ 405.00 received, receipt number 11124. (kop) (Entered: 08/15/2025) |
| 08/19/2025 | | |

| | | |
|---|---|---|
| | | Modification of Docket: Pursuant to a voicemail received from Plaintiff, the Cause Code has been corrected from 28:1330 to 28:1331. (eat) (Entered: 08/19/2025) |
| 08/19/2025 | 10 | DOCKET TEXT ORDER ADOPTING 8 REPORT AND RECOMMENDATION denying 3 Motion for Leave to Proceed in forma pauperis. Plaintiff has paid the filing fee in full. No document attached. Signed by Judge Dale A. Kimball on 8/19/2025. (eat) (Entered: 08/19/2025) |
| 08/25/2025 | 11 | MOTION and Affidavit for Recusal of the Jurist filed by Plaintiff Carlos Velasquez. Motions referred to Cecilia M. Romero. (eat) (Entered: 08/25/2025) |
| 08/26/2025 | 12 | Motions No Longer Referred: 11 MOTION and Affidavit for Recusal of the Jurist. District Judge Dale A. Kimball will handle the motion. (jed) (Entered: 08/26/2025) |
| 09/03/2025 | 13 | Summons Issued Electronically as to Amazon.com Services. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (mdj) (Entered: 09/03/2025) |
| 09/15/2025 | 14 | NOTICE OF FILING Plaintiff's Unsworn Certificate of Mailing filed by Plaintiff Carlos Velasquez. (eat) (Entered: 09/15/2025) |
| 09/25/2025 | 15 | MOTION to Dismiss and Memorandum in Support filed by Defendant Amazon.com Services. (Attachments: # 1 Exhibit Index, # 2 Exhibit A – Lexis Nexis Report) Motions referred to Cecilia M. Romero. Attorney Brian D. Tuttle added to party Amazon.com Services(pty:dft)(Tuttle, Brian) (Entered: 09/25/2025) |
| 09/25/2025 | 16 | CORPORATE DISCLOSURE STATEMENT under FRCP 7.1 filed by Defendant Amazon.com Services. (Thomas, Ethan) (Entered: 09/25/2025) |
| 10/03/2025 | 17 | MOTION/Formal Request to Show Cause for Delay on Action for Recusal filed by Plaintiff Carlos Velasquez. Motions referred to Cecilia M. Romero. (eat) (Entered: 10/03/2025) |
| 10/08/2025 | 18 | ORDER DENYING 11 Motion for Recusal; and DENYING AS MOOT 17 Motion/Formal Request to Show Cause for Delay on Action for Recusal. Signed by Judge Dale A. Kimball on 10/8/2025. (eat) (Entered: 10/08/2025) |
| 10/09/2025 | 19 | MOTION to Show Cause for Refusal on Recusal filed by Plaintiff Carlos Velasquez. (Attachments: # 1 Victims Affidavit) Motions referred to Cecilia M. Romero. (eat) (Entered: 10/09/2025) |
| 10/09/2025 | 20 | Motions No Longer Referred: 19 MOTION to Show Cause for Refusal on Recusal. District Judge Kimball will handle the motion. (awm) (Entered: 10/09/2025) |
| 10/15/2025 | 21 | MOTION for Extension of Time to File Response/Reply as to 15 MOTION to Dismiss filed by Plaintiff Carlos Velasquez. Motions referred to Cecilia M. Romero. (eat) (Entered: 10/15/2025) |
| 10/15/2025 | 22 | Motion No Longer Referred: 21 MOTION for Extension of Time to File Response/Reply as to 15 MOTION to Dismiss. District Judge Dale A. Kimball will handle the motion. (eat) (Entered: 10/15/2025) |
| 10/15/2025 | 23 | NOTICE OF FILING of Proof of Publication on a Notice to Cease and Desist filed by Plaintiff Carlos Velasquez. (eat) (Entered: 10/15/2025) |

| 10/16/2025 | 24 | NOTICE OF FILING Notice to Cease and Desist filed by Plaintiff Carlos Velasquez. (eat) (Entered: 10/16/2025) |
|---|---|---|
| 10/21/2025 | 25 | RESPONSE to Motion re 21 MOTION for Extension of Time to File Response/Reply as to 15 MOTION to Dismiss and Memorandum in Support , 19 MOTION to Show Cause for Refusal on Recusal *and 23 Notice of Filing Proof of Publication and 24 Notice of Filing Notice of Cease and Desist* filed by Defendant Amazon.com Services. (Tuttle, Brian) (Entered: 10/21/2025) |
| 10/23/2025 | 26 | RESPONSE to Motion re 15 MOTION to Dismiss filed by Plaintiff Carlos Velasquez. (eat) (Entered: 10/23/2025) |
| 10/28/2025 | 27 | ORDER denying 19 Motion to Show Cause for Refusal, on Recusal; and denying as moot 21 Motion for Extension of Time to File Response. Signed by Judge Dale A. Kimball on 10/28/2025. (eat) (Entered: 10/28/2025) |
| 11/06/2025 | 28 | REPLY to Response to Motion re 15 MOTION to Dismiss and Memorandum in Support *Plaintiff Complaint* filed by Defendant Amazon.com Services. (Thomas, Ethan) (Entered: 11/06/2025) |
| 11/06/2025 | 29 | NOTICE OF INTERLOCUTORY APPEAL as to 18 Order Denying Motion for Recusal and 27 Order Denying Motion to Show Cause for Refusal on Recusal filed by Carlos Velasquez. Appeals to the USCA for the 10th Circuit. Fee Status: Not Paid. Filing fee: $605. (eat) (Entered: 11/06/2025) |
| 11/06/2025 | 30 | Transmission of Preliminary Record to the USCA for the Tenth Circuit re 29 Notice of Appeal – Interlocutory. (Attachments: # 1 Appendix) (eat) (Entered: 11/06/2025) |
| 11/06/2025 | | Case no longer referred to Magistrate Judge Cecilia M. Romero. (eat) (Entered: 11/06/2025) |
| 11/07/2025 | 31 | USCA Case Number Case Appealed to Tenth Case Number 25–4145 for 29 Notice of Appeal – Interlocutory, filed by Carlos Velasquez. (kec) (Entered: 11/07/2025) |
| 11/10/2025 | 32 | Full Payment for Appeal: $ 605 received, receipt number 12044 (kec) (Entered: 11/10/2025) |
| 11/10/2025 | 33 | DOCKET TEXT ORDER taking under advisement 15 Motion to Dismiss. The court intends to issue a decision on the Motion to Dismiss on or before November 14, 2025. Signed by Judge Dale A. Kimball on 11/10/2025. No attached document. (awm) (Entered: 11/10/2025) |
| 11/12/2025 | 34 | RESPONSE re 28 Reply Memorandum/Reply to Response to Motion filed by Carlos Velasquez. (eat) (Entered: 11/12/2025) |
| 11/13/2025 | 35 | ORDER of USCA Tenth Circuit as to 29 Notice of Appeal – Interlocutory, filed by Carlos Velasquez. Jurisdiction challenged. Response due on 12/01/2025 for Carlos Velasquez. Briefing on the merits is suspended pending further order of the court. (jrj) (Entered: 11/13/2025) |
| 11/14/2025 | 36 | MEMORANDUM DECISION AND ORDER granting Defendant's 15 Motion to Dismiss. Plaintiff's action is dismissed with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Judgment will be entered accordingly. Signed by Judge Dale A. Kimball on 11/14/2025. (eat) (Entered: 11/14/2025) |
| 11/14/2025 | 37 | |

| | | |
|---|---|---|
| | | JUDGMENT – Pursuant to the 36 Memorandum Decision and Order Granting Defendant's Motion to Dismiss, dated November 14, 2025, Plaintiff Carlos Velasquez's action is dismissed with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Case Closed. Signed by Judge Dale A. Kimball on 11/14/2025. (eat) (Entered: 11/14/2025) |
| 11/17/2025 | 38 | OBJECTIONS filed by Carlos Velasquez. (eat) (Entered: 11/17/2025) |
| 11/20/2025 | 39 | MANDATE of USCA as to 29 Notice of Appeal – Interlocutory, filed by Carlos Velasquez. According to the USCA the appeal is dismissed for lack of jurisdiction. (kec) Modified by correcting docket text on 11/20/2025 (eat). (Entered: 11/20/2025) |
| 11/20/2025 | | Modification of Docket re 39 USCA Mandate. The clerk has corrected the docket text to clarify that the appeal was dismissed for lack of jurisdiction. (eat) (Entered: 11/20/2025) |
| 12/01/2025 | 40 | RESPONSE re 38 Objections, filed by Amazon.com Services. (Tuttle, Brian) (Entered: 12/01/2025) |
| 12/03/2025 | 41 | ORDER of USCA Tenth Circuit as to 29 Notice of Appeal – Interlocutory. Order filed by Judges Holmes, Phillips, and Federico denying petition for rehearing filed by Appellant Mr. Carlos Velasquez. (kec) (Entered: 12/03/2025) |
| 12/08/2025 | 42 | SURREPLY to Document 40 filed by Carlos Velasquez. Procedural Concession and Declaration of Intent to File a Separate Motion Within a Reasonable Time. (eat) (Entered: 12/08/2025) |
| 12/15/2025 | 43 | MOTION for Discretionary Review filed by Plaintiff Carlos Velasquez. (eat) (Entered: 12/15/2025) |
| 12/16/2025 | 44 | ORDER OVERRULING 38 Plaintiff's Objection and DENYING 43 Plaintiff's Motion for Discretionary Review. Because this action has been dismissed and judgment has been entered against Plaintiff, this case is closed. Any document emailed or otherwise sent to the court by Plaintiff will be lodged in the docket as correspondence. The court will not respond to any future filings by Plaintiff in this case, and Defendant need not respond to any filing by Plaintiff unless specifically directed to do so by the court. Signed by Judge Dale A. Kimball on 12/16/2025. (eat) (Entered: 12/16/2025) |
| 01/05/2026 | 45 | NOTICE OF APPEAL as to 36 Order on Motion to Dismiss, Memorandum Decision, 37 Judgment, 44 Order on Motion for Miscellaneous Relief filed by Carlos Velasquez. Appeals to the USCA for the 10th Circuit. Fee Status: Not Paid. Filing fee $ 605. (Attachments: # 1 Addenda)(kec) (Entered: 01/05/2026) |
| 01/05/2026 | 46 | Transmission of Preliminary Record to USCA re 45 Notice of Appeal. (Attachments: # 1 Appendix)(kec) (Entered: 01/05/2026) |
| 01/05/2026 | 47 | USCA Case Number Case Appealed to Tenth Case Number 26–4000 for 45 Notice of Appeal, filed by Carlos Velasquez. (kec) (Entered: 01/05/2026) |
| 02/04/2026 | 48 | USCA Appeal Fees received $ 605 receipt number 13000 re 45 Notice of Appeal, filed by Carlos Velasquez. (jrj) (Entered: 02/04/2026) |

FILED
2025 AUG 12 AM 10:28
CLERK
U.S. DISTRICT COURT

Carlos Velasquez, Pro Se Plaintiff

Civil Bureaucratic Federalist

PHONE: 801.671.0371

P.O. Box 581365

Salt Lake City, UT 84158

| | |
|---|---|
| Plaintiff,<br>Carlos Velasquez Pro Se<br><br>v.<br><br>Amazon.com Services Inc. | OPENING COMPLAINT<br><br>Action on Constructive Termination |

Civil Action under a Preamble Approach

intended to vindicate the Rights of Workers

**TABLE OF CONTENTS**

I.      DEFENDANTS ...................................................................................... iii

II.     PERSONS OF INTEREST ..................................................................... iii

III.    TABLE OF AUTHORITIES .................................................................. iv

IV.     DISCLOSURES ..................................................................................... v

V.      PREAMBLE ........................................................................................... 1

VI.     ABSTRACT RESOLUTION OF THE CASE.......................................... 1

VII.    FACTS AND BACKGROUND ............................................................... 4

1.      FIRST INCIDENCE ........................................................................ 10

2.      SECOND INCIDENCE .................................................................... 14

3.      THIRD INCIDENCE ....................................................................... 14

4.      FOURTH INCIDENCE .................................................................... 16

5.      FIFTH INCIDENCE ........................................................................ 20

6.      SIXTH INCIDENCE ........................................................................ 22

7.      SEVENTH INCIDENCE .................................................................. 23

8.      EIGHTH INCIDENT ....................................................................... 27

9.      NINTH INCIDENT .......................................................................... 31

10.     TENTH INCIDENT .......................................................................... 33

11.     ELEVENTH INCIDENT: DIRECT CIRCUMSTANCE OF RESIGNATION ........... 36

12.     TWELFTH INCIDENCE .................................................................. 37

13.     OTHER CIRCUMSTANCES ........................................................... 38

VIII.   ARGUMENTS.................................................................................... 39

1.      BREACH OF CONTRACT, INTENTIONAL NEGLIGENCE ....................... 40

A. Violations of the Code of Conduct................................................... 41

B. Irreparable Damage to Integrity of Leadership .............................. 43

2.      WORKPLACE STALKING, HARASSMENT, HOSTILE WORK ENVIRONMENT .. 45

3.      VICARIOUS INFLICTION OF EMOTIONAL DISTRESS,  ARBITRARY
DISCRIMINATION AND RETALIATIONS,  DOCTRINE OF RESPONDEAT SUPERIOR 47

IX.     PLAINTIFFS FIRST CLAIM FOR RELIEF ................................................ 50

i

X.    PLAINTIFFS SECOND CLAIM FOR RELIEF ................................................................. 52

XI.    PLAINTIFFS THIRD CLAIM FOR RELIEF ................................................................. 53

XII.    PLAINTIFF'S FOURTH CLAIM FOR RELIEF ............................................................ 54

XIII.    FIFTH CLAIM FOR RELIEF .......................................................................................... 55

XIV.    PRE-TRIAL REQUEST FOR DISCLOSUES ................................................................ 55

1.    Personally Important Documents ..................................................................................... 55

2.    Site-Specific Documents .................................................................................................. 56

XV.    CLOSING ......................................................................................................................... 56

ii

# I.   DEFENDANTS

Amazon, LLC, "Amazon.com," Amazon.com Services, Inc., by and through Site "DUT7" and Pioneer Region Human Resources

> Attn: Amazon LLC General Counsel
>
> Registered Agent: Corporation Service Company
>
> 300 Deschutes Way, SW Suite 304
>
> Tumwater, WA 98501

Alt Address:

> 15 West South Temple, Suite 600
>
> Salt Lake City, UT 84101

# II.   PERSONS OF INTEREST

Regional Human Resources (Pioneer) – Kerri Alger – keralger@amazon.com

Corporate Human Resources – Amy Nally – awwashle@amazon.com

Corporate Human Resources – Jerry Yeung

Amazon Logistics (AMZL/AMXL) Human Resources – Katy Brown – brownklq@amazon.com

AMZL/AMXL Site Leadership – Kevin Sargent – sargkevi@amazon.com

AMZL/AMXL Leadership – Vicki Soliz – vssoliz@amazon.com

AMZL/AMXL Leadership – Pablo Alvarez – pablavar@amazon.com

AMZL/AMXL Leadership – Margarita Wayman – mwwayma@amazon.com

AMZL/AMXL Leadership – Dalton Hanks – dalhanks@amazon.com

AMZL/AMXL Leadership – Shanese Walters – washanes@amazon.com

# III. TABLE OF AUTHORITIES

## Cases

*Newsome v. McKesson Corp.,* 932 F.Supp. 1339, 1343 (D. Utah, 1996) ..................................... 48

*Pierson v. Hubbard,* 802 A.2d 1162, 147 N.H. 760 ....................................................................... 5

*Tingey v. Midwest Office, Inc. et al.,* No. 1:2022cv00145 (D. Utah), ........................................... 48

# IV. DISCLOSURES

Exhibit 1 - Preliminary Offer of Employment, 10/19/2018

Exhibit 2 - Offer of Part-Time Employment, 4/18/2019

Exhibit 3 - Offer of Promotion (Level 3), 6/5/2021

Exhibit 4 - Letter Confirming Voluntary Termination, 7/24/2023

Exhibit 5 - RESERVED.

Exhibit 6 - Supportive Feedback Document, 6/22/2022

Exhibit 7 - Supportive Feedback Document, 6/29/2022

Exhibit 8 - Ethics Point, Complaint, 12/10/2022

Exhibit 9 - Plaintiff's Resume, 10/25/22

Exhibit 10 - Supportive Feedback Document, 12/18/2022

Exhibit 11 - Supportive Feedback Document, First Written, 12/18/2022

Exhibit 12 - Email Related to Ethics Point Complaint (12/10/2022), Add'd. to Kerri A.

Exhibit 13 - Ethics Point, Complaint, 1/20/2023

Exhibit 14 - Email from DUT7 Human Resources Disposing an Ethics complaint, 2/16/2023

Exhibit 15 - Ethics Point, Complaint, 2/25/2023

Exhibit 16 - Email to the Plaintiff, OpsHR Panorama, Disciplinary Appeals Query, 3/1/2023

Exhibit 17 - Emails confirming date of disciplinary Appeal interview, Plaintiff Talking Points included, 3/3/2023-3/9/2023

Exhibit 18 - Emails confirming Receipt of an Ethics Point Complaint, 3/3/2023

Exhibit 19 - Email confirming date for Interview, 3/3/2023

Exhibit 20 - Plaintiff's Email Follow-up after Interview, Listing three attachments, 3/7/2023 (needs attachments appended)

Exhibit 21 - Disposition of Disciplinary Appeal, Favorable to the Plaintiff, 3/10/2023

Exhibit 22 - Supportive Feedback Document, 3/15/2023

Exhibit 23 - Emails Disposing Ethics Complaint, Plaintiff Follow-up interrogatory, 3/20/2023

Exhibit 24 - Email from the Plaintiff to DUT7 "Management Team," Mismanagement Complaint (needs attachment)

Exhibit 25 - Ethics Point, Complaint, 5/10/23

Exhibit 26 - Email from Amazon Human Resources, follow-up from Interview, "Mismanagement Complaint," 6/2/2023

Exhibit 27 - Email from Plaintiff initiating a Legal Query, 6/12/23

Exhibit 28 - Email from Plaintiff showing a Legal Notice, 6/11/23

Exhibit 29 - Email Acknowledgement to Plaintiff, Personal Leave of Absence, 7/3/23

Exhibit 30 - Amazon Owner's Manual

Exhibit 31 - Amazon "Workplace Harassment & Equal Employment Opportunity Policy Acknowledgment Form," signed 10/20/2018

Exhibit 32 - Amazon "Code of Business Conduct and Ethics"

Exhibit 33 - Amazon Technical Academy Application Process

ALSO FILED

Victim's Unsworn Affidavit

## V. PREAMBLE

1. The Constitution of the United States of America is dedicated to the people without *exception,* and does manifest protective, injunctive, compensatory, and punitive reliefs for workers, interpreting and having observed the relevant *rights of workers,* who are people and may be employed, managed, and supervised by other such *workers* who are in *good faith,* or who take *exception* from *good faith* practices, against real tortfeasors including *employers* whose rights otherwise are in properly *conferential* order of any *withstanding* employment contract.

2. Jurisdiction is proper while the Plaintiff resides in the State of Utah, the United States District Court for the District of Utah, and the Federal Jurisdiction accepts a case or controversy, **28 U.S.§ 1331,** State laws may be used as rules of decisions where withstanding, **28 U.S. § 1652.**

3. The events related in the Complaint originally took place in North Salt Lake, UT and may have been extended into Seattle, WA and any States where Amazon LLC operations relayed direct communications.

## VI. ABSTRACT RESOLUTION OF THE CASE

4. COMES NOW action on conditions of Constructive Termination in context to a resignation coerced as stalked-after the Plaintiff in the workplace, *neglect* to *intentional neglect,* accompanied with repeated *retaliations* for apparent differences in Leadership Approach, to have undermined and usurped his natural authority at "Fulfillment" by Amazon.com Services, Inc. where he was employed four and a half years, two of which were in

Supervisory and Leadership roles where incidences took precedence, the corporate "Level 3 Process Assistant" and "Yard Marshall" roles at Amazon Delivery Station "DUT7," located at 989 W Center St., North Salt Lake, UT 84054; both roles with promise for *promotion;* the "At-Will" contract maintains inherent interpretive conditions who naturally manifest *good faith,* and violating such a Code of Conduct, corrupting the observable ethical Amazon.com Leadership philosophy, permitting others to violate it, failing to present constructive remedy, shows bad faith design on the termination/resignation of any such person or persons.

5. Repeated impositions of *false* and *insolvent disciplinary claims,* and subsequent *neglect* to address questions of *insolvency* and *false statements* on disciplinary records, conditions of direct *mismanagement* and *intolerance* for extraordinary circumstance tortiously dispositioned the workplace culture and rendered an ultimately *hostile* and *irremediable* environment, where repeated low order *retaliations* resulted in a failed attempt to terminate the Plaintiff, Carlos Velasquez, Associate ID: "VELACA," proved a point of impasse and *bad faith* wherein the Plaintiff could not recover *confidence* for *endorsement* from the same Management Team, nor rely on his own Performance Records versus questions of *bias,* nor have relied upon Amazon's having prompted the question and this application for review of Constructive Termination and relevant law, *confidence* in the "At-Will" employment contract failed where its Management Team and extensive Human Resources network rather colluded to maintain a *hostile* place to work, courted the Constructive Termination intentionally and negligently, and did *Breach Contract,* did commit themselves to *vicarious harm.*

2

6. Amazon.com, "DUT7," andor the Pioneer Region Human Resources agency treats disciplinary and behavioral disputes on a basis of **Absolute Privilege,** so we infer confidence on the basis of a mutual employment contract, the "At-Will Contract," whose contractual obligations are limited to the *at-will* term, and otherwise demand compliance with a "Code of Business Conduct and Ethics," and another document, "The Owner's Manual," both of which condition the cultural resolution of the "At-Will Contract," and do provision its Leadership culture.

7. Whether Amazon.com has *intended* at large to proceed on a policy of **Absolute Privilege** for Human Resources considerations while simultaneously having declared its "At-Will" conditions to be interpreted on the basis of conduct, or whether it was a regional malpractice, or simply a form of targeted abuse and harassment constitutes a question of whether Amazon.com does program vicarious harm generally, and did sublet a wrongful policy based in centralized prejudices improperly predicated on the term of "At-Will" employment, we say this was the expression made by so many Persons of Interest.

8. *Tortious interference* with "At-Will" contract; so many of those *persons of interest* actively engaged disorganized workplace *stalking* designed to either directly *harass,* or that amounted to extended *harassment* within a workplace that meets a *worker* standard for *civil stalking,* canonical *management-led stalking* described to be unethical prerogative leverage for *privilege, influence* and *power* within the workplace, the power to control *who works there* under the absolute "At-Will" term, canonical abuse of an Absolute Privilege, Abuse of Discretion otherwise, used largely to render environment *hostile* to the Plaintiff on even ordinary business needs.

9.  Members of the DUT7 Management Team *stalked* the plaintiff on an undefined prejudice for Constructive Termination, and high-level off-site Human Resources agents appeared to recognize the behavior and did not provide any relief from a long-term disposition that could clarify the quality of the plaintiff's workplace conduct, and the excellence of his workplace practices.

10. The plaintiff seeks Compensatory and Punitive Damages against Amazon.com postured *Respondeat Superior* for lost Retirement Savings, for Tortious Interference with the Promotion Opportunity, Invasion of Privilege and Fraudulent Misrepresentation by Publication and Transmission of Defamatory Information, Neglect and intentional Neglect to Initiate Constructive Termination, Breach of Contract, Vicarious Infliction of Emotional Distress to Maintain Conditions of Constructive Termination.

11. Persons of Interest repeatedly violated State and Federal anti-Stalking laws in the course of attempting to have controlled and scattered the Plaintiff's power to be successful in the workplace, and double to treble severed him from workplace austerity relevant to Human Resources, having attacked him at point of *immediate* to *historical memory* of incidence with gross abandon, who would abscond with the plaintiff's *work experience* and coerce his *work ethics.*

## VII.        FACTS AND BACKGROUND

12. Plaintiff resigned from Amazon, LLC. on July 24, 2023 after four and a half years of steady employment that began 10/16/2018 as a temporary Part-Time Associate at a "DUT1" in Salt Lake City, UT, was onboarded on 4/21/2019; and promoted to Level 3 Yard Marshall and Process Assistant after 6/25/21.

4

13. These statements relate disciplinary records compared against responses the Plaintiff entered, and larger Behavioral Misconduct complaints the Plaintiff reported to Amazon Human Resources, records in the company's keeping which, to the Plaintiff's knowledge, were open to managers and Human Resources, these documents are a format for documenting disciplinary variances.

14. The disciplinary policy in question related directly to "VELACA," the Plaintiff, and was proceeded largely on an ex converso construction of that  policy wherein the several managers appear to have perceived themselves to be "absolutely privileged to publish defamatory matter concerning another in the performance of [duties]," *Pierson v. Hubbard,* 802 A.2d 1162, <u>147 N.H. 760</u> (N.H. 2002); See *Restatement of Torts, 2d §§ 553, 559, 581.*[1]

---

[1]RESTATEMENT OF TORTS (2D) §§ 553, 559, 581.

§ 553. Fraudulent Misrepresentations Inducing Gifts to Maker or Third Persons  One who by a fraudulent misrepresentation, or by the nondisclosure of a fact which as between himself and another it is his duty to disclose, intentionally induces the other to make a gift to him or to a third person is subject to liability to the donor for the loss caused by the making of the gift.

§ 559 Defamatory Communication Defined  A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

15. Starting late in 2021 **Pablo Alvarez**, **Johnathan Cowan**, and **Adrian Caldera** engaged in a conspiracy to issue *false statement* respecting the Plaintiff, "VELACA," in written disciplinary forms, in the course of that conduct the trio refused to hear facts about the incidence which would have adjusted their reporting; the facts were reviewable according to a Safety Manager who had been consulted by the Plaintiff; all facts were reviewable according to records of on-site surveillance.

16. In coercing false statements, they generated a social precedence for another Manager, **Devlen Bridges**, who colluded with **Adrian Caldera**, and **Johnathan Cowan** delivered yet another false and misleading discussion of the Plaintiff's conduct. At delivery they refused to hear facts and discussion which would have adjusted or pre-empted the issue.

17. After **Devlen Bridges'** termination, **Margarita Wayman** took on the role of direct manager to "velaca," and was either improperly influenced by those ADAPTS, andor later directly influenced by **Adrian Caldera,** and **Pablo Alvarez** to build a mismanagement standard which arrested competent reporting and discussion of the Plaintiff's performance.

18. **Adrian Caldera** and **Margarita Wayman** kept secret their disciplinary reservations against the Plaintiff from the time when **Margarita Wayman** took a promotion to Level

---

§ 581 Transmission of Defamation Published by Third Person (1) Except as stated in subsection (2), one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character. (2) One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher.

4, until around September-October 2022 when **Adrian Caldera** demanded from the Plaintiff that he admit his own behavior was bad, and even fatally unpopular, and to present that admission to subordinates as a self-improvement interrogatory.

19. The site was a consistent high performer in the Region; **Adrian Caldera** repeatedly sought to divest the Plaintiff of the merit of his *experience.*

20. Given the Plaintiff's several Documented Coachings did not address a more general than instant *performance impact,* it is plausible to the Plaintiff **Margarita Wayman** had inherited through **Adrian Caldera** and **Pablo Alvarez** criminal animus for the Plaintiff, a spirit of *pre-emptive* retaliation (discrimination), the plain cause of *good faith* versus *bad faith* Team Play, disagreements with management communicated a *bad faith* context, while leaving the Plaintiff with the choice and burden of knowing their trespasses.

21. **Adrian Caldera** and **Margarita Wayman** could not address nor resolve a complaint of *intentional mismanagement* that issued from the Plaintiff once it was apparent their disciplinary demands were trumped up, and the document was forwarded to the Site Manager, **Kevin Sergeant** and Human Resources, who could not recognize the scale of the complaint and took no action apparently to maintain comity between the Plaintiff and the two managers; altogether, they were *stalking* "VELACA" for *constructive termination,* in a long attempt to steal his *personal power.*

22. **Adrian Caldera** and **Margarita Wayman** conspired to have the Plaintiff terminated, and failed on an errant observation of *policy* related to the Associate *record.*

23. **Kerri Alger's** failure at intervention granted high-level corporate *consent* to whatever the management team's tacit scheme was, opting primarily to confidence the authority of the

7

written management statement and aiding their scheme of self-aggrandizement, **Kerri Alger** may have recognized the degree of *privilege* taken by these Persons of Interest and sought to offer them *protective relief* by improperly limiting her own investigations; she may also have *suborned* or *solicited* others by leaving open the implication of *harassment* andor *constructive termination,* and may have implicated *character assassination,* having conducted merely *cursory* reviews andor *invaded privilege* to have mollified the appearance of a plain *gross misconduct;* **Alger** seems to have recognized an opportunity to have allowed a Management Team an **Absolute Privilege,** and various members of Human Resources also appeared to maintain such a condition as *conspiracy.*

24. The Plaintiff's complaint to **Kerri Alger**, and a subsequent complaint *against* **Kerri Alger** for failure to review was addressed by **Jerry Yeung**, were pending from late summer 2022 into the first weeks of the New Year 2023.

25. **Kevin Sergeant,** then Level 7-8 Senior Manager, met with the Plaintiff to attempt discuss it, but largely eschewed the direct complaint and attempted instruct the Plaintiff to remain focused in his duties, and to not complain. The importance of the *standing* of site leadership overrode the circumstance of the complaint; **Kevin Sergeant** did not ever make any report of the meeting that would disclose its contextual reasoning, or how compromised elements within Management Reporting, questions on *performance, disciplinary issues,* would define any remedial conditions.

26. **Amy Nally** was an off-site Human Resources officer who was tasked to review the resultant disposition left by **Kerri Alger** and **Jerry Yeung,** and defined the ultimate precedence for the Plaintiff's resignation. **Nally** met with the Plaintiff via telephone, took

8

some notations or recording and could not make any recommendations on the Plaintiff's behalf, and left him to the mercy of the circumstance.

27. During the period between first and second complaint against **Kerri Alger** and **Adrian Caldera, Margarita Wayman** and **Caldera,** and **Shanese Walters** retaliated against the Plaintiff for the complaints he had issued against the two Managers between September 2022 and January 2023 by casually excluding him from the information loop, and then executed a *hostile takeover* of the Plaintiff's routine duties, they more or less embarrassed him in front of the post-holiday team, a single incidence.

28. The plaintiff presented a complaint against it, but again the Human Resources agency could not find anything wrong with the conduct, and protected the misbehavior under color of an **Absolute Privilege.**

29. **Adrian Caldera** and **Margarita Wayman** only accelerated their Mismanagement Practices, **Wayman** failed to conduct and maintain in-depth "Seek to Understand" ("STU") discussions, failed to admit or disclose *biases* regarding "VELACA," and failed to build a constructive dialogue that would pre-empt *stress* related issues; the Leadership team therein sought to exaggerate any possible harm or error, and attempted to have the Plaintiff put on a "Final Written" policy that would risk *termination* for *any error,* and lost on the internal Appeal for *misstatements* of the *final written* policy.

30. **Adrian Caldera** resigned from Amazon.com after taking a Human Resources recommendation for a Promotion in another company, a point advertised to the entire work crew the day of his departure; the apparent tenure of a pending *application* coincided with

the *escalation* of their mismanagement practice and was intended to inflict emotional distress.

31. **Adrian Caldera** and **Margarita Wayman** felt repeatedly encouraged to have disabused themselves of the Plaintiff, and once he had become the subject of tangible complaints it is plausible to the Plaintiff how the Amazon.com Human Resources agency lacked the wherewithal to control its Management Team and had programmatically encouraged Constructive Termination and leant *False Light* to Team Play ethics, they took the quality and dignity of the "At-Will" contract by abusing **Absolute Privilege** to publish information that was *hostile* to the Plaintiff.

32. All incidental facts were reviewable according to records of on-site surveillance, while the plaintiff refused to acknowledge or critically disagreed with multiple reports.

33. The issues against were extremely critical, and the Management and Human Resources Team neglected to take action once it was plain they had been accused of making *false statements.*

34. Much of the principle information from disciplinary issues was provided by **Katy Brown** via email, was recorded in PDF format, or stored the plaintiff personal Gmail account, and are provided to a record, labeled as a Pre-Trial Exhibit cit. **28 U.S. § 1732,** record made in regular course of business; PDF Copies.

35. Any information that could be considered to be proprietary or confidential by Amazon.com is filed and labeled as a Pre-Trial exhibit cit. **28 U.S. § 1732.**

## 1.  FIRST INCIDENCE

36. According to the Plaintiff, the first "Documented Coaching" issued from the Plaintiff's direct-report Manager, **Pablo Alvarez,** who alleged the plaintiff had committed two actions of *gross insubordination,* on a complaint the Plaintiff had worked through some several lunches, and on the exaggerated complaint the Plaintiff had repeatedly refused to follow a Holiday-Peak *safety* rule the manager was instituting after another Associate was nearly struck with a heavy cart due to an overburdened work space on the Inbound/Outbound Dock of the Delivery Station. (November/December 2021) [Exhibit No. 5,   **Reserved**]

37. Verbally, the plaintiff attempted to correct the Manager, declared he had to use his own discretion in capacity to the Yard Marshall role, and also included how the Manager was repeatedly *unavailable,* and so the plaintiff had to consult the Warehouse Safety Manager, a Level 4 Manager, who agreed it appeared safe to continue. Later, when **Pablo Alvarez** returned he refused to hear the diligence conducted by the Plaintiff, and incorporated a distortion of events into documentation the Plaintiff had skipped several lunches.

38. More specifically, the manager related the rule to the Plaintiff prior to the Start of Shift, and the Plaintiff agreed. The Manager's complaint issued wherever the Plaintiff *continued* unload freight within his discretion, which, according to the Plaintiff was anytime the dock had sufficient space.

39. **Pablo Alvarez** issued his request for the Plaintiff to discontinue unloading unsorted Amazon Freight *three different times* on the same shift, and, according to the Plaintiff, within ten minutes of each of those directives was out of radio communication so the Plaintiff was compelled to evaluate the limits of his discretion on the *uninterrupted task,* which is the formal term advised by Amazon.com when training the Plaintiff in the Yard

11

Marshall role; it is also plausible the complaints issued by way of a proxy with whom **Alvarez** was more familiar, and who may have been zealous to uphold a rule without evaluating how to *Earn Trust* in the Plaintiff and Yard Marshall position; it is plausible to the Plaintiff **Pablo Alvarez** and the acting Process Assistant on the shift, **Melissa Murano,** capriciously and intentionally enforced the rule to instigate semi-organized *Stalking,* and the subsequent behavior of **Pablo Alvarez** did not permit the Plaintiff to reach another conclusion once the disposition was tangible in all business activities.

40. **Pablo Alvarez** may have held a *conflict of interest* at the core of his Leadership principles, the Plaintiff had recently resolved an intra-network scheduling conflict that would have positioned him well for a management interview, effectively having networked a solution for *late delivery times* that had plagued DUT7 Sortation Shift for months, which involved independent exercise of the Yard Marshall *authority* with Management and Leadership at the Regional Fulfillment Center. Hitherto the Management Team had expressed confusion and powerlessness at the prospect of communicating with off-site management. The Plaintiff's Exercise of the Yard Marshall discretion independently may have made **Pablo Alvarez** feel insecure and he may have *retaliated* pre-emptively; restated, **Pablo Alvarez** may have discriminated against the Plaintiff's *leadership* ethics.

41. The Plaintiff raised the disagreement to the attention of Human Resources, **Johnathan Cowan,** who dismissed the "fraud" allegation out of hand, and refused to hear the Plaintiff out.

42. When the Plaintiff spoke again to **Pablo Alvarez** he was confronted by him, **Johnathan Cowan,** and **Adrian Caldera** who all three directly attacked the Plaintiff's account without

12

any clarifying statement; they overrode the Plaintiff and violated Corporate anti-Harassment Policy. Again, their presentation communicated *bias* for "Absolute Privilege," given there was no status for verification of statements made, and the Plaintiff claims to have recorded an objection against the factuality of the document.

43. It is important to note how **Adrian Caldera** was not a part of the exchange, but happened upon it and acted impulsively to amplify the verbal assault.

44. The Plaintiff REFUSED TO SIGN the "Documented Coaching" and only later reported details of incidence in an ethics complaint; **Devlen Bridges** was the Plaintiff's Direct Report manager, and placed the entry for "VELACA."

45. **Katy Brown** for Human Resources declared she could not find the Documented Coaching from 2021, the document had *deprecated.*

46. Later, when **Kerri Alger** was alerted to the disposition she was made aware of the Safety Manager's potential insight, but appears not to have reached out to him.

47. It is plausible to the Plaintiff **Kerri Alger** privately demured from evaluating *video records* of the site in order to offer **Pablo Alvarez, Adrian Caldera,** and **Johnathan Cowan** *protective relief* under color of Management Authority, the **Absolute Privilege.**

48. **Johnathan Cowan** also resigned from DUT7 in that timeframe leading up to Summer of 2022.

49. The Plaintiff did not report the incident until *after* it was apparent the Management Team had lost control, which did not become apparent until a second Documented Coaching issued on 6/22/2022.

50. The plaintiff retains a copy of a Resume from that period listing under its "Proven Management Success" the "Repair of Incompatible Delivery Times, SLC9->DUT7," and "Clarification of Unified Reverse Logistics for deployment for SLC9," with network hyperlinks to those *transactions* where resolved critical site issues. See Plaintiff's Exhibit No. 7.

## 2.  SECOND INCIDENCE

51. It is plausible to the Plaintiff, **Devlen Bridges,** was self-destructing either at missing a promotion, or had found temporary dissatisfaction at "Fulfillment," he was acting-out his frustration against the Plaintiff, and either under coercion from **Adrian Caldera** andor **Johnathan Cowan,** or **Pablo Alvarez,** did falsely report four separate disciplinary instances on dates 5/29, 5/31, 6/8, and 6/9. Again, the delivery made by **Adrian Caldera** and **Devlen Bridges** communicated *bias* for "Absolute Privilege."

52. The Plaintiff REFUSED TO SIGN and later reported details of the subject incidents in an ethics complaint. **See Fourth Incidence.**

## 3.  THIRD INCIDENCE

53. The second Documented Coaching issued on 6/29/22, **Devlen Bridges** falsely compared a *Failure to adhere to standard work guidelines* on three occasions 6/13, 6/22, 6/27, for an "ATLAS Dynamic tracker" used to validate whether On-Site Safety had actually trained an Associate for a given role *prior* to the Shift's *labor encoding;* it was many months before that process was sufficiently refined to rely upon, and the Documented Coaching was part of *separational-disciplinary entrapment* that was ongoing; it was easy for Level 3

14

Associates to make *labor encoding errors* in that time-period, and the system was not operating until Spring 2023.

54. It should also be noted at this time, individual *Performance Tracking* for "VELACA" completely fell-off or was reset, and the Plaintiff was under the impression after Spring 2022 that his Performance Evaluations had been deleted and reset due to an administrative decision. When **Devlen Bridges** made that delivery at the Plaintiff's quarterly Performance Evaluation, it was conducted under *false light;* on transfer to management under **Margarita Wayman** it is unclear what was communicated between the two, or what impression **Wayman** took from reading any such documentation respecting the Plaintiff.

55. **Devlen Bridges** may have been under investigation by Amazon Human Resources at the time.

56. **Devlen Bridges** was terminated or resigned between Summer and Autumn of 2022, was a secondary witness to the Plaintiff's refusal to sign the first "Documented Coaching," and may have had a grievance against **Pablo Alvarez** for either retaining knowledge of plausible misconduct, or for competitive differences, and also have held a grudge against **Adrian Caldera.**

57. **Devlen Bridges** was likely terminated either on a Drug Policy violation, or on a No Fraternization policy violation, **Devlen Bridges** may have *disfavored* the Plaintiff for promotion on a *retributive* basis (retaliation) wielded against Amazon.com by and through its Human Resources Agency, knowing either its casual *forensic* culture, or even hatred for the Plaintiff.

58. It is plausible to the Plaintiff another proxy, **Shanese Walters,** a Process Assistant who worked adjacent to the Plaintiff under **Devlen Bridges,** had solicited the manager under a quiet policy for *favoritism,* "Favoritisms" are expressly forbidden under Amazon.com, just as *harassment* and *stalking,* because it obstructs other individual growth, and may disorient team objectives.

59. *Favoritism* used to conduct *stalking* designs and implements wrongful prerogative leverage within the business culture.

### 4.  FOURTH INCIDENCE

60. As related from the Second Incidence, and bears the collateral detail.

61. On 12/10/2022 the Plaintiff filed an "Ethics Point" disciplinary complaint through an off-site Web Portal located at: "https://secure.ethicspoint.com," and reported a complaint against **Devlen Bridges, Adrian Caldera,** and **Johnathan Cowan** citing harassment, disciplinary fraud, and character assassination that took place "At or around the HR Desk," and reported the incidence as part of a greater movement.

62. Incidence detailed Allegations against all-three individuals, against **Devlen Bridges,** "FRAUD," "NON-CONSTRUCTIVE COACHING," and "CHARACTER ASSASSINATION," where it was detailed, "I received a very serious coaching statement from him detailing several other Amazon Associate complaints more or less conduct which may have been felt to be too curt in non-specified instances." See Exhibit No. 8 (Reproduced verbatim with some omissions).

63. "A quote was provided on the page of the coaching which depicted me as being highly critical of a person whose accommodated health condition Amazon.com was aware to look

16

out for. I was depicted as making a statement more or less in malice against the Associate."

*Id.*

64. "What happened in actuality was that I had in fact stated to the associate how she appeared

in 'fine' health. This was a statement in candor, which seemed to be appreciated at the

time." *Id.*

65. "I then proceeded to ask the associate whether the discomfort experienced required

immediate attention, or if she might be capable to continue in her then-present role." *Id.*

66. "The Associate stated next that she was okay, but that she was sure some adjustment would

be necessary." *Id.*

67. "I was prepared to call a Learning Ambassador to stand-in, however the Associate stated

her condition was not yet overwhelming." *Id.*

68. "I then RADIOED devlen for his more or less immediate assistance on the floor, for his

familiarity with the Associate' accommodation..." *Id.*

69. "I advised the Associate we would have devlen appear to make any appropriate

considerations, for his familiarity and confidentiality related to the accommodation." *Id.*

70. "I did not receive a response from devlen. The incidence took place near the labor board,

at C-D Cluster spur where the Associate was tasked." *Id.*

71. "Devlen was situated on the dock, was somehow engaged in a manner which may not have

allowed him to respond." *Id.*

72. "I RADIOED devlen a second time, and he advised he would come out onto the stow floor

before too long." *Id.*

73. "It was more than fifteen minutes before devlen arrived." *Id.*

17

74. "I was occupied with Floor Monitoring duties, including labor tracking, individual stow rate monitoring, and any other safety conditions." *Id.*

75. "I passed the Associate several times in my other duties, and she did not demand my attention directly, and did not demand any other individual's attention." *Id.*

76. "Several minutes later I found devlen had arrived and had addressed the issue. Based in his direct knowledge of the issue, devlen made a minor path adjustment for the Associate who continued through the end of Sort Shift." *Id.*

77. "Once the coaching issued, it came blindsidedly, out of issues not prior raised, and of dubious import." *Id.*

78. "However, the management team therein, devlen and adcald, refused to acknowledge the difference in the narrative and more or less accused me of refusing constructive coaching." *Id.*

79. "I was depicted as being somehow beligerent and even unconscionable." *Id.*

80. "I was so stunned at the abuse I left the room paralyzed, and devlen submitted the coaching without my signature, with a specious statement of my neither accepting nor declining." *Id.*

81. "I later brough this complaint to the attention of the Human Resources manager (Johnathan Cowan) who improperly deflected responsibility for what I openly stated was a kind of Fraud; both in the conference with Devlen and Adcald, and in confidence Jonathan Cowan more or less attempted to blame me for delay in response which rendered any single individual issue unaddressable." *Id.*

82. "Jonathan Cowan made no record of anything that transpired thereon, so only the incoherence of the written document is tangible. The management team undertook so little diligence on these problems more or less attempting to prove either the Amazon Human Resources network is corruptible and neglectful, and otherwise were attempting to render me more vulnerable to criticism, social engineering, bias or abuse otherwise." *Id.*

83. "The correct and best approach is to amend the coaching statement to fit any substantive discussion, and to maintain the old statement only as a discussion point, so to deflect non-constructive bias whether affirmative or negative to any intended result." *Id.*

84. "I have not seen the Management Team take a personal interest to clarify its own misapprehensions. The several complaints put forward are similar in that adcald and Jonathan Cowan both routinely violate the law, and breach confidence to bias toxic coaching standards." *Id.*

85. "OTHER LIABILITIES: This written coaching issued the very same week as Amazon Technical Academy was making decisions for admissions. The ATA admissions paradigm rejects any applicant with an active coaching, an ADAPT, and this coaching may have been issued to prevent or pre-empt a favorable decision rel. to ATA." *Id.*

86. The Plaintiff uploaded a written out version of the same complaint, and a lost "Ethics Point" document.

87. "The HR team in this region did not conduct a sufficient inquiry with [Amazon Associates], did not evaluate the breadth of her perceptions, nor did any of these individual conduct a Seek to Understand dialogue with me on the separate ADAPTable question." *Id.*

19

88. **Kerry Alger** responded to the Plaintiff on this complaint, and promised to reach out to [Amazon Associate] who had transferred out of state to another Amazon facility; **Kerry Alger** may have recognized the Level 1 Associate after processing the document; alternatively, it is plausible to the Plaintiff the complaint was made not by [Amazon Associate] but by **Bridges:** in either event, the disposition from Human Resources left the question unclarified.

89. A follow-up query (1/20/23) was improperly *deflected* by **Celestia Browning** on (1/26/23).

90. Human Resources did not ever identify the process it undertook, did not describe any inherent limitations thereto, and did not limit the plausible disposition; the result was that every statement identified was held to be *true,* while the background statements made on 5/29, 5/31, 6/8, were also reinforced as *true* per se while the Plaintiff's detail of the circumstance does not permit a cursory disposition.

91. It seems plausible to the Plaintiff, **Kerri Alger** and **Celestia Browning** merely overruled the plaintiff on the basis of Absolute Privilege, or it is even plausible they were posturing *litigious* circumstance, the Plaintiff's complaint falls into a completely *post facto* prejudice where Human Resources affirmed *unverified* statements.

### 5.  FIFTH INCIDENCE

92. On 12/18/2022 **Margarita Wayman** delivered a false and unverified "First Written" warning after interrogatory conducted by **Celestia Browning/Leme,** Human Resources, on 11/23 twelve days after the plaintiff was alleged to have made off-color statements to an Associate. Again, their presentation communicated bias for **"Absolute Privilege."**

93. The report is plausible to have been *retaliation* for an Ethics Complaint filed by the plaintiff
    on 12/10/22, primarily because the incidence in question was a passing conversation, the
    Associate may not have felt familiar with the Plaintiff to appreciate *any* comment, or
    attempt at conversation, lasted less a very short time, and may have behaved vexatiously
    to even make the complaint.

94. The report is plausible *retaliation* because it may appear to communicate a cautionary
    innuendo against *behavioral complaint,* that it was intended to insinuate *intimidation* into
    the disciplinary culture; Again, their presentation communicated *bias* for **"Absolute
    Privilege."**

95. The report is plausible *retaliation,* the First Written Warning accrual was an *escalated*
    behavioral misconduct, and appears *related* to the two "Documented Coaching" issues
    which were of a separate subject-matter, and were by that time *colorable.*

96. *Retaliation,* the **"Absolute Privilege"** narrative communicates an illiberal work ethic who
    attacks a perceived "outsider," canonical "Not a Team Player" narrative, one who would
    betray the *confidence* of the team and encourage perceived *negative exposure.*

97. A Documented or Written Coaching may not have been an appropriate response
    considering how it was a comment in a line for a payment kiosk in the breakroom or
    "cantina;" maybe it was perceived to be bland, or maybe the Associate knew of someone
    who had committed theft and felt provoked, whatever Associate made the complaint, the
    complaint itself was a retaliatory means of attempting to intimidate the Plaintiff, and
    Celestia Browning/Leme and Margarita Wayman recognized that expression and sought to
    elaborate a narrative of how the Plaintiff was a pariah.

### 6. SIXTH INCIDENCE

98. The following incident led directly into a failed attempt to terminate the Plaintiff.

99. On 12/18/2022 Margarita Wayman issued a "Behavioral—First Written" documentation and stated, "DETAILS OF CURRENT INCIDENT/SPECIFIC CONDITIONS On 11/28/2022, 11/29/2022, 11/30/2022 you failed to follow appropriate standard work practices. Specifically, you failed to correctly code AA to their assigned functions. A seek to understand conversation took place with you on all three dates listed above to which you stated: Sorry for the miscode, I will improve next time on the coding and make sure it is more accurate. I will also do better to communicate with Shanese for changes that occur with assignments on the dock." See Exhibit No. 10.

100.    It was reasonably stated under "Areas of Improvement Required by Associate," how "Amazon expects associates to adhere to standard operating procedures with regards to processing orders in each function within the delivery station." *Id.*

101.    The Plaintiff did concede it with caveat, "These specific errors were mechanical errors in Labor Process coding, non-deliberate and may have been related to stress. I will attempt to prevent such errors in the future. To my knowledge these were mechanical errors." *Id.*

102.    It is plausible to the Plaintiff, **Margarita Wayman** was attempting to have justified **Adrian Caldera's** favoritism for **Shanese Walters** by exaggerating the meaning of the job site impact, it was provoked after **Walters** issued the change-up via Radio communication that went unheard by the Plaintiff.

22

103.    This *incidence* leads into an attempt to *coerce termination,* where repetition of the action six months later showed a *mechanical* and not a *contextual* error, *Coaching* to *Final Written* disciplinary status, **Margarita Wayman** seems to have inappropriately collated an actual *mechanical* encoding error against an atypical request from **Shanese Walters.**

### 7. SEVENTH INCIDENCE

104.    On 1/11/2023, **Adrian Caldera** and **Shanese Walters** executed a hostile takeover of the Plaintiff's assigned duties, while simultaneously discriminating against other associates. An "EthicsPoint" report was filed on 1/20/2023. See Exhibit No. 13.

105.    Incidence detailed allegations against **Adrian Caldera** and **Shanese Walters,** "Social Engineering, Statements negatively characterizing an individual performance intended to manipulate management decisions...Individual role selection issue;" and "SOCIAL ENGINEERING and partial RETRIBUTIVE HARASSMENT." *Id.*

106.    The complaint shows amazon codenames, and also included the name **Margarita Wayman,** "CONTEXT End of Sort to Pick and Stage transition," According to the Plaintiff's Affidavit, the *labor shift* is divided between an eight hour segment, and a two-hour segment, called *Sortation* and *Pick and Stage,* respectively. *Id.*

107.    **Adrian Caldera** was reported to be the acting Pick and Stage manager, contexted the incident, and then described WHAT happened, "The Process Assistant returned from GEMBA while I was operating in GATEKEEP, and immediately noticed an associate operating to pick and stage 'Full Routes' whom she did not favor for the process. We discussed the issue and I was overruled by the manager on the subject. The sole reasoning

23

presented by the PA was how she believed the individual was attempting to harm herself to find her way into a new accommodation." *Id.*

108.    "I was incredulous at the expression by the PA (Process Assistant), out of consideration that we were very far ahead in timelines to complete the process. Given also how operating 'full routes' is open-ended with confidence to the time available to pick a route, my application was not addressed." *Id.*

109.    "**[Adrian Caldera]** interjected over this, stated his expectation over the timeframe for utilization, did not address the statement by the PA and then expressed how he favored the PA for the GATEKEEP role over my efforts on it." *Id.*

110.    "Next, he adjusted our immediate PICK RATE standard from 375 to 400 to favor a discussion escalating my decisional role-simultaneously accusing me of understaffing us. He looked squarely at the other PA doing this, in a show of direct confidence thereto." *Id.* Note: The Plaintiff intended to express how **Adrian Caldera** did not care if any of his reasoning was understood.

111.    "The PA did not think twice about accepting and enforcing an arbitrary change in production standards while we were projected to be ahead by more than 40 minutes. (SOP at Pick and Stage requires a 30 Minute buffer, and our standard practice regarding individual VTO issues is based in anticipated time to completion)." *Id.*

112.    "Both abused their roles in capacity to express unqualified disfavor, more or less to allow themselves at an advantage over other individuals in their work flow." *Id.*

113.    Next a direct narrative of the incidence out of Leadership context, "**[Shanese Walters]** expressed an process objection to an individual labor assignment asserted, against

24

the wisdom of this PA," [associate codename omitted] is trying to hurt herself to get back

on her accommodation." *Id.*

114.    "I responded, 'Really?'" *Id.*

115.    **[Shanese Walters]** Replied in the Affirmative, claiming witness over [Amazon

Associate] intentionally lifting heavy shipments." *Id.*

116.    The complaint provides further context demonstrating the *work accommodation*

context; the *Operation* context of the "Routing System" programs *manifests* for individual

delivery drivers, and assigns the "Pick and Stage" associate to *pick* the assigned route from

its place on the Stow racks, and *stage* it at a location convenient for *drivers* to take

responsibility over the *work*. Typically a *pick list* constituted one third of a *full route*.

117.    The Plaintiff, "MY REASONING Given there was an extensive lead on the time

available to pick certain routes, I agreed at [associate]'s request to allow her that process

out of consideration for the level of uncertainty she expressed more or less on a limited

basis." *Id.*

118.    "The Question is primarily about Bias for Action, self-reliance, completing a whole

process, and taking new confidence. Similar to processes veteranizing individuals, nesting

individuals, and coaching individuals, I found we had the time and the process showed it."

*Id.*

119.    "I was not allowed to explain. [**Adrian Caldera**] did not allow me to explain, and

took that success directly from me and awarded to someone else." *Id.*

120.    With some omission, "Essentially I was attempting to allow the Associate a limited advantage against her previous accommodation status, while we had plenty of time to complete staging." *Id.*

121.    "The L6 (**Adrian Caldera**) attack on my adjusted Headcount neither correctly identified the ten-relevant status, nor informed other issues. Instead, the interjection served to interrupt the direct the direct discussion, to actively divert and/or misdirect it, failed to disposition what was being discussed, and ended in a declaration of his favor the [**Shanese Walters**] stating his preference for her standing in the Gatekeeper role." *Id.*

122.    "The adjustment expressed an indefinite disciplinary standard in a manner intended to attack my credibility; the L6 has a low-level strategy for personal attacks wherein he adjusts his ethical posture from retributive to accommodative, his behavior in essence mirrors the behavioral and procedural ethics of the individual attempting to render a limited exception to aid individual growth while the outcome of the Standard Process is not in peril." *Id.*

123.    "Just to clarify the above paragraph, the L6 basically imitates the ethical posture of the individual, condescending in error even malice, and then renders a repeatable disfavor to the individual PA who makes a leap in good faith. It is actually predatory, zero-tolerance, zero-respect, and not justified on an actual principal than speculated." *Id.*

124.    One comment, "L6 does tend to aggressively favor the [**Shanese Walters**], and while I respect zealousness in the Management Team's interest to cultivate an individual when the opportunity is tangible, L6 has a tendency to also have avoided communicate

26

direct versus indirect standards, and risks damage the process, and with it individual confidence." *Id.*

125.    The complaint shows several witnesses, as well.

126.    The complaint was dispositioned by **Celestia Browning/Leme,** and failed to address the more precise scope of her investigation. See Exhibit No. 14.

127.    It is plausible to the Plaintiff the language is *under misuse* by the Human Resources agency there, it appears to be boilerplate, "No further action is needed from you," and, "As a reminder, Amazon has a policy prohibiting retaliation against anyone who has raised a complaint or who has participated in an investigation," and, "Thank your again for your cooperation," are rendered under *false light,* and intimate a process of weak *deflection* that disfavored him.

128.    It is plausible to the Plaintiff, the incident was *retaliation* for the commencement of a complaint process in December of 2022.

129.    It is plausible Amazon Associates who were described as witnesses to the complaint desired the *constructive termination* of the Plaintiff, or even desired a more *absolute advantage* in the workplace.

## 8.  EIGHTH INCIDENT

130.    On 3/1/23, the Plaintiff was advised of an opportunity to appeal a "corrective action," and it was affirmatively notified a "Date and Time" to *appeal* a "Final Written Warning through the Amazon Appeals Process by meeting with the Senior Site Leader." See Exhibit Nos. 16 and 17.

131.    After confusion over whether it had been scheduled, a date was set for 3/10/23 at 8 AM, a teleconference, "The appeal process will have you presenting your concern directly to the site leader." *Id.* The plaintiff attached a binder with some documentation, and his talking points.

132.    The Talking Points addressed three major factors that could contribute to having discredited a "Final Written Warning," a "FIRST instance of this process depicted an individual flippantly using the scanner as a cause for issue." Spec. Exhibit No. 17.

133.    "In my view this a trust versus bias issue; I think the manager may have other biases which he or she is attempting to misdirect, or reserve, meaning the ADAPT is NOT interested to capture a true Root Cause at a pragmatic policy level discussion, even though it is severe in its tone to have to take seriously." *Id.*

134.    "The HR policy level discussion is simply too prejudiced to recognize this discussion as anything other than Insubordination; the prejudice, I fear, is intentionally misplaced." *Id.*

135.    "HR on-site is not prejudiced to represent the Associate versus Manager where a policy dictum appears violated, even if the Root Cause discussion has not been addressed." *Id.*

136.    "The SECOND instance took place in mid to late February, and was the exact same error. I say 'error' because I literally could not have anticipated it; it was not like forgetting something and then remedying it later while preoccupied, it was an unforeseeable cognitive/rational lapse." *Id.*

28

137.     Some content omitted, "Rather than hear me out, and generate a more sensitive level of discussion, she ignored me and repeated aggressively the policy standard sought. More or less attempting to discipline me without appreciating my most direct position, and so generated a second disposition on delivery of a verbal STU." *Id.*

138.     Provided discussion from the binder, the same "EthicsPoint" complaints from 12/10/22 and 2/25/23 already demonstrated under the **Fourth** and **Seventh Incidences,** noting the teleconference with **Jerry Yeung,** "I seem to have become a target possibly based in management behavioral queues surrounding False Statements rel. to question of my conduct. I have attempted to demonstrate at least THREE instances with THREE different managers wherein an L6 critically disrupts a discussion to coerce the entry, to ignore valuable information, and to disfavor further fact finding." *Id.*

139.     "This type of low-level retributive context may have been more prevalent early in December, and may have contributed to excessive stress." *Id.* The document also presented a relevant TIMELINE.

140.     The third cause, "I have an unrelated independent civil litigation ACTIVE during this time, which does require an enormous level of effort." *Id.*

141.     "Whatever prejudices or preconceptions you, or any of us may have about Pro Se and prejudiced legal or civil claims, I assure in confidence I am in good faith. Moreover, any of us may also understand that an actual Fraud committed by a Federal Officer works to disestablish the individual critically at the level of his most conscious efforts." *Id.*

142.     "For whatever reason, the energy I had committed to my extrinsic legal process may have undermined my conscious attention. (I was holding back to back 80 to 100 hour work weeks)." *Id.*

143.     "TIMELINE: 12/1/22 I filed an Appellate Brief in U.S. Court of Appeals for the Tenth Circuit." *Id.* The binder demonstrates a Docket slip from a case showing the Plaintiff's name, shows the appeal was pending through that time. Note: the Appeal did not discharge until Summer 2023, and remains the subject of ongoing litigation against United States Judiciary, Judges Howard Nielson and Jared Bennet are alleged to have compounded a *Fraud on the Court* question with new *malpractice.* The case may be filed concurrently with this one, and is action to relieve the Plaintiff from repeated assaults on his personal and civil rights.

144.     The "CLOSE" of talking points speculates on *prejudice* that may characterize plain demonstration of a *perception* of a *hostile environment,* "Because the management team may yet harbor improper prejudices and reservations which disrupt intended issues, Amazon.com should consider to make an EXCEPTION from a FINAL WRITTEN WARNING status, and may also choose to REJECT one or both of these ADAPTS." *Id.*

145.     That document was available to Amazon Human Resources, its "Appeals Team," after 3/9/23.

146.     The *teleconference* took place as planned, was conferenced with a Senior Site Leader from a different territory who brought to bear, according to the Plaintiff, how the rule compounding the infraction in itself was improperly enforced, given that both its *cause* and *timing* for 60-day deprecation of the record since 12/18/22 to 2/19/23, and rescinded

30

the "Final Written Warning." Note: There is not a source for the rule, given how **Kerri Alger** did not ever respond to the Plaintiff on the question of policy level documentation for ADAPTS issuance and review. It may be the *rule* was simply an interposition from a different leadership perspective.

147.    It is Plausible to the Plaintiff, the issue that was dissolved after 2/19/23 was a retaliation. As expressed from his written Talking Points, the impact of negative results and unresolved questions for ongoing mismanagement questions, besides personal issues that were beyond the willingness of Margarita Wayman and Adrian Caldera to have engaged, conditions to have exaggerated and misdirected corporate bias, "Bias for Action," were ripe.

### 9.  NINTH INCIDENT

148.    On 3/15/2023, **Adrian Caldera** and **Margarita Wayman** initiated a process to attempt to terminate the Plaintiff.

149.    A "Behavioral—First Written" ADAPT defined a "First Written" context which according to policy would have resulted in a summary termination of the Plaintiff from employment with Amazon.com for *cause*.

150.    The "Behavioral—First Written" identifies the dissolved disciplinary issue from the Eighth Incident, and the Plaintiff admits the relevance of the Policy Level discussion on Labor Encoding questions, and disclosed the Root Cause from February, "I was asked to recognize this ADAPT process is NOT an exception or a accommodation for any kind Standard Process, and I fully agree and will work to maintain more perfect standard for staffing process in general. Pursuing this, I did use some sensitive language above, in the

previous discussion on this subject, and all that I can disclose is that I was under some more high-level stress which may have contributed to the oversight. I am a little concerned the ADAPT is postured liberally without regard for the scope of the error, which is stress related, and is difficult to anticipate. Meaning, the ADAPT could be used to define an issue at any point without very constructive discussion. In this instance, I attempted to communicate how this issue was not entirely avoidable and found the L4 was in a posture unable to hear exactly how. This seems to be in line with the policy discussion regarding retraction of a Final Written Warning, that the issue cannot repeat over 30 days. A more complex discussion would have originally framed this issue efficiently." See Exhibit No. 22.

151.    **Margarita Wayman** produced the *same* complaint context as was prior attempted; The issue describes the overall impact to process from February, *after* the *appeal,* and recasts it to be a "Behavioral – First Written," and not a "Final Written."

152.    It is Plausible to the Plaintiff, **Margarita Wayman** was engaged in a format for high-level *retaliation* whereall she took justification in her own zealousness to have attempted, or even merely postured attempt it, *protected* the work site's *production history* from even unintentional to mechanical errors.

153.    *Reissuance* showed total disregard, *intentional neglect,* of the meaning of a "Coaching" question who seeks to have understood ("STU") the facts *before* a record of impact, and communicated **Margarita Wayman** and **Adrian Caldera** total disfavor for the Plaintiff, as well Human Resources total deference to their whim.

154.     The action may have deliberately inferred *vicarious harm* upon the Plaintiff, a will to promote encouraged by both **Pablo Alvarez,** and **Adrian Caldera,** and a will to misbehave encouraged by **Devlen Bridges** and likely **Shanese Walters,** it was the consistent bias of the Management Team supported Human Resources Team, including more powerful Regional and Central Human Resources who overlooked the Plaintiff's most substantive questions and failed to advise, that **Margarita Wayman** captured in that 3/15/23 document.

155.     Restated, it was misbehavior derived out of unchecked *stalking* ethics who would see the victim as his or her own worst enemy.

**10. TENTH INCIDENT**

156.     On 5/10/23, the plaintiff was prompted to complain for the last time, at the end of the day's shift **Adrian Caldera** and Human Resources announced he would be leaving the company to take a promotion at another company, "It has come to my attention an individual who is subject of a serious intentional Mismanagement Complaint is being offered a recommendation from Amazon.com, the individual admitted this in confidence to the team, on terms for happy departure from the company." See Exhibit No. 25.

157.     "The extent of 'Intentional Mismanagement' is sufficient to constitute 'Stalking' under Utah law, and whether Amazon.com will file a sufficient legal complaint is a relevant question." *Id.*

158.     "That is, the individual has dispositioned numerous very close working relationships, has damaged the integrity of several managers." *Id.*

159.    "New incidence arise where the team openly discloses his impending departure." *Id.*

160.    "For example, [**Adrian Caldera**] now exchanges personal contact information with [Amazon Associate] who is a reliable member of the management team, and may maintain destructive influence thereby while [Amazon Associate] may be unwitting." *Id.*

161.    "For example, [**Adrian Caldera**] may also maintain personal contacts with numerous members of leadership and management, who may be more or less under his most direct influence incl.: [**Pablo Alvarez**], [**Margarita Wayman**], [**Shanese Walters**]." *Id.*

162.    Some parts omitted, "The company must consider to HOLD its recommendation pending an investigation. The individual leaves on poor terms." *Id.*

163.    It is plausible to the Plaintiff **Adrian Caldera's** Corporate Recommendation and Plan to Leave Amazon.com were prompted by his knowing gross misconduct andor that Human Resources in its general knowledge of circumstances offered him *protective relief* by sabotaging its investigations and colluding against the plaintiff.

164.    The complaint was also addressed against **Kerri Alger** for failing to protect the Plaintiff from management bias more plainly, to have addressed the longer standing question of *mismanagement;* she contemned the victim of their conspiracy.

165.    "Issue #2" addressed against **Kerri Alger** largely speculates against *intentional neglect* wherein she looked at a document and declared how there was not plain "fraud" within the document, and implicated a larger policy to have withheld an integral question. **Alger's** direct mismanagement was entirely designed to define Constructive Termination

34

and may have held out the most hostile promise against the Plaintiff, by referring to him within the business culture as the defect per se, "[**Kerri Alger's**] lack of insight compares intentional neglect to further magnify harm, in this instance she may be allowing [**Adrian Caldera**] the opportunity to get away with, and further glamorize, his own criminal mystique." *Id.*

166.    "No Associate should suffer personal liability of frivolous, false, and whimsical disciplinary complaints." *Id.*

167.    The complaint quoted Utah Code for *stalking.*

168.    The Complaint was answered by **Amy Nally** who interviewed the Plaintiff by telephone, and could not provide any relief. She replied via email, "On 5/6/2023, 12:00 PM you raised concerns to our team. Amazon takes concerns of this nature very seriously and has a process in place to investigate. My role in this process was to be a fair and obejctive fact finder and to conduct and complete a thorough investigation. As part of this process, I spoke with relevant parties and reviewed relevant documentation…I completed a thorough investigation and did not find a violation of Amazon policy or standards of conduct." See Exhibit No. 26, on 6/13/2023.

169.    More precisely the events of the **Ninth Incident** were coincident, a complaint against "Intentional Mismanagement" was sent to **Kevin Sargeant** on 5/6/23, and was also transmitted to Human Resources team, **Josh Shelhammer** and **Katy Brown,** the Plaintiff met with **Kevin Sargeant** who, as the Senior most Leadership on-site could not resolve the complaint of mismanagement; it is plausible to the Plaintiff the Manager chose not to believe him in order to maintain a Status Quo.

## 11. ELEVENTH INCIDENT: DIRECT CIRCUMSTANCE OF RESIGNATION

170.　　The 5/10/23 complaint was never responded to, and fell under the conclusions made after the **Tenth Incident,** the plaintiff contacted **Amy Nally** on a question for legal queries and Nally provided a service address for the Registered Agent, Corporation Service Company. See Exhibit No. 27.

171.　　The plaintiff was on a Leave of Absence after the middle of June, had enrolled at the University of Utah, and on 7/11/23 dispatched a "NOTICE OF LEGAL INTENT" and also declared he did mail a copy of the Notice to the address provided by **Amy Nally.**

172.　　The plaintiff reports thereafter; the e-mail was sent in-network via a Corporate Laptop and Security Token, still in the Plaintiff's possession, from off-site, that his Security Token was *revoked* at that point and no response was ever received. The document was sent to the entire "Under the Roof" ("UTR") management team, anyone on-site with whom the plaintiff had direct conversations or complaints. See Exhibit No. 28.

173.　　The Human Resources and Management Team were attempting to have played a *war game* against the Plaintiff, and by leaving its *actions* undefined admitted their dialogue to be both intent upon *intrusive thinking,* and *bad faith* disciplinary context.

174.　　The team had successfully constructed a *hostile* environment who could no longer reach out to, or recognize in the Plaintiff a site peer without summoning a spirit derision, their conflicts of interest were deliberate and had removed the Plaintiff from even professional contact.

175.　　It is presumptive they took a vicarious triumph over the Plaintiff in the cause of Amazon's own policy that compares **Absolute Privilege,** who more or less nakedly had

36

stalked the plaintiff for a year and a half while the larger and more general mechanisms of Amazon.com and Leadership Principals and Policies failed, and were in fact used against the Plaintiff, who otherwise was respected by Amazon Associates for successful leadership strategies.

## 12. TWELFTH INCIDENCE

176.    Related to the **Third** and **Fourth Incidences,** the Plaintiff had applied to the Amazon.com, the company had opened the Amazon Technical Academy ("ATA") to Associates in good standing, an opportunity to gain paid admission to Professional Skills Training for Employment in Amazon.com, a paid certification course. See Exhibit No. 33.

177.    The ATA website on a July 1, 2025 story declared, "Amazon has upskilled over 700,000 employees globally through prepaid education and training programs." (Source: https://www.aboutamazon.com/news/workplace/amazon-employees-upskilling-education-training).

178.    The plaintiff applied, and was made aware during the interim period that if he was not in good standing, would not be considered eligible. The date of the Documented Coaching that held a narrative of *abusive behavior* was June 22, 2022, just 14 days before the ATA application would issue.

179.    The document was *false,* and whimsically postured *behavioral reports* to prevent the Plaintiff from even plausible succeeding at the ATA application.

180.    It is plausible to the plaintiff, the two managers engaged *conspiracy* under *retaliations* against the Plaintiff's Leadership ethics, delivered by **Devlen Bridges** and

37

**Adrian Caldera,** and approved by Human Resources to guarantee and pre-empt the Plaintiff would not gain Admission.

181.    The Plaintiff was denied admission, "After careful review of applications, we are unable to offer you admission to ATA's 2022 August cohort." *Id.*

182.    According to the Plaintiff, **Kerri Alger** at the in-person meeting related to those complaints attempted to explain how the ADAPT would not have been included on a disciplinary review for ATA qualification, however the language in the exhibit portrays an individual totally disaffected from the well-being of others, the individual *behavior* constitutes critical questions for whether a person can sit in a collegial environment, or be trusted within ordinary *workgroups.*

183.    **Devlen Bridges, Adrian Caldera,** and **Kerri Alger** may have tacitly agreed the Plaintiff was unfit for *peer status* on any ulterior basis, the apparence of complaint, etc.

184.    The persistent *appearance* of a *tortious interference* after the fact was *harassing* to the Plaintiff from June 2022 all the way into March 2023.

### 13. OTHER CIRCUMSTANCES

*Performance Reviews*

185.    Performance Reviews may have entirely suffered the setbacks initiated by Pablo Alvarez, and the Management Team may have engaged praxis beneath conditions of subornation, or finally embracing more plainly elements of conspiracy, duplicitous representation, improper overcompensation of bias; whether the Plaintiff's Performance Reviews were reported faithfully is a serious question on the depth of gross misconduct.

*Other Internal Amazon Investigations*

186.     "DUT7" on the other hand was under scrutiny *not* for weaknesses in production, its

production scores were routinely high; instead, there was a string of Leadership violations,

violations of no-fraternization and favoritism policies, circumstances unknown to the

Plaintiff but took precedence under the rumor mill, the site saw at least five different site

Mangers terminated for misconducts, and the Plaintiff was questioned by external site

management on qualitative work conditions, well-being in general.

## VIII.    ARGUMENTS

187.     RELIEFS DUE FROM DEFENDANTS, a three-part argument binds them to the

"At-Will" contract and does not limit the Plaintiff's Legal and Civil Rights to "At-Will"

exclusivity because the Absolute Privilege was violated, withstood on the Plaintiff's

independence and competence, and once subjected to complaint, left unremedied and even

uninvestigated, so that the Plaintiff was divested inherent of both *success* and *experience,*

and reasonably *resigned* than suffer a broken ethical legacy.

188.     Argument sounding in tort knows a three-part ligature qualifies *breach of contract*

for *Constructive Termination/Coerced Resignation* conditions.

189.     (i) A *breach of contract* results when the "At-Will" employer fails *intentionally* and

*negligently* to address real *violations* of *Behavioral Conduct* and *Integrity,* just as in Civil

Society when *misbehaviors* result in violations of individual *civil integrity,* so that there is

a *civil* and *criminal* victim, there is a dark boone within the *culture* for having harmed the

victim, who is at least *person* for the purposes of *civil suit* under the Constitution of the

United States of America.

190.        (ii) Actions at *Stalking, Harassment, Conspiracy* or *Collusion,* to render the *hostile*

work environment even plausible demand the question of the meaning of the *statutory*

*application* from the pleader, any action that was also *tortious interference* from any

Employee, *negligent* or *intentionally negligent,* provoked the *civil violation* as provoked

the *breach of contract.*

191.        (iii) *Vicarious infliction of harm* is elemental to *harassment,* any sufficient term,

and the doctrine of Respondeat Superior is provoked where *discrimination* and *retaliation*

are (a) observable, and at least (b) partially remediable; the Defendant failed to exercise

diligence that would prevent other Amazon.com Employees from exercising **Absolute**

**Privilege** to publish defamatory and insolvent statements about the Plaintiff.

### 1. BREACH OF CONTRACT, INTENTIONAL NEGLIGENCE

192.        The "At-Will" contract largely binds Employer and Worker to a mutual condition

of contract solvency, all *workers* at Amazon.com are bound to an "At-Will" contract, sign

a code of conduct, and must interpret Leadership Principals in order to successfully

navigate the contours of right in the "At-Will" contract.

193.        "Employment at Amazon is not for any specified length of time, and both the

associate and the company have the right to end the employment relationship at any time,

with or without cause and with or without prior notice or warning. Only Amazon's general

counsel and chief financial officer have authority to bind the company to policies or

agreements that conflict with this policy of at-will employment. Any such exception must

be in a written agreement signed by Amazon's general counsel or chief financial officer.

See Exhibit No. 30, Page 8, "At Will Employment."

194.      (i) A *breach of contract* results when the "At-Will" employer fails *intentionally* and

*negligently* to address real *violations* of *Behavioral Conduct* and *Integrity,* just as in Civil

Society when *misbehaviors* result in violations of individual *civil integrity,* so that there is

a *civil* and *criminal* victim, and there is a dark boone within the *culture* for having harmed

the victim, who is at least *person* for the purposes of *civil suit* under the Constitution of the

United States of America.

195.      Liability of Inferior Respondents, "Persons of Interest," may be due on Separate

Action.

196.      Liability of the Superior Respondent, the *employer,* Amazon.com Services, Inc.,

"Amazon.com," is demonstrated.

### A. Violations of the Code of Conduct

197.      *Good Faith* in *employment contract* dealings limits and expresses the *culture* and

*work environment,* so a *hostile* work environment results when *Good Faith* conditions are

either *no longer evident,* or have suffered *significant infringement.*

198.      All Amazon.com *employees* sign an agreement to the *Code of Business Conduct

and Ethics,* demanding "Compliance with Laws, Rules and Regulations," stated, "In

performing their job duties, employees are expected to use their judgment to act, at all

times and in all ways, in the best interests of Amazon.com." See Exhibit No. 32.

199.      "Discrimination and Harassment," stated, "Amazon.com…will not tolerate any

illegal discrimination or harassment of any kind." *Id.*

200.      "Recordkeeping, Reporting, and Financial Integrity," stated, "Amazon.com's

books, records, accounts and financial statements must be maintained in appropriate detail,

must properly reflect the Company's transactions and must conform both to applicable law

and to the Company's system of internal controls." *Id.*

201.    And, "Employees should speak with anyone in their management chain or the Legal

Department when they have a question about the application of the Code of Conduct or

when in doubt about how to properly act in a particular situation…The Amazon.com Legal

Department has developed and maintains reporting guidelines for employees who wish to

report violations of the Code of Conduct." *Id.*

202.    And, "Amazon.com will not allow retaliation against an employee for reporting

misconduct by other in good faith. Employees must cooperate in internal investigations of

potential or alleged misconduct." *Id.*

203.    "Waivers of this Code of Conduct may be made only in a manner permitted by law."

*Id.*

204.    Any *gross misconduct* may be identified on conditions of *civil stalking* and

*harassment, civil conspiracy,* State Law, statutes under the Public Law, and because

*unintentional* to *intentional harassment* occupies a sufficiently visible and workable ethical

plane, any decision on the part of Amazon.com to maintain the implication of disfavor does

admit *inferior* and *superior* breach of the Code of Conduct.

205.    If a *retaliation* was merely coincident, it did yet demand a cognizable remedy to

have allowed the Plaintiff to have survived low-level Management prejudice; none of

Human Resources investigations were capable to state factual limitations that would have

pre-empted sincere pursuit of the truth.

206.    Where Management andor Human Resources may have *tolerated* disorganized *stalking* those individuals violated the Code of Conduct on at least three general clauses; and *vicarious harm* is implied under the term, "in the best interests of Amazon.com…" whereall the victim is instantly excluded from said *interests,* and implicates *gross misconduct* of understated *conflict of interest.*

207.    The Code of Conduct is interpreted to prevent a *hostile work environment* by setting a standard for *communication* that brings Amazonians together.

### B. Irreparable Damage to Integrity of Leadership

208.    *Integrity in Leadership* maintains how *specific leadership principles* are observable and practicable in the workplace, so a *hostile* work environment results when *Integral* conditions become *impracticable.*

209.    The plaintiff was put in the position to have to repeatedly disagree with various members of the Management Team, and fell under Leadership Principle to have coped with it, "Have Backbone; Disagree and Commit," which states from the Amazon.com *Owner's Manual and Guide to Employment – Decemeber 2017,* "Leaders are obligated to respectfully challenge decisions when they disagree, even when doing so is uncomfortable or exhausting. Leaders have conviction and are tenacious. They do not compromise for the sake of social cohesion. Once a decision is determined, they commit wholly." See Exhibit No. 30, Pages 6-8.

210.    An "Open Door" policy was never appreciated related to the Plaintiff, and instead the operative "Open Door" was repeatedly applied against him, holding him to dysfunctional standard. *Id.*

43

211.     In any circumstance where a disagreement in the *expression* or actual *context* of some incidence was presented to be withstanding, the Plaintiff was postured so, this includes all seven of the Behavioral Documentations suffered by the Plaintiff, not a single one of those was entirely valid.

212.     In any circumstance where Human Resources either failed to restate the Complaint presented, failed to meet and demonstrate even an abstract of a burden of *diligence,* or failed to actually conduct a *significant investigation* and relate the *investigation* to the complaint, they abused a capacity for **Absolute Privilege** and failed to allow the Plaintiff the *authority* of his *disagreement* and instead relied upon the implied relationship the Management Team held with the Plaintiff for rational *solvency.*

213.     The Management Team and Human Resources Team crucially failed to tailor their disciplinary **Privilege** to Leadership Principles, they forced the Plaintiff to *double* and *triple down* on the "Have Backbone; Disagree and Commit" question, and compromised their own *convictions* as Amazon.com leaders, they compromised the perimeter of their own discretion and were never obligated to *substantiate* their ethics in light of the Plaintiff's statements; therefore, behavioral documentation never met a definition for constructive *coaching,* and critical disagreement were not monitored.

214.     The Plaintiff's obligation was therefore to have *reported* these infractions, and his decision *to delay* that report met direct *retaliation* and *punishment;* the Human Resources Team does not appear to have investigated **any numbered incident** in a manner that would grant *administrative relief* to the Plaintiff within the terms of the "At-Will" contract; while

44

several leads and an entire investigatory avenue were left unresolved, and the Plaintiff not given sufficient confidence to preclude a question for *litigation.*

215.    The Justifications of Management were affirmed not with *fact* and with *substantial investigation,* but with Deflections from the Human Resources Team, on understated and unstated *policy expositions;* the exact cause for their *professional hostility* to the Plaintiff has not been explained, whether they favored some other Amazon.com associates whom they knew within the regional network, or whether they were racially motivated, or culturally biased, or believed him to be corrupted or unnatural, are all unclear.

216.    The Management Team engaged *tortious interference* and thereby designed *contract defamation* by deliberating on deformation and distortion of the inherent work environment, and failing to protect it.

## 2.  WORKPLACE STALKING, HARASSMENT, HOSTILE WORK ENVIRONMENT

217.    (ii) Actions at *Stalking, Harassment, Conspiracy* or *Collusion,* to render the *hostile* work environment even plausible demand the question of the meaning of the *statutory application* from the pleader, any action that was also *tortious interference* from any Employee, *negligent* or *intentionally negligent,* provoked the *civil violation* as provoked the *breach of contract.*

218.    In light of the argument described to be Breach of Contract, Ut. Code § 76-5-105.5(2), "An actor commits stalking if the actor intentionally or knowingly (a) engages in conduct directed at a specific individual and knows or should know that the course of conduct would causes a reasonable person; (i) to fear for the individual's own safety or the

45

safety of a third individual; or (b) to suffer other emotional distress… Part (4), 'In a prosecution under this section, it is not a defense that the actor: (a) was not given notice that the course of conduct was unwanted; or (b) did not intend to cause the victim fear or other emotional distress.'"

219.　　The Federal Public Law bears a comparable import, 18 U.S. § 2261A(1)(B), "Whoever causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in [§2261A] clause (i), (ii), or (iii) of subparagraph (A); or [(2)(B)] with the intent to [*harass* and *intimidate* another person] uses any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in [aforementioned clause (1)(A)].

220.　　The Amazon.com network is inherently an *interstate commerce* system, who communicates Operational Information and logs it in real-time with off-site datacenters Seattle, WA; San Jose, CA; and Manassas, VA. (Source: Wikileaks.org/amazon-atlas/map/ pub.: Oct. 11, 2018. Alt. Source: datacentermap.com/c/amazon-aws/datacenters).

221.　　There lacks sufficient *confidence* in Criminal Reports to State and Federal Officials on this matter, so that the *civil context* will bear the optimal precedence for any *findings of fact* where Federal and State Law are consistent; the *emotional distress* elements of arbitrary workplace *discrimination, negligencies* and *retaliations,* is properly restated from

State and Federal Law to define *workplace harassment* and *hostile working environment* conditions.

### 3.  VICARIOUS INFLICTION OF EMOTIONAL DISTRESS, ARBITRARY DISCRIMINATION AND RETALIATIONS, DOCTRINE OF RESPONDEAT SUPERIOR

222.    (iii) *Vicarious infliction of harm* is elemental to *harassment,* any sufficient term, and the doctrine of Respondeat Superior is provoked where *discrimination* and *retaliation* are (a) observable, and at least (b) partially remediable; the Defendant failed to exercise diligence that would prevent other Amazon.com Employees from exercising **Absolute Privilege** to publish defamatory and insolvent statements about the Plaintiff.

223.    Because the standard of review is potentially capricious, we say the claim of *Intentional* to *Negligent misrepresentation* does not properly accrue until a *Retaliation* standard has been met, and until the *Negligence* standard can be shown to have failed Duty of *Good Faith and Fair Dealing,* against *reasonable* or *negotiable* demands, where failed, constituted *gross misconduct* showing elements of *gross defamation,* and *gross criminal stalking.*

224.    The implication of the Management Team was to import *vicarious* prejudice, on Amazon.com' own term of *Ownership,* "Leaders are owners. They think long term and don't sacrifice long-term value for short-term results. They act on behalf of the entire company, beyond just their own team. They never say 'that's not my job.'" See Exhibit No. 30, Page 7.

47

225.     *Negative ownership* characterizes *bad faith* practices who assert *adversity* and victory through domination, and does not characterize minute errors or growing pains.

226.     In context, it was perceived *retaliations* against Plaintiff *success stories,* and suppression of favorable *Performance Reports,* Improper disfavor against questions for *Management Recommendation, Intimidation* that discouraged fungibility of standing at Amazon.com to another similar employer post-resignation, up to and including the extant *legal dispute;* for whatever reason the Management Team summoned the core of its Leadership principles and construed an inverted rendition in the very action *to complain,* that in the view of the Plaintiff, should have resulted in *terminations* for *gross misconduct,* or a statement of *relief* from any subjective bias.

227.     The Management Team took offense at the Plaintiff successes and retaliated again and again.

228.     The intrinsic *Fraud claim,* that bearing the implication of both *tortious interference* and *contractual defamation,* may or may not be proven depending on the depth of *evidence* retained by Amazon.com related to the Plaintiff, Carlos Velasquez, AMAZON ID: "VELACA," so we say the *Employer* is obligated on *any dispute* who shows the even possibility of *breach of confidence,* a question of *Duty of Good Faith and Fair Dealing,* this for the same reason both retain some "At-Will" Legal Rights found in the several Employment Contracts, and so compare *Intentional* to *Negligent Misrepresentation,* "unless it is shown that the employer intended or directed the act which caused the emotional distress." *Tingey v. Midwest Office, Inc. et al.,* No. 1:2022cv00145 (D. Utah), cit. *Newsome v. McKesson Corp.,* 932 F.Supp. 1339, 1343 (D. Utah, 1996).

229.     The ethical culture terminated at "DUT7" appears to the Plaintiff and Victim to have been critically insular, and without sufficient transparency, and so finally bears the appearance of attempting to have provoked the Plaintiff *to retaliate,* and the Management Team's apparent perceptions conducted the inverse rendition of the Plaintiff, so that it was preferable to Human Resources to assert *status quo* and constructively *terminate* or *resign* the Plaintiff, who were so capricious as to have failed to *reach out* to the Plaintiff at any point they believed he was troubled, or at any point a reasonable person would assume his confidence in continued Employment was damaged unduly or improperly.

230.     Moreover, the Plaintiff extended two critical disagreements with the Management Applications, Exhibits related to the **First** and **Second Incidence,** on terms that were *severe* from the Management perspective and did not follow through because they could not *prove* the things they were saying.

231.     Given the entire *extended* Human Resources network took that unethical path and generated an inverse rendition of Amazon.com culture, provides the conclusion that Amazon.com *admits* vicarious prejudice on the basis of Site-Leadership Consensus, the *Absolute Privilege,* and bears the same *intentional neglect.*

232.     The qualified argument may constitute a *class basis* for litigation, as whether the Plaintiff was singled out, or whether the company entertains the disposition, whether its *disciplinary reporting standards* always risk the inherent *integrity* of the "At-Will" contract.

## IX. PLAINTIFFS FIRST CLAIM FOR RELIEF

233.    Any *dispositive motion* may cite argument and fines **per incidence,** this is not a

dispositive motion.

234.    The Plaintiff demands Amazon.com will pay to him the amount of $12,000,000 on

findings of *vicarious infliction of emotional distress* consistent with *statutory stalking* that

was ongoing from Late 2021 until the Plaintiff resigned in the Summer of 2023.

235.    After the corporate culture could no longer sustain the Plaintiff's *Integrity in

Leadership* he was compelled *to resign,* because (a) he been denied the merits of his efforts

and resource and would be forced to labor on under *false light,* and under an implied degree

of *disfavor* inconsistent with interpreting and succeeding under Amazon.com' "At-Will"

contract, while questions of *gross misconduct* were either *unsubstantiated* to bear criticism

or completely *exaggerated* to admit the Plaintiff should not have been such a subject, the

same question of *why* the culture became improperly *inured* to the Plaintiff's actual

statements and recollections, including his complaints, apparently collected across at least

a **dozen incidences** and affected **thousands of professional interactions** at the "DUT7"

distribution warehouse.

236.    Amazon.com in its Human Resources capacities failed to resolve two orders of

questions, questions on (a) Conduct in disciplinary issues, and questions on (b) Leadership

between circumstances of direct and critical disagreement evident from the original

documentation, so that it was understood the Plaintiff may continue "At-Will" maintaining

his perceptions of gross misconducts, showing precise questions of differences in

continuity, and having presented both verbal and written basis for investigation, timely or

50

no, the appropriate expectation for Leadership was that Amazon.com, by and through its Human Resources agency, should have evaluated *repetition* and *protraction* of the claim of *intentional mismanagement* for failures in the *sources of information,* and other low-level *failures in management communications,* such as *performance reports,* circumstances of *factual disagreement,* etc.

237.    Punitive Fine for *vicarious infliction* of *pain and suffering,* the Human Resources agency within DUT7 and the Amazon Pioneer Region construed those terms and conditions on a basis to compare **Absolute Privilege** without having developed longer, and more productive "coaching," either to isolate *actual misperceptions* between various subordinate Associates and Managers, or have critically moderated *serious disagreements.*

238.    Moreover, the vulnerability of the Plaintiff to a scheme *dispositive* to the Amazon.com Code of Conduct, and Leadership culture, communicated a gambit of *tortious interference* that compares *invasion of privilege* on *breach of contract;* who gambled the entire integrity of the individual Associate, i.e. the Plaintiff, to compare *interference* with his *personal agency,* to have meddled with his plausible *due promotion* and daily constructive *attributions,* confidence in departure for another company which suffered pre-emptive *retaliation* by **Adrian Caldera** on his departure, repeated suppressions from **Margarita Wayman,** managerial gripes from both **Devlen Bridges** and **Pablo Alvarez,** which could have been easily remedied with a strong conference designed to *relieve the management team* as related to "VELACA" from their *historical prejudices,* which otherwise would have followed the Plaintiff to have transferred to a different warehouse.

51

239.    The fact is, Amazon.com failed to maintain the discrete contours of its inherent *worker* contract, and once it was apparent the Management Team had more or less generated *consensus* to have obstructed or denied the Plaintiff the opportunity, to have disfavored him, the Human Resources agency in both the Pioneer Region and Seattle, WA were summoned not in genuine capacity, but in *bad faith,* they recognized it, and in an effort to prove themselves the stronger and the wiser, constructively terminated the associate by failing to meet the standard presented in his complaints.

240.    Alternatively stated, they refused to confer upon him the illiberal right of **Absolute Privilege,** engaged *conferential discrimination,* and maligned his *professional image* with the whole and repeated appearance of someone attempting to disabuse himself of an unstated grievance, did take *vicarious privilege* on-site, and did summon the *vicarious standing* of Amazon.com and its liberal to plausibly illiberal Human Resources agency.

## X. PLAINTIFFS SECOND CLAIM FOR RELIEF

241.    The plaintiff demands Amazon.com will pay him the amount of (a)$896000 on findings of tortious interference to have improperly interfered with and even denied promotion L3 Yard Marshall and Process Assistant to a career-level opportunity as Level 4-6 Operations Manager under an "At-Will" contract, where Performance Reviews standardized for such an evaluation and therefore expectation, a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6: 2 Years at L4, for est. $58900/year; 4 years at L5 for est. $72300; 5-10 years at L6 for 105600, to find the above total.

52

242.      Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal,* and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success.*

243.      These are Compensatory to Punitive conversions for *constructive termination* on conditions of a *hostile environment* defined on Amazon.com' own Code of Conduct, and Leadership program, all of which design contextual relief for disciplinary questions in the *workplace.*

244.      The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief,* the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith.*

## XI. PLAINTIFFS THIRD CLAIM FOR RELIEF

245.      The plaintiff demands Amazon.com will pay him the amount of (b) of $53760 for missed retirement savings on findings of *tortious interference* to have improperly interfered with and even denied promotion from a plainly qualified L3 Yard Marshall and Process Assistant, interference with an "At-Will" contract, as based in a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6.

246.      Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal,* and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success.*

247.     Amazon's 401(k) offers a 50% match on the first 4% of base salary contributed by the employee (effective 2% employer contribution). Employee contributions are immediately vested; employer matches have a 3-year cliff vesting schedule. With 10 years of service, all matches are fully vested.

248.     The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief*, the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith*.

## XII.     PLAINTIFF'S FOURTH CLAIM FOR RELIEF

249.     The plaintiff demands Amazon.com will pay him the amount of (c) $290400 for missed stock options on findings of *constructive termination* to deny promotion from a plainly qualified L3 Yard Marshall and Process Assistant, interference with an "At-Will" contract, as based in a general assessment of a workable or favorable track record to promote within the company on a two-year to four-year, to ten-year time line and presuming an opportunity as high as Level 6.

250.     Amazon.com failed to secure the Plaintiff's "At-Will" contract right to be treated as an "Amazonian," while his peers took exceptions from the *Code of Conduct* and *Leadership Principal*, and were allowed by Human Resources to have successfully *interfered* with, *stalked* after, the Plaintiff's *opportunity* and *success*.

251.     Amazon provides Restricted Stock Units ("RSU") rather than traditional stock options. The total represents the cumulative vested RSU value over 10 years, using annualized vested amounts per level (accounting for a backloaded vesting schedule across

overlapping grants from promotions). Actual vested value may depend on Amazon's stock price at a vesting date, which fluctuates; assuming no price in change from grant.

252.    The sum total may be counted toward any *definite sum* defined in the Plaintiff's *first claim for relief,* the context for *tortious interference* follows conditions the *employer* is obligated to in *good faith.*

### XIII.    FIFTH CLAIM FOR RELIEF

253.    The qualified argument especially where the Plaintiff had recently excelled, *or* where the Plaintiff's *Performance Ratings* suffered even *false representation* or the stressful effects of *retaliatory discrimination;* condition of *personal tort, tortious interference, vicarious harm* is consistent for private fines against individual **Persons of Interest** in a separate andor lateral action.

### XIV.    PRE-TRIAL REQUEST FOR DISCLOSUES

254.    Provided are a list of documents may resolve circumstancial questions more definitively, and evenly in the Plaintiff's favor.

#### 1.    Personally Important Documents

255.    Any and All Documented Coachings between 2021 and 2024.

256.    Any and All Records of Human Resources Investigations Submitted by the Plaintiff Carlos Velasquez, including assessments and conclusions, about "Velaca" between 2021 and 2024.

257.    Any and All Records of Human Resources Complaints and Investigations Submitted *against* the Plaintiff, Any and All Disciplinary Records, Carlos Velasquez, "Velaca."

258.    Any and All Performance Evaluations Resp. the Plaintiff, Carlos Velasquez, "Velaca" submitted by: Pablo Alvarez, Devlen Bridges, Paul Kondrat, Margarita Wayman.

### 2.    Site-Specific Documents

259.    Any and All Safety Documentation from July 2021 through July 2023, incl. Reports, "Roundtable" discussions, Investigations, any Safety paperwork related to "Velaca" or discussing "Velaca," held by DUT7 by the Safety Manager, by Amazon.com Services, Inc.

260.    Any and All Human Resources or Special Investigations Documentation that may bear import on site-wide investigations, Any Documentation that shows the state of the workplace culture.

### XV.    CLOSING

261.    Amazon.com has a maxim, "Work Hard, Have Fun, Make History."

262.    The meaning of *history* in site-specific terms amounts to efforts *to maintain* overall high site and regional *scoring;* the sites are evaluated every fifteen minutes by off-site *monitors* usually based in regional databases, or in Seattle, WA, and negative impacts to that scoring system prove not *flukes,* but instead identify the meaning of a work site's

history; Managers are uniquely positioned to take attribution from high-scoring sites, and from consistency in terms of improvement.

263.     The processes engaged by the Management Team, especially **Margarita Wayman** and **Adrian Caldera** related to the Plaintiff were beyond *retaliations* and knowing *constructive termination* ethics and strategies, complete misconceptions of the meaning of *history*, because it is a *worker* driven environment, the goal of Leadership is to motivate *workers*, and the Management Team repeatedly attacked the Plaintiff to prevent him from gaining sufficient ethical leverage that would have altered their preferred Management Style, and they are less diverse and in fact show themselves to be less competent to the challenges of *worker efficiency*, than to have literally stolen the *vested* opportunity at which the Plaintiff alone had demonstrated surpassing excellence.

264.     *Context* in terms of *Stalking*, the Persons of Interest fail to resolve larger *contextual questions* and prevail their disposition on withstandingness of *employement context* per se, the idea that it is a *good place* to work, good enough to tolerate *abuse*, and good enough to be without *the plaintiff.*

265.     For the above reasons we brought suit to guarantee the *rights of workers* who must meet routine *challenges* and overcome them in an *essential worker* economy consistent with Amazon LLC, and "Amazon.com," and other companies whose ethics have accelerated the *rights of workers* in the United States of America on the basis of *efficiency*.

266.     s/Carlos Velasquez,   Carlos Velasquez   Digitally signed by Carlos Velasquez
Date: 2025.08.11 14:45:17 -06'00'

267.     Pro Se Plaintiff

268.     Civil Bureaucratic Federalist

57

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

2025 AUG 12 AM 9:36

CLERK
U.S. DISTRICT COURT

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Carlos Velasquez

**(b)** County of Residence of First Listed Plaintiff   <u>Salt Lake County</u>
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se
PHONE: 801.671.0371
P.O. Box 581365

## DEFENDANTS

Amazon.com Services Inc.

County of Residence of First Listed Defendant   <u>Multiple/OOS</u>
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Amazon.com Services Inc. General Counsel
Registered Agent: Corporation Service Company
300 Deschutes Way, SW Suite 304

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | **PERSONAL INJURY** | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability | Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **SOCIAL SECURITY** | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 862 Black Lung (923) | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 863 DIWC/DIWW (405(g)) | |
| | | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI | |
| | | ☐ 555 Prison Condition | ☐ 865 RSI (405(g)) | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** | |
| | | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Constructive Termination

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
12,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE   8/10/2025

SIGNATURE OF ATTORNEY OF RECORD

Case: 2:25-cv-00674
Assigned To : Romero, Cecilia M.
Assign. Date : 8/12/2025
Description: Velasquez v. Amazon.com
Services Inc.

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____

71

JS 44 Reverse (Rev. 10/20)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: **federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Assigned To : Romero, Cecilia M.
Assign. Date : 8/12/2025
Description: Velasquez v. Amazon.com
Services Inc.

2025 AUG 12 AM 9:38
CLERK
U.S. DISTRICT COURT

Owner's Manual and Guide to Employment – December 2017

> **EXHIBIT**
> **30**



# Owner's Manual
## And Guide to Employment

1

Owner's Manual and Guide to Employment — December 2017



## WELCOME TO AMAZON!

We're thrilled to have you join us as we work hard, have fun, and make history! We think we've created an exceptional work environment that marries hard-charging intensity with major-league fun. As you get to know the folks at Amazon, you'll discover a group of diverse, world-class associates who treat each other with respect, work together as a team, and act like what they are: true owners of the company.

Our overall mission is simple: we want Amazon.com to be the place where our customers can find, discover, and buy, anything online! Whatever our customers tell us they want, we will find the means to deliver. In doing so, we will create the most customer-centric company in the universe -- a company that customers from all over the globe will recognize, value and trust for both our products and our service. With your help, Amazon will continue to enable people to discover new worlds and create change in a meaningful and lasting way.

Amazon is at the beginning of its history. Already millions of people have shown their faith in our future, through buying from us, through investing in us, and through working with us. Thanks again for joining Amazon and helping us shape the future.

Once again, welcome aboard!


*Jeff Bezos*
Founder & CEO

Owner's Manual and Guide to Employment – December 2017

```
┌─────────────────┐
│    EXHIBIT      │
│      30         │
└─────────────────┘
```

# Table of Contents

Amazon and You ........................................................................................................................ 6

About This Document ............................................................................................................. 6

Getting Started ...................................................................................................................... 7

What We Can Expect from Each Other ................................................................................. 8

Open Door Policy and Conflict Resolution ........................................................................... 8

At-Will Employment .............................................................................................................. 8

Employment Classifications .................................................................................................. 8

Working Hours ...................................................................................................................... 9

Attendance and Punctuality ................................................................................................. 9

Corrective Action ................................................................................................................ 10

Performance Evaluation ..................................................................................................... 10

Internal Transfers and Promotions ..................................................................................... 10

Dealing with the Public ....................................................................................................... 11

Personnel Information and Records .................................................................................... 11

Resignation ........................................................................................................................ 11

Pay Periods and Direct Deposit .......................................................................................... 12

Payroll Deductions .............................................................................................................. 12

Overtime Pay ....................................................................................................................... 12

Travel Time Pay ................................................................................................................... 13

Holidays ............................................................................................................................... 13

Additional Paid Time Off ..................................................................................................... 13

    Vacation .......................................................................................................................... 13

    Paid Personal Time Off ................................................................................................... 14

    Bereavement Time Off .................................................................................................... 14

    Jury and Witness Duty Time Off ..................................................................................... 14

    Sick and Safe Time Required Notices ............................................................................ 14

3

Owner's Manual and Guide to Employment – December 2017

Leaves of Absence .................................................................................................................. 15

    Benefits during a Leave of Absence .................................................................................. 15

    Family and Medical (FMLA) Leave .................................................................................... 15

    Medical Leave .................................................................................................................. 16

    Personal Leave ................................................................................................................ 16

    Military Leave .................................................................................................................. 16

Alternative Work Arrangements ........................................................................................... 17

    Types of Alternative Work Arrangements ........................................................................ 17

Code of Business Conduct and Ethics .................................................................................... 18

Confidential Information ...................................................................................................... 19

Cost Efficiency ...................................................................................................................... 19

Purchasing and Spending Authorization ............................................................................... 19

Travel and Entertainment ..................................................................................................... 19

Amazon Rental Vehicle Policy ............................................................................................... 20

Drug and Alcohol Use ........................................................................................................... 20

Employees with Disabilities .................................................................................................. 20

Employment Outside of Amazon ........................................................................................... 21

Employment of Relatives and Friends ................................................................................... 21

Employment References ........................................................................................................ 21

Equal Employment Opportunity ............................................................................................ 21

Health and Safety ................................................................................................................. 21

Safety Programs and Training ............................................................................................... 21

Reporting Accidents and Concerns about Workplace Safety .................................................. 21

Information Security ............................................................................................................. 22

Privacy .................................................................................................................................. 22

Acceptable Use ..................................................................................................................... 22

    Protecting Data and Securing Access to the Company Network ......................................... 22

Reporting Violations ............................................................................................................. 23

Insider Trading ..................................................................................................................... 23

Physical Security ................................................................................................................... 24

    Badges and Other Important Information .......................................................................... 24

4

Owner's Manual and Guide to Employment – December 2017

Workplace Emergency Response ........................................................................................ 24
Inspections on Company Premises .................................................................................... 24
Solicitation ............................................................................................................................ 25
Transitional Work ................................................................................................................ 25
Workplace Harassment ...................................................................................................... 25
Anti- Sex Buying Policy ....................................................................................................... 26
Sexual Harassment ............................................................................................................. 26
Other Harassment ............................................................................................................... 26
Consensual Relationships .................................................................................................. 26
Responding to Inappropriate Conduct or Possible Incidents of Harassment ............... 27
Standards of Conduct ......................................................................................................... 27

EXHIBIT
30

# Amazon and You

## About This Document

This Owner's Manual and Guide to Employment (the Manual) summarizes Amazon's basic personnel policies and practices and is intended to serve as a resource concerning your employment at Amazon. Other helpful materials and information are distributed during new hire orientation and are made available on the company intranet and from Human Resources.

The Manual is designed to provide you with a brief overview of Amazon's policies, procedures, and benefits. Amazon reserves the right to modify, revoke, suspend, terminate, or change any or all its policies or procedures in whole or in part at any time, with or without notice. This Manual is not intended as a contract and supersedes any previous policy statements, written or oral. As described in the Manual, your employment is not for a fixed term and is "at will," meaning both you and Amazon have the right to end the employment relationship at any time, with or without cause and with or without prior notice or warning.

Unless otherwise stated, the Manual applies to all associates – all regular or temporary full-time and part-time employees – of Amazon.com, Inc. and its wholly owned United States subsidiaries (Amazon or the company) with the exception of Alexa.

Some of Amazon's groups or sites may develop their own specific guidelines, policies, and/or procedures that apply only to their associates. These guidelines, policies or procedures supplement the information provided in the Manual. If they supersede the Manual, associates will be advised of that.

Remember that both the HR intranet and the Amazon Owner's Manual are living things. They are changed from time to time to keep pace with what's going on around us.

## Our Leadership Principles

Whether you are an individual contributor or a manager of a large team, you are an Amazon leader. These are our leadership principles, unless you know better ones. Please be a leader.

### Customer Obsession
Leaders start with the customer and work backwards. They work vigorously to earn and keep customer trust. Although leaders pay attention to competitors, they *obsess* over customers.

### Ownership
Leaders are owners. They think long term and don't sacrifice long-term value for short-term results. They act on behalf of the entire company, beyond just their own team. They never say "that's not my job."

### Invent and Simplify
Leaders expect and require innovation and invention from their teams and always find ways to simplify. They are externally aware, look for new ideas from everywhere, and are not limited by "not invented here." As we do new things, we accept that we may be misunderstood for long periods of time.

### Are Right, A Lot
Leaders are right a lot. They have strong judgment and good instincts. They seek diverse perspectives and work to disconfirm their beliefs.

6

Owner's Manual and Guide to Employment – December 2017

### Learn and Be Curious
Leaders are never done learning and always seek to improve themselves. They are curious about new possibilities and act to explore them.

### Hire and Develop the Best
Leaders raise the performance bar with every hire and promotion. They recognize exceptional talent, and willingly move them throughout the organization. Leaders develop leaders and take seriously their role in coaching others. We work on behalf of our people to invent mechanisms for development like Career Choice.

### Insist on the Highest Standards
Leaders have relentlessly high standards — many people may think these standards are unreasonably high. Leaders are continually raising the bar and drive their teams to deliver high quality products, services and processes. Leaders ensure that defects do not get sent down the line and that problems are fixed so they stay fixed.

### Think Big
Thinking small is a self-fulfilling prophecy. Leaders create and communicate a bold direction that inspires results. They think differently and look around corners for ways to serve customers.

**EXHIBIT 30**

### Bias for Action
Speed matters in business. Many decisions and actions are reversible and do not need extensive study. We value calculated risk taking.

### Frugality
Accomplish more with less. Constraints breed resourcefulness, self-sufficiency, and invention. There are no extra points for growing headcount, budget size, or fixed expense.

### Earn Trust
Leaders listen attentively, speak candidly, and treat others respectfully. They are vocally self-critical, even when doing so is awkward or embarrassing. Leaders do not believe their or their team's body odor smells of perfume. They benchmark themselves and their teams against the best.

### Dive Deep
Leaders operate at all levels, stay connected to the details, audit frequently, and are skeptical when metrics and anecdote differ. No task is beneath them.

### Have Backbone; Disagree and Commit
Leaders are obligated to respectfully challenge decisions when they disagree, even when doing so is uncomfortable or exhausting. Leaders have conviction and are tenacious. They do not compromise for the sake of social cohesion. Once a decision is determined, they commit wholly.

### Deliver Results
Leaders focus on the key inputs for their business and deliver them with the right quality and in a timely fashion. Despite setbacks, they rise to the occasion and never settle.

### Getting Started

New associates will undoubtedly have questions regarding Amazon. We hope that this Manual will satisfy the most frequently asked questions, but please do not hesitate to ask your manager or Human Resources if you have further questions. In Seattle, you may contact the Employee Resource Center. Contact information for your Human Resources Business Partner can be found through the following link on the corporate intranet:

https://contactstool.amazon.com/

7

## What We Can Expect from Each Other

You've probably figured out by now that this is not an ordinary company, and we have extraordinary people on our team. Accordingly, the company is committed to treating each associate fairly and with respect, and to maintaining an environment of open communication. As an associate, your primary responsibility is to do an outstanding job on your work. The efforts of each person, working individually and as part of the Amazon team, are the means for meeting the overall objectives of the company. We do also expect associates to maintain a high professional standard of behavior and job performance and to adhere to the policies set forth in this Manual.

## Open Door Policy and Conflict Resolution

Amazon believes that candid and constructive communication is essential to the smooth functioning of our workplace and to maintaining an atmosphere of mutual respect. Accordingly, we have an "open door" policy, which means that you are welcome to discuss any suggestion, concern, or other feedback with any member of the company's management. Associates are encouraged to bring their ideas to the attention of management.

The majority of misunderstandings are satisfactorily resolved by a thorough discussion and mutual understanding between the parties involved. In general, it is best to discuss any concerns with your immediate supervisor first. If you are unable to reach a satisfactory resolution with your supervisor or are not comfortable discussing the issue with your supervisor, you are welcome to discuss the matter with the next level of management, with Human Resources, or with any member of senior management. When you bring a concern to Human Resources, it will be reviewed, and if appropriate, action will be taken. Human Resources will communicate with you regarding the outcome.

If you believe that you or another associate has been subject to workplace harassment, pursuant to the provisions of the Workplace Harassment policy in this Manual, you should immediately report this to any manager or member of Human Resources. See the Workplace Harassment policy for more information.

# Employment at Amazon

## At-Will Employment

Employment at Amazon is not for any specified length of time, and both the associate and the company have the right to end the employment relationship at any time, with or without cause and with or without prior notice or warning. Only Amazon's general counsel and chief financial officer have authority to bind the company to policies or agreements that conflict with this policy of at-will employment. Any such exception must be in a written agreement signed by Amazon's general counsel or chief financial officer.

## Employment Classifications

Each position at the company is broadly classified by regularly expected work hours and whether the associate is eligible for overtime pay. These classifications are dictated both by the company's business needs and state and federal wage-hour laws.

Each position falls into one of the following employment types:

Owner's Manual and Guide to Employment – December 2017

- Regular full-time: Regular (non-temporary) associate who is regularly expected to work at least 40 hours per week.
- Regular part-time 30+ hours: Regular (non-temporary) associate who is regularly expected to work at least 30, but less than 40, hours per week.
- Regular part-time 20+ hours: Regular (non-temporary) associate who is regularly expected to work at least 20, but less than 30, hours per week.
- Flex associate: Regular (non-temporary) associate who is not regularly expected to work 20 or more hours per week, such as an on-call associate.
- Short-term associate: Hired for employment that is expected to last no more than six months, such as an intern or seasonal associate.

**EXHIBIT 30**

The above employment types only apply to Amazon associates. Outsourced workers such as temporary agency employees placed on assignment at the company, independent contractors, or consultants are not considered Amazon associates.

Associates are also classified as exempt or non-exempt. Non-exempt associates are eligible for overtime pay and are ordinarily paid by the hour and, and exempt associates are not eligible under federal and state laws for overtime pay and are ordinarily paid a salary.

Eligibility for stock-based awards and benefits is based on employment type (such as regular full-time or regular part-time, etc.). Changes to an associate's employment type must be approved the associate's manager and Human Resources.

## Working Hours

Managers are responsible to establish work schedules that accommodate operational priorities, and each associate should be flexible in meeting these priorities. Work schedules for hourly associates may vary from site to site and week by week. This flexibility is critical to Amazon's success as a company. The intense nature of our business and the demands of an e-commerce environment require that associates make a serious commitment of time and energy to Amazon. Salaried associates should clearly understand that they may frequently work extended hours to help the company succeed. Hourly associates may also be required to work varying amounts of overtime, as Amazon's needs require.

Most positions at the company require associates to work full-time. The company recognizes that situations may occur where associates may need to temporarily alter their work schedules in order to better accommodate difficult or demanding periods of their lives, while still meeting the demands of their job. Additionally, associates may sometimes require an alternative work arrangement when medically necessary while recovering from an illness or injury. Towards these ends, Amazon will consider requests for an alternative work arrangement. For further information, please see the Alternative Work Arrangement Policy in this Manual.

Hourly associates must report all hours worked, whether at an Amazon building or off-site. No one may allow or ask any hourly associate to work "off the clock" without being paid. Hourly associates working more than five hours are generally required to take a work-free, unpaid 30-minute meal period. The meal period must start no later than five hours or, in some locations, five-and-a half hours after the associate begins working. Additional meal periods are provided in some circumstances. Hourly associates are required to take a minimum ten-minute paid break for every four hours worked or major fraction thereof. Please check with your manager or Human Resources Business Partner regarding your work schedule. For more information, see the complete U.S. Working Hours Policy for non-exempt/hourly associates: Working Hours (Non-Exempt/Hourly) Policy.

## Attendance and Punctuality

Regular attendance and punctuality are important parts of your obligations as an Amazon associate. You are to work the hours scheduled by your manager. If you are going to be absent or late to work, we expect to

Owner's Manual and Guide to Employment – December 2017

hear from you before the start of your workday. Please be aware that unsatisfactory attendance may be a basis for disciplinary action, up to and including dismissal.

Individual sites or departments may establish specific guidelines for attendance and punctuality, based on the needs of the business. If your site or department has specific guidelines, your manager or Human Resources will review them with you, and it is expected that you will abide by them throughout your employment in that department.

In the event that we have not heard from you for three (3) consecutive workdays, you will be considered to have resigned from your employment.

## Corrective Action

To ensure orderly operations and provide the best possible environment, Amazon expects associates to follow rules and exhibit conduct that will protect the interests and safety of all associates and the organization. The appendix to the Owner's Manual includes the Standards of Conduct, a list of examples of infractions that may result in corrective action, up to and including termination of employment. The Standards of Conduct are only guidelines. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, and the Standards of Conduct is not intended to be all-inclusive or exhaustive. Abiding by the Standards of Conduct is necessary but is not sufficient for continued and successful employment at Amazon. The bar is much higher, and associates are expected to perform at a very high level in serving our customers. As an at-will employer, Amazon reserves the right in all circumstances to apply any level of corrective action as appropriate, up to and including immediate termination of employment, without prior corrective action or notice for conduct in either category or for conduct not described in the Standards of Conduct.

## Performance Evaluation

Managers and associates are strongly encouraged to discuss job performance and goals on an informal and frequent basis. Formal performance evaluations are typically conducted on an annual basis. Amazon or individual sites or departments may establish more frequent performance review periods. Performance evaluations become a part of your personnel file and may be used for future employment decisions and consideration such as transfers, promotions, compensation decisions, training, salary reviews, and corrective action.

## Internal Transfers and Promotions

Employees may apply for a voluntary internal transfer at any time. Employees who are not currently meeting performance standards must obtain manager approval before interviewing. More information regarding the Internal Transfer process is available from your Human Resources Business Partner or on the intranet at: Job Transfers

At Amazon, we have two types of promotions: Career Development and Open Position. A Career Development Promotion occurs when there is an increase in an associate's current job level within the same job family (for example, a move from Financial Analyst to Sr. Financial Analyst). For an associate to be promoted, the manager (1) must justify the business need for that position to be one job level above the associate's current level; and (2) must show that the associate has demonstrated the skills and competencies needed to assume the responsibilities of the new position. Career Development Promotions are reviewed on a calendared cycle.

An Open Position Promotion can occur when an associate applies and is hired into an approved, budgeted, and posted position that is one job level higher than the associate's current level. All associates must use the Internal Transfer Process to apply. More information regarding the Promotion process is available from your Human Resources Business Partner or on the intranet at:

Promotions

10

Owner's Manual and Guide to Employment – December 2017

Associates who are transferred or promoted to a new position sometimes receive a compensation adjustment to a level that is appropriate for the new position. A position change may also affect certain benefits (such as vacation accrual and benefit premiums), trading window restrictions, pay periods, and future pay increases or additional stock-based award grants.

**EXHIBIT 30**

## Dealing with the Public

To ensure that Amazon follows all rules applying to a public company regarding disclosure of information, the company has designated certain associates to represent the company to the public. No other associate should speak with media representatives on Amazon's behalf , even to answer apparently innocuous questions. Press inquiries and requests for interviews or public appearances by Amazon should be forwarded to the Strategic Communications department at 206-266-7180 (or x6-7180 when dialing internally). Financial inquiries should be directed to the Investor Relations department at 206-266-2171 (or x6-2171 when dialing internally) or ir@amazon.com. It is extremely important that all questions directed to Amazon are forwarded to one of the above departments, who are the company's only designated spokespeople.

Associates must always comply with Amazon's Confidential Information policy (see below in this Owner's Manual) by not revealing, confirming, or discussing confidential information without authorization. Nothing in the Owner's Manual prohibits non-supervisory employees' communications about wages, hours, or working conditions.

## Personnel Information and Records

The company maintains personnel records in personnel files, in payroll, and in several other forms (information stored electronically, etc.). The information the company maintains is needed by the company in conducting its business or is required by federal, state, or local laws.

Personal Information: Human Resources should be notified promptly of any changes in name, residential address, home telephone number, marital status, name of beneficiary, or dependents listed on your insurance policy, number of dependents for withholding tax purposes, or person to notify in case of an emergency. Most associates can make changes to this information by using our PeopleSoft self-service option located on the intranet at:

PeoplePortal

Associates who do not have access to the self-service option in PeopleSoft should notify Human Resources with such changes. Additionally, your manager will be provided with your home telephone number in the event he or she needs to contact you for business purposes.

Personnel files: Human Resources will maintain your personnel file. Your personnel file ordinarily will be made available to your manager and others with a need to know, such as a hiring manager if you apply for a new position internally. You may review your personnel file periodically, upon giving written request with reasonable notice to Human Resources. Personnel files are company property and may not be removed from company property. If you believe that certain materials in your personnel file are irrelevant, inaccurate, or obsolete, you may informally request their removal by speaking with HR or submit a written statement that may be included in your personnel file. You may also request copies of specific documents in your file. Seattle employees can contact the Employee Resource Center to schedule a time to review their file.

## Resignation

If you decide to resign from your employment at Amazon, we request that you provide at least two (2) weeks' notice. This will give your manager the opportunity to adjust his or her plans with the least amount of interruption to company work schedules. We encourage associates who resign voluntarily to submit such resignation in writing, with the reason for resigning and the effective date stated.

# Compensation

## Compensation

Hiring, retaining, and motivating talented, versatile, and driven associates are critical success factors for Amazon. Towards this end, Amazon seeks to compensate associates relative to the nature and extent of their contribution to the company's success, their responsibility and commitment to the company, and their skill level, all as measured in the context of market comparables. Amazon views all forms of rewards provided to associates, including cash compensation, equity compensation, health, and other benefits, as part of its total compensation package. If the company does well, associates will be well rewarded through their equity compensation, which is an important component of compensation over the long term.

In determining compensation for our associates, the company strives to attract and retain the best associates, reinforce ownership, emphasize performance and potential as a basis for rewards, recognize the need for global and flexible compensation approaches, and to filter our compensation decisions through our core values. Amazon's compensation philosophy is available from your Human Resources Business Partner or on the intranet at:

<p align="center">Compensation</p>

## Pay Periods and Direct Deposit

Hourly associates are paid every other Friday. Hourly associates' workweek starts at 12 a.m. Sunday and ends at 11:59 p.m. Saturday. Salaried associates are paid either monthly or biweekly; however, in some locations, the pay frequency may vary. More information regarding hourly and salaried payroll periods is available from your Human Resources Business Partner or on the intranet at:

<p align="center">Getting Paid in the U.S. FAQ</p>

Direct deposit of your paycheck into your bank account is available and encouraged. It is a fast, safe, and dependable way to put your money in the bank and, best of all, it is completely free. Your paycheck will be deposited into your bank account automatically every pay period. If interested, please fill out the appropriate form, which is available from your Human Resources Business Partner or through Employee Self-Service at:

<p align="center">https://portal.adp.com/public/index.htm</p>

## Payroll Deductions

Amazon is legally required to take certain deductions from every associate's compensation, including federal income taxes, state and local income taxes (where applicable), Social Security, and other mandatory withholdings. Associates are required to complete and change, as appropriate, a W-4 form indicating the number of allowances claimed for tax withholding purposes. In some cases Amazon may be required by law to make other deductions, such as garnishment and child support. The company will also deduct amounts authorized by an associate in accordance with the associate's benefit elections. Finally, at termination of employment, Amazon may also deduct from associates' last paychecks (where permissible) for items owed to the company, including but not limited to corporate credit card debt, negative vacation balance, lost equipment, or money owed to the company. If you have questions regarding payroll deductions, please contact your Human Resources Business Partner.

## Overtime Pay

Owner's Manual and Guide to Employment – December 2017

Only associates who do not qualify as exempt under federal or state law are eligible for overtime pay. Overtime must be approved in advance and will be paid at the rate of one and one-half times the associate's regular hourly rate of pay for all hours worked in excess of 40 hours during a workweek. Vacation, personal/sick, holiday, or other paid time off hours are not considered "hours worked" in the calculation of overtime pay.

## Travel Time Pay

> **EXHIBIT**
> **30**

From time to time, employees may be required to travel for work purposes. Non-exempt employees who are required to travel for work purposes are eligible for paid travel time in certain circumstances, consistent with applicable state and federal wage and hour laws. Travel time will be paid at the employee's regular hourly rate and will be used in overtime calculations. Non-exempt employees should refer to the Working Hours (Non-Exempt/Hourly) Policy for detailed information.

Exempt employees are not separately compensated for time spent traveling for business. More information regarding travel time pay is available from your HR Business Partner.

# Benefits

Amazon offers a comprehensive benefits package, subject to eligibility requirements. The company reserves the right to alter, amend, or terminate the benefits it provides at any time, at the sole discretion of the company, with or without advance notice.

For more information about your benefits, visit the Benefits Enrollment Tool. From an Amazon computer or network, go to benefits.amazon.com. From any other computer or network, go to amazon.ehr.com. You can also call the Benefits Service Center with questions at 1-866-644-2696. The Benefits Enrollment Tool will be ready for you to view about three days after your start date.

## Holidays

Information about Amazon holidays is found here. All U.S. employees can review each individual holiday policy on the U.S. Employment Policies & Guidelines page on Inside Amazon, here.

Please contact the Employee Resource Center  (ERC) if you have questions.

You can review your time off balances by accessing ADP at mypay.amazon.com when on the Amazon network or portal.adp.com from any computer outside of the network.

## Additional Paid Time Off

Vacation

Amazon believes that associates should earn and take vacation on a regular basis for their personal well-being and continued high performance. All regular associates working 20 or more hours per week accrue vacation during each pay period. Accrued vacation may be carried over from year to year up to 160 hours. There may be some limited exceptions for subsidiaries with legacy policies. Managers must approve vacation in advance.

For non-FC/CS employees working in California, and all A100 and Goodreads employees, please refer to the CA PTO policy. Employees working at Fulfillment Centers or in Call Center Operations are excluded from CA PTO.

13

Owner's Manual and Guide to Employment – December 2017

Paid Personal Time Off

Amazon will provide all regular associates who are expected to work more than 20 hours per week with paid personal time, to be used in the event of illness or other personal business. All regular associates who are expected to work 20 or more hours per week accrue paid personal time during each pay period, up to a maximum. The maximum amount is equal to the annual accrual corresponding to the associate's scheduled work hours. Accrued paid personal time off may not be carried over from year to year. Associates will lose their remaining paid personal time hours on December 31. In California, paid time off carries over per local law.

Some policies that apply only to Operations, FC or CS sites also exist. Check with your local HR team for other site-specific policies and processes or if you have any questions about any policies at Amazon.

For non-FC/CS employees working in California, and all A100 and Goodreads employees, please refer to the CA PTO policy. Employees working at Fulfillment Centers or in Call Center Operations are excluded from CA PTO.

Bereavement Time Off

Amazon provides associates up to three days of paid time off to attend a funeral or grieve if an associate suffers a death of an immediate family member. Immediate family members include your spouse, domestic partner, children (including step and foster children), parents (including step and foster parents), parents-in-law, grandparents, brothers and sisters (including step siblings), or special circumstances outside these relationships.

Jury and Witness Duty Time Off

Amazon provides up to ten (10) additional days of paid time off to associates if they are required to serve on a jury or are subpoenaed as a witness in a civil or criminal court case if they provide advance notice of their scheduled appearance date and a copy of the summons to serve as a witness or juror. Any paid time off provided under this policy is in addition to the paid time off regularly accrued by eligible employees.

Sick and Safe Time Required Notices

City of Saint Paul Earned Sick and Safe Time Ordinance (ESST). This ordinance requires employers to provide employees working in Saint Paul with paid leave that can be used for sick time (an employee or family member's medical or mental condition or preventive care) and safe time (reasons related to domestic violence, sexual assault, stalking, school closures due to inclement weather or public safety issues, for an employee or an employee's family member). Employers must grant at least 1 hour of sick/safe time per 30 hours worked in Saint Paul. Employees can accrue up to 48 hours per year and save unused time and carry over up to 80 unused hour per year. Accrual must begin on the 1st day of employment, and employees may start using sick/safe time after 90 days of employment. Employees must work 80 hours in Saint Paul to be eligible. Amazon may require an employee to provide written certification form a health care provider if use of sick/safe leave will exceed three days. Retaliation against employees for exercising any sick/safe leave rights is illegal. An employee who believes any of these rights have been violated may file a complaint in court and/or with the City of Saint Paul Department of Human Rights and Equal Economic Opportunity Labor Standards Unit. Contact options: 651-266-8900 | laborstandards@stpaul.gov | www.stpau.gov/esst | 15 W. Kellogg Blvd, Suite 280, Saint Paul, MN 55102.

City of Minneapolis Sick and Safe Time Ordinance. This ordinance requires employers to provide employees working in Minneapolis with paid leave that can be used for (a) a medical or mental health condition; (b) to seek services for domestic abuse, sexual assault, or stalking; (c) close of an employee's pace of business for public health reasons; (d) needs related to health, mental health, or physical safety of a child, spouse, domestic partner, parent, grandparent, or member of household; (e) unexpected closure of a family member's school or place of care, including for inclement weather. Employers may require advance notice as soon as practicable (but not more than 7 days), and reasonable explanation of need. Upon request, the

14

## EXHIBIT 30

Owner's Manual and Guide to Employment – December 2017

employer must provide information stating the employee's then-current amount of accrued sick and safe time and used sick and safe time. An employee who believes any of these rights have been violated may file a report with the City of Minneapolis Labor Standards Enforcement Division. Contact options: 350 S. Fifth St., Rm. 239, Minneapolis, MN 55415 | Call 311 | www.minneapolismn.gov/sicktimeinfo.

A complete overview of all the paid time off policies, including copies of each entire policy, is available from your Human Resources Business Partner or on the intranet at:

Paid Time Off Policies

## Leaves of Absence

Amazon recognizes that situations will arise that may require associates to be absent from work for extended periods of time. The company offers a variety of leaves of absences summarized below. An associate must apply for and Human Resources (or designated representative, i.e., MyLeave Services) must approve any leave request before it is authorized.

A complete overview of all the leave of absence policies, including copies of each entire policy and complete information on the effect of each type of leave on benefits and compensation, is available from your Human Resources representative, the Employee Resource Center or on the intranet at:

Leave of Absence Policies

Benefits during a Leave of Absence

Associates do not accrue vacation, holiday, or personal days while on an unpaid leave of absence, unless required by regulation. Associates also will not be provided an annual grant of paid personal time if their leave of absence occurs when such grants are made. Rather, associates will be provided their regular paid personal time grant upon their return to active work. Medical insurance coverage will typically remain in effect during the leave, although the associate may be required to pay the employee portion of the premium, the entire premium amount, or become subject to COBRA coverage, depending on the type and duration of leave. Each complete leave policy provides information as to the effect of the leave on each type of benefit.

Family and Medical (FMLA) Leave

Eligible associates may qualify for a leave of absence under the Family and Medical Leave Act (FMLA). Amazon provides eligible associates who are unable to work due to the reasons listed below up to 12 work weeks of unpaid, job-protected leave in a 12-month period:

- birth and care of your newborn child or adoption/foster care placement of a child in your custody;
- your own serious health condition including sickness or disability associated with pregnancy and/or childbirth;
- to care for your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, or parent with a serious health condition;
- for qualifying exigencies arising out of the fact that your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, or parent is on active duty or called to active duty as a member of the U.S. National Guard or Reserves in support of a contingency operation.
- In addition, eligible associates may qualify for up to a total of 26 work weeks of unpaid, job-protected leave during a single 12-month period to care for:
- your spouse, qualified domestic partner, child, qualified child of a qualified domestic partner, parent, or next of kin who is a current member of the U.S. Armed Forces, including the National Guard or Reserves, with a serious injury or illness incurred in the line of duty.

During your FMLA leave, you will receive health insurance benefits. Intermittent leave or a reduced work schedule is also available if it is medically necessary because of your or your family member's serious health condition or for military exigency leave.

15

Owner's Manual and Guide to Employment – December 2017

You may review the FMLA policy and your Rights And Responsibilities Under FMLA here:

<u>Leave of Absence Policies</u>

Medical Leave

If you are unable to work because of a medical condition affecting you and are not eligible for or have exhausted your leave entitlement under the Family and Medical Leave Act (FMLA), you may be eligible for a medical leave of absence. If you haven't received health benefits coverage for your medical condition during a prior FMLA leave, you're eligible to receive health insurance benefits until the end of the month following 12 weeks of leave.

Personal Leave

When you need time off, you ordinarily are expected to use paid personal time and vacation. Amazon may provide you an unpaid personal leave of absence when you need extended time off for personal reasons not covered under FMLA or medical leave. Prior to the start of your personal leave, you may elect to apply any or all of your accrued, unused vacation or paid personal time. Your manager or Human Resources representative also must approve any personal leave, and the company reserves the right to decline any request.

Military Leave

Amazon provides a military leave of absence to associates for military service, for training, and for examinations to determine an associate's fitness for military service in the regular Armed Forces, the Armed Forces Reserves, the National Guard, and the Commissioned Corps of the Public Health Service.

16

Owner's Manual and Guide to Employment – December 2017

# Company Personnel Policies

<table><tr><td>EXHIBIT<br>30</td></tr></table>

This section details some important company policies that concern your employment at Amazon. These policies help to define and clarify the company's expectation of you, and they help associates know what to expect from the company. If you have any questions about the policies presented in this handbook or about other employment policies, please feel free to contact the Human Resources department.

## Alternative Work Arrangements

In considering any request for an alternative work arrangement, the company must balance the need to achieve business priorities and objectives with an associate's need to balance personal responsibilities and work demands. In general, an alternative work arrangement is a privilege that may be granted under appropriate circumstances to associates in good standing and whose job responsibilities are suited to such an arrangement. Amazon will evaluate requests for alternative work arrangements on a case-by-case basis and retains discretion to change or discontinue such arrangements at any time. If approved, an associate's compensation, benefits, and other stock-based awards may be affected.

Types of Alternative Work Arrangements

The following are types of alternative work arrangements that Amazon may consider for an associate. Except for part-time work arrangements, these alternative work arrangements do not change the associates' job expectations or the amount of time an associate is expected to contribute to his or her work for Amazon. Associates on any alternative work arrangement may still be required to work additional hours and work during scheduled time off as necessary to meet business objectives.

- Flextime: An arrangement that permits managers and associates to agree to starting and quitting times within guidelines established by department management. Regardless of the associate's flextime schedule, the associate must be present during department designated "core" hours. An example of such an arrangement would be when an associate regularly works 6 a.m.-3:30 p.m.
- Compressed workweek: An arrangement that allows associates to compress their regular working hours into fewer work days by working longer days for part of the workweek, in exchange for shorter days and/or days off each workweek.
- Telecommuting: An arrangement that allows an associate to work from home or an alternate work site, for all or part of the scheduled workweek, through a formal written agreement with their manager. See Amazon's Telecommuting policy for more information.
- Part-Time Work Arrangement: An arrangement that allows an associate to voluntarily work less than a full-time schedule. See Amazon's part-time work arrangements policy for more information.

The company may determine that some positions, departments, or sites may not be eligible to participate in alternative work arrangements unless it involves a reasonable accommodation of a disability or work-related injury or illness. For instance, alternative work arrangements are generally not available for positions in fulfillment or customer service centers unless it is medically necessary or requested by the company. Check with your Human Resources representative to determine if any alternative work arrangements are available for your position, department, or site.

Because telecommuting and part-time work arrangements typically involve more logistical planning and consideration, each of these alternative work arrangements are described in greater detail in their own policy statement. Flextime and compressed workweeks are described more fully in the Alternative Work Arrangement Policy, which is available from your Human Resources representative or on the intranet at:

Alternative Work Policy

17

Owner's Manual and Guide to Employment – December 2017

## Code of Business Conduct and Ethics

In performing their job duties, Amazon employees should always act lawfully, ethically, and in the best interests of Amazon. To help employees understand and apply these principles, Amazon has developed the Code of Business Conduct and Ethics (the "Code of Conduct") which sets out basic guiding principles for all employees. All employees are expected to review the Code of Conduct and comply with its provisions.

Employees who a) have a question about the application of the Code of Conduct, b) believe that a violation of the Code of Conduct has or is about to occur, or c) are in doubt about how to properly act in a particular situation should promptly discuss the issue with their manager, anyone in their management chain or the Legal Department at (206) 266-1742. Employees may also raise questions or report suspected violations through the Amazon Ethics Line. Calls to the Ethics Line are answered by an independent third party and may be anonymous upon request. The Amazon Ethics Line may be accessed by dialing:

| Country | Ethics Line Number |
|---|---|
| Australia | 1-800-088-054 |
| Brazil | 0800-892-1581 |
| Canada | 877-781-2416 |
| China (Beijing) | 10-800-711-0538 |
| China (Outside | 10-800-110-0523 |
| Costa Rica | 888-402-9003 |
| Finland | 0800-91-5573 |
| Germany | 0800 589 4314 |
| Hong Kong | 800-933-699 |
| India | 000 800 440 2115 |
| Italy | 800-788 2784 |
| Japan | 800-7465 7465 |
| Singapore | 800-110-1567 |
| Luxembourg | 00 800 7465 7465 |
| Republic of Ireland | 800-7465 7465 |
| South Africa | 0800-980-054 |
| Spain | 900 814 521 |
| Sweden | 201 605 949 |
| United States | 877 781 2416 |
| United Kingdom | 800-7465 7465 |

In the following countries, dial the Direct Access Number to connect with the AT&T network, then dial the Ethics Line Number.

| Country | Direct Access | Ethics Line |
|---|---|---|
| Egypt (Cairo) | 2510-0200 | 800-505-2951 |
| Egypt (Outside Cairo) | 02-2510-0200 | 800-505-2951 |
| Morocco | 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 | 800-505-2951 |
| Romania | 0808-03-4288 | 800-505-2591 |

More information, including the entire Code of Business Conduct and Ethics, is available from your Human Resources representative and at the following links on the intranet:

18

Owner's Manual and Guide to Employment – December 2017

- Code of Business Conduct and Ethics
- Code of Conduct Frequently Asked Questions
- Gift Reporting Guidelines
- Gift Reporting Form

**EXHIBIT**
**30**

## Confidential Information

Customer information and proprietary information concerning the business of Amazon must be protected. Such confidential information or data is not to be discussed within the company or outside, except as the normal course of business makes necessary. Confidential information includes information about new products and services, transactions, financial data, ordering and shipping techniques, volume of shipments, lists of customers or suppliers, and any other proprietary information acquired through your employment with Amazon. The complete Confidential Information Guidelines and Policy is available from your Human Resources representative or on the intranet at:

Confidential Information and NDA Guidelines Policy

As a condition of your employment, you are required to sign an employee confidentiality agreement on or before your first day of employment. If, for some reason, you have not yet signed this agreement, please let your Human Resources representative know so that they may provide you with one to sign. This agreement grants Amazon exclusive rights to all proprietary information and inventions developed as a result of your employment with Amazon; requires you to maintain confidentiality of proprietary information; and restricts may restrict your ability to engage in competitive activities for 18 months after you discontinue employment with Amazon.

In some circumstances, the disclosure of employee information can create security or competitive risks. For these reasons, confidential employee information must be maintained with appropriate confidentiality. However, nothing in this policy prohibits non-supervisory employees' communications about their own or their coworkers' wages, hours, or working conditions. For more information, see:

Confidential Employee Information FAQ

## Cost Efficiency

One important factor in our long-term success will be our ability to keep costs low. Accordingly, we have developed guidelines for general spending and for travel and entertainment.

## Purchasing and Spending Authorization

All associates should understand and contribute to the company's philosophy of spending money carefully and wisely. Spending should be done conservatively, with the overall goal of spending money only in order to increase the value to our customers. Associates should plan ahead as much as possible, and purchases should be approved in advance of being made. The complete Purchase and Spending Authorization policy is available from your Human Resources representative or on the intranet at:

Purchase and Spending Authorization Policy

## Travel and Entertainment

Upon approval, associates will be reimbursed for reasonable travel, entertainment, and other expenses incurred in connection with company business. With manager approval, corporate credit cards may be issued to full-time regular associates strictly for business and travel purposes. Any associate who will travel or entertain for business purposes should review the complete Travel and Entertainment policy, which is available from your Human Resources representative or on the intranet at:

## Amazon Rental Vehicle Policy

The following is intended for all employees while driving in vehicles rented for use on behalf of Amazon. Renters must adhere to the conditions below and any violation of this policy may result in corrective action, up to and including termination of employment.

- ☐ Rental vehicles should be procured through Carlson Wagonlit with one of Amazon's preferred vendors: National/Enterprise or Avis.
- ☐ When operating a rental vehicle, Amazon employees are expected to behave as a reasonable person would under the same or similar circumstances.
- ☐ Vehicle operators must comply with Amazon's Drug & Alcohol Policy and all applicable laws when operating rental vehicles.
- ☐ Negligence or improper conduct leading to damage of the rental vehicles is prohibited. All vehicles must be maintained in accordance with the rental agencies' requirements.
- ☐ Any vehicle accident/injury must be reported immediately to Corporate Risk Management regardless of severity.
- ☐ Possession of dangerous or unauthorized materials, such as explosives or firearms, is prohibited.
- ☐ Drivers must be approved Amazonian business renters. Drivers are responsible for ensuring that all passengers act in accordance with this Rental Vehicle Policy for Amazon business or personal use.

Please reference the following Inside pages to understand Amazon's rental car and corporate travel policies.

- ☐ Rental Car
- ☐ Corporate Travel Policy

Use this Notice of Loss form for reporting an auto accident.

## Drug and Alcohol Use

Being under the influence of alcohol while at work or while engaged in work-related activities is prohibited. Alcohol may be served on company premises or at work-related events only when authorized by management. On such occasions, associates are expected to act responsibly, drink alcohol only in reasonable quantities, and make plans to avoid driving after drinking alcohol. The use or possession of illegal drugs or inappropriate use of prescription drugs while at work or engaged in work-related activities is also prohibited. Violation of this policy may lead to discipline, up to and including termination. Some departments, organizations, or sites may establish more detailed drug and alcohol policies, including policies pre-employment or other drug and alcohol testing. Some departments, organizations, or sites may prohibit alcohol at all company functions. Check with your Human Resources representative for local drug and alcohol policies.

## Employees with Disabilities

Amazon complies with the Americans with Disabilities Act and applicable state and local laws prohibiting discrimination in employment based on a person's physical, mental or sensory disability. All employment practices, employment decisions, and activities are conducted on a non-discriminatory basis. Amazon also will provide reasonable accommodation for qualified individuals with a disability where medically necessary to perform one's job, except in cases in which the reasonable accommodation would create an undue hardship or a health or safety risk would exist.

If you have a disability that affects your ability to perform your job and you feel you need an accommodation, please contact your manager or Human Resources Business Partner. Amazon will work with you to determine

## EXHIBIT

## 30

Owner's Manual and Guide to Employment – December 2017

if a reasonable accommodation is necessary and appropriate. The company may request medical certification to verify the existence of a disability or work restrictions, to identify potential reasonable accommodations, or to determine any safety or health risks. In addition, Amazon may contact your healthcare provider(s) in appropriate situations. Amazon will treat information regarding your medical conditions and restrictions as confidential, except to the extent your manager or other individuals need to know about your medical situation to help with the reasonable accommodation process.

## Employment Outside of Amazon

Amazon does not allow outside employment without written approval from your manager. Holding another job may adversely affect job performance, efficiency, and/or attendance. If an associate finds it necessary to seek outside employment, the associate must discuss this matter with his or her manager and gain written approval from a department vice president or fulfillment center general manager. Failure to obtain written approval to hold outside employment may be grounds for discipline, up to and including termination of employment. If approval is granted and your manager later determines that your outside employment conflicts with your performance or company interests, you will be requested to stop such activity immediately as a condition of continued employment. Some sites may permit outside employment for hourly associates during low volume cycles or as business interests dictate.

## Employment of Relatives and Friends

Although preferential treatment in employment of relatives and friends is not permitted, we do encourage associates to refer qualified applicants for any open positions. To minimize the potential for actual or perceived conflicts, Amazon does prohibit direct or indirect supervisory relationships between relatives, except in unusual circumstances.

## Employment References

It is Amazon's policy to provide prospective employers with only the dates of employment and positions held by former associates. An associate may also request that Amazon provide additional information regarding his or her work performance to prospective employers who request such information. Any associate who requests additional information beyond dates of employment and positions held must sign the authorization form attached to the policy before any information will be communicated to a prospective employer. Managers who receive requests for an employment reference must first confirm with Human Resources that an authorization form has been signed by the associate before providing a reference. The complete Employment Reference Policy and authorization form is available from your Human Resources representative or on the intranet at:

<u>Employment References</u>

## Equal Employment Opportunity

Amazon firmly believes in equal employment opportunity for all and the importance of each associate as an individual. It is the policy of Amazon that there will be no discrimination against any associate or applicant for employment on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, the presence of any physical, sensory, or mental disabilities, or other legally protected status. This policy pertains to all personnel-related activities, including selection, hiring, benefits, work schedules, promotions, demotions, transfers, recruiting, advertising, reductions-in-force, terminations, and all forms of compensation and training. A strong commitment by each associate is necessary to ensure equal employment opportunity for all.

Any associate who believes that he or she has been discriminated against or has suffered from harassment or retaliation for reporting discrimination or harassment should report it to his or her manager, or to any member of management at Amazon, or to Human Resources. Upon receipt of the complaint, the company will conduct a prompt investigation and will take appropriate corrective action as may be warranted.

20

Owner's Manual and Guide to Employment – December 2017

Amazon will not tolerate or permit any associate to suffer retaliation of any kind or to suffer any adverse employment action as a result of reporting an unlawful discrimination or harassment claim. Amazon will not discharge or in any other manner discriminate against employees or applicants because they have inquired about, discussed, or disclosed their own pay or the pay of another employee or applicant. However, employees who have access to the compensation information of other employees or applicants as a part of their essential job functions cannot disclose the pay of other employees or applicants to individuals who do not otherwise have access to compensation information, unless the disclosure is (a) in response to a formal complaint or charge, (b) in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or (c) consistent with the contractor's legal duty to furnish information.

## Health and Safety

Amazon places a high value on the health and safety of its associates. As part of its commitment to providing a safe workplace for all associates, Amazon complies with all applicable regulations and has adopted a core safety policy that no task is so important that an associate must violate a safety rule or put themselves at risk of injury or illness in order to get it done. Ensuring a healthy and safe work environment is a responsibility that must be shared equally by each associate. Associates are encouraged to actively participate in identifying ways to maintain a safe and healthy workplace. All managers are responsible for the safety of their associates and are expected to monitor the workplace for unsafe conditions, procedures, or behaviors and take prompt action to eliminate any hazards.

## Safety Programs and Training

Amazon has developed an extensive safety program that is regularly reviewed and improved. During their orientation, associates receive important information about safety procedures as appropriate for their site. Business groups or separate sites may develop and publish safety procedures, guidelines, or rules specific to their operations or site. The safety policy for our fulfillment centers, for instance, is available from your Human Resources representative or on the intranet at:

Safety, Health, & Environmental Policies

Where appropriate, Amazon also provides regularly scheduled safety training that provides guidelines on safe work practices to minimize workplace hazards. Associates are expected to be aware and comply with general safety guidelines, as well as the policies and procedures that pertain to each work site, and to use safe equipment, proper protective equipment, and the proper tools that are appropriate for each job.

## Reporting Accidents and Concerns about Workplace Safety

Associates are responsible to and should immediately report any accidents or unsafe work practices to their immediate manager, Safety manager, Human Resources, or any member of Global Security. In the event of a work-related accident that results in injury or illness, associates must immediately notify their manager, Human Resources, and Global Security. Such reports are necessary to comply with federal and state laws and to initiate insurance and workers' compensation benefits coverage for the associate's medical expenses and lost salary. Associates will be required to complete an "Employee Report of Incident" form and sign a copy of their "Supervisors Incident Investigation Report of Injury" form. These forms are available from your Human Resources representative or on the intranet at:

Accident Reports

No retaliation of any kind will be permitted or tolerated against an associate for making a workers' compensation claim or reporting unsafe work practices. If associates believe that they have been retaliated against, they should report this immediately to their manager or to their Human Resources Business Partner.

| EXHIBIT 30 | Owner's Manual and Guide to Employment – December 2017 |

For more information regarding work place injuries, including state specifics, please follow the link below:

Workers' Compensation Information

## Information Security

This is a summary of the Amazon Information Security Policy that sets forth the rules that associates must abide by as a condition of being provided access to the company's technology and information assets. The complete Information Security Policy and related policy documents address a wide variety of important, practical issues, including the use of instant messaging and handheld devices, protecting your passwords and the company's network, and other information security issues. You are strongly encouraged to review the complete Information Security Policy, which is available from your Human Resources representative or on the intranet at:

https://policy.amazon.com

General Security Questions

Policy Specific Questions

## Privacy

All email correspondence and other computer files created, stored, or transmitted on the company systems and all traffic generated on the company's network is the property of the company. While we will attempt to respect an associate's privacy, company management may access or monitor files, keystrokes, network traffic, and communication channels as circumstances warrant. Associates are expected to exercise discretion and good judgment and to demonstrate respect for each other's privacy and for company confidential information. Associates should not access any data beyond what they need to get their job done. Access to data other than that in one's own home directory or a shared department directory should be performed only with the explicit permission of the owner of that directory or when instructed by a manager. Similarly, associates should not sign up for any business-related list whose content is not appropriate for their job.

## Acceptable Use

The company provides some associates with computers and computer accounts for work-related purposes to perform job duties and to assist in intra-company communication. A computer account gives you access to the company's computer and email systems, as well as access to the Internet. Associates may only access the company network from centrally-managed (through "SMS" or "cmf") computers that comply with the *Desktop/Laptop Security Policy* (see: https://infosec.amazon.com/?ComputingDevices). As a condition of this access, associates are expected to respect the obligations and responsibilities associated with having a company computer account. Associates are also responsible for ensuring that electronic communication is effective, ethical, and lawful. The use of abusive, offensive, or profane language is prohibited. Fraudulent and obscene messages, or harassment of any kind, are also prohibited. Please keep in mind that associates' activity on the Internet reflects on the company.

Protecting Data and Securing Access to the Company Network

Users are responsible for taking all steps to protect information and secure access to the company network, including the following:

☐  Passwords and Accounts

o  You are responsible for keeping your password private. Don't disclose your passwords to anybody.

30

Owner's Manual and Guide to Employment – December 2017

- o   Don't share your account (e.g., don't allow others use of your account).

- Email and Sharing

  - o   Never forward your email outside of the company (e.g., using a forward setting).

  - o   Never store any company data on a computer system outside the administrative control of Amazon (e.g., your home computer). Certain applications (including POP e-mail clients, etc.) store data locally and thus must not be used on personal, non-Amazon-issued computers.

- Computing Devices and Network Access

  - o   Any new connection or change to the company network (the data network that connects all our locations) must be approved by both Information Security (https://sword.amazon.com) and Network Engineering (network-eng@amazon.com).

  - o   Never connect an unauthorized modem, wireless card or other network device to any Amazon computer or network.

  - o   Never download and install unauthorized software (including Java applets and ActiveX controls) on your system. Note: While there is not a single list of authorized software for all users, for the majority of users is recommended to only install software that is approved by IT Support (deskside@amazon.com).

- Customer Data and Security

  - o   Never circulate customer information in electronic form other than by customer or order id. If you escalate a problem, refer to order nnn-nnnnnnn-nnnnnnn or to customer number nnnnnnn rather than to the purchase of "Item" by customer "CustomerName."

  - o   Always report unusual patterns in systems or network performance immediately (either to your department escalation point or to the IT operators at (206) 266-2187).

  - o   Always report a suspected security compromise immediately (see https://w.amazon.com/index.php/Infosec#ReportanInformationSecurityIncident)

## Reporting Violations

Violations of the Information Security Policy must always be reported through a secure ticket to Information Security.

Violations should never be discussed with anyone outside Legal and Information Security unless approved by one of them.

Secure Ticket to Information Security

## Insider Trading

Because Amazon is a public company, we are subject to a number of legal requirements, including a prohibition on insider trading. Federal law prohibits any of the company's employees, directors, or consultant's associates, directors, or consultants from trading in Amazon securities based on material, nonpublic information. This means that if you have material information that has not been disclosed to the public by the company, you may not buy, sell, or enter into any other type of transaction involving any Amazon securities, including Amazon common stock. You may not give material nonpublic information to friends or family members or to any other third parties. Nor may you advise friends or family members or any other third parties to trade based on material nonpublic information. Certain associates and members of their households are also prohibited from trading in Amazon securities during certain periods each quarter, generally beginning

30

**EXHIBIT**

**30**

Owner's Manual and Guide to Employment – December 2017

on the first day of the last month of the company's fiscal quarter and ending on the third day following the quarterly earnings announcement. In addition, there may be other periods that associates are prohibited from trading that the company will announce from time to time. Certain associates are also required to pre-clear all transactions involving Amazon securities with the legal department.

In addition to being against our policy, insider trading is against the law. The federal penalties for insider trading include large fines and jail time. Every associate should review and become familiar with Amazon's complete Insider Trading policy, which is available from your Human Resources representative or on the intranet at:

<u>Insider Trading Guidelines</u>

## Physical Security

### Badges and Other Important Information

Associates and other outsourced employees (contractors, vendors, etc.) must wear their ID/access badges in a visible manner at all times on company property and at company events. Visitors must check in with Security or Reception, be issued a visitor badge that should be worn in a visible manner, and be escorted while on company property. If associates see someone on company property without appropriate identification, they should either alert Security or ask the individual to show their identification.

Associates should also safeguard their access cards, codes, keys, passwords, computers, and other valuable property and equipment. Associates should not circumvent ordinary security systems or procedures and should report vulnerabilities to Amazon's security systems. It is the responsibility of each Amazon associate to adhere to all physical Security policies, procedures, processes and instructions given by a member of the Security staff in order to safeguard the relationship of trust with customers and employees alike. Other specific expectations regarding security are available from your Human Resources representative or on the intranet at:
<u>http://globalsecurity.amazon.com/</u>

You are encouraged to review these and other security policies relevant to your workspace at:
<u>http://policy.amazon.com/</u>

## Workplace Emergency Response

Associates are expected to treat each other, contractors, customers, and visitors with courtesy and professionalism. Amazon will not tolerate violence, threats of violence, or other intentional or reckless conduct by anyone that harms or threatens the safety of associates or others. Any associate who observes or experiences conduct that violates this policy or any situation that has a potential risk of workplace violence, should immediately report it to a manager, Human Resources, Safety manager, or any member of Global Security. Global Security can be contacted 24-hours a day by calling (206) 740-SAFE (7233) or visit the <u>Business Assurance Center</u> page on Inside Amazon. <u>Emergencies and imminent threats of harm should be reported immediately to the police or other emergency personnel by dialing 911.</u>

The complete Workplace Emergency Response policy is available from your Human Resources representative or on the intranet at:

<u>Workplace Emergency Response</u>

## Inspections on Company Premises

To provide a safe workplace and to protect associate and company property, the company reserves the right to conduct a search of any area on company premises. This includes an associate's office, workspace, or locker. The Company also reserves the right to inspect personal articles carried to or from Company premises.

30

These articles may be accessed by authorized personnel of the Company, who may enter your office, workspace, or locker in order to do so. Typically, the Company will conduct searches on Company premises when it receives a report of or suspects a violation of the Company's Standards of Conduct. However, the Company reserves the right to inspect for any purpose. The Company also may use various electronic detection devices, such as walk-through or hand-held metal detectors. Refusal to permit the company to conduct the searches identified in this section may lead to disciplinary action, up to and including termination of employment.

## Solicitation

The orderly and efficient operation of Amazon's business requires certain restrictions on solicitation of associates and the distribution of materials or information on company property. This includes solicitation via company bulletin boards or email or through other electronic communication media.

The following activities are prohibited:

- Solicitation of any kind by associates on company property during working time;
- Distribution of literature or materials of any type or description (other than as necessary in the course of your job) by associates in working areas at any time; and
- Solicitation of any type on company premises at any time by non-associates.

Examples of prohibited solicitation include the sale of merchandise, products, or services (except as allowed on forsale@Amazon alias), soliciting for financial contributions, memberships, subscriptions, and signatures on petitions, or distributing advertisements or other commercial materials.

The only exceptions to this policy are communications for company-sponsored activities or benefits, or for company-approved charitable causes, or other specific exceptions formally approved by the company. All communications under these exceptions must also have prior approval of Human Resources. Violation of this policy may result in immediate disciplinary action, up to and including termination of employment.

## Transitional Work

In the event you are temporarily unable to perform your job due to a work-related injury or occupational disease, we hope to assist you in obtaining proper treatment and returning you to your regular job as soon as possible. If you are unable to immediately return to your regular job, we will attempt to return you to temporary transitional work if it is consistent with your medical restrictions and consistent with Amazon's business needs. This policy outlines the procedures for notifying the Company concerning your condition to assist in your return to work. By this joint effort, Amazon hopes to help associates recover at a rapid rate, retain productive value, and reduce unnecessary medical costs. The complete Transitional Work Policy is available from your Human Resources representative or on the intranet at:

<p align="center">Transitional Work Policy</p>

## Workplace Harassment

At Amazon, we believe that our associates should be treated with respect and dignity. Therefore, we will not tolerate inappropriate conduct, including discriminatory harassment, of any kind based on race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities, or other legally protected status.

Conduct prohibited by this policy is unacceptable in the workplace and in any work-related setting outside of the workplace, such as during business trips, business meetings, or business-related social events. This policy applies to the conduct of all Amazon associates as well to the conduct by or toward non-employees involved in our business, such as subcontractors, consultants, clients, customers or vendors. This policy is intended to be consistent with federal and state laws prohibiting discriminatory harassment in the workplace.

<p align="center">30</p>

## EXHIBIT 30

Owner's Manual and Guide to Employment – December 2017

**Anti-Sex Buying Policy**

It is against Amazon's policy for any employee or Contingent Worker to engage in any sex buying activities of any kind in Amazon's workplace or in any work-related setting outside of the workplace, such as during business trips, business meetings or business-related social events. It likewise is prohibited to engage in sex buying activities in using any company property, equipment or software (including, without limitation, company credit cards, expense accounts, buildings, parking lots, grounds, computers, storage devices, websites, social media channels, networks, vehicles, and phones). This prohibition applies regardless of whether the activity is legal or tolerated in a particular jurisdiction, foreign or domestic.

## Sexual Harassment

One type of harassment prohibited by this policy is sexual harassment. Sexual harassment generally consists of unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when (1) submission to or rejection of such conduct is the basis for employment decisions affecting an applicant or associate; or (2) such conduct has the purpose or effect of creating a sexually offensive, hostile, or intimidating work environment that interferes with an individual's ability to perform the job.

Examples of sexual harassment include, but are not limited to:

- requests or demands of sexual favors in exchange for favorable or preferential treatment;
- sexual jokes or use of sexually explicit language;
- unwelcome or unwanted physical contact;
- sexually degrading words used to describe an individual;
- sexual comments injected into business communications;
- the communication of sexually offensive material via electronic mail or voice mail;
- graphic verbal comments about an individual's body;
- physical or verbal abuse of a sexual nature;
- unwelcome sexual flirtations, advances, or propositions; and
- downloading, circulating, or displaying in the workplace, sexually suggestive objects and/or pictures, including such material from the Internet.

## Other Harassment

Workplace harassment prohibited under this policy is not limited to sexual harassment. Statements or actions that offend or demean an individual based on his/her race, religion, creed, color, national origin, citizenship, marital status, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities are also inappropriate and are strictly prohibited.

## Work-Related Exposure to Potentially Offensive Materials

In many areas of our business, we create, market and distribute products and programming that is adult themed, sexually explicit, or includes images and speech related to personal characteristics such as race, religion, sexual orientation, gender, gender identity, national origin, disability, and age. Associates may be exposed to materials that some may consider offensive. While this exposure is often unavoidable in our work environment, harassing conduct directed at someone because of any protected personal characteristic is strictly prohibited. Associates should discuss any concerns about the nature of our business or their work environment with their supervisor, a department manager, or Human Resources.

## Consensual Relationships

At times, consensual, romantic and/or sexual relationships between co-workers may occur. When such a relationship is between an associate who has supervisory authority and one who does not, an actual or perceived conflict of interest may exist. Therefore, these situations should be avoided. If such relationships arise, they will be considered carefully by Amazon, and appropriate action will be taken. Such action may

30

include a change in the responsibilities of the individuals involved, re-assignment or transfer of location within the Company, or termination of employment.

Additional information for the Fulfillment Center and Customer Service location is available here:

Consensual Relationship Policy

## Responding to Inappropriate Conduct or Possible Incidents of Harassment

All associates, regardless of position, are responsible for ensuring that our workplace is free from offensive behavior and harassment. Associates who observe or experience inappropriate or harassing conduct in the workplace by anyone, including supervisors, coworkers, customers, or visitors, may advise the offender that their behavior is unwelcome and request that it stop. In addition, associates who encounter such behavior should report it immediately to their supervisor, to a department manager, or to a Human Resources Business Partner. It is important that associates feel comfortable reporting such incidents; therefore, no retaliation of any kind will be permitted or tolerated against an associate for reporting a suspected incident of harassment. If associates believe that they have been retaliated against for making a good faith complaint of harassment or discrimination, they should report this immediately to their supervisor, a department manager or to a Human Resources Business Partner. You can locate your appropriate Human Resources Business Partner through the following link on the intranet:

https://contactstool.amazon.com/

Amazon will promptly investigate any reports of workplace harassment or inappropriate conduct and will enforce appropriate disciplinary action where necessary. To the extent possible, the associate's privacy, and that of any witnesses, as well as of the alleged harasser, will be protected against disclosure, except as necessary to conduct the investigation.

Prompt, corrective action will be taken when appropriate. This action may include disciplinary action such as a warning, reprimand, reassignment, temporary suspension with or without pay, or termination of employment, as Amazon believes appropriate under the circumstances. False complaints of harassment, discrimination, or retaliation that are not made in good faith may be the subject of similar appropriate disciplinary action.

# Appendix - Standards of Conduct

## Standards of Conduct

The Standards of Conduct are a list of examples of infractions that may result in corrective action, up to and including termination of employment. The Standards of Conduct are only guidelines. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace, and the Standards of Conduct is not intended to be all-inclusive or exhaustive. As an at-will employer, Amazon reserves the right in all circumstances to apply any level of corrective action as appropriate, up to and including immediate termination of employment, without prior corrective action or notice for conduct in either category or for conduct not described in the Standards of Conduct. Employment with Amazon is at the mutual consent of Amazon and the associate, and either party may terminate that relationship at any time, with or without cause, and with or without advance notice.

Category 1

The following work conduct infractions are regarded as extremely serious, and termination of employment may result following one offense:

- ☐ Disrespect or rudeness to an Amazon customer
- ☐ Theft or inappropriate removal or possession of property

30

Owner's Manual and Guide to Employment – December 2017

- Assaulting, threatening, intimidating, coercing, or interfering with supervisors or fellow associates
- Making unauthorized statements on behalf of the company to the press or in any public forum (as only the company's authorized spokespersons may make authorized statements)
- Use or possession of dangerous or unauthorized materials such as hazardous chemicals or explosives, or use or possession of firearms, knives, explosive devices of any kind, or weapons of any kind
- Violation of the company's Health and Safety policy including possession, distribution, sale, transfer, or use of alcohol or illegal drugs in the workplace, while on duty or on breaks, or while operating employer-owned or leased vehicles or equipment
- Fighting or threatening violence in the workplace
- Gross misconduct
- Gross negligence
- Sexual or other unlawful or unwelcome harassment
- Making, publishing, or repeating knowingly or maliciously false statements concerning an associate, the company, or its products
- Discriminating against a fellow associate or prospective associate on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity[1], veteran status, political ideology, ancestry, or the presence of any physical, sensory, or mental disabilities or other legally protected status
- Negligence or improper conduct leading to damage of employer-owned, employer-leased, or customer-owned property

- Insubordination or intentional disregard of instructions
- Falsification of personnel or other company documents/records, including employment application
- Unauthorized removal of company documents
- Unauthorized disclosure of business "secrets" or confidential information
- Intentionally making entries on another associate's time card/sheet, or falsely altering a timekeeping document
- Leaving company premises without permission during assigned work hours (unpaid meal periods are not "work hours" for purposes of this policy)
- Failure to fully cooperate with company investigations (except for questions regarding labor organizations or protected concerted activity)
- Violation of safety policies, procedures, standards, regulations, or laws
- Creating a hazardous or dangerous situation
- Engaging in any conduct that places the health and safety of any person at risk
- Violation of personnel policies
- Violation of security policies, procedures, processes, or instructions
- Violation of the Anti-Sex Buying Policy.

**EXHIBIT 30**

Category 2

The following work conduct infractions are considered serious and generally result in corrective action:

- Unauthorized absence, excessive absenteeism, or any absence without notice
- Failure to carry out a work assignment in an efficient, responsible, and acceptable manner
- Abusive, vulgar, or harassing language to a supervisor, fellow associate, or vendor
- Failure to adhere to starting time, quitting time, or break time policies, or wasting time
- Unauthorized use, misuse, or abuse of equipment, products, material, or property belonging to other associates, belonging to the company, or in the company's custody
- Leaving a company-assigned work area during scheduled working hours without permission
- Violations of the no-solicitation, no-distribution policy
- Creating or contributing to disorderly or unsanitary conditions
- Failing to report or remedy any unsafe conditions, procedures, or behaviors
- Failure to immediately report an accident/injury, regardless of severity, when it occurs on company property, or while performing company business

---

[1] Updated on 12.30.08 (EEO, Workplace Harassment, Other Harassment, Category 1 discrimination)

30

Case: 2:25-cv-00674
Assigned To : Romero, Cecilia M.
Assign. Date : 8/12/2025
Description: Velasquez v. Amazon.com
Services Inc.

FILED US District Court-UT
AUG 12 '25 AM 09:48

### PLAINTIFF'S UNSWORN AFFIDAVIT OF VICTIMHOOD

Pro Se Narrative Work for Background

and Cause of Action Against Amazon.com Services Inc.

1.  I first began work at Amazon LLC in Salt Lake City, UT in October 2018. I was hired 10/31/2018 for Part-Time/Seasonal labor at an Amazon facility labeled "DUT1" wherein I was contracted to do any of several ordinary tasks in Amazon fulfillment.

2.  The building was a completely contiguous space excepting the Site Manager's Office which had a window and door, the Conference Room, the Lactation Room, the Ablution Room, and the Network Closet (a locked room with critical Internet Technology). The Human Resources agency was open-air, a set of tables near the cafeteria/breakroom and Management/Conference Offices.

3.  Actual delivery companies are Private Contractors who network through Amazon LLC., and were positioned next to an indoor Maintenance and Materials cages, toward the center of the room and near the front.

4.  The front entrance is located on the North side of the building, and is electronically locked through a security system, and along the sides of the building are about forty east and west facing terminals for loading and unloading of delivery trucks, the dock is at the south side. The building is less than 1000 meters in length with about 1.5 foot thick concrete walls, and the ceilings are about 125 feet high.

5.  People walking into the building will notice several high pilons, jointed pilons for earthquake and wind resistance, and vertical pilons. There are high electric ceiling fans about thirty-feet in diameter positioned on the ceiling, and also high gas furnances. A 40-feet high roll of insulation is wrapped around the entire interior of the building so that the

1

interior appears white-colored, and unexposed. The building appears as a single bright column when standing anywhere within it, the floors are concrete and have a lustre, reflect light and form.

6. Most of the building is filled with a conveyance systems with its headwaters at the dock, and filters North toward the Entrance.

7. Some background on the work, and the work-site: "DUT1" was a self-contained and original Amazon LLC warehouse at 2291 COMMERCE CENTER DR STE 400. in Salt Lake City UT, 84104. The site was a ground-lease, and was described to me by one supervisor there as an older "iron-sides" type site. Meaning it had been installed in an ad-hoc manner on a ground-lease, and could operate at any scale and be modified to meet demand, but was not designed *for* AMAZON.

8. "DUT" is a common abbreviation for Amazon distributions facilities in the Utah valleys; "DUT1" was effectively the *first* general distribution center owned and operated by Amazon LLC for deliveries from its internet front end, "Amazon.com."

9. I obtained my first promotion in 2019 from Part-Time/Seasonal to Fulltime in Winter-Spring 2019.

10. At Amazon LLC the labor Associate obtains a "Blue Badge" for building access and may discard a "White Badge" which at the time only had a blue border with a white interior, a picture of the Associate, the Associate's corporate alias, and the Associate's actual full name.

2

11. I submitted to the company a limited complaint over Associate rights to gain Full-Time employment before the opportunity was announced, and received the Blue Badge with the first batch of hires from the Holiday Season.

12. I worked Nights, originally from 6PM to 10PM, and then the worksite transitioned to Full-Time 40+ hour weeks.

13. At the time of my initial employment I was not very invested in the work-site. I was instead working to fund a Pro Se civil litigation in Federal Court.

14. The work-place culture was more hidden from view; as a part-time Associates I did not have any technical details for daily work, and did not have any important interaction with leadership. Instead, I felt it simply had a virtuous intent.

15. The management culture in that period was different as well; it was actually a different *era*: an era of Second-class status for entry-level people. Amazon managers at the time on hire/promotion were vested stock options, and "Blue Badge" matriculations were granted a privilege for Benefits; it was maybe a vestigial of dot-com culture. It was only after the COVID-19 crisis that benefits became mandatory for Part-Time associates.

16. People came and went, and I stuck around largely because the civil litigation I had filed kept running into political snags; *Fraud on the court*, Federal Rule of Civil Procedure 60(d) provides sections (1) and (3) grant relief for some kind of *fraud* in the court's transaction. Such a civil question largely amounts to a Perjury (18 U.S. § 1623) quest, and evaluating results of a patently False Declaration (18 U.S. § 1001) in the written transaction. The

*constitutional* object of it is to prevent Federal officers from treating the U.S. Court system like a Parliament.[1]

17. The rule is meant to protect the civil rights of pleaders with any efficient standing, and may really be designed to correct and punish any kind of Bad Behavior. It is not really in practice in the United States of America, we think because there is ambiguity in politics of Authority under the Constitution, so many people have a living conviction there are not "Guarantees" to our "Social Contract."

18. The case was suffered repeated criminal delays and so I took the Full-Time position, and worked into 2019 and 2020.

19. I did not build a critical savings plan, or 401k option because I expected my legal case would be resolved in my favor, the object was pretty well-defined. And even if, in the unlikely event of it, I was unsuccessful, the matter would be resolved so efficiently that I would not be in suspense.

---

[1] Three cases involved in this unresolved question, District of Utah Case Nos. 2:18-cv-00728; 2:21-cv-533; 2:23-cv-00133; Judges Nuffer, Benson, Nielson, and Bennet. This is a matter of major concern where *fraud on the court* is a realized problem for the victim; the Federal Officers committing crimes against the plaintiff will hypersensitize this proceeding where these new Defendant parties, whom will have shown a criminal allegation against, will learn of their opportunity to conspire to commit a further to compare improper influence. In essence, the more *standing* I can show, the greater the political threat I can be to any of the Defendant parties.

4

20. My original goal was to transfer to the University of Utah. I was already older then, about Thirty-Five years old. Two years before I had been in published the Salt Lake Community College in their literary magazine and so things were looking up Academically, while I basically had too many delays completing school otherwise.

21. I ran into legal troubles which precipitated the legal action discussed above. The end result was that instead of transferring to the state University from the city college and working, I was caught up in working and being the victim of Political Fraud which I could not discuss with anybody at work, because the work place policy does not appreciate political context.[2] Generally, at each wrongful disposition I found *confidence* in the work place was attacked, and I still feel these repeated offenses from within AMAZON LLC were precipitated by constitutional *breach of confidence* in these several U.S. Courts venues; *confidence* and *confidentiality* are not always different things *within the same forum*, and instead are intended to be toward uniform where *discretion* is paramount.

22. But Judicial Malpractice is *unheard of* outside what I imagine are very close legal circles, and the personal disposition sensitized and impacted my workplace plans. Suddenly my temporary confidence was deflated and I was instantly vulnerable to criticism and social distancing. My plans for a 90-180 day stint as "Stower" at AMAZON LLC were instantly covered by a Fog of War based in the months-long deliberation over the Political Fraud committed against me.

---

[2] Amazon holds Code of Conduct, Leadership Tenets, and Human Resources Practices to define a constructive workplace culture, "Work Hard, Have Fun, Make History!"

5

23. Those Months became years, and my financial insecurity led me to take promotions. I simply did not want to stagnate after more than a year of being an Amazon associate, while I proceeded through appeals cycles, time after time, finding my own real arguments and positions vindicated in all the settled law of the nation, while the Judiciary lied and secretly asserted some form of incompetence. I had no actual reason to take a different course of action.

24. Many people have a "non-political" policy for certain kinds of discussions, sometimes U.S. Courts are those kinds forums. But in actuality it is a factor to consider as *why* so many people discriminated against me the way they did; disfavor of political discussion usually has a roundabout *punitive* and/or *discriminatory* bent because of the historical influence of *contract law* over legalism in general. So I always felt that talking about "Pro Se Petitioning" would result in disfavor and discrimination; plus, it has often been good advice NOT to talk about pending litigation.

25. I can recall violating the rule at Amazon LLC only a handful of times, usually with Associates I was friendly with who did not make any complaint. In one instance I accused a Second Amendment advocate of "raping the constitution;" the second amendment is not plainly a constitutional restatement than is a conferential interposition, and is sometimes treated as implied right to breach the constitution of the country. The Federalist will already see that as *breach of confidence* in terms of meritocratic entitlement; the U.S. constitution does not advocate *strict remedialism*, where we presume that *civil rights* must be *prescribed* in all their capacities in order to sustain *textualist* methodology.

26. In any event, I was gainfully employed there without much change in my work process all the way until the start of the Pandemic in 2020. I had recognized I was going to be in for awhile at Amazon LLC, and that I had better take a promotion given how significant the delay had become—so I applied for an Ambassador role, was first denied it, and then it was handed to me after the previous site Ambassador had made some critical error and had the status revoked.

27. I took it up and operated mostly to attempt to be helpful, and encountered all kinds of different political attitudes about work. Some people are loyal to particular leadership, or cliques, and refuse to take instructions and only will assist. Others would participate directly in meeting leadership oriented goals, some attempt to be physically or verbally intimidating, while others are invested attitudes and terms like "Emotional Intelligence" and "Cooperation." It simply seems to depend on where a person is at in his or her life.

28. The Ambassador role in that time had three major parameters: (1) COVID-19 Testing, and (2) "Stow Master" and low-level Supervisory process; (3) New Hire Training.

29. The work process was then called "Sortation," is a technical term in delivery logistics which defines sorting out usually thousands of shipments by delivery region prior to loading delivery vehicles. The work-site would process for eight-hours shipments that were scheduled for the delivery *per diem*.

30. The remaining two-hours were devoted to "Pick and Stage" wherein closed vinyl sortation bags were *picked* and placed into specific delivery manifests by computer, and *staged* at an appropriated zone for pickup by an Amazon LLC contracted delivery driver.

31. Operations at the time were divided into Categories, with two different schedules; (1) Under the Roof ("UTR") Sortation, and (2) On the Road ("OTR") Outbound-Delivery. Respectively, *last-mile* and *final-mile* logistics. The Sortation process was comprised of an early AM shift starting just before Midnight, and a second Morning shift beginning about 6AM, while the OTR shift began around 7-8AM to oversee Departures after Staging.

32. At "DUT1" COVID-19 testing began after the Sortation process. So instead of doing Staging ("Pick and Stage"), I would wait under Amazon's COVID-19 procedures at a table with Swab Testing kits. My duties were as follows: (1) PPE Gear required, Facemask, Gown, Gloves; (2) Contact off-site Medical Assistant to Conduct actual Testing; (3) Packaging Completed Testing Kits for weekly shipments.

33. As "Stow Master" my task was to assist stowers from the Ambassador role. Sometimes this involved alerting individuals to areas that needed work, and other times it involved organizing strategies and working with a willing Associate; I felt that I earned my promotions developing strategy to keep us ahead of routine delays in stowing.

34. As an Ambassador I developed a methodology for addressing recurrent intra-process to end-process delays; I called it "Macro Stow" and usually had to implement it myself because there was not a supervisory chain of command available to implement more discretely. The system amounted to conducting Sortation at a strategic pace to streamline personal efficiency and maximize group efficiency, stowing small parts of everyone's section to reduce burdens which contributed to dark, unsafe, and overfilled Sortation racks.

35. Amazon associates have an interesting habit of slowing down their work pace once the actual work aisle becomes *darkened* with unstowed shipments. Aisles are about a meter

8

wide, and 50 feet long, most associates will work 2 to 5 aisles in a shift, and stow 200 to 500 shipments in an hour.

36.

37. The other supervisory process was to train New Hires; when new hire training was being conducted, during the pandemic, we observed *mandatory* social distancing practices and utilized a Tour Guide intercom system to describe Best Practices and field questions that were extant from training videos.

38. In December of 2020 I became aware that there were promotion opportunities, and linked up with my then L4 Manager, Eric Turner, who advised there were multiple opportunities at new sites scheduled to open in 2021.

39. I put in an application and did not hear anything for a significant period of time.

40. In spring it became common knowledge to most associates the capacity of the site was being split between three new warehouses, "DUT3," "DUT4," and "DUT7." So I began to reach out to people I was advised were reviewing the hiring process.

41. Amazon LLC for T1 Associates has a three-stage promotion process; (1) Application screening, (2) Interview for Incline Status, (3) Selection. Higher level positions may have multiple interviews, as is common in most industries. I did not have difficulty receiving a recommendation; and did moderate preparatory work with another Manager prior to the interview.

42. Just two weeks before the move was scheduled I was hired as L3 Yard Marshal for Amazon DUT7. I underwent two weeks of training at Amazon DUT3 with another individual who

gained the same promotion, with whom I would subsequently work at DUT7. I was trained

by one associate with whom I was already familiar, and another who was new to me.

43. The training process was a little bit vague, but the documentation was sufficient. The most

important piece of information I was given *relevant to the suit:* the Yard Marshall's task to

receive and unload trailers is by default *uninterrupted task* meaning the Yard Marshall

operates *more independently* from the Sortation and Pick and Stage Process, it is a

*specialized role*.

44. The Yard Marshall was "UTR" role to maintain Operational relay of truck drivers and

trailers between delivery stations, sortation centers, and fulfillment centers, delays at any

Delivery Station or Fulfillment Center could delay the entire regional network where

drivers          were          typically          pre-assigned          a          schedule.

(DOCUMENT  REQUEST:  YARD  MARSHAL  TRAINING  MATERIALS  FOR

AMAZON LLC DELIVERY STATIONS IN UTAH, 2020 THROUGH 2022)

45. Additionally, The Yard Marshall was responsible to communicate Status Updates to the

UTR Management team (Arrival times, delays, on-site issues.), conduct intranetwork

escalations using different APPs, to reach out via telephone to drivers and managers and

supervisory Associates off-site to relay Intelligence and advise the operation in light of the

most relevant data; most commonly this meant asking the Fulfillment Center ("FC") to

assign a driver to a linehaul that was delayed, advising delivery times, and plotting "Trailer

Dock and Release."

46. Other low level duties included; breaking trailer seals, completing standard Trailer Dock

and Release ("TDR") mechanisms, investigating trailers for damage, investigating the

"Yard" for safety discrepancies, safety cleanup and organization, investigating bad loading practices from the FC, directing other Associates to assist Standard Work tasks related to the Yard Marshall.

47.

48. The role was a minor adjustment; it was not the role I had originally applied for. I knew how to solve operational problems in sortation centers related to Associate groups who Stow.

49. In my first week, one of the Defendants aggressively chided me for organizing my workspace while my task unloading was completed, but the team never really took steps to include the Yard Marshal in operational discussions in those days, it was a bad habit of theirs carried over from DUT3 and DUT7.

50. This was an important point: The individual who "chided" me was Def. Margarita Wayman, and she projected on my behavior at that moment her own prejudices and in a manner to offend, and create social and disciplinary distance without cause or warrant. She mistook me for someone who was taking it easy in an effort to instill a sense of disciplinary disfavor against her peers, and against me.

51. The other major observation to point out the narrative; the team at DUT7 was composed of leadership, Supervisors and Managers, from DUT1 and DUT3. Most with about as much tenure in the company as myself, a difference of about one year being the greatest. The job is largely composed a separate rationale for Standard Work, and spends a significant hours of the work shift inside of a trailer. It is also more physically demanding, in general.

52. The implicit question at the time: who among all of the new L3 transfers would be the first to take a management role. The question was subtle and was intended to be a quest for competence, and I think was debated from time to time in closed conversations, and made out into Action and Theatrics. Like most jobs, the question of *who* promotes and *when* is very tangible; I can remember even when I was not seeking a promotion, when I deferred Ambassador applications and other L3 spots, how pronounced the disposition of the promotion was, it was always palpable; I was always encouraged to congratulate someone even if I was not close with him or her.

53. My experience as a L1 associate had given me insight into how to make a very streamlined process for Yard Marshal, but I found the staff was unwilling to work with me directly. That is, the Delivery Stations have a traditional role called the "Waterspider" (the name indicates *trailer awareness,* puddles, chemical spills, and deadly spiders) we usually kept 1-3 on any night, and the experience level of some of the Ambassadors who did the role consistently made them confident to reject my experiments.

54. I spoke to the Process Assistants who were governing the process then, Whitney Richenbach and Dalton Hanks, the first actively argued with me against my suggestions, and the second invented an excuse not to hear it. Later, the corporate entity of Amazon LLC would compel us to adopt a similar practice, as the one I had then suggested; one major challenge teams of associates often face at high rates of production was emptied go cart congestion, and I often observed behaviors which I thought were objectionable, where the more tenured associates would task a new associate with loading empty carts into trailers, and would fail to accompany those individuals through that process they would

12

113

thereby attempt to eliminate them from a competitive plane and at the same time would introduce delays into the work cycle.

55. My plan was to have Waterspiders *work together* more; I would have tasked them distinct sides, so that the more experienced associate could always aid the less experienced one in reloading the trailer with empty carts. It was an absolutely critical process which the Yard Marshal role otherwise had to take care over.

56. Instead, the DUT3 culture was invested in ethics of *promissory vestiture;* this meant attempting to allow tenured associates, ideally because their efficiency was high, more independence generally. It's actually a common strategy, but again as stated above, created favoritism, cliques, and longer periods of inefficiency wherein the Ambassador did not really invest in a new associate's training for what appeared to be capricious reasoning.

57. The Supervisor, the Process Assistant, there were two with whom I worked a lot, Melissa Murano, and J (First Name initial) , under Defendant Pablo Alvarez, operated as upon Management track, often attempting to do as little as possible physically in anticipation of promotion and demonstration of their experience and authority, even against the dignity of their peers whom they may have perceived to be in competition. (This meant that I worked much harder than they did.)

58. One wore extremely long nails, and could be seen to remain stationary at a desk for long periods of time. While the other was more chatty, and would show hesitance to do physical labor unless it was mandatory *business need*, such as filling in for someone using the restroom.

13

59. The workplace culture was actually cultivated to operate that way by individual managers, to design individual vestiture, while the Standard Work processes remained the same. It was a low-level corruption scheme, which operated a capacitive *screen* against poor work ethics, and a social screen, against people who were socially undesirable. Again, it's a common behavioral trait in work places, and Amazon defines it as "Ownership," a leadership value based in a liberal terminology of *proximity*, asserted by most competent people; the word "Ownership" is literally painted on the Human Resources wall.

60. But I was left with the feeling they thought it would reduce them, and as it turns out they may have a very negative and false perception of my conduct as based in ethical differences of Leadership.

61. I would witness them playing *War and Peace* with the Inducting stations, and trying to inflate themselves on the work in general, sometimes socializing a lot, while the new guy was nearly suffocating in a darkened trailer full of carts; we always found solutions so I did not think it was a systemic problem, just elements of *competition* which were sometimes bad for work-related communication. I felt naturally discriminated against looking for constructive solutions.

62. Eventually, AMAZON LLC imported a comparable process to us from European sites to solve the exact problem, and the fact is that the solution in place at the time I resigned was still vulnerable to the same problems of *favoritism,* and deliberate *attrition* strategies, which were used to *disfavor* associates who were not part of a convenient workgroup.

63. The way the Sortation shift works; the crew is divided between the Stow floor, with all of its shelving and vinyl bags, and the Dock area, with the trailer doors and loaded go-carts,

14

cardboard bins, and wrapped pallets. Both sides of the associate base interact with a lengthy electric conveyance, and observe more or less uniform standard work practices respecting the customers' shipments and operational integrity of the conveyance.

64. The Dock crew is smaller than the Stow group and is usually more experienced; the shift begins with the Dock Team cutting open cardboard bins ("Gaylords" and later, "Shuttles"), opening doors on go-carts and unloading those contents onto a narrow conveyance "finger" where a designated "Inductor" used a gavel-like infrared scanner/printer to *receive*, and *label* the package so that associates along the conveyance route will direct into the appropriate sort cluster-location, Labeled A, B, C, D, E, G, H, J, K, M, P by pushing them down a slide onto a regional sortation cluster conveyance. (I was advised at the start of my work by Paul Kondrat, then Site manager (L8) as Yard Marshal the site could handle as much as 250k *per diem*).

65. Facially, there were only minor disciplinary problems; one new associate would leave pallets haphazardly and would react aggressively when corrected, an Associate would assert his own independence to risk disposition my authority. These were minor, self-resolving events.

66. Later, I would have associates intentionally *delay* production, or *refuse* to do other roles and tasks, and who would attract the animus the Operations Manager against me, primarily for theatrics since we could not really alter our daily process without impacting production. Again, I would let it roll off my back primarily because the delays they imposed were usually minute, and they themselves were experimenting, like intelligent people do, with reasonable and effective control over the leadership and workplace process. Where they

became persistent, the only solutions were (a) replace and individual; (b) swap individuals who were delaying by socializing; (c) demand people to meet a Standard of work.

67. *Leading* people, and *working with* people are sometimes two different tasks, depending on how much authority any individual is attempting to exert. What I really found was that *Emotional Intelligence* was more dynamic, was more capable to aid people who actually needed or wanted help, and was only a little bit disfavorable to people who were more likely to misbehave. But it was precisely on those terms that a first critical misconduct precipitated.

68. Their tangible conspiracy became perpetual; these claims are predicated on two major considerations:

   a. I overcome the obstacles presented;

   b. The Human Resources agent did not protect me from deliberate mismanagement where I had overcome obstacles.

69. I understood it was even possible associates on-site had participated in schemes at DUT3 to ouster higher level managers to favor particular lower-level managers at promotion, and supervisors at the same vertical scale. They may have accomplished it by deliberately creating *safety* problems, and *reporting* them. This is something an individual would have to investigate surrounding resignation of upper site-management at DUT3 between 2018 and 2021. I at least thought I had heard some aside from Def. Alvarez on the subject.

70. The workplace conspiracy first started; the Waterspider who I had approached regarding this other policy (First Name: Felipe) had rejected it pretty critically, subsequent to that I received a reciprocal complaint from Dalton Hanks, I was speaking with him about whether

16

76. Def. Alvarez had complained to me how Managers at his level were not allowed to make direct hiring decisions, complained of having more or less groomed individuals and then having no greater power under Amazon hiring practices, and had lamented the excessive and unforeseeable favor placed upon "College Hires," individuals who sometimes take precedence at *promotions:* he communicated a desire for excessive power, and Attributed that management structuring decision to the corporate policy forbidding *Favoritism.* I knew how hard I had worked at DUT1, and knew the ins and outs of the process better than anyone else on my team, so at the time I did not think it was a vindictive or conspicuous statement.

77. I was affirmative. Originally, I thought maybe it would be better to keep the same role and further perfect it. Maybe someone deserving in the L1 ranks would appreciate it. I could see how at least one of the Ambassadors really wanted the job, and how some of the Process Assistants had groomed him for the role. He was often allowed to stand and "Own" the PA's computer, would direct other associates sometimes aggressively, and was a favorite of the Manager.

78. I think it is possible Def. Alvarez acted retributively in the cause of his *favored* Ambassador.

79. Beyond that, my legal circumstances were showing promise of more extended and criminal delays, and I knew judging by everyone's behavior, how *possessive* they were over the Supervisor and Supervisory capacity, that getting in line for a Level 4 Manager promotion was a smart idea. The legal case that was pendant in 2021 did not resolve the questions that were presented, and ultimately precipitated a lawsuit against several Judges in this same

court, and in the Court of Appeals. That matter has now extended into more overtime, and is in process adjacent to this matter. **Both complaints advise the jurist.**

80. So Defendant Alvarez apparently *also* must have thought that Eric Turner was stepping on his toes when *I* was leant the opportunity for the PA role at preference; Eric Turner was an L5 at the time, while the Defendant was an L4.

81. Other Defendant managers, Devlen Bridges (L4) and Adrian Caldera (L6) disclosed this to me much later, on occasion of a SECOND MAJOR INCIDENCE by them, that a SAFETY Roundtable meeting had a group of Associates complain that I was somehow improper and/or highly angry at one or more individuals. It obviously was not a substantive statement, and I can remember one such incidence where, in my inexperience, I had attempted to holler to someone under the noise of the environment, and my voice went off-pitch and sounded like a an inappropriate and hoarse command.

---> DOCUMENTS REQUEST

82. The same Ambassador at the center of this discourse had heard me, and then disregarded the statement apparently for the tone of my voice. I addressed him later about it, to be sure that it was not taken too offensively, and he explained that he had simply been too busy to have understood my request.

83. I was gaining experience and attempting to conduct several things at once and had found a minor delay in my process, which only the "Waterspider"/Ambassador was positioned to react to.

19

84. In retrospect, the ambassador may have reported that incident capriciously, in a manner to goad management into taking wrongful action on his behalf. The Safety and Management *never* timely reported that to me, instead they withheld like an inside-joke, and waited for a shoe to drop.

## FIRST INCIDENCE

85. The first allegation of real *fraud* in work place practices took place right as I was concluding my time as the Yard Marshal; I was in a position as the Yard Marshal and we ramping up production in the 2021 holiday "PEAK Season," this involves Mandatory overtime days for everyone (6 Days a week, with lots of extra pay), lots of new faces, and importantly lots of people doing *progression* in terms of the Standard Work practice, it becomes fun and competitive.

86. As a result, we had some days with too much material coming off of the trailers at any given point, the Waterspiders would move quickly and in one instance nearly struck someone with a cart. Shipping carts weigh 200 to 400 lbs. when loaded, are guided on wheels with breaking systems.

87. The incident culminated the following day with Def. Alvarez asking me to being extra-cautious at Unloading the trailer, with the proviso that he may at any time that it looks too crowded on the dock, call a cessation to carts-unloading. This was fine by me, and I went from the start of the shift to the handoff from the Yard Marshal who was on-duty there during the early evenings Def. Kaj Gibson.

88. So the shift went fine, and naturally our available dock space filled up so that my unloading practice had to slow. Finally, after I found that we did not have enough walk space for the

Waterspider (Def. David O., a late L3 promote) to haul cardboard, we had to walk a very narrow path between the tail end of carts staging, and the loading dock platforms, I received a verbal message to discontinue unloading from Def. Alvarez.

89. At the time, there were three to four open spaces available at any moment when usually there are twenty or more. So I took a break from unloading and updated trailer information, and then proceeded assisting other associates with their tasks. These are subordinate elements to Yard Marshal standard work. The *drive* for a Yard Marshal during the Peak season should have two major priorities; (1) Safety of Associates; (2) Unloading and releasing empty trailers.

90. Both principles are day to day priorities; during Peak season, the timeliness of trailer unloading is helpful to drivers who may have to queue at the Fulfillment Centers, this was at least my understanding at the time from information that came to me from other Yard Marshals, this was the essential character of the *uninterrupted task*. That is, Operations Management in UTR platforms did not often advise amendments to any standard practice for specific or memorable reasons, and could not really demand a permanent cessation of Standard Work practices in light of the potential network-wide delays. In short, Operations Managers are only narrowly authorized, and would have to conduct broad networking to have adjusted such a circumstance.

91. On that day, I found after about ten to fifteen minutes of delayed *unloading*, that there was room to continue unloading the trailer. So I radioed Def. Alvarez more or less for permission because he had been fairly clear that he wanted to monitor the situation. But at

21

the time that I radioed him, he did not reply. I radioed him repeatedly and he did not comply, or was detained otherwise.

92. I asked the Process Assistant if she knew where he was, and she could not advise (Melissa Murano). I explained the situation and she was reticent to offer any advice or input whatsoever. So I stalled for several minutes and continued assisting other standard work processes while attempting to reach Def. Alvarez sporadically.

93. Finally, remembering my training, and seeing more and more space opening up on the staging floor, that my role was an *uninterrupted process* I proceeded to unload more carts in order to guarantee timely release of trailers, and careful not to rush the process and so not imperil someone's safety.

94. Def. Alvarez returned and stated that he did not want to continue unloading trailers at the time, stating that I had violated his direct instruction. I explained the standard work process, and the manner in which I had been proceeding, the extra care taken over the *uninterrupted task,* which he seemed to appreciate but was emphatic as if I had actually put someone in harm's way. But he continued to assert his decision in the first place, and ignored my statements against his radio silence; in retrospect, I would say he had created a *false narrative* of me, as a "Yard Marshal" having become detached from a "Safety first" priority, and also from L1 and other L3 associates, more or less having implicated I had an attitude problem.

95. That last element is at the origin of *abuse of discretion;* SAFETY policy is intended to be observed strictly, so it can be confusing when we are *attempting* to be safe versus when we think *are* being safe. Def. Alvarez discretion over the unloading practice could have been

22

properly advised based in statement or parameter of *trust* (AMZL "Earn Trust") in my Standard Work Process, in lieu of directly correcting any claimed breach of safety policy, and did not account for his own absence.

96. This took place an additional two times, according to his report; I can remember being asked to discontinue loading via radio, and I can also recall three different instances where Def. Alvarez was either (1) Not in radio communication, or (2) *vague* about his instruction. That is, it was not ever clear that his instruction would override any Standard Work Process, nor did his team actively and effectively communicate such an understanding.

97. I did communicate with our L4 Safety Manager to maintain an above board approach, on a third decision *to continue* while the Def. Alvarez was again *not available* on radio communication. Later, when I would defend my actions directly to the Defendant, he would ignore the opportunity to have consulted with Safety; it was an improperly postured rule.

98. I felt empowered and relied upon to make that call myself each time based in the observable work space.

99. It was not that same day, but not long after it, I received *written warning* called an "ADAPT" based on those incidences, and also based on incidences of my not having taken lunches for several weeks. The language of the ADAPT held an implied term of insubordination and made a full declaration of incompetence bearing the implication of Management authority.

100.    I verbally contested the ADAPT. In retrospect, it is clear that Def. Alvarez was conducting a form *entrapment,* his continuous radio silence, and his refusal to hear my reasonable objections, plus the anonymous reporting of my conduct as insubordinate, all

23

of it communicated a team dissatisfied with my person on a basis that would equitably

compare intolerance for Diverse work ethics and management styles.

101.        The team would build a long-term platform for defamation.

102.        I spoke first to Def. Alvarez objecting that he had been repeatedly absent; he

discarded that claim on the condition that *his instruction* had been clear. I countered that

he had been out of radio communication, and that it was *uninterrupted process.* Again he

ignored that position, and took point in the argument on his own terms.

103.        I spoke next to Jonathan Cowan, our Human Resources officer there (since resigned

in 2022), and asked if a misleading representation of incidence would not be *fraud.* The

cause at the issue was vague, was *reasonably interpretable* from my perspective, and I was

not actually violating company policy. Def. Cowan eschewed the question without

addressing it, "No. It's not."

104.        I persisted and he began to degrade the constructive quality of my question to

generalizing about leadership character. I carried the same discussion with Def. Cowan

back to Def. Alvarez and attempted to convince that they were in error over the safety issue,

and that it had to be amended for me to agree to the ADAPT.

105.        At that point, Def. Caldera who was passing by engaged the conversation. The three

of them together *disregarded* my objections without any constructive input, literally

ignoring my objection about the logistics and semantics of knowing when cart placement

is or is not safe, ignored elements regarding the manger's absence, and ignored *training*

*oriented* discussion about Standard Work processes, literally coercing the impression of

my cognitive incompetence three versus one.

106.      Def. Alvarez literally attacked my memory of the incidence by rendering his own positions relevant to mine *vague*, while Defs. Caldera and Cowan both leant him the full weight of their consensus without consideration for the measure or the effect, interrupting me with semantic questions and disregarding stuff I thought was relevant.

107.      Altogether, the three reinforced a complex fraud practice where I was (A) the subject of false declaration in a disciplinary report, and (B) where the team had no basis for real interest in the same discussion which involved essentially (1) communications availability for critical issues, (2) continuity on Standard Work Processes. Essentially, what to do when the manager gives you a special instruction, and then is out of communication for much longer than expected.

108.      It is plausible they expected me to communicate with Eric Turner, but he was nowhere in sight. Additionally, the ADAPT had included an incidence of me *working through lunch*, which is forbidden, and we held no constructive conversation on that point related to the ADAPT. They were using the entire circumstance to harm and humiliate me with false impunity.

109.      Any discussion which could have clarified a *cause* for what was interpreted to be *my error* was completely destroyed. Even discussion about missing lunches, which I think went on for several weeks, was never broached.

110.

111.      A brief explanation: I was experiencing delays completing Yard Marshal records-keeping and trash disposal before the start of the Pick and Stage process; additionally, I

was usually working *through* the standard lunch-time, so one part of the shift would lead

into the next. I would get a radio call to appear by 9AM at the Launchpad.

112.       At the time management appears to have become aware of it, I was just mastering

timeliness in the process.

113.       On the ADAPT I declined to AGREE, and made some very short statement about

how the facts of the ADAPT were not wholesome. Clarifying, the statement was entered

for me by another manager, Devlen Bridges who did so at my verbal consent, while I

looked at the stuff he had written.

114.       When I left Amazon LLC, the above ADAPT had deprecated from my record, and

the Human Resources agent the time,   [ First Name ?] Brown, stated she could not easily

get ahold of it. It is possible she was lying at the time, her body language and verbal

expression were comparable to Def. Cowan, *avoidant* and *unapologetic*, fasey *naïve*,

largely *posturing* me as breaking from the corporate social culture; *improper deflection*.

115.       (DISCOVERY REQUEST: FIRST ADAPT, ALL DISCIPLINARY RECORDS OF

AGAINST CARLOS VELASQUEZ, VELACA @ AMAZON.COM, DUT7, DUT1)

116.       An allegation of STALKING/HARASSMENT begins here; it is also held here that

it was a *defamation*; a statement of a person *unbecoming* to Management process was not

in order, was not defined, nor was there any plan or program in place to clarify that.

117.       Subsequent, an Allegation of FORCED RESIGNATION also begins here; the

failure to address and alleviate subjective objections, literally the Defendants Managers did

not want to admit their own error, and so demurred in actual malice and *Breach of Contract*.

26

118.    Rel. to STALKING/HARASSMENT, the allegation here is that Def. Alvarez had

personal objections to my taking the Process Assistant role; I had shifted from working

under Def. Bridges to Def. Alvarez, had been placed back into my original role where I

was sufficiently experienced to survive the PEAK season, and where subsequently Def.

Alvarez had essentially contributed to the very problem he complained against by being

unavailable.

119.    His subsequent hostility to allowing me to inform him, and the management culture

at DUT7, betrays an intent to have conducted *entrapment* to commit *fraud*; *given* that some

one or other associate *reported* that I was violating his limited policy, and given that the

individual did not come to me (this may have been Melissa, or an Ambassador) to uphold

it as a Standard Work Practice, it seems more than *plausible* that his absences were *planned*

*absences* or at least *intentional* to promote a *wait and see* attitude which actually divested

the organization from its *Earn Trust* business tenet.

120.    *Breach of Contract*, Def. Alvarez policy was effectively in contradiction to the *Earn*

*Trust* tenet wherein his enforcement of it was as if *by its letter*, while it was a limited safety

policy based not in misconduct but in *observable* Work Safety standards, standards which

can change repeatedly and require direct oversight. Def. Alvarez provided no measurable

basis for his own standard, and the behavior of his subordinates suggests they were intent

to divest *trust*, rather than in shared commitment to *Fulfillment*.

121.

122.    It is possible he did so knowing that I was also missing lunches, and it is also

possible he did so out of spite for Eric Turner, who had usurped a desirable authority. That

27

is, he foresaw that he could make a false declaration of *insubordination* that would be left *unquestioned*, *or* it was possible Def. Cowan *suborned* him into a false and malicious practice; it is likely Def. Alvarez harbors long-term animus for Eric Turner within *corporate relations* for more coveted promotional opportunities.

123.     The *false declaration* in the ADAPT process was a direct result of the undisclosed Safety Roundtable wherein I was characterized as hostile to a person, or persons, and whereafter Managers took *wait and see* attitude rather than approaching me directly, as if they regarded at the extreme of Amazon LLC behavioral policy, which prohibits disclosures for fear of any retaliation.

124.     What follows in the Narrative, I no longer interact with Def. Alvarez on an unrelated change in organization, but Def. Caldera shows repeated *animus* based in the interaction we had where I worked first with Def. Bridges, and later after Def. Bridges summary termination, with Margarita Wayman who engaged in a further plot to elaborate the culture of misleading statements.

125.     Thereby the allegation from this statement is that the Management team will be shown to have *pre-emptively retaliated* against me for anything from being good at the job, to behavioral and territorial issues.

126.     We will also be able to plausibly speculate that numerous critical and personal decisions made by these people were directly in their knowing misconduct, and an intent to magnify harm done in these incidences by stepping beyond the reach of the corporate infrastructure, or otherwise to manipulate the circumstance, just as they manipulated the victims of their abuse of the authority granted to them AMAZON LLC.

127.     We will also be able to show the higher level corporate network does not evaluate the dignitary conditions of its work site, DUT7 and instead labors to cement consensus based in the conclusions of authorities, and thereby we show that AMAZON LLC, as based in these people's clear misconducts, and even their failure to make genuine showing (overstep), has failed to maintain a policy for truth-telling in terms of how its membership defines pre-emption conditions of statements and the effect of statements.

128.     Essentially, subsequent narrative will show nearly two years of conspiracy among managers and some associates to commit STALKING, to issue FALSE DECLARATIONS, to BREACH CONTRACT by violating both generalized standard work tenets, and by violating behavioral policies.

129.     We will also have shown their clear intent to compromise the integrity of AMAZON LLC in their various deliberations.

## SECOND INCIDENCE

130.     On a second incident I was advised to meet Defs. Bridges and Caldera in the Management Office where Def. Bridges delivered a second ADAPT under the direct supervision of Def. Caldera.

131.     I read the document and immediately was surprised, but also definitely offended the discussion related to an injured Amazon Associate ("Jamie") had described me as contemptuous to her needs, while every component of our actual discussion was workable.

132.     She had provided to Def. Bridges some kind of relation of what I had said to her, in the course of a minute conversation I had told her she looked healthy and she had reminded me her recovery was in progress, and that she might require a break.

29

133.    I offered at the time of the conversation to bring an Ambassador to stand-in for her,
and that implied that it could be offered at any time, but she declined at that moment and I
advised I would return before too long.

134.    I do not recall at the time of this affidavit was produced what all I was doing, my
routine tasks involved communicating with stowers on Stow Rates, standing for Associates
who needed the restroom, picking up shipments, engaging individuals ad hoc on process
and other matters, but it was about fifteen to twenty minutes where I was engaged when I
received a radio communication from Def. Bridges vehemently asking me to meet him at
the Labor Board.

135.    I recall being delayed for a short time, because I advised I would be there as soon
as possible.

136.    Def. Bridges asked why I had neglected the Associate, and I advised him of the
brief conversation we had, and he advised me of the solution he had worked out with her,
was to position her *oppositely* from the one side of the conveyor belt to the other, which
apparently had allowed her to decompensate for muscular discomfort on one side of her
back.

137.    The "Puller" role at Amazon Distribution facilities positions Associates on one side
of the conveyance for an extended time to *pull* packages pre-sorted for regional clusters,
so most Associates experience moderate to sometimes severe discomfort facing a single
direction, and sometimes change sides with one another to balance their approach.

138.    It is possible the Associate lodged a *retaliatory complaint,* or it is possible Def.
Bridges took a *discriminatory* posture, in his mind the value of finding a *personal solution*

30

had disfavored *me* from *promoting* to manager; erstwhile, as related to the **first incidence**, it was not lost on him that Def. Alvarez had sought to undermine my successes as a Yard Marshall.

139.      So I refused to sign the document; additionally, Defs. Bridges and Caldera advised me the ADAPT was issued on an aggregate of complaints starting with a Safety Roundtable from much earlier in the year, and could not identify any real cause.

140.      They sought to portray me as *irascible,* but fabricated a circumstance wherein we *did not ever resolve the integrity of ADAPT,* so miscommunications and misperceptions by Associates were treated as exaggerated disciplinary challenges while it was obvious between the Management Team they engaged *gross misconduct.*

141.      Later, I wrote an Ethics Complaint on the subject, and Def. Kerri Alger advised me she would contact "Jamie" who had moved to Delaware (?), but returned a notice failing to find any infraction against Def. Bridges and Def. Caldera, and also failed to resolve my question on the substantivity of the issues involved.

142.      I also brought to Def. Alger's the **first incident,** and she promised she would look into it; the diligence required of her investigation should have sought several things, (1) Dates of Def. Alvarez Safety Rule; (2) Video Recording of Particular Shifts of Interest; (3) Personal Accounts of Management Associate behaviors.

143.      Def. Alger did adjust Def. Alvarez shift assignment away from mine, but took no other action to relieve me of the unethical prejudice.

144.      Def. Alger may have recognized the depth of the collateral problem, may have regarded her own familiarity with Def. Alvarez, or managers whom she may have thought

31

had *included* the Defendants to their circle, other members of the Management Team, the
Pioneer Region was slowly expanding after 2017, and she may have thought it would not
be a team-oriented play to conduct a whole investigation.

145.     The depth of animus at that point became relatively *severe,* while I did maintain
*professional leverage* it was obvious to me the Management Team had lost integrity. I
began deliberating more consistently on the credibility of an Ethics Complaint.

146.     Def. Cowan resigned at some point in that summer, and I felt it was related to the
circumstance with Def. Bridges and another Level 4 Manager, both were under internal
investigation for policy violations, and when the latter manager was terminated and another
promoted off-site, the disruption in the continuity of the culture broke evenly for me and
so I continued without complaint until later in the year.

147.     Def. Bridges was likely termination for Drug Abuse, and it was also confided to me
he may have been terminated for Fraternization violations that could have appeared to a
reasonable to be tortious, contemptuous at being passed over for Level 5 promotion, which
Def. Alvarez had received *after* the **first incident.**

148.     Def. Bridges is a romantic, and may have blamed himself for having witnessed the
disposition of the **first incident.**

149.     During this time, I was subjected to disciplinary revision rooted in bad instructional
policies; the ATLAS dynamic track for Labor Tracking was broken, self-contradictory from
week to week, contradicted actual Associate skill levels, a semi-automated spreadsheet to
cross-reference associate *skills training* prior to *labor assignments* at the Start of Shift
("SOS"), and it was a sole point of *needs improvement* on site-wide metrics; literally every

week one of the Process Assistants or Site Managers would trigger a ATLAS level *alert* how an associate was not properly assigned a direct role.

150.    While these issues were not taken very seriously, they were later used to attempt to justify a *final written* warning; it was an entire year before that Labor Tracking System was sufficiently refined and flexible enough for actual implementation, not until Spring 2023.

## THIRD INCIDENT

151.    On 12/18/2022, after the termination of Def. Bridges, DUT7 Senior Site Leader Paul Kondrat promoted Def. Margarita Wayman to Level 4 manager, who had worked with Amazon.com for as long as I had, she delivered an ADAPT after interrogatory conducted by Human Resources Def. Celestia Leme accusing me of attempting to influence someone to commit theft.

152.    The interrogatory was conducted weeks after the conversation, I did not recall it with any significance, and recollected a brief anecdote I had made about the relative *efficiency* of Amazon production as related to the Break Room "Cantina," as I then learned it was named.

153.    The Associate was relatively new then, and because I had to observe individual standard work practices I had taken an opportunity to talk to the individual, and I can recall he was not impressed with my attempt at conversation.

154.    It is possible the Associate *retaliated* against me for provoking conversation, and intentionally misconstrued my statement.

155.    I admitted to Def. Leme how the conversation could not have taken on that much definition, but she misconstrued that and reported the issue.

33

156.    It now occurs to me her action there was *retaliatory,* after the 12/10/2022 complaint: an attempt to construct an *intimidation* culture; whether Def. Wayman had somehow solicited or encouraged Def. Leme, or whether it was solicited by other implication was not demonstrated to me.

157.    My Performance reviews were also aborted at this time, so that I suffered improper *animus* in the breakroom, increasing *ambiguity* on workplace tasks, and took less *confidence* at opportunities.

### FOURTH INCIDENT

158.    On 12/18/2022, Def. Wayman delivered a second ADAPT tracking errors I claimed were *mechanical* at Labor Coding, that is, one or two errors versus a third error were then vulnerable to the same *mechanical* problems associated with the ATLAS dynamic labor tracker.

159.    The document also included an incidence not prior recorded, wherein the other Level 3 Process Assistant on our shift, Def. Shanese Walters, had requested me to record a labor change, and the request went unheard because I had engaged with an Associate at the conveyance.

160.    At the time, this was an atypical request; labor changes on that order were conducted either casually, Associated tasking with "Unloading" shipments would casually swap places with the Associate logged into the "Induction" scanner, and log scans for said associate, the *indirect* labor path.

### FIFTH INCIDENCE

34

161.    On 1/20/2023 I filed an Ethics Complaint against Defs. Caldera and Walters for a *hostile takeover* of my Pick and Stage set up; I was obligated as the Stow section Process Assistant that week to make *labor assignments* for the remaining 2½ hours of the shift following the end of Sortation, I was advised a standard Pick Rate from Def. Wayman and had assigned the shift accordingly.

162.    Def. Caldera and Def. Walters executed a kind of pincer move, Def. Walters engaged me in a disagreement about an Associate who had been proceeding under an accomodation for a personal issue, who had been routinely assigned to conduct "Full Routes" wherein we assigned routes relatively *in advance* so that she could operate at an *accommodated* pace.

163.    Def. Walters disagreed with me *allowing* the associate that request, the Associate had expressed mild concern that stepping into a faster-pace could aggravate the injury, so it seemed appropriate to allow her to

164.    Def. Walters also attempted to bully another associate while her *accomodation* had lapsed, expressly because she wanted to veteranize associates in the role the *accomodated* individual had been routinely assigned; the associate would cry with pain when put into certain other roles, and Def. Walters was overzealous to instill her own *influence* and take "Ownership."

165.    It is possible Def. Caldera was ambitious to promote outside of Amazon, and had disassociated himself from the company psychologically, because he advised against respecting the Associate for tangible questions and needs, additionally he appears to have transgressed against the agreement he had made with Def. Bridges.

35

166.    Def. Caldera wanted to be perceived as very powerful, and experienced, but he often appeared *insecure* I think because he does not respect the *rights of workers,* and encouraged that behavior in Def. Walters largely because she communicated how *insecure* she felt, and how much she desired to overcompensate for personal inexperience and insecurity.

167.    The documentation related to these incidences, including the Human Resources responses, were *inconclusive* and failed to acknowledge the Complaint I presented, and did not apply the Code of Conduct, the language was too dismissive; the Human Resources officer may have expressed it in *derision* and *retaliation,* certainly the Defendants had no other reasonable expression.

168.    Other associates were queried on this matter, but its they were improperly zealous; these types of abuses have become more consistent with the Republican Party who are too insecure for leadership.

## SIXTH INCIDENCE

169.    I was handed via email a notice I could appeal a *final written* warning for my misconduct issued by Def. Wayman, the appeal went to may favor although it could not hear my whole pleading on the subject, where I had direct standing.

170.    I spoke to a Senior Site Leader from out of State who found in my favor the *timing* for any *final written* notice had not been reached, however the invidual I spoke to did not elaborate any kind of *misapplication,* and failed to deter the issue.

## SEVENTH INCIDENCE

171.    Defs. Caldera and Wayman had prior *retaliated* against me on the misplaced *final written,* and resurrected that issue within *one day* of the expiration of a ADAPT policy when I encountered a more frightening error.

172.    I experienced a minute, total lapse, like a *fugue state,* and skipped a routine low-level step and improperly coded between six and eight associates.

*173.*    The Management Team refused to hear that discussion, and Def. Wayman attempted to take satisfaction in failing to hear the discussion out, and failed to admit how the circumstance was not a routine disciplinary failure; how it was a result *intimidation* and *real contempt* at being *denied* the opportunity to have *terminated the plaintiff.*

174.    Def. Wayman pretended to be *zealous* to protect our site's *production history* in that ADAPT, but the defect was a direct result of her management ethics, and their inability to show *interest* in how I had represented myself directly to Leadership.

175.    There is a concurrent case filed in the United States District Court for the District of Utah, a fact to which the team was not apprised. I had posted on my Amazon Profile how one of my interests was "Complex Litigation," and none of them had ever asked me about it. The Amazon Profile is visible to anyone who has network access to review Associate Profiles, such L3+ Associates.

176.    It was obvious they had taken that as an improper social queue to conduct *coerced termination/resignation,* and demanded my complicity to their inherent violence against the *rights of workers.*

177.    I admitted the policy could be observed, but denied that it was the appropriate response to the circumstance; going forward, the Management Team was increasingly distant, and appeared increasingly incompetent.

178.    My performance reviews failed in these periods on the basis of those ADAPTS, against the circumstance of *Judicial Malpractice* which had upended my life, the Management Team sought more aggressive *invasions* against my *psyche* and *person,* and from that point forward, Level 1 Associates who were ambitious became increasingly *deflective* and framed my work *praxis* as incompetent, likely based in Management social queues.

179.    Def. Walters became increasingly *presumptive* as based in orchestrations conducted by Def. Caldera.

*180.*    Altogether, the Management Team *on the basis of their malpractices* had elected *to favor* Def. Walters and at that time I suffered more extreme dispositions in the workplace, my hard work was being treated as a *defective* leadership approach, even while I continued to work at a critical pace, and engineer new solutions *against* Management adversity.

181.    Defendants actively took part in a quiet *stalking* exercise, and appear to have coached other associates into constructive *derision* over my person.

### EIGHTH INCIDENCE

182.    On 5/10/23 I filed an Ethics Complaint against Def. Caldera and Def. Alger.

183.    I had put together a "Mismanagement Complaint," had spoken to our then-site Leader, Def. Kevin Sargeant, who was not helpful and attempted to encourage me to take the fall for the Team, to remain focused on work, and not to call into question site Ethics.

38

184.    The Ethics Complaint I filed was separate, and accused the Defendants of having colluded to protect both the internal image of the DUT7 site, and also to protect Def. Caldera who at the time had taken a reccommendation from Amazon for Promotion, one which came directly at my expense.

185.    Defs. Alvarez, Caldera, and Cowan had robber me in part of "Ownership" over taking advanced leadership steps independent of their supervision, they sought in harming and stalking me to insinuate themselves with leadership who are at a higher level, who may prefer to discourage Leadership independence than admit corrections.

186.    I had repaired Delivery Times at our station, while we were at risk before the holiday and routinely finishing late; Regional managers, including our own, had somewhere decided it was not worth the effort to fix it before the actual holiday schedule kicked in.

187.    I reached out, was denied by a more Senior Manager, and then found the Responsible Manager who found the Lane and validated a transaction; I signed off for our site as I was the only other officer with standing aside from the Level 8, Senior Site Leader Def. Paul Kondrat.

188.    It is very possible the Management Team used the episode as a point of entry to gain advantage against the Senior Site Leader prior to his resignation in 2023.

189.    Having stolen that attribution, Def. Caldera had finally given me a task at self-humiliation and demanded that I routinely ask Level 1 Associates what I could do better for them, which I followed through with only minutely to recognize I was largely in good favor with them.

190.    I later spoke to both Def. Caldera and Wayman about dissolving that task, to see if they could improve their outlook without putting me beneath wrongful suppression, and was flatly denied by both.

191.    Once Def. Caldera left the site, the hostility that remained had been insinuated into my working relationship with Defs. Shanese Walters and David Olave, who had both played aggressively into the pattern of mismanagement, and were incompetent to take fewer risks, and to appear beyond either conversation or advice.

192.    Once I realized the site leadership and the Human Resources altogether were refusin to confer me upon efficient standing, the same way as a criminal Republican Party, I became both afraid for my life and afraid that I would suffer repression underneath the gloating and knowing expressions of Def. Walters and Def. Olave, both of whom took wrong attribution in a complex stalking exercise initiated by Def. Alvarez and strategically aggravated by Defs. Caldera and Wayman.

193.    The Ethics Complaint sought review of the process undertaken by Human Resources, and was referred to Def. Amy Nally who was Corporate Human Resources person, and could not clarify any part of my question, and refused to find a means to relieve me of their disposition.

194.    It was clear the entirety of the culture was intent on constructive termination, and coerced failure; it was as if they had co-opted the criminal spirit of Republican Judiciary, who are not friends to the people before the party.

OTHER INCIDENCE

1.

40

195.     We had instance of an Associate who, for whatever reason, carried an aggressive attitude about work, and was primarily engaged in the whole process as a high-functioning worker.

196.     But he instigated a few disagreements for his own reasons, primarily on safety questions. Whether he was allowed to sit inside a cart, and also being very emphatic that he felt the entire process was at least little bit unsafe, and that I, in particular, could not guarantee by any degree of correction or instruction.

197.     He later became injured, and so was given a task that was suitable for the severity of his injury and apparently he did not like it. I can recall him more or less threatening me with disciplinary sanction for harassment while I was basically trying to correct part of the process he was engaged in; we were getting a lot of packages on the floor and I had to repeat myself several times.

198.     These were related incidents taking place just before that associate and his significant other resigned.

199.     What I recognized in his behavior, was his consciousness of how badly disfavored I was on site; I felt like he was being angry for me. There he was, completely misbehaving for weeks on end, and he was still better regarded than I was because I was vulnerable to lies about work place ethics.

2.

200.     I was denied access to Amazon Technical Academy on plausibly dubious terms; whereall the impositions of Def. Bridges and Def. Caldera coincided with the decisional timing for ATA, which would have pre-empted furtherance of the disposition.

201.    The program discriminates against associates who were not in good standing at the time decisions are made; it was a plainly discriminatory practice they were engaged in, and they took vicarious harm; as did Def. Alger who attempted to convince the ADAPT was not consistent with that parameter of ATA review.

202.    Altogether they present the appearance of having directly created an image of me as someone hostile, and stupid; the very people they became out of contempt for the workplace, and the American worker.

3.

203.    DUT7 site was investigated repeatedly in 2023 for cultural defects, problems with Associate and Manager behavior; and any of these circumstances may shed light on causes and even liabilities.

204.    s/Carlos Velasquez, Carlos Velasquez    Digitally signed by Carlos Velasquez
                                                Date: 2025.08.11 16:03:46 -06'00'

205.    Pro Se Plaintiff in Authentic Victim's Capacity

206.    Civil Bureaucratic Federalist

7/25/25, 7:28 AM                                Gmail - Thanks for Scheduling your First Day On-Site



M Gmail                                                     Carlos <cfv1983@gmail.com>

**EXHIBIT 1**

## Thanks for Scheduling your First Day On-Site
1 message

**Recruiting Ops** <noreply-ops-jobs@amazon.com>                    Fri, Oct 19, 2018 at 10:07 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>



Hello Carlos,

This email confirms your first day at Amazon! We look forward to seeing you soon.

### Appointment Details

**Date / Time:**
11/3/18 7:30 PM

**Address:**
DUT1 - 2291 S Commerce Ctr Dr Ste 400
West Valley, UT 84120
United States

### Directions / Instructions:

**Congratulations!** You're all set and it's time to attend Day 1 at Amazon! Welcome to the team!

This is confirmation that you will be hired as an employee of Amazon (pending a final rehire eligibility check if you have previously worked for Amazon) with the shift you confirmed at your New Hire Event.

### Before arriving to Day 1

*1. Complete New Hire Documents*

- Look for an email from "MyDocsAdmin" using the email address,\MyDocs-noreply@onbaseonline.com (*Tip: Check your email Spam folder if you do not receive the email)*
- These digital documents are a critical part of your on-boarding process, including setting up how you receive your pay. Please take the time to review all documents and complete this step *__prior__* to arriving to Day 1.
- **NOTE:** MyDocs will ask you to complete a Form I-9. Since you have already completed this step, you may acknowledge this section without doing the I-9 again by clicking on 'My I-9 is Complete.'

*2. Complete Online New Hire Orientation*

- Look for an email from KNET (KNET-System_do_not_reply@csod.com) with instructions on how to complete your online orientation.
- The online orientation will include information about the Amazon culture, pay and benefits, and time off and attendance policies. You will watch some exciting videos about Amazon and complete training on the Code of Conduct, Workplace Harassment Awareness, and Safety.
- This training is *mandatory* and must be completed *prior to Day 1 or your start date may be delayed*.

### What to expect on Day 1:

Arrive on time at the work location. A member of the Amazon Learning team will greet you at the entrance and provide you with your Amazon badge. From there, you will receive a tour of the facility and get started training for your new role.

Dress at Amazon is casual; for example, jeans/shorts, t-shirt/polo, sweatshirt/light jacket and comfortable closed toed, rubber-soled shoes. Hair ties will be needed — all long hair must be worn up and above the shoulders.
An Amazon team member will greet you at the entrance with your Amazon badge and expectations for the day.

If you require any accommodations, such as an ASL interpreter for the Amazon New Hire Event, please go to http://www.amazon.com/accommodations and chat with us. Contact us immediately upon scheduling your appointment. We need at least 48 business hours prior to your appointment to guarantee an interpreter.

We look forward to seeing you soon and welcome to the team!

Thank you,
Amazon Staffing Team

Replies to this email are undeliverable. Please do not reply.

Questions? Visit our FAQ page for more information.



P.O. BOX 81226, SEATTLE, WA, 98108-1226

4/18/2019

```
EXHIBIT
2
```

Amazon.com Services, Inc.
410 Terry Ave N.
Seattle, WA 98109
Employee Resource Center:  (888) 892-7180


Carlos  Velasquez
1848 East Ramona Ave
Salt Lake City, UT
84108
USA

Dear Carlos:

On behalf of Amazon.com Services, Inc. (the "Company"), I am very pleased to offer you the
Part-time (20-29 hours) position of Sortation Associate. This letter clarifies and confirms the
terms of your employment with the Company. You will be working a Part-time (20-29 hours)
schedule.

**Start Date and Compensation**

Unless we mutually agree otherwise in writing, you will commence employment on April 21,
2019 ("Start Date"). You will ordinarily be scheduled to work 20 hours per seven-day week.
Your salary will be $15.00 per hour, ($15,600.00 annualized based on 1,040 hours per year)
and a $1.00 per hour Shift Differential ($1,040.00 annualized based on 1,040 hours per year),
payable Weekly (Friday) in accordance with the Company's standard payroll practice and
subject to applicable withholding taxes. You will be eligible for overtime pay in accordance with
applicable laws.

**Department, Manager and Shift**

Department: 1092 DUT1 USA AMZL Logistics – DS Variable
Manager: Christopher Young
Shift Pattern:

Your shift or schedule may change in the future. Based on business need, Amazon.com
Services, Inc. reserves the right to modify shift times or rotate employees between existing
shifts at any time in the company's sole discretion. Peak schedule information will be posted
when it becomes available.





DocuSign Envelope ID: F4D876C0-68B9-4492-89A8-4F1CBE7DE1EC

Case 2:25-cv-00074-DAK   Document 5-1   Filed 08/12/25   Page 2 of 4   PageID 153
Appellate Case: 26-4000   Document: 11-1   Date Filed: 02/05/2026   Page: 147

**Shift Information**

Employees who work in Fulfillment Centers are expected to be open to working a variety of shifts. Most buildings, for instance, have night and weekend shifts, and many of our day shifts include one weekend day as part of the regular schedule. We do our best to match shifts with personal preference, but we reserve the right to assign employees to shifts and schedules based on business needs. All employees may be required to work overtime or on holidays, especially during our busy seasons.

### Preemployment Screening

This offer is contingent on the successful completion of a background check and drug test.

### Employment at Will

If you accept our offer of employment, you will be an employee-at-will, meaning that either you or the Company may terminate our relationship at any time for any reason, with or without cause. Any statements to the contrary that may have been made to you, or that may be made to you, by the Company, its agents, or representatives are superseded by this offer letter.

### Confidentiality and Invention Assignment Agreement

As a condition of your employment, you must sign the enclosed Confidentiality and Invention Assignment Agreement (the "Agreement"). Please review the Agreement carefully and, if appropriate, have your attorney review it as well.

### Employment Eligibility

To comply with immigration laws, you must provide the Company with evidence of your identity and eligibility for employment in the United States no later than three (3) business days after your date of hire. If you are in visa status, you also must provide new or renewed evidence of your eligibility for employment immediately prior to or upon expiration of your visa authorization.

### Additional Provisions

If you accept this offer, the terms described in this letter will be the initial terms of your employment, and this letter supersedes any previous discussions or offers. Any additions to or modifications to this offer must be in writing and signed by you and an officer of the Company.

**This offer and all terms of employment stated in this letter will expire ten calendar days from the date of this letter.**

Carlos, we are very excited about the possibility of you joining us. I hope that you will accept this offer and look forward to a productive and mutually beneficial working relationship. Please let me know if I can answer any questions for you about any of the matters outlined in this letter.

Sincerely,





Christopher Young
Manager II, Operations

## ACCEPTANCE

I accept employment with Amazon.com Services, Inc. under the terms set forth in this letter.

DocuSigned by:

*Carlos Velasquez*

1SCE7D5E85524D9...

_____
Signature

4/19/2019

_____
Date

Carlos  Velasquez

┌─────────────────┐
│    **EXHIBIT**    │
│                 │
│       **2**       │
└─────────────────┘







P.O. BOX 81226, SEATTLE, WA, 98108-1226

> **EXHIBIT**
> **3**

6/25/2021

Carlos Velasquez
1848 Ramona Ave
Salt Lake City, UT 84108
US

Dear Carlos:

On behalf of Amazon.com Services LLC (the "Company"), I am very pleased to offer you an internal transfer to the position of Yard Marshal (Job Level: 3). This letter clarifies and confirms the new terms of your employment with the Company. Except as specifically stated below, all of your current terms and conditions of employment remain unchanged.

## Start Date and Compensation

Unless we mutually agree otherwise in writing, you will commence employment in your new position with the Company on July 4, 2021 ("Start Date") reporting to Paul Kondrat. Your salary will be $18.70 per hour, ($38,896.00 annualized based on 2,080 hours per year) and a $0.50 per hour Shift Differential ($1,040.00 annualized based on 2,080 hours per year), payable in accordance with the Company's standard payroll practice and subject to applicable withholding taxes.

## Department, Manager and Shift

Department: 1092 - AMZL Logistics - DS Variable
Manager: Paul Kondrat
Shift Pattern: 0100 - US FC Wed-Sat 10 hr 0100

Your shift or schedule may change in the future. Based on business need, Amazon.com Services LLC reserves the right to modify shift times or rotate employees between existing shifts at any time in the company's sole discretion. Peak schedule information will be posted when it becomes available.

## Shift Information

Employees who work in Fulfillment Centers are expected to be open to working a variety of shifts. Most buildings, for instance, have night and weekend shifts, and many of our day shifts include one weekend day as part of the regular schedule. We do our best to match shifts with personal preference, but we reserve the right to assign employees to shifts and schedules based

on business needs. All employees may be required to work overtime or on holidays, especially during our busy seasons.

## Medical, Vacation, and Other Benefits

Consistent with the policies and practice of the Company, you will participate in and receive benefits under the local employee benefits plan to the extent generally applicable to other employees of your level. Depending on local employment law, any accrued vacation and personal time may be paid out by your current company prior to your transfer. Once you relocate, the amount of time off available for you will also be dependent on the local policies and practice of the Company. Your pre-transfer hire date will be used for determining your rate of benefit accrual if based on tenure.

For additional Benefit information, please review the Benefits information on the Inside Amazon site for your new Company and Country.

## Employment at Will

Nothing in this offer of internal transfer alters your employee-at-will status.

## Confidentiality and Invention Assignment Agreement

As a condition of your transfer to this new position, you may be required to sign a new Confidentiality and Invention Assignment Agreement (the "Agreement"). When a new Confidentiality and Invention Assignment Agreement is not required, you continue to be bound by the Confidentiality and Invention Assignment Agreement you signed when you were hired by the company.

If you need a copy of this Agreement, please contact the Employee Resource Center(ERC).

## Next Step

**To accept your offer, please select the 'acknowledge' button. Please know that by selecting this button you are officially accepting your offer. If you have any follow up questions to the offer letter please reach out to the hiring manager.**

**This offer and all terms of employment stated in this letter will expire ten calendar days from the date of this letter.**

Both Paul Kondrat and your Internal Transfer Team are very excited about the possibility of you accepting this offer and look forward to a productive and mutually beneficial working relationship. Please let us know if we can answer any questions for you about any of the matters outlined in this letter.

Sincerely,

Internal Transfer Team
on behalf of
Paul Kondrat

SR MGR, Operations Pathways

2021-06-25-16-31-42968b05-8999-40ce-bd27-dcf36c8ca5cd



EXHIBIT
4

Carlos Velasquez
1848 East Ramona Ave
Salt Lake City, UT 84108

Dear Carlos (EEID: 103957754):

This letter confirms that the date of voluntary termination of your employment with Amazon.com Services LLC is July 24, 2023.

You have executed a Confidentiality and Invention Assignment Agreement with the Company. You are reminded that certain provisions of the agreement survive the termination of your employment with the Company and remain in full force and effect. Your agreement is available for review in the MyDocs portal for 90 calendar days after the end of your employment.

We wish you the best in your future endeavors.

Sincerely,
Amazon Human Resources





Refused to sign by associate on June 22, 2022, 12:07:45 PM - Delivered by Bridges,Devlen (devlen)

**EXHIBIT**
**6**

### Supportive Feedback Document
### Behavioral - Documented Coaching

amazon.com

**Associate Name:** Velasquez,Carlos (velaca)
**Manager Name:** Bridges,Devlen (NA5-0120)
**Created On:** June 22, 2022, 12:07:45 PM



## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|

## Details of Current Incident/Specific Concerns

Throughout the dated observations below you made inappropriate/unprofessional comments and/or behaviors here at work. Please reference below: On the week of 5/29 - AAs reported during our safety round tables that they felt unsupported while working in areas where packages would over flow and create a safety hazard. Specifically they said they requested your help and instead of helping addressing their need, that you walked away. On 5/31/22 AM received feedback from AAs at the dock that you were "barking orders" to the AAs, AAs felt that your direction towards them was unprofessional by tone of voice. On 6/8/22, AM received feedback from an AA that their back was hurting from a previous work injury and you proceeded to say "you look fine to me" then left them in path rather than addressing the safety concern. On 6/9/22, AA reported a statement noting that your tone to AAs was one that was perceived as "talking down to people" and came off as disrespectful.

## Areas of Improvement Required by Associate

In an effort to maintain a professional workplace for all associates, Amazon.com prohibits the repeated use of foul/inappropriate language, spreading malicious gossip or rumors about co-workers, and statements containing stereotypes about race, gender, age, religion, etc. that can make co-workers feel uncomfortable. You must be respectful and professional in all your communications, whether verbal, electronic (email) or other written. As detailed above, you have failed to meet this expectation. Failure to meet this expectation in the future may result in further discipline, up to and including termination of employment.

## Associate Comments

AA wasn't sure if he wanted to "acknowledge" or "refuse to sign." Will follow up with HR.

**Associate Signature:** Velasquez,Carlos REFUSED TO SIGN                    **Date:** June 22, 2022, 12:07:45 PM

**Manager Signature:** Acknowledged by Bridges,Devlen (BadgeID: 14193378)                    **Date:** June 22, 2022, 12:07:45 PM

**EXHIBIT 7**

Acknowledged by associate on June 29, 2022, 5:14:42 AM - Delivered by Bridges,Devlen (devlen)

## Supportive Feedback Document
## Behavioral - Documented Coaching



amazon.com

**Associate Name:** Velasquez,Carlos (velaca)
**Manager Name:** Bridges,Devlen (NA5-0120)
**Created On:** June 29, 2022, 5:14:42 AM

## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|-------|-------|-------------|
| Documented Coaching | 1 | June 20, 2022, 2:20:02 PM |

## Details of Current Incident/Specific Concerns

DETAILS OF CURRENT INCIDENT/SPECIFIC CONDITIONS On 06/13/2022, 06/22/2022, 06/27/2022, you failed to follow appropriate standard work practices. Specifically, you failed to utilize the ATLAS Dynamic tracker to ensure AA's are trained in a specific path before coding them to that path. A seek to understand conversation took place with you on all three dates listed above to which you stated you knew you were supposed to use the tracker but did not use it. You stated the AA told you they were good to go but failed to verify.

## Areas of Improvement Required by Associate

AREAS OF IMPROVEMENT REQUIRED BY ASSOCIATE As detailed above, you have failed to meet Amazon's Standards of Conduct and behavioral expectations. Amazon expects associates to adhere to standard operating procedures with regards to processing orders in each function within the delivery station. Failure to adhere to standard work guidelines includes, but is not limited to, any action that artificially inflates an individual's rate (i.e. double-scanning, machine-gunning), dishonest behavior or discriminatory work selection that directly or indirectly hinders others' performance (i.e. cherry picking), knowingly causing a virtual/physical mismatch, or circumventing critical steps in a process/PMV. Failure to meet these expectations and/or future violations of these guidelines may result in additional discipline, up to and including termination.

## Associate Comments

**Associate Signature:** Acknowledged by Velasquez,Carlos (BadgeID: 11759273)     **Date:** June 29, 2022, 5:14:42 AM

**Manager Signature:** Acknowledged by Bridges,Devlen (BadgeID: 14193378)     **Date:** June 29, 2022, 5:14:42 AM

3/7/23, 2:15 PM                                    EthicsPoint

```
┌──────────────┐
│  EXHIBIT     │
│              │
│     8        │
└──────────────┘
```

**REPORT DETAILS**

**Report Submission Date**
12/10/2022

**Reported Company/Branch Information**
Location 989 West Center St, DUT7, , UT, 84054
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
DEVLEN BRIDGES – AREA MGR
ADRIAN CALDERA – OPS MGR
JONATHAN COWAN – HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
SEE ABOVE

**Is management aware of this problem?**
Do Not Know / Do Not Wish To Disclose

**What is the general nature of this matter?**
HARRASSMENT
DISCIPLINARY FRAUD
CHARACTER ASSASSINATION

**Where did this incident or violation occur?**
DUT7 – AT OR AROUND THE HR DESK

**Please provide the specific or approximate time this incident occurred:**
6/2002

**How long do you think this problem has been going on?**
3 months to a year

**How did you become aware of this violation?**
It happened to me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
PABLAVAR
CELESTIA BROWNING

**Details**
COMPLAINT TO HR: REPEATED INCIDENCE OF FRAUD, AND NON-CONSTRUCTIVE COACHING AT DUT7

#1
Devlen, Adcald, Jonathan Cowan

ALLEGATION AGAINST DEVLEN (no longer with amazon):
FRAUD: Devlen literally fabricated the context and tone of a coaching incidence by taking a statement I made out of context, and placed it in context with other material not previously coached or discussed. It had an intentional effect of character assassination.

NON-CONSTRUCTIVE COACHING: Non-constructive coaching destroys the coaching opportunity by failing to provide the most immediate knowledge of incidence to the party most responsible, it may also inflate incidence without gathering sufficient information, and otherwise do harm to the person coached.

CHARACTER ASSASSINATION: Misrepresentation of character, and behavioral intent to portray intra-network a character either socially or morally incompetent, possibly in an attempt to engineer prejudice of disfavor.

ALLEGATION AGAINST ADCALD: FRAUD and CHARACTER ASSASSINATION, NEGLIGENCE
Adcald advocated too aggressively for one depiction of events, and did not maintain the composure of the incidence I presented.
Quite literally, adcald allowed the verbal discussion to depict a social or behavioral disposition, while the written instrument depicts a person critically out of touch with a constructive social and work culture.
Moreover, adcald was not professionally postured to tolerate conflicting representations of incidence, nor was adcald capable to recognize the difference in perception could amount to FRAUD.

https://amazondotcom.ethicspointvp.com/Followup/Details/Print?key=1B0C9D47-F6C5-4F77-9FAD-8E2D9A6930FD&culture=EN                                    1/5

3/7/23, 2:15 PM                                                                                     EthicsPoint

When it was brought to the attention of the room the depiction of the events was untrue, Adcald aggressively reasserted the position I claim was in fraud without either suspending the conversation or conducting interrogatory over his direct subordinate.

ALLEGATION AGAINST JONATHAN COWAN, "JC"
JC was approached after this meeting to discuss how to address inconsistencies in the narrative, against questions about simple differences in perceptions. JC distorted statements presented to inappropriately misdirect questions about misrepresentation.
This is the second complaint of FRAUD against JC, who did not encourage managers to amend their coachings, and did not investigate once a more serious statement had been presented.
JC also has a political habit of ignoring crucial information; such as whether another individual was a true witness or participant, whether the coherence of the statements presented was questionable, what the best solution would be for a complex problem, or whether some more discussion of perspectives and expectations could be helpful.

ALLEGATION NARRATIVE
I must apologize for the delay in writing this complaint, it is now several months since the incidence on record. I was made unavoidably busy at the time by matters outside of the workplace.

About one month before his termination, Devlen presented false statements about my conduct under the AM process at DUT7.

I received a very serious coaching statement from him detailing several other Amazon Associate complaints more or less conduct which may have been felt to be too curt in non-specified instances.

Specifically, devlen misstated an allegation of an incidence to which he was a part, and in fact lead contributor.

A quote was provided on the page of the coaching which depicted me as being highly critical of a person who accommodated health condition Amazon was aware to look out for.

I was depicted as making a statement more or less in malice against the Associate.

What happened in actuality was that I had in fact stated to the associate how appeared in "fine" health. This was a statement in candor, which seemed to be appreciated at the time.

I then proceeded to ask the associate whether the discomfort experienced required immediate attention, or if might be capable to continue in her then-present role.

The Associate stated next that she was okay, but that she was sure some adjustment would be necessary.

I was prepared to call a Learning Ambassador to stand-in, however the Associate stated her condition was not yet overwhelming.

I then RADIOED devlen for his more or less immediate assistance on the floor, for his familiarity with the Associate' accomodation, and also for his repeated assertions then NOT to make accommodations.
(We have since abandoned that practice of his, and will routinely make adjustment for discomfort over preference.)

I advised the Associate we would have devlen appear to make any appropriate considerations, for his familiarity and confidentiality related to the accommodation.

I was under the impression the Associate could even have departed, the discretion general to the AM any action necessary for individual well-being.

I did not receive a response from devlen. The incidence took place near the labor board, at C-D Cluster spur where the Associate was tasked.

Devlen was situated on the dock, was somehow engaged in a manner which may not have allowed him to respond.

I RADIOED devlen a second time, and he advised he would come out onto the stow floor before too long.

It was more than fifteen minutes before devlen arrived.

I was occupied with Floor Monitoring duties, including labor tracking, individual stow rate monitoring, and any other safety conditions.

I passed the Associate several times in my other duties, and she did not demand my attention directly, and did not demand any other individual's attention.

Several minutes later I found devlen had arrived and had addressed the issue. Based on his direct knowledge of the issue, devlen made a minor path adjustment for the Associate who continued through to the end of Sort Shift.

Devlen became critical over my handling of the situation. I explained I had communicated every element stated above, the AM would arrive with more direct discretion, the issue was not yet critical.

At the time of the coaching, I raised the objection and clarified the incidence verbally.

Devlen accepted my explanation.

Once the coaching issued, it came blindsidedly, out of issues not prior raised, and of dubious import.

3/7/23, 2:15 PM                                                         EthicsPoint

However the management team therein, devlen and adcald, refused to acknowledge the difference in the narrative and more or less accused me of refusing constructive coaching.

I was depicted as being somehow beligerent and even unconscionable.

I was so stunned at the abuse I left the room paralyzed, and devlen submitted the coaching without my signature, with a specious statement of my neither accepting nor declining.

I later brought this complaint to the attention of the Human Resources manager who improperly deflected responsibility for what I openly stated was a kind of Fraud; both in the conference with Devlen and Adcald, and in confidence Jonathan Cowan more or less attempted to blame me for delay in response which rendered any single individual issue unaddressable.

Blamed me, Jonathan Cowan took statements I made about my personal life at that time as direct and causal abuses of mine against individuals who were not named on the complaint, completely distorting the narrative of events.

Jonathan Cowan made no record of anything that transpired thereon, so only the incoherence of the written document is tangible. The management team undertook so little diligence on these problems more or less attempting to prove either the Amazon Human Resources network is corruptible and neglectful, and otherwise were attempting to render me more vulnerable to criticism, social engineering, bias or abuse otherwise.

GENERAL STATEMENT
Responsible Associates and Process Assistants, people, always take personal accountability to the people who feel they were wronged.

Timely verbal/written coaching is essential to defining problems of behavioral disorder, whether critical or negligible, to clarify and ameliorate differences in perspective. To avoid wrongful affection of any single issue.

In verbal discussion over the coaching incidence, devlen was not more professionally postured than criminal, and could not account for critical variance in the substance of the discussion. Nor did offer to amend the statement on the coaching to allow for actual "coaching" wherein we discuss issues more in-depth, with more correct informational standards.

The conference over this written coaching was essentially a bullying session; very characteristic of adcald, who prefers an "in your face" approach to issues discussion, and sometimes appears to glorify violation of trust at the opportunity to exaggerate animus.

The correct and best approach is to amend the coaching statement to fit any substantive discussion, and to maintain the old statement only as a discussion point, so to deflect non-constructive bias whether affirmative or negative to any intended result.

I have not seen the Management Team take a personal interest to clarify its own misapprehensions. The several complaints put forward are similar in that adcald and Jonathan Cowan both routinely violate the law, and breach confidence to bias toxic coaching standards.

OTHER LIABILITIES: This written coaching issued the very same week as Amazon Technical Academy was making decisions for admissions. The ATA admissions paradigm rejects any applicant with an active coaching, an "ADAPT," and this coaching may have been issued to prevent or pre-empt a favorable decision rel. to ATA.

When addressed this question, the HR team misadvised me insisting the ATA option would not reject an applicant due to a behavioral coaching. Jonathan Cowan or Celestia Browning may have been committed to dissolving any appearance of impropriety rather than have brought this problem and question to task sooner, so as be less damaging.

Velaca@amazon.com
s/Carlos Velasquez
12/4/22

_____

**Uploaded Files**
1. cmpl1.pdf

2. EthicsPoint.pdf
   FIRST ETHICS POINT ISSUE - LOST PASSWORD

_____

**Follow-Up Notes**
1/20/2023 6:36 AM
REQUEST FOR FURTHER REVIEW AND ESCALATION

Please conduct further review in light of this complaint, and the lack of disposition thereof.

The HR team in this region did not conduct a sufficient inquiry with jammcgae, did not evaluate the breadth of her perceptions, nor did any these individuals conduct a Seek To Understand dialogue with me on the separate ADAPTable question.

I am aware that jammcgae may yet be with AMAZON, she transferred out of state.

A statement by jammcgae has not been evaluated on a question of FRAUD in the representation of an ADAPT.

jammcgae was the individual subject of the complaint in question where a quote of something I said in candor, which was accepted in candor at the time, was taken willfully out of context by a former AM (devlen) who actively and passively contributed to jammcgae complained of disposition.

3/7/23, 2:15 PM                                                                                           EthicsPoint

I was the subject an ADAPT late in the summer of 2022 which mischaracterized an incidence, and per the original narrative of the complaint I filed here, was a total and deliberate distortion by my then AM (devlen) who delayed against my repeated callouts and actively contributed to jammcgae personal discomfort complained against. The complaint was generally against two individuals, devlen (no longer with AMAZON) for actual FRAUD in the management transaction, and adcald (L6) for totally and deliberately failing to hear the claim of FRAUD when it was presented.

In my original account of this matter, I reported how because of the sensitivity of the ADAPT, at jammcgae approval out of consideration that her condition was workable, I would have the manager come consult her.

The QUESTION is whether she recalled my radio communication to the manager, and whether she recalls how I reassured her the manager would address her situation.

The QUESTION is also whether she recalled having stated to me she could continue to work in the Pick to Buffer (Puller) capacity until the manager arrived.

Certainly if she had requested immediate relief, it would have been provided.

devlen did not appear for 15-20 minutes, and directly contributed to delays in addressing jammcgae concerns. I radioed him multiple times before my Standard Work Process took me into a different task.

It was unethical and even criminal for him to quote jammcgae in the way that he did, and if there was an extant question of how we were addressing injuries, sickness, and accomodations, the ADAPT did not discuss it. It was to make a political injury against me.

My general perspective is that no single one of the issues rel. was fully verifiable, and the HR team did not bother to conduct a STU with me in a way that was timely to this issue.

It was misused by devlen and adcald primarily, I think, to vent fear and frustration at devlen own personal issues, and adcald personal biases to favor management establishment.

Adcald being the subject here, is extremely aggressive and biased to be postured in Malice over the Appearance of Error. When the subject a FALSE STATEMENT was presented he immediately discredited me. Adcald in this instance disfavors me too much, and prefers total submission to frivolous and destructive expressions of company authority.

Adcald may not have been aware devlen was lying; but he refused to listen when I explained so, refused to return the matter to HR for further STU, and more or less the conversation into dysfunction.

As reported previously, it is a strategy he knows how to maintain when he believes the team is not biased to prevent its occurrence. adcald is capable to deploy falsification and misdirection inappropriately and in a manner which destroys intended confidence at the Supervisory and Management relationship.

My demand in this instance is to EXCORIATE the ADAPT in question from my record, or otherwise have it reviewed.

My other demand is to have adcald disciplined or terminated from employment; reinforcement of falsification of behavioral standards of others, beyond violating the rules, is potentially highly extreme. No manager should be allowed to be practice abuse.

It can lend an entire behavioral queue, a tool in social engineering, to disempower and mislead others against the target individual.


REQUEST THAT KERRI A. NOT REVIEW

My original expression of this event was in part based in a statement of how the ADAPT in question was not facially acceptable, for all of the negativity claimed expressed by me it was not invested in credible or coachable representations of actual incidence; sufficient that any actual violation of a company policy were tangible, it was speculated against me in bad faith.

I was traumatized by the presentation for its unexpectedness, and its falsehoods. I refused to acknowledge it - I attempted to discuss the nature of "ACCEPT" and "REJECT" terms on an ADAPT process with Kerri, and should could not clarify that for me which signaled to me that she was actively misleading in the conversation about how much diligence she could have conducted.

Kerri made several critical oversights which amounted to improper deflections of bias;

(1) She appeared to insinuate I may have been using the ethics complaint retributively;
(2) She asserted the authority of the ADAPT without having interviewed the individual whose statement was subject;
(3) She disavowed an understanding of what FRAUD is, as any representational proscription;
(4) She left the dialogue in an unresolved posture, too general, and may have insinuated there was legal context involved.
(5) She was also unable to directly advise Accept/Reject conditions of ADAPTS.

My goal here is to openly and visibly pre-empt any further kind of FALSE representations from Management on site at DUT7 - not to draw general conflicts in the process of reviewing ADAPTS.

I might have treated these discussions very differently; my general impression at this time is that ADAPTs dialogues are not treated as reliable discussions or coachings, the reporting standard in this instance is extremely low.

Kerri's Bias for Action at a truth-finding did not go to the length to interview jammcgae on whether she was aware the Area Manager had been notified by radio to come to her attention.

She may have been left with a wrong impression, and the Management dialogue in this instance may have been knowingly and wrongfully misused by the former AM (devlen), and the current L6 (adcald) at the time of the report.

I struggled to report this to adcald who was in-person at the presentation, and he refused to recognize my objections and reinforced the ADAPT process in the face conflicting information.

adcald expresses improper bias in this instance as person not on-record, but reinforcing a destructive standard when coaching and issuing ADAPTS.

3/7/23, 2:15 PM                                                    EthicsPoint

Kerri struggles to understand in-person how this was the subject of the complaint, and misdirected our conversation to reinforce her discussion of cloture as insinuated retribution against the former L4 devlen.

She also lacks supervisory sensitivity over management questions; FRAUD does not even appear to be plausible discussion at issue on an ADAPT.

CONCLUSION

My view on these ADAPTS is finally that no single one of them could have resulted in a disciplinary instance. That is, the ADAPTS were unrecognizable to me after several weeks of delay at issue, so my inclination to accept "coaching" was treated in bad confidence.

Moreover, we never engaged at DUT7 any Seek To Understand conference timely to any single issue so that there was no immediate and personal oversight entailed; I was literally depicted as being aggressive and overbearing; I think the individuals involved in the issue concocted social distortions of the incidences and the discussion in an attempt to valorize themselves while they were actively harming total confidence.

Kerri is not postured to mitigate the complaint on this scale; the relationship between a true or false statement was not investigated sufficiently to maintain confidence in the record of the documentation referenced on ADAPT. This was one of several very hostile situations engendered by [adcald] presumption and false zealousness.


Please conduct further review in light of this complaint, and the lack of disposition thereof.
12/10/2022 6:20 AM
This is a second facsimile report as 256636404601 (report key).
I lost the password to the first.
_____
**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.
_____
**Chat Transcripts**
There are no chat transcripts for this incident.



# CARLOS VELASQUEZ

*We Administrate Streamlined Fulfillment*

velaca@amazon.com

Process Assistant/AMZL-DUT7-L3

**EXHIBIT
9**

I am familiar with Amazon's core of *customer obsession;* at Customer-Facing stores, in Learning, in Operations this works by getting everyone *Set Up For Success* and creating the opportunity to *Earn Trust* in light of Standard Operating Procedures!

I am on a constructive and advanced path into Management and Operations, with an ULTIMATE GOAL of operating my own business at an efficient industrial scale.

I have a clear path through finalizing a professional business degree from an accredited University, and a clear financial vector in view to make it happen! What I want is more experience managing people, and resources.

I have clear communication skills, and am excited to work in a NEW part of our company.

### AMAZON EXPERIENCE

| | |
|---|---|
| Amazon Yard Marshal L3 2021 | DUT7 Launch 2022 (L3) |
| Amazon Associate L1 2018-2021 (DUT1) | Hire Date: 10/31/2018 @ DUT1<br>Blue Badge: 4/2019 |
| Amazon Ambassador 2020-2021 (DUT1) | DUT3 Launch (2019) |

### EDUCATION

High School Diploma – Rowland Hall St. Mark's (Headmaster's List/99% SAT Verbal)

Some College – St. John's College (NM); Salt Lake Community College (Salt Lake City)(undegreed)

I understand persons of Diversity, and will always look for a new perspective on any role, and on any problem. I think the best solution to solving problems is through patience, so I respect a *Learn and Be Curious* approach to any role or position of responsibility.

I understand critical readers, and can bring a dynamic, educated perspective to logistics questions and presentations. I have strong, well-rounded, multi-disciplinary background, with deep insights into Mathematics, Philosophy, History, Politics, and Literature.

1

## CURRENT AMAZON EXPERIENCE

I understand Operations and Distribution level procedures, in the little Yard Marshal team at DUT7, there was needed more management oversight. I was able to fill into the role independently and improve our site process at launch with careful cooperation and management communication from the Sortation Center!

Presently, I am operating in the **Process Assistant** role at the DUT7 distribution facility and am empowered to help and instruct All operations levels to meet regular and critical goals by managing Amazonian skillsets, limited planning and organizing, and presenting myself constructively in a high-communicating attitude.

New Hire Trainer/Ambassador from March 2020 through July 2021 at Amazon DUT1 (delivery station).

## PROVEN SUCCESSES

### PROVEN MANAGEMENT SUCCESS

Top Regional Performers in 2022

Link:

Repair of Incompatible Delivery Times, SLC9 -> DUT7

Link:
https://issues.amazon.com/issues/ATS-64840

Clarification of Unified Reverse Logistics deployment for SLC9

Link: https://issues.amazon.com/ATS-66507

### PRIOR SUCCESS

Ambassador/STOW-MASTER – HAZ-MAT CERTIFIED

I Piloted DUT1 Campus Ship Program Holiday 2020

20K+ Inducting/Unloading (Multicycle)

Personal Stow Rate Record: 666+/2k-4k Nightly (2020 All-DUT Stow Contest

## OTHER EXPERIENCE

I have extensive and instructible computer literacy, am familiar with Microsoft Access, Excel, and Word, and am also familiar with Adobe products for Office solutions.

I have customer service experience in extremely Popular Restaurants; *Opening* two distinctive restaurant chains in Salt Lake City, UT. I have also worked in Five Star Gastronomy Bar.

s/Carlos Velasquez, 10/25/22

2

Acknowledged by associate on December 18, 2022, 9:39:18 AM - Delivered by Wayman,Margarita (mwwayma)

## Supportive Feedback Document
## Behavioral - First Written

amazon.com

**Associate Name:** Velasquez,Carlos (velaca)
**Manager Name:** Wayman,Margarita (NA5-0120)
**Created On:** December 18, 2022, 9:39:18 AM



**EXHIBIT**

**10**

## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Coaching | 2 | June 28, 2022, 6:10:19 AM |

## Details of Current Incident/Specific Concerns

DETAILS OF CURRENT INCIDENT/SPECIFIC CONDITIONS On 11/28/2022. 11/29/2022, 11/30/2022 you failed to follow appropriate standard work practices. Specifically, you failed to correctly code AA to their assigned functions. A seek to understand conversation took place with you on all three dates listed above to which you stated: Sorry for the miscode, I will improve next time on the coding and make sure it is more accurate. I will also do better to communicate with Shanese for changes that occur with assignments on the dock.

## Areas of Improvement Required by Associate

AREAS OF IMPROVEMENT REQUIRED BY ASSOCIATE As detailed above, you have failed to meet Amazon's Standards of Conduct and behavioral expectations. Amazon expects associates to adhere to standard operating procedures with regards to processing orders in each function within the delivery station. Failure to adhere to standard work guidelines includes, but is not limited to, any action that artificially inflates an individual's rate (i.e. double-scanning, machine-gunning), dishonest behavior or discriminatory work selection that directly or indirectly hinders others' performance (i.e. cherry picking), knowingly causing a virtual/physical mismatch, or circumventing critical steps in a process/PMV. Failure to meet these expectations and/or future violations of these guidelines may result in additional discipline, up to and including termination.

## Associate Comments

These specific instances were mechanical errors in Labor Process coding, non-deliberate and may have been related to stress. I will attempt to prevent such errors in the future. To my knowledge these were mechanical errors.

**Associate Signature:** Acknowledged by Velasquez,Carlos (BadgeID: 11759273)    **Date:** December 18, 2022, 9:39:18 AM

**Manager Signature:** Acknowledged by Wayman,Margarita (BadgeID: 0234840)    **Date:** December 18, 2022, 9:39:18 AM

Acknowledged by associate on December 18, 2022, 9:44:48 AM – Delivered by Wayman,Margarita (mwwayma)

### Supportive Feedback Document
### Behavioral - First Written



**EXHIBIT 11**

amazon.com

**Associate Name:** Velasquez,Carlos (velaca)
**Manager Name:** Wayman,Margarita (NA5-0120)
**Created On:** December 18, 2022, 9:44:48 AM

## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Coaching | 2 | June 28, 2022, 6:10:19 AM |

## Details of Current Incident/Specific Concerns

On 11/11/22, you were reported to have violated the Code of Business Conducts and Ethics by telling someone that they should take items from the breakroom cantina. On 11/23/22 a seek to understand conversation took place with you to which you stated that you had made a joke to another AA telling them to take items from the cantina without paying. During the course of the investigation, it was found that this comment is considered a violation of the Code of Business Conducts and Ethic "Unauthorized use, misuse, or abuse of equipment, products, material, or property belonging to other associates, belonging to the company, or in the company's custody".

## Areas of Improvement Required by Associate

As detailed above, you have failed to meet Amazon's Standards of Conduct and behavioral expectations. At this time, based on your violation of Amazon's Standards of Conduct and behavioral expectations, you are receiving a first written warning.

## Associate Comments

This was an instance of candor, maybe slightly off-color, or perhaps perceived as Not Funny. I have not ever advocated for theft from the breakroom store in any manner to any reasonable person.

**Associate Signature:** Acknowledged by Velasquez,Carlos (BadgeID: 11759273)    **Date:** December 18, 2022, 9:44:48 AM

**Manager Signature:** Acknowledged by Wayman,Margarita (BadgeID: 0234840)    **Date:** December 18, 2022, 9:44:48 AM

3/7/23, 2:18 PM                                    Gmail - (no subject)

**M** Gmail                                        Carlos <cfv1983@gmail.com>

**(no subject)**                          **EXHIBIT**
1 message                                 **12**

**Carlos** <cfv1983@gmail.com>                    Thu, Dec 22, 2022 at 12:28 PM
To: "Velasquez, Carlos" <velaca@amazon.com>

Message also forwarded through Amazon internal to keralger@amazon.com

In Reply to Kerri Alger,

Thank you for listening to the complaint and raising attention to the questions I presented.
We met on or about 12/15/22.

For my part, I have a definite conviction that when I find a false or misleading representation of my conduct, and find the individuals around me fail to support me in raising critical questions, as was the nature of the complaint I presented reg. an Adapt which claimed I had dispariaged individual associate needs which were totally of critical importance.

In my report to the organization, I wrote how the Area Manager (devlen) had falsified statements of his own neglect and used them against me, retributively.

I have several follow-up questions about the depth of our investigation.

1. Please link or provide for me a whole statement or brief of the ADAPT process. I have undergone not very much training on this subject, and I do not really understand the coaching process. In these instances nature of the document has been left critically vague and I have a lot of difficulty recognizing the discussions with any consistency as they do not often define my conduct directly but are precipitated on a different narrative.

2. Did you interview any of those individuals who submitted related complaints?

3. What about the value of a false representation of incidence rel.? In the complaint I presented I stated that I attempted to raise a question of false representation in the document. The L4 manager had presented a problem he himself engendered as against me, based apparently on the associate involved having perceived that I was somehow at fault.

4. When interviewed, you explained to me the ADAPT process is not ever reviewed for hiring considerations; that seems like an assumption – given these ADAPT forms are a permanent record; will I have sole confidence to those documents or is any high-level manager able to review that documentation?

5. Was the time taken from incidence to report more or less critical to how we found this matter resolved?

Reiterating from the Ethics Complaint, I felt the ADAPT put words into my mouth at the deliberate expense of the truth. I felt the Ops Manager overseeing the ADAPT delivery totally and deliberately failed to represent the highest standard of clarity and respect for the

3/7/23, 2:18 PM                                              Gmail - (no subject)

subject matter.


We also discussed how the Ops Manager's behavior had been witnessed previously. May I assume this previous incidence was not
investigated?

Please update this account as well. Thank you.


Sincerely, Carlos Velasquez
velaca@amazon.com
AMZL-DUT7-PA

8/20/23, 2:57 PM                                           EthicsPoint

☰  **EP ETHICSPOINT**®
    Incident Management

Questions and Comments

Add Follow-Up Notes

Upload Files

Report Details

Print My Report

ISSUE TYPE: UNFAIR EMPLOYMENT PRACTICES

**REPORT DETAILS**

**Report Submission Date**
1/20/2023

**Reported Company/Branch Information**
Location 989 W Center St, North Salt Lake, UT 84054
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
adrian caldera - L6
shanese walters - L3
HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
adrian caldera - adcald

**Is management aware of this problem?**
Do Not Know / Do Not Wish To Disclose

**What is the general nature of this matter?**
Social - Engineering, statements negatively characterizing an individual performance intended to manipulate management decisions

individual role selection issue

**Where did this incident or violation occur?**
DUT7 - EG CLUSTER SPUT - LABOR STAFFING BOARD/GATEKEEP

**Please provide the specific or approximate time this incident occurred:**
910AM - 1/11/23

**How long do you think this problem has been going on?**
Don't know

**How did you become aware of this violation?**
Other

**If other, how?**
It happened to me, I observed it - the action against another individual was used against me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
adcald - ignored it, altered immediate work standards unnecessarily to exaggerate impact (retributive)

**Details**
UNFAIR PRACTICES

@

SOCIAL ENGINEERING
and partial RETRIBUTIVE HARASSMENT

1/11/23

Process Assistant: washanes
L4: mwwayma
L6: adcald

CONTEXT
End of Sort to Pick and Stage transition, characterized by Stow Down, new Labor Tracking, reduction in Headcount, and Pick and Stage timing.

The L4 Sort Manager concludes Sortation with a Handoff to the Pick and Stage Manager; adcald L6 was acting Pick and Stage Manager.

Delivery Stations have an unofficial LABOR ROLE sometimes in use when the On The Road team has "unassigned" routes

EXHIBIT
13

8/20/23, 2:57 PM                                            EthicsPoint

Log Off

which require direct work on an ad hoc basis, unassigned routes (routes not assigned a staging location) sometimes have unexpected staging locations, or early departures – otherwise the practice is standard based on an assigned pick list which assigns an individual a full and complete route consisting of two or more picklists.

Our Process in this respect usually maintains a very fast work pace for this role, but it is also treated as a "voluntary" role. (mwwayma)

WHAT:
The Process Assistant returned from GEMBA while I was operating in GATEKEEP, and immediately noticed an associate operating to Pick and Stage "Full Routes" whom she did not favor for the process. We discussed the issue and I was overruled by the manager on the subject. The sole reasoning presented by the PA was how she believed the individual was attempting to harm herself to find her way onto a new accomodation.

I was incredulous at the expression by the PA, out of consideration that we were very far ahead in timeliness to complete the process. Given also how operating "full routes" is open-ended with confidence to the time available to pick a route, my application was not addressed.

adcald interjected over this, stated his expectation over the timeframe for utilization, did not address the statement by the PA and then expressed how he favored the PA for the GATEKEEP role over my efforts on it.

Next, he adjusted our immediate PICK RATE standard from 375 to 400 to favor a discussion escalating my decisional role – simultaneously accusing me of understaffing us. He looked squarely at the other PA doing this, in a show of direct confidence thereto.

The PA did not think twice about accepting and enforcing an arbitrary change in production standards while we were projected to be ahead by more than 40 minutes. (SOP at Pick and Stage requires a 30 Minute buffer, and our standard practice regarding individual VTO issues is based in anticipated time to completion).

Both abused their roles in capacity to express unqualified disfavor, more or less to allow themselves at an advantage over other individuals in their work flow.

INCIDENCE NARRATIVE
washanes expressed an process objection to an individual labor assignment asserted, against the wisdom of this PA, " [davciars] is trying to hurt herself to get back on to her accomodation."

I responded, "Really?"

[washanes] Replied in the Affirmative, claiming witness over [davciars] intentionally lifting heavy shipments.

OTHER GENERAL SUBJECT MATTER
[davciars] I have been advised by her directly no longer maintains standard work accomodation, and was advertent this week in desire to build strength over the core process, incl. Pick and Stage which she has not operated on for quite some time.

Typically, [davciars] has operated on Dispatch role or Sweeper role. The implication is that either of those roles are more characteristic or preferable to the Associate.

I was not allowed to explain my reasoning; the L6 took control over the conversation on alternative point where we recognized we would not have an opportunity to train a different associate for the Dispatch role due to our Learning Coordinator being on a vacation.

We discontinued the dialogue at that point; however the process remained prejudiced on the [washanes] declaration of the [davciars] bad intent.

The next element of the discourse involved a criticism over the current Headcount, why we had elected to offer VTO to as many 4 associates, and whether there was or was not sufficient headcount to complete the Pick and Stage process. The [mwwayma] had made an allotment based on the numbers visible on the board.

The L6 compounded the prejudice of what I recognize is a defamatory statement by (A) adjusting the standard Pick Rate from 375 to 400 which prejudiced the more immediate decision of the VTO process against the current process I had executed already. That latter object was not necessary because we had an advantage in terms of TIME and HEADCOUNT, instead the [adcald] was engaged in a process improperly amending the Pick Plan to accommodate his posture to favor [washanes].

There was no reason to amend the Pick plan.

adcald used a defamatory statement made by another individual whom he should otherwise favor with relevant Standard Work to leverage a misrepresentation of the demands of the process, and created a reason not only to dismiss the plausible needs of the [davciars] who role was relevant, but also to ensure that I would not be allowed to conduct the Gatekeeper role.

The adcald expressed this as a Business Need implicit, on terms to compare retributive ethics of a Communication failure either between he and the mwwayma, to favor some communication between he and the [washanes].

MY REASONING
Given there was an extensive lead on the time available to pick certain routes, I agreed at davciars request to allow her that process out of consideration for the level of uncertainty she expressed more or less on a limited basis.

The Question is primarily about Bias for Action, self-reliance, completing a whole process, and taking new confidence. Similar to processes veterinizing individuals, nesting individuals, and coaching individuals, I found we had the time and the process

8/20/23, 2:57 PM                                    EthicsPoint

showed it.

I was not allowed to explain. Adcald did not allow me to explain, and took that success directly from me and awarded it to someone else.

[mwwayma] has previously advised the "Full Routes Squad" category, an unofficial rule, was at least by Volunteer.

Essentially I was attempting to allow the Associate a limited advantage against her previous accomodated status, while we had plenty of time to complete staging.

The [L6] attack on my adjusted Headcount neither correctly identified the then-relevant status, nor informed other issues. Instead, the interjection served to interrupt the direct discussion, to actively divert and/or misdirect it, failed to disposition what was being discussed, and ended in a declaration of his favor to the [PA] stating his preference for her standing in the Gatekeeper role.

The adjustment expressed an indefinite disciplinary standard in a manner intended to attack my credibility; the [L6] has a low-level strategy for personal attacks wherein he adjusts his ethical posture from retributive to accomodative, his behavior in essence mirrors the behavioral and procedural ethics of the individual attempting to render a limited exception to aid individual growth while the outcome of the Standard Process is not in peril.

Just to clarify the above paragraph, the L6 basically imitates the ethical posture of the individual, condescending in error or even malice, and then renders a repeatable disfavor to the individual PA who makes a leap in good faith. It is actually predatory, zero-tolerance, zero-respect, and not justified on an actual principal than speculated.

In many circumstances, a serious individual associate will not tolerate abuse on that scale, to compare caprice compounded on management error.

OTHER COMMENTS

1.

[PA] is very vocal and sometimes aggressively motivated over procedural questions; I think she is going through critical personal growth and change, and is finding narrative conflicts about general terms such as "team," "management team," and is very vocal about becoming a "manager."

2.

[L6] does tend to aggressively favor the [PA], and while I respect zealousness in the Management Team's interest to cultivate an individual when the opportunity is tangible, [L6] has a tendency to also have avoided communicate direct versus indirect standards, and risks damage the process, and with it individual confidence.

The L6 may be in some way posturing or advantaging direct attempt to discredit my approach to our shared process.

Earn Trust respects that criticism over a non-standard practice, or an exception thereto, is a process question - and is not a strict vanguard against individual Credibility; Attack the Process is the most efficient Amazon maxim in this respect, because the tone and rectitude of informative criticism does not seek to destroy individual confidence or credibility.

There is no clear Seek To Understand dialogue taking place here, and again the Management Team is not remit to criticism.

WITNESSES
leftnaht - Learning Ambassador present at Debrief
mwwayma - Area Manager at Hand-Off

**Follow-Up Notes**
There are no additional notes for this report.

**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.

**Chat Transcripts**
There are no chat transcripts for this incident.



Privacy Statement | Terms In Use | Cookie Statement | About
© NAVEX Global 2023. All rights reserved.

7/12/25, 3:28 PM                                     Gmail - Investigation Update



**EXHIBIT 14**

Carlos <cfv1983@gmail.com>

## Investigation Update
1 message

**Leme, Celestia** <brownice@amazon.com>                    Thu, Feb 16, 2023 at 10:13 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

Hello Carlos,

On 1/26/23 you raised concerns about a situation you experienced on site. Amazon takes concerns of this nature very seriously and has a process in place to investigate. My role in this process was to be a fair and objective fact finder and to conduct and complete a thorough investigation. As part of this process, I spoke with relevant parties and reviewed relevant documentation.

I completed a thorough investigation. We now consider this investigation to be closed. No further action is needed from you.

As a reminder, Amazon has a policy prohibiting retaliation against anyone who has raised a complaint or who has participated in an investigation. Amazon expects that anyone who participates in an investigation will not engage in any retaliatory behavior – this applies to and has been discussed with all the parties in the investigation.

Thank you again for your cooperation.



*Celestia Browning*

*HRBP* | brownice@amazon.com

3/3/23, 11:59 AM                                                    EthicsPoint

≡   **EP ETHICSPOINT®**    ISSUE TYPE: FRAUD OR EMBEZZLEMENT

```
┌─────────────────┐
│   EXHIBIT       │
│     15          │
└─────────────────┘
```

Questions and Comments

Add Follow-Up Notes

Upload Files

Report Details

Print My Report

**REPORT DETAILS**

**Report Submission Date**
2/25/2023

**Reported Company/Branch Information**
Location 989 West Center St
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
kerry alger - human resources
HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
kerry alger is a regional human resourcs manager

**Is management aware of this problem?**
No

**What is the general nature of this matter?**
A question of Negligence or Willful Misconduct, failing to respond and escalate a complaint question left unanswered.

All of keralgr's statements indicated Amazon had difficulty even recognizing the question I presented, which left these questions undefined and our discussion unsatisfactory.

**Where did this incident or violation occur?**
DUT7 - across several HR discussions (unrecorded) and several documents which I am not privvy to.

**Please provide the specific or approximate time this incident occurred:**
The issued generated after the middle of january, when I contacted keralgr requesting further review after keralgr had suggested I do so if I had more questions.

**How long do you think this problem has been going on?**
More than a year

**How did you become aware of this violation?**
It happened to me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
keralgr (allegation)

**Details**
COMPLAINT FOR FURTHER INVESTIGATION
RELATED TO COMPLAINTS 256636404601 (EthicsPoint), 624709432501 (EthicsPoint)

Complaint against keralgr for having left investigation INCOMPLETE.

BASIS
SOCIAL ENGINEERING – a direct attempt to mislead the company/organization about an individual in order to manipulate that individual or manipulate the company culture.

In the two related complaints, these are facsimile complaints, I complained about a Level 6 manager who I described as repeatedly managing and coercing false statements about me.

I have presented on our site, DUT7, at least two of these instances which I think may indicate a deep and extended effort to harm me in order to manipulate and otherwise control certain other elements on site at least since November of 2022.

My present concern is on how the Human Resources team onsite at DUT7 did not fully investigate the questions I presented when reaching its conclusions; meaning I question the motive for concluding the investigation.

Specifically, keralgr may be engaged in COLLUSION to have conducted or maintain elements of SOCIAL ENGINEERING for the following reasons.

(1) I asked critical questions about the origin of content contained in one written ADAPT form, incl. a question of FRAUD in the manager's transaction which keralgr failed to restate.

3/3/23, 11:59 AM                                                    EthicsPoint

Log Off

(2) Keralgr failed to recognize the question; when we met face to face on-site on 1/6/2023 she asked me this specifically, what I had intended by use of the word of the "fraud" wherein I related a usage of a Federal criminal statute for guidance

(3) Keralgr failed to clarify standards and practices regarding the ADAPT process, meaning she left this complaint and process vulnerable to further ambiguity after our meeting.

(4) Keralgr may be biased to disfavor the complaint for a perceived lack of diligence on my part, rather than have reviewed it more completely.

In this instance, the term I should clarify, I have accused an L6 manager of enforcing the falsification of behavioral records about me by refusing to listen, and by conspiring with other managers in open hostility to my complaint of misrepresentation of the disciplinary question at hand, and the disciplinary process in general.

The L6 has critically denied access to ethical standards in order to affirm an unethical policy favoring management authority; my general fear is there is a tacit campaign of CHARACTER DEFAMATION ("ASSASSINATION") maintained at DUT7 which is uncharacteristic to any associate.

I asked via email if Keralgr would not, as she verbally offered in our meeting, escalate review of the complaint.

I also amended the original standing complaint to question the individual who was claimed subjected to mistreatment if could recall the steps I took conscientiously, as whether it was plausible an L4 Area Manager (No longer with AMAZON) may have blamed me for his own fault in responding to my requests for his presence on the stow floor.

Keralgr has not responded, and may not have seen my email, and either way did not recognize the structure of the question I presented in a manner to maintain the confidence of the complaint.

GENERAL STATEMENT
I have proceeded these complaints this way in part because I think coercion of false standards is, in a single instance, a completely terminable misconduct, it is a gross misconduct which harms an individual out of criminal contempt for his or her standing in the company.

It is fraud which seeks out ulterior security by undermining the daily and regular efforts of the individual on a basis to compare a preference for FAVORITISM, so that the fraudster expresses FRAUD simultaneously with disinterest in actions of illicit prejudice while perhaps appropriately FAVORING others.

An Operations Manager really cannot ever ethically maintain false standards of interest in the issues of his subordinate managers, the result is that Area Managers become contaminated with the secret history of transgression against subordinates.

This complaint is therefore to move reinvestigation of this matter on a basis demanding a more complex Seek To Understand dialogue, and may involve contacting at least one associate who may have transfered or resigned from the DUT7 jurisdiction.

My understanding is that keralgr will not oversee further review of this question which I develop over time primarily to allow the simplicity of any single investigation to take breadth before generating a comprehensive complaint.
2/25/2023
s/Carlos Velasquez

NOTE: I will be updating this complaint with related documentation in the coming days.

---

**Uploaded Files**
1. EthicsPoint.pdf
   First Related Complaint
   256636404601

   Fraud in Social Engineering - Making false representations about an associate, and refusing to hear how representation of an issue was false - against two managers

   The present complaint relates to how HR did not recognize a question of misrepresentation maintained coercion conducted by a L6 associate in a context free from oversight.

2. EthicsPoint2.pdf
   Second Facsimile Ethics Complaint
   624709432501

   Fraud in Social Engineering, the same complaint of a failure to hear and resolve a question of misrepresentation of issues conducted by an L6 in a context without supervision.

   The second was complaint was opened after the first complaint was thought lost.

3. RE_ HR Investigation .pdf
   Email Communications Referred to from the complaint
   Dates: 1/31/23

---

**Follow-Up Notes**
2/27/2023 10:20 PM

3/3/23, 11:59 AM                                    EthicsPoint

UPDATED: 2/27/23

**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.

**EXHIBIT**

**15**

**Chat Transcripts**
There are no chat transcripts for this incident.

SAS70
Type II Certified

PRIVACY FEEDBACK
Powered by TRUSTe

Privacy Statement | Terms of Use | Cookie Statement
© NAVEX Global 2023. All rights reserved.

7/12/25, 3:28 PM                    Gmail - Amazon Confidential: Urgent – Appeal Available for Next 7 Days

 Gmail

**EXHIBIT 16**

Carlos <cfv1983@gmail.com>

## Amazon Confidential: Urgent – Appeal Available for Next 7 Days
1 message

**OpsHR Panorama** <opshrpanorama@caseservices.panorama.hr.a2z.com>                    Wed, Mar 1, 2023 at
To: "cfv1983@gmail.com" <cfv1983@gmail.com>                                                      5:52 PM

Hello Carlos

Our records indicate you received corrective action. For a few particular AMZL sites, Amazon provides the ability to
appeal employment terminations and final warnings if an associate believes we failed to apply policy properly and/or
consistently. Employment terminations stemming from violation of Amazon's Workplace Violence, Drug and Alcohol abuse
policy or actions stemming from findings of harassment, retaliatory or discriminatory behavior are not eligible for appeal.
Your corrective action may fall within Amazon Appeals eligibility for appeal. If you would like to appeal the corrective
action, you may click on this link https://app.smartsheet.com/b/form/00343c4349894a94a797057ca397aa1b to start the
appeals process.

You have seven (7) days from the date of this e-mail to appeal the corrective action delivered. Failure to submit the form
within 7 days of this e-mail will end the ability to appeal the corrective action. If you have any problems in completing, or
any further questions related to your corrective action, please contact hrc-appeals@amazon.com

Kind regards,

Amazon Associate Appeals

103957754

ref:_00D36b5qS._5001Q1Wkimr:ref

7/13/25, 8:51 PM                    Gmail - Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

 Gmail                                                                    Carlos <cfv1983@gmail.com>

**Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]**

6 messages

| EXHIBIT |
| 17 |

**Exact HR** <hr@exact.hr.amazon.dev>                                            Fri, Mar 3, 2023 at 6:21 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

3/3/2023

**Carlos Velasquez**

Dear **Carlos,**

On 03/03/23 11:01 AM you notified us that you wished to appeal your Final Written Warning through the Amazon Appeals Process by meeting with the Senior Site Leader. We have scheduled the requested Appeal Hearing and the details are below.

# Date and Time:

## <mark>Wednesday, 3/8/2023 at 9:00 AM MST</mark>

## Location:

## Call in using your phone:

## United States Toll-Free (1): <u>+1 855-552-4463</u>

## Meeting ID: 8080 75 4000

## Dial-in attendees must enter *7 to mute or unmute themselves.

If you have relevant documentation, which you wish to be considered, need an interpreter, have witnesses you believe we should speak to, or need any accommodation for a disability at the hearing, please let me know no later than 24 hours prior to the appeal hearing.

The appeal process will have you presenting your concern directly to the Senior Site Leader. You may not bring anyone with you to the Appeal Hearing. If you have questions about this, please contact me. If, for any unforeseen and unavoidable reason, you are not able to attend the Appeal Hearing, please contact me as soon as possible. Also, if you have any questions, please feel free to contact me.

Best regards,
BA

7/13/25, 8:51 PM                    Gmail - Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

ref:_00D3t2mKvO._5003t1g96p1:ref

---

**Carlos V** <cfv1983@gmail.com>                                    Fri, Mar 3, 2023 at 7:14 PM
To: Exact HR <hr@exact.hr.amazon.dev>

Greetings to Exact HR,

I may have made a decision in error where I elected to discuss with site leadership this subject.

Some of what I have to say relates to several other complaints I have, and I would prefer to maintain some confidence
given that this involves a greater subject breadth than any single instance.

Please allow this APPEAL to follow a CENTRALIZED process, I was not aware I had received a final written warning and
eouod have selected the CENTRQLOZED process was I fully informed.

Thanks
CV

Sent from my iPhone

> On Mar 3, 2023, at 6:21 PM, Exact HR <hr@exact.hr.amazon.dev> wrote:

[Quoted text hidden]

---

**Carlos** <cfv1983@gmail.com>                                    Tue, Mar 7, 2023 at 3:18 PM
To: Exact HR <hr@exact.hr.amazon.dev>

Greetings,

I was not responded to previously.
A much better day, one which is not rushed, will be Friday 3/10/23.
I simply have too much on my plate this afternoon to have prepared a full presentation which forms the basis for my
appeal.
I have quite a bit of information to present, and would like to reschedule the hearing.

I have had today a separate conference with Human Resources on what I am going to claim is a related problem.
The time required to consult with HR competes with the time required to prepare for this interview.
Is this the appropriate email to forward documentation to?

PLEASE RESPOND.

Sincerely,
CV

[Quoted text hidden]

---

**Exact HR** <hr@exact.hr.amazon.dev>                              Tue, Mar 7, 2023 at 3:32 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

Hello Carlos,

Thank you for your email and we are sorry that you did not receive a reply to your previous email.  All appeals are heard
with a Sr Leader from another site, so all hearings are fair and consistent.  We just received notification that the leader we
had assigned to your case unfortunately, will not be able to join due to a family emergency.  We are in the process of
getting your appeal rescheduled with a new leader.  Due to the timeframe, we will be moving your appeal to either
Thursday or Friday – we will have it rescheduled by end of day today.

As for any documents, you can respond to this email and attach anything you need.  We will make sure it is attached to

https://mail.google.com/mail/u/0/?ik=a35517a20b&view=pt&search=all&permthid=thread-f:1759398204036046026&simpl=msg-f:17593982040360460...    2/4

201

7/13/25, 8:51 PM                    Gmail - Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

your appeals case.

Regards,
PIE Appeals Team - CR

------------- Original Message -------------
**From:** Carlos [cfv1983@gmail.com]
**Sent:** 3/7/2023, 5:18 PM
**To:** hr@exact.hr.amazon.dev
**Type:** Re: Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

**EXHIBIT 17**

Greetings,

I was not responded to previously.
A much better day, one which is not rushed, will be Friday 3/10/23.
I simply have too much on my plate this afternoon to have prepared a full presentation which forms the basis for my appeal.
I have quite a bit of information to present, and would like to reschedule the hearing.

I have had today a separate conference with Human Resources on what I am going to claim is a related problem.
The time required to consult with HR competes with the time required to prepare for this interview.
Is this the appropriate email to forward documentation to?

PLEASE RESPOND.

Sincerely,
CV

[Quoted text hidden]

---

**Exact HR** <hr@exact.hr.amazon.dev>                    Tue, Mar 7, 2023 at 5:55 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

3/7/2023

Carlos Velasquez

Dear Carlos,

On 3/3/2023} you notified us that you wished to appeal your Termination through the Amazon Appeals Process by meeting with the Senior Site Leader. We have scheduled the requested Appeal Hearing and the details are below.

## Date and Time: Friday 03/10/23 at 8:00 AM MST

Location: Call in using your phone:
United States Toll-Free (1): +1 855-552-4463
Meeting ID: 8080 75 4000
Dial-in attendees must enter *7 to mute or unmute themselves

7/13/25, 8:51 PM                    Gmail - Case 20230304-630632 : Appeal Hearing Scheduled [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

If you have relevant documentation, which you wish to be considered, need an interpreter, have witnesses you believe we should speak to, or need any accommodation for a disability at the hearing, please let me know no later than 24 hours prior to the appeal hearing.

The appeal process will have you presenting your concern directly to the Senior Site Leader. You may not bring anyone with you to the Appeal Hearing. If you have questions about this, please contact me. If, for any unforeseen and unavoidable reason, you are not able to attend the Appeal Hearing, please contact me as soon as possible. Also, if you have any questions, please feel free to contact me.

Best regards,
PIE Appeals Team - CR


ref:_00D3t2mKvO._5003t1g96p1:ref


**Carlos** <cfv1983@gmail.com>                                              Thu, Mar 9, 2023 at 6:36 AM
To: Exact HR <hr@exact.hr.amazon.dev>

I will be there, thank you.
I have provided some relevant documents, and a written statement since there is a lot of ground to cover.
Thank you!

**-CV - velaca**
[Quoted text hidden]

_____

**2 attachments**

 **Binder1_Redacted.pdf**
1854K

 **VELACA_talkingpoint_forappeal.pdf**
84K

TALKING POINTS

EXHIBIT

**17**

I must state in the first instance, I am not in disagreement with policy direction being reviewed.

A pdf of attachments is provided, documents are in the order of relevance to the numbered list below.

I asked for this APPEAL on a FINAL WRITTEN WARNING to request an EXCEPTION from the rule implementing a FINAL WRITTEN WARNING, on several Bases.

(1) The ADAPTS as expressed do not reflect the STU engaged between myself and the manager, the process that way is not guaranteed to be in good faith;

(2) I have absolutely critical stress factors rel. to an ongoing complaint of Character Assassination/Harassment against an L6 on-site who has routinely enforced false standards of issue, i.e. False Declarations on ADAPTS process on in-person context – I fear the cause of these errors is unnecessary anxiety coerced on my in CONTEMPT;

(3) I have even more critical stress factors rel. to extrinsic legal issues, which I am more hesitant to disclose (though I will provide some part of it), I have a serious piece of litigation suffering criminal misconduct under the Federal court which I was also filing at the same time as the first ADAPT took precedence – I will respect this information is not disclosed to my Management Team in CONFIDENCE because it may change their behavior.

### (1) BAD STU REPRESENTATION BY THE L4 AT ISSUE

The FIRST instance of this process *depicted* an individual flippantly using the scanner as a cause for issue; I had actually explained that I may have had some kind anxiety rel. congitive lapse. I verbally explained this to the manager – the documentation provided destroys trust in the expression therefore, this was an instance of unforeseeable freak human error.

In my view this is a trust versus bias issue; I think the manager may have other biases which he or she is attempting to misdirect, or reserve, meaning the ADAPT is NOT interested to capture a true Root Cause at a pragmatic policy level discussion, even though it is severe in its tone to have to take seriously.

It has the power to destroy whatever real coaching opportunity there is, to misstate or misrepresent divergence of perspectives.

The ADAPT instead was delivered on the dock with the oversight of an L6 against whom I presenting a complaint serious misconduct across 18 Months; I fear the manager at issue is attempting to sensitize the most critical elements of this discussion rather than relate to me directly.

The HR policy level discussion is simply too prejudiced to recognize this discussion as anything other than Insubordination; the prejudice, I fear, is intentionally misplaced.

HR on-site is not prejudiced to represent the Associate versus Manager where a policy dictum appears violated, even if the Root Cause discussion has not been addressed.


The SECOND instance took place in mid to late February, and was the exact same error. I say "error" because I literally could not have anticipated it; it was not like forgetting something and then remedying it later while preoccupied, it was an unforeseeable cognitive/rational lapse.

The manager may have recognized I was suffering a Panic Attack, and rather than hear the scope of problem, he or she became aggressive to express procedural override – an element of direct and intentional misbehavior.

Rather than hear me out, and generate a more sensitive level of discussion, she ignored me and repeated aggressively the policy standard sought. More or less attempting to discipline me without appreciating my most direct position, and so generated a second disposition on delivery of a verbal STU.

Again, my interest was to address a ROOT CAUSE and not discuss an excuse per se; the causes of such an anxiety could tolerate disclosure with manager, she is however not routinely postured to hear criticism of her active approach.

The L4s aversion to the appearance of being discredited while palpable, is also forgivable – even if not understanding the problem it is not out of alignment with an

INSIST ON THE HIGHEST STANDARDS approach when discussing an
UNCHARACTERISTIC issue.

| EXHIBIT |
| 17 |

(2)

I have attached documents with details on this subject; I have a meeting scheduled with Human Resources (Exact HR) 3/7/2023 to discuss the complexity of this problem and issue.

I seem to have become a target possibly based in management behavioral queues surrounding False Statements rel. to questions of my conduct. I have attempted to demonstrate at least THREE instances with THREE different managers wherein an L6 critically disrupts a discussion to coerce the entry, to ignore valuable information, and to disfavor further fact finding.

May relate to ADAPTS discussion, there are many numerous instances on a day to day basis wherein we direct favor and sometimes disfavor, where discussion of variance and communication suffer disposition related to these false statements, where some otherwise remediable oversight does not give way to discussion but gives way to threatening characterizations, misrepresentations, and otherwise resurrects discussions where I suffered excessive disfavor.

This type of low-level retributive context may have been more prevalent early in december, and may have contributed to excessive stress.

UPDATE: The issue represented is under investigation, and must be kept in confidence. I consider this discussion to be confident, given it is to some extent beyond the immediate scope of on-site Associates.

TIMELINE:

12/10/22: I initiated a complaint.

12/15/22: Meeting with HR Regional Mgr.

12/22/22: Request for Further Investigation (HR did not reply)

2/25/23: New Ethics Complaint Init. Against the HR Mgr.

3/3/23: Meet to Speak engaged.

EXHIBIT
**17**

(3)

I have unrelated independent civil litigation ACTIVE during this time, which does require an enormous level of effort.

The litigation presently suffers further obstruction, and is a several years effort suddenly imperiled at what I have alleged is criminal misconduct.

Whatever prejudices or preconceptions you, or any of us may have about Pro Se and prejudiced legal or civil claims, I assure in confidence I am in good faith. Moreover, any of us may also understand that an actual Fraud committed by a Federal Officer works to disestablish the individual critically at the level of him most conscious efforts.

I advise you, the individual liability for criminal and political doing is extreme to the victim; the level of energy is very different from that energy I was applying my at Process Assistant role – the assistancy is far more critically brief, and finds reward and correction/rebuke to often be alignment with the policy scope. Corruption threatens to discredit and destroy that capacity.

For whatever reason, the energy I had committed to my extrinsic legal process may have undermined my conscious attention. (I was holding back to back 80 to 100 hour work weeks)

Given the scale of anxiety against wrongful treatment, and the limited evidence I have provided of having to actually think about, work about, the subject of ministerial corruption an EXCEPTION to protect this tenured associate (4 going on 5 years since 10/31/2018) from personal dispositions under abuse seems fitting.

I thought to include this when I recognized these lapses both occurred related to my having to raise issues.

TIMELINE: 12/1/22 I filed an Appellate Brief in U.S. Court of Appeals for the Tenth Circuit.

CLOSE

On-Site, there has become a tacit policy to allow statements in complaint standing at ADAPTS based on mere Individual perceptions. That is, I have been encouraged by HR and L6 managers to admit as valid any kind of complaint against any statement, any kind of conduct.

INSIST ON THE HIGHEST STANDARDS may respect that I have seen uncharacteristically low standard of issue on documenting an addressing substantive issues on these ADAPTS; the strategy here is ATTRITIVE, to make or break CONFIDENCE based in whether we agree on conformity to the process and Standard Operating Procedure, this includes manager caprices.

I fear a holistic disposition motivates manager misbehavior, these individuals threaten, collude, or are naive to catastrophic conditions for their Process Assistant.

What is left are lingering questions of the behavioral integrity of on-site leadership. This question alone requires SEPARATE INTERVENTION.

All these elements generate difference at an unremediable scale; quite literally the company is misled about my performance, my conduct, and my active potential.

Constructively, because of their repeated high-level pessimism, they are unreachable, and  not believable; they have neglected the STATUS QUO in favor of personally disinterested policy prejudice.

More plainly, I simply have no idea how I effectively stand with my team because of the depth Character Assassination instigated from the management level; because these issues are a reality, it would be convenient and practical to reject a Final Written Warning status, and even to reject the ADAPT altogether.

BECAUSE whole elements of the interpretable prejudice of a L4 manager are in question;

BECAUSE manager expressions are outside of the confidence of any verbal STU which are vague to compare MALICE of DISTRUST;

BECAUSE the INTEGRITY of the management dialogue here is broadly in question, HARRASSMENT and SOCIAL ENGINEERING are close and evaluable terms based in the variance between the manager and associate reporting;

BECAUSE there are conditions relevant to the timing of these issues which are CONFIDENT to this Process Assistant, an experienced member of our management team, where excess STRESS is a question;

BECAUSE the management team may yet harbor improper prejudices and reservations which disrupt intended issues, AMAZON LLC should consider to make an EXCEPTION from a FINAL WRITTEN WARNING status, and may also choose to REJECT one or both of these ADAPTS.

Please value the integrity of all individuals.

S/Carlos Velasquez – velaca – AMZL - L3PA

<div style="border:1px solid black;">

**EXHIBIT**

**17**

</div>

INFORMATION WHICH MAY RELATE TO
AN APPEAL FROM
A FINAL WRITTEN WARNING

MEETING RE-SCHEDULED 3/10/23 @ 8AM VIA
TELEPHONE

SUBJECT ASSOCIATE: VELACA

SOME NAMES AND INFORMATION IN THIS
DOCUMENT ARE REDACTED TO PROTECT
IDENTITY IN PERFECT CONFIDENCE

3/7/23, 2:15 PM                                              EthicsPoint

REPORT DETAILS

| **EXHIBIT 17** |
| --- |

**Report Submission Date**
12/10/2022

**Reported Company/Branch Information**
Location 989 West Center St, DUT7, , UT, 84054
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
DEVLEN BRIDGES – AREA MGR
ADRIAN CALDERA – OPS MGR
JONATHAN COWAN – HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
SEE ABOVE

**Is management aware of this problem?**
Do Not Know / Do Not Wish To Disclose

**What is the general nature of this matter?**
HARRASSMENT
DISCIPLINARY FRAUD
CHARACTER ASSASSINATION

**Where did this incident or violation occur?**
DUT7 - AT OR AROUND THE HR DESK

**Please provide the specific or approximate time this incident occurred:**
6/2002

**How long do you think this problem has been going on?**
3 months to a year

**How did you become aware of this violation?**
It happened to me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
PABLAVAR
CELESTIA BROWNING

**Details**
COMPLAINT TO HR: REPEATED INCIDENCE OF FRAUD, AND NON-CONSTRUCTIVE COACHING AT DUT7

#1
Devlen, Adcald, Jonathan Cowan

ALLEGATION AGAINST DEVLEN (no longer with amazon):
FRAUD: Devlen literally fabricated the context and tone of a coaching incidence by taking a statement I made out of context, and placed it in context with other material not previously coached or discussed. It had an intentional effect of character assassination.

NON-CONSTRUCTIVE COACHING: Non-constructive coaching destroys the coaching opportunity by failing to provide the most immediate knowledge of incidence to the party most responsible, it may also inflate incidence without gathering sufficient information, and otherwise do harm to the person coached.

CHARACTER ASSASSINATION: Misrepresentation of character, and behavioral intent to portray intra-network a character either socially or morally incompetent, possibly in an attempt to engineer prejudice of disfavor.

ALLEGATION AGAINST ADCALD: FRAUD and CHARACTER ASSASSINATION, NEGLIGENCE
Adcald advocated too aggressively for one depiction of events, and did not maintain the composure of the incidence I presented.
Quite literally, adcald allowed the verbal discussion to depict a social or behavioral disposition, while the written instrument depicts a person critically out of touch with a constructive social and work culture.
Moreover, adcald was not professionally postured to tolerate conflicting representations of incidence, nor was adcald capable to recognize the difference in perception could amount to FRAUD.

3/7/23, 2:15 PM                                                                 EthicsPoint

When it was brought to the attention of the room the depiction of the events was untrue, Adcald aggressively reasserted the position I claim was in fraud without either suspending the conversation or conducting interrogatory over his direct subordinate.

ALLEGATION AGAINST JONATHAN COWAN, "JC"
JC was approached after this meeting to discuss how to address inconsistencies in the narrative, against questions about simple differences in perceptions. JC distorted statements presented to inappropriately misdirect questions about misrepresentation.
This is the second complaint of FRAUD against JC, who did not encourage managers to amend their coachings, and did not investigate once a more serious statement had been presented.
JC also has a political habit of ignoring crucial information; such as whether another individual was a true witness or participant, whether the coherence of the statements presented was questionable, what the best solution would be for a complex problem, or whether some more discussion of perspectives and expectations could be helpful.

ALLEGATION NARRATIVE
I must apologize for the delay in writing this complaint, it is now several months since the incidence on record. I was made unavoidably busy at the time by matters outside of the workplace.

About one month before his termination, Devlen presented false statements about my conduct under the AM process at DUT7.

I received a very serious coaching statement from him detailing several other Amazon Associate complaints more or less conduct which may have been felt to be too curt in non-specified instances.

Specifically, devlen misstated an allegation of an incidence to which he was a part, and in fact lead contributor.

A quote was provided on the page of the coaching which depicted me as being highly critical of a person whose accommodated health condition Amazon was aware to look out for.

I was depicted as making a statement more or less in malice against the Associate.

What happened in actuality was that I had in fact stated to the associate how appeared in "fine" health. This was a statement in candor, which seemed to be appreciated at the time.

I then proceeded to ask the associate whether the discomfort experienced required immediate attention, or if might be capable to continue in her then-present role.

The Associate stated next that she was okay, but that she was sure some adjustment would be necessary.

I was prepared to call a Learning Ambassador to stand-in, however the Associate stated her condition was not yet overwhelming.

I then RADIOED devlen for his more or less immediate assistance on the floor, for his familiarity with the Associate' accomodation, and also for his repeated assertions then NOT to make accommodations.
(We have since abandoned that practice of his, and will routinely make adjustment for discomfort over preference.)

I advised the Associate we would have devlen appear to make any appropriate considerations, for his familiarity and confidentiality related to the accommodation.

I was under the impression the Associate could even have departed, the discretion general to the AM any action necessary for individual well-being.

I did not receive a response from devlen. The incidence took place near the labor board, at C-D Cluster spur where the Associate was tasked.

Devlen was situated on the dock, was somehow engaged in a manner which may not have allowed him to respond.

I RADIOED devlen a second time, and he advised he would come out onto the stow floor before too long.

It was more than fifteen minutes before devlen arrived.

I was occupied with Floor Monitoring duties, including labor tracking, individual stow rate monitoring, and any other safety conditions.

I passed the Associate several times in my other duties, and she did not demand my attention directly, and did not demand any other individual's attention.

Several minutes later I found devlen had arrived and had addressed the issue. Based on his direct knowledge of the issue, devlen made a minor path adjustment for the Associate who continued through to the end of Sort Shift.

Devlen became critical over my handling of the situation. I explained I had communicated every element stated above, the AM would arrive with more direct discretion, the issue was not yet critical.

At the time of the coaching, I raised the objection and clarified the incidence verbally.

Devlen accepted my explanation.

Once the coaching issued, it came blindsidedly, out of issues not prior raised, and of dubious import.

3/7/23, 2:15 PM                                                    EthicsPoint

**EXHIBIT**
**17**

However the management team therein, devlen and adcald, refused to acknowledge the difference in the narrative and more or less accused me of refusing constructive coaching.

I was depicted as being somehow beligerent and even unconscionable.

I was so stunned at the abuse I left the room paralyzed, and devlen submitted the coaching without my signature, with a specious statement of my neither accepting nor declining.

I later brought this complaint to the attention of the Human Resources manager who improperly deflected responsibility for what I openly stated was a kind of Fraud; both in the conference with Devlen and Adcald, and in confidence Jonathan Cowan more or less attempted to blame me for delay in response which rendered any single individual issue unaddressable.

Blamed me, Jonathan Cowan took statements I made about my personal life at that time as direct and causal abuses of mine against individuals who were not named on the complaint, completely distorting the narrative of events.

Jonathan Cowan made no record of anything that transpired thereon, so only the incoherence of the written document is tangible. The management team undertook so little diligence on these problems more or less attempting to prove either the Amazon Human Resources network is corruptible and neglectful, and otherwise were attempting to render me more vulnerable to criticism, social engineering, bias or abuse otherwise.

GENERAL STATEMENT

Responsible Associates and Process Assistants, people, always take personal accountability to the people who feel they were wronged.

Timely verbal/written coaching is essential to defining problems of behavioral disorder, whether critical or negligible, to clarify and ameliorate differences in perspective. To avoid wrongful affection of any single issue.

In verbal discussion over the coaching incidence, devlen was not more professionally postured than criminal, and could not account for critical variance in the substance of the discussion. Nor did offer to amend the statement on the coaching to allow for actual "coaching" wherein we discuss issues more in-depth, with more correct informational standards.

The conference over this written coaching was essentially a bullying session; very characteristic of adcald, who prefers an "in your face" approach to issues discussion, and sometimes appears to glorify violation of trust at the opportunity to exaggerate animus.

The correct and best approach is to amend the coaching statement to fit any substantive discussion, and to maintain the old statement only as a discussion point, so to deflect non-constructive bias whether affirmative or negative to any intended result.

I have not seen the Management Team take a personal interest to clarify its own misapprehensions. The several complaints put forward are similar in that adcald and Jonathan Cowan both routinely violate the law, and breach confidence to bias toxic coaching standards.

OTHER LIABILITIES: This written coaching issued the very same week as Amazon Technical Academy was making decisions for admissions. The ATA admissions paradigm rejects any applicant with an active coaching, an "ADAPT," and this coaching may have been issued to prevent or pre-empt a favorable decision rel. to ATA.

When addressed this question, the HR team misadvised me insisting the ATA option would not reject an applicant due to a behavioral coaching. Jonathan Cowan or Celestia Browning may have been committed to dissolving any appearance of impropriety rather than have brought this problem and question to task sooner, so as be less damaging.

Velaca@amazon.com
s/Carlos Velasquez
12/4/22

_____

**Uploaded Files**
1. cmpl1.pdf

2. EthicsPoint.pdf
   FIRST ETHICS POINT ISSUE - LOST PASSWORD

_____

**Follow-Up Notes**
1/20/2023 6:36 AM
REQUEST FOR FURTHER REVIEW AND ESCALATION

Please conduct further review in light of this complaint, and the lack of disposition thereof.

The HR team in this region did not conduct a sufficient inquiry with jammcgae, did not evaluate the breadth of her perceptions, nor did any these individuals conduct a Seek To Understand dialogue with me on the separate ADAPTable question.

I am aware that jammcgae may yet be with AMAZON, she transferred out of state.

A statement by jammcgae has not been evaluated on a question of FRAUD in the representation of an ADAPT.

jammcgae was the individual subject of the complaint in question where a quote of something I said in candor, which was accepted in candor at the time, was taken willfully out of context by a former AM (devlen) who actively and passively contributed to jammcgae complained of disposition.

3/7/23, 2:15 PM                                                                                  EthicsPoint

I was the subject an ADAPT late in the summer of 2022 which mischaracterized an incidence, and per the original narrative of the complaint I filed here, was a total and deliberate distortion by my then AM (devlen) who delayed against my repeated callouts and actively contributed to jammcgae personal discomfort complained against. The complaint was generally against two individuals, devlen (no longer with AMAZON) for actual FRAUD in the management transaction, and adcald (L6) for totally and deliberately failing to hear the claim of FRAUD when it was presented.

In my original account of this matter, I reported how because of the sensitivity of the ADAPT, at jammcgae approval out of consideration that her condition was workable, I would have the manager come consult her.

The QUESTION is whether she recalled my radio communication to the manager, and whether she recalls how I reassured her the manager would address her situation.

The QUESTION is also whether she recalled having stated to me she could continue to work in the Pick to Buffer (Puller) capacity until the manager arrived.

Certainly if she had requested immediate relief, it would have been provided.

devlen did not appear for 15-20 minutes, and directly contributed to delays in addressing jammcgae concerns. I radioed him multiple times before my Standard Work Process took me into a different task.

It was unethical and even criminal for him to quote jammcgae in the way that he did, and if there was an extant question of how we were addressing injuries, sickness, and accomodations, the ADAPT did not discuss it. It was to make a political injury against me.


My general perspective is that no single one of the issues rel. was fully verifiable, and the HR team did not bother to conduct a STU with me in a way that was timely to this issue.

It was misused by devlen and adcald primarily, I think, to vent fear and frustration at devlen own personal issues, and adcald personal biases to favor management establishment.

Adcald being the subject here, is extremely aggressive and biased to be postured over the Appearance of Error. When the subject a FALSE STATEMENT was presented he immediately discredited me. Adcald in this instance disfavors me too much, and prefers total submission to frivolous and destructive expressions of company authority.

Adcald may not have been aware devlen was lying; but he refused to listen when I explained so, refused to return the matter to HR for further STU, and more or less the conversation into dysfunction.

As reported previously, it is a strategy he knows how to maintain when he believes the team is not biased to prevent its occurrence. adcald is capable to deploy falsification and misdirection inappropriately and in a manner which destroys institutional confidence at the Supervisory and Management relationship.

My demand in this instance is to EXCORIATE the ADAPT in question from my record, or otherwise have it reviewed.

My other demand is to have adcald disciplined or terminated from employment; reinforcement of falsification of behavioral standards of others, beyond violating the rules, is potentially highly extreme. No manager should be allowed to be practice abuse.

It can lend an entire behavioral queue, a tool in social engineering, to disempower and mislead others against the target individual.


REQUEST THAT KERRI A. NOT REVIEW

My original expression of this event was in part based in a statement of how the ADAPT in question was not facially acceptable, for all of the negativity claimed expressed by me it was not invested in credible or coachable representations of actual incidence; sufficient that any actual violation of a company policy were tangible, it was speculated against me in bad faith.

I was traumatized by the presentation for its unexpectedness, and its falsehoods. I refused to acknowledge it - I attempted to discuss the nature of "ACCEPT" and "REJECT" terms on an ADAPT process with Kerri, and should could not clarify that for me which signaled to me that she was actively misleading in the conversation about how much diligence she could have conducted.

Kerri made several critical oversights which amounted to improper deflections of bias;

(1) She appeared to insinuate I may have been using the ethics complaint retributively;
(2) She asserted the authority of the ADAPT without having interviewed the individual whose statement was subject;
(3) She disavowed an understanding of what FRAUD is, as any representational proscription;
(4) She left the dialogue in an unresolved posture, too general, and may have insinuated there was legal context involved.
(5) She was also unable to directly advise Accept/Reject conditions of ADAPTS.

My goal here is to openly and visibly pre-empt any further kind of FALSE representations from Management on site at DUT7 - not to draw general conflicts in the process of reviewing ADAPTS.

I might have treated these discussions very differently; my general impression at this time is that ADAPTs dialogues are not treated as reliable discussions or coachings, the reporting standard in this instance is extremely low.

Kerri's Bias for Action at a truth-finding did not go to the length to interview jammcgae on whether she was aware the Area Manager had been notified by radio to come to her attention.

She may have been left with a wrong impression, and the Management dialogue in this instance may have been knowingly and wrongfully misused by the former AM (devlen), and the current L6 (adcald) at the time of the report.

I struggled to report this to adcald who was in-person at the presentation, and he refused to recognize my objections and reinforced the ADAPT process in the face conflicting information.

adcald expresses improper bias in this instance as person not on-record, but reinforcing a destructive standard when coaching and issuing ADAPTS.

3/7/23, 2:15 PM                                                EthicsPoint

Kerri struggles to understand in-person how this was the subject of the complaint, and misdirected our conversation to reinforce her diagnosis that I was insinuated retribution against the former L4 devlen.

She also lacks supervisory sensitivity over management questions; FRAUD does not even appear to be plausible discussion at issue on an ADAPT

CONCLUSION

My view on these ADAPTS is finally that no single one of them could have resulted in a disciplinary instance. That is, the ADAPTS were unrecognizable to me after several weeks of delay at issue, so my inclination to accept "coaching" was treated in bad confidence.

Moreover, we never engaged at DUT7 any Seek To Understand conference timely to any single issue so that there was no immediate and personal oversight entailed; I was literally depicted as being aggressive and overbearing; I think the individuals involved in the issue concocted social distortions of the incidences and the discussion in an attempt to valorize themselves while they were actively harming total confidence.

Kerri is not postured to mitigate the complaint on this scale; the relationship between a true or false statement was not investigated sufficiently to maintain confidence in the record of the documentation referenced on ADAPT. This was one of several very hostile situations engendered by [adcald] presumption and false zealousness.

Please conduct further review in light of this complaint, and the lack of disposition thereof.
12/10/2022 6:20 AM
This is a second facsimile report as 256636404601 (report key).
I lost the password to the first.

---

**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.

---

**Chat Transcripts**
There are no chat transcripts for this incident.

---



**Carlos <cfv1983@gmail.com>**

## Meet to Speak [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

**Exact HR** <hr@exact.hr.amazon.dev>                                    Fri, Mar 3, 2023 at 8:30 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

3/3/2023

Dear Carlos,

My name Is Jerry Yeung, HR Investigator from Amazon. I am currently looking into the confidential concern that was raised to our attention.

I would like to speak with you to discuss further on Tuesday, 3/7/2023 **at** 2:00 pm (MST).

If this time does not work for you, please feel free to suggest an alternate date and time.

If this time work for you, please reply to all to this email for your confirmation. Once a date and time are confirmed, I will call you at 801-671-0361 unless you provide another number you prefer me to contact you on.

I look forward to speaking with you.

Jerry Yeung
Amazon HR Investigator

ref:_00D3t2mKvO._5003t1g95Nc:ref

3/3/23, 11:59 AM                                      EthicsPoint

☰  **EP ETHICSPOINT®**
        Incident Management

ISSUE TYPE: FRAUD OR EMBEZZLEMENT

┌─────────────────┐
│   **EXHIBIT**   │
│     **17**      │
└─────────────────┘

Questions and Comments

Add Follow-Up Notes

Upload Files

**Report Details**

Print My Report

**REPORT DETAILS**

**Report Submission Date**
2/25/2023

**Reported Company/Branch Information**
Location 989 West Center St
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
kerry alger - human resources
HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
kerry alger is a regional human resourcs manager

**Is management aware of this problem?**
No

**What is the general nature of this matter?**
A question of Negligence or Willful Misconduct, failing to respond and escalate a complaint question left unanswered.

All of keralgr's statements indicated Amazon had difficulty even recognizing the question I presented, which left these questions undefined and our discussion unsatisfactory.

**Where did this incident or violation occur?**
DUT7 - across several HR discussions (unrecorded) and several documents which I am not privy to.

**Please provide the specific or approximate time this incident occurred:**
The issued generated after the middle of january, when I contacted keralgr requesting further review after keralgr had suggested I do so if I had more questions.

**How long do you think this problem has been going on?**
More than a year

**How did you become aware of this violation?**
It happened to me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
keralgr (allegation)

**Details**
COMPLAINT FOR FURTHER INVESTIGATION
RELATED TO COMPLAINTS 256636404601 (EthicsPoint), 624709432501 (EthicsPoint)

Complaint against keralgr for having left investigation INCOMPLETE.

BASIS
SOCIAL ENGINEERING – a direct attempt to mislead the company/organization about an individual in order to manipulate that individual or manipulate the company culture.

In the two related complaints, these are facsimile complaints, I complained about a Level 6 manager who I described as repeatedly managing and coercing false statements about me.

I have presented for our site, DUT7, at least two of these instances which I think may indicate a deep and extended effort to harm me in order to manipulate and otherwise control certain other elements on site at least since November of 2022.

My present concern is on how the Human Resources team onsite at DUT7 did not fully investigate the questions I presented when reaching its conclusions; meaning I question the motive for concluding the investigation.

Specifically, keralgr may be engaged in COLLUSION to have conducted or maintain elements of SOCIAL ENGINEERING for the following reasons.

(1) I asked critical questions about the origin of content contained in one written ADAPT form, incl. a question of FRAUD in the manager's transaction which keralgr failed to restate.

3/3/23, 11:59 AM                                                  EthicsPoint

Log Off

(2) Keralgr failed to recognize the question; when we met face to face on-site on 1/6/2023 she asked me this specifically, what I had intended by use of the word of the "fraud" wherein I related a usage of a Federal criminal statute for guidance

(3) Keralgr failed to clarify standards and practices regarding the ADAPT process, meaning she left this complaint and process vulnerable to further ambiguity after our meeting.

(4) Keralgr may be biased to disfavor the complaint for a perceived lack of diligence on my part, rather than have reviewed it more completely.

In this instance, the term I should clarify, I have accused an L6 manager of enforcing the falsification of behavioral records about me by refusing to listen, and by conspiring with other managers in open hostility to my complaint of misrepresentation of the disciplinary question at hand, and the disciplinary process in general.

The L6 has critically denied access to ethical standards in order to affirm an unethical policy favoring management authority; my general fear is there is a tacit campaign of CHARACTER DEFAMATION ("ASSASSINATION") maintained at DUT7 which is uncharacteristic to any associate.

I asked via email if Keralgr would not, as she verbally offered in our meeting, escalate review of the complaint.

I also amended the original standing complaint to question the individual who was claimed subjected to mistreatment if could recall the steps I took conscientiously, as whether it was plausible an L4 Area Manager (No longer with AMAZON) may have blamed me for his own fault in responding to my requests for his presence on the stow floor.

Keralgr has not responded, and may not have seen my email, and either way did not recognize the structure of the question I presented in a manner to maintain the confidence of the complaint.

GENERAL STATEMENT
I have proceeded these complaints this way in part because I think coercion of false standards is, in a single instance, a completely terminable misconduct, it is a gross misconduct which harms an individual out of criminal contempt for his or her standing in the company.

It is fraud which seeks out ulterior security by undermining the daily and regular efforts of the individual on a basis to compare a preference for FAVORITISM, so that the fraudster expresses FRAUD simultaneously with disinterest in actions of illicit prejudice while perhaps appropriately FAVORING others.

An Operations Manager really cannot ever ethically maintain false standards of interest in the issues of his subordinate managers, the result is that Area Managers become contaminated with the secret history of transgression against subordinates.

This complaint is therefore to move reinvestigation of this matter on a basis demanding a more complex Seek To Understand dialogue, and may involve contacting at least one associate who may have transfered or resigned from the DUT7 jurisdiction.

My understanding is that keralgr will not oversee further review of this question which I develop over time primarily to allow the simplicity of any single investigation to take breadth before generating a comprehensive complaint.
2/25/2023
s/Carlos Velasquez

NOTE: I will be updating this complaint with related documentation in the coming days.

_____

**Uploaded Files**
1. EthicsPoint.pdf
   First Related Complaint
   256636404601

   Fraud in Social Engineering - Making false representations about an associate, and refusing to hear how representation of an issue was false - against two managers

   The present complaint relates to how HR did not recognize a question of misrepresentation maintained coercion conducted by a L6 associate in a context free from oversight.

2. EthicsPoint2.pdf
   Second Facsimile Ethics Complaint
   624709432501

   Fraud in Social Engineering, the same complaint of a failure to hear and resolve a question of misrepresentation of issues conducted by an L6 in a context without supervision.

   The second was complaint was opened after the first complaint was thought lost.

3. RE_ HR Investigation .pdf
   Email Communications Referred to from the complaint
   Dates: 1/31/23

_____

**Follow-Up Notes**
2/27/2023 10:20 PM

3/3/23, 11:59 AM                                                EthicsPoint

UPDATED: 2/27/23

**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.

**Chat Transcripts**
There are no chat transcripts for this incident.

EXHIBIT
17

SAS70
Type II Certified        PRIVACY FEEDBACK
Powered by TRUSTe

Privacy Statement | Terms of Use | Cookie Statement
© NAVEX Global 2023. All rights reserved.

3/7/23, 2:18 PM                                        Gmail - (no subject)

 **Gmail**                                                          **Carlos <cfv1983@gmail.com>**

## (no subject)
1 message

**Carlos** <cfv1983@gmail.com>                                      Thu, Dec 22, 2022 at 12:28 PM
To: "Velasquez, Carlos" <velaca@amazon.com>

Message also forwarded through Amazon internal to keralger@amazon.com

In Reply to Kerri Alger,

Thank you for listening to the complaint and raising attention to the questions I presented.
We met on or about 12/15/22.

For my part, I have a definite conviction that when I find a false or misleading representation of my conduct, and find the individuals
around me fail to support me in raising critical questions, as was the nature of the complaint I presented reg. an Adapt which claimed I
had dispariaged individual associate needs which were totally of critical importance.

In my report to the organization, I wrote how the Area Manager (devlen) had falsified statements of his own neglect and used them
against me, retributively.

I have several follow-up questions about the depth of our investigation.

1. Please link or provide for me a whole statement or brief of the ADAPT process. I have undergone not very much training on this
subject, and I do not really understand the coaching process. In these instances nature of the document has been left critically vague
and I have a lot of difficulty recognizing the discussions with any consistency as they do not often define my conduct directly but are
precipitated on a different narrative.

2. Did you interview any of those individuals who submitted related complaints?

3. What about the value of a false representation of incidence rel.? In the complaint I presented I stated that I attempted to raise a
question of false representation in the document. The L4 manager had presented a problem he himself engendered as against me,
based apparently on the associate involved having perceived that I was somehow at fault.

4. When interviewed, you explained to me the ADAPT process is not ever reviewed for hiring considerations; that seems like an
assumption – given these ADAPT forms are a permanent record; will I have sole confidence to those documents or is any high-level
manager able to review that documentation?

5. Was the time taken from incidence to report more or less critical to how we found this matter resolved?

Reiterating from the Ethics Complaint, I felt the ADAPT put words into my mouth at the deliberate expense of the truth. I felt the Ops
Manager overseeing the ADAPT delivery totally and deliberately failed to represent the highest standard of clarity and respect for the

3/7/23, 2:18 PM                                        Gmail - (no subject)

subject matter.

**EXHIBIT 17**

We also discussed how the Ops Manager's behavior had been witnessed previously. May I assume this previous incidence was not investigated?

Please update this account as well. Thank you.


Sincerely, Carlos Velasquez
velaca@amazon.com
AMZL-DUT7-PA

If you view the  Full Docket  you will be charged for 1 Pages $0.10

**General Docket**
**Tenth Circuit Court of Appeals**

| | |
|---|---|
| **Court of Appeals Docket #:** 22-4098 | **Docketed:** 10/19/2022 |
| **Nature of Suit:** 2440 Other Civil Rights | |
| Velasquez v. Baldock, et al | |
| **Appeal From:** United States District Court for the District of Utah - Salt Lake City | |
| **Fee Status:** Fee Paid | |

**Case Type Information:**
   **1)** civil
   **2)** USA as party
   **3)** -

**Originating Court Information:**
   **District:** 1088-2 : 2:22-CV-00133-HCN
   **Trial Judge:** Howard C. Nielson, Junior, U.S. District Judge
   **Date Filed:** 02/25/2022

| **Date NOA Filed:** | **Date Rec'd COA:** |
|---|---|
| 10/18/2022 | 10/19/2022 |

**EXHIBIT 17**

| | | |
|---|---|---|
| 11/02/2022 | | [10952169] Order filed by Judges Matheson and Bacharach denying appellant's motion for permission to file electronically. Served on 11/02/2022. [22-4098] [Entered: 11/02/2022 01:53 PM] |
| 11/08/2022 | | [10953653] Appellant's motion filed by Carlos Velasquez to reconsider the denial of his ECF filing privileges [10952169-2]. Served on 11/05/2022. Manner of Service: US mail. [22-4098] [Entered: 11/08/2022 11:55 AM] |
| 11/08/2022 | | [10953779] Order filed by Judges Matheson and Bacharach denying appellant's motion to reconsider the denial of ECF filing privileges filed by Mr. Carlos Velasquez. Served on 11/08/2022. [22-4098] [Entered: 11/08/2022 02:09 PM] |
| 11/14/2022 | | [10955135] Entry of appearance filed by Mr. Carlos Velasquez. CERT. OF INTERESTED PARTIES: y. Served on 11/14/2022. Manner of Service: email [22-4098] [Entered: 11/14/2022 03:43 PM] |
| 12/01/2022 | | [10959079] Appellant's brief filed by Mr. Carlos Velasquez. [22-4098] [Entered: 12/01/2022 01:54 PM] |
| 12/01/2022 | | [10959082] Appellant's motion for review en banc filed by Mr. Carlos Velasquez. Served on 11/28/2022. Manner of Service: email. [22-4098] [Entered: 12/01/2022 02:03 PM] |
| 12/01/2022 | | [10959083] Letter (envelope) sent with brief and motion received from Mr. Carlos Velasquez but not filed. [22-4098]– [Edited 12/05/2022 by JM Certificate of Service attached.] [Entered: 12/01/2022 02:05 PM] |
| 12/05/2022 | | [10959576] Order filed by Clerk of the Court referring Appellant's motion for review en banc to the panel of judges that will later be assigned to consider this case on the merits (no ruling will issue at this time). Served on 12/05/2022. [10959082-2]. Served on 12/05/2022. [22-4098] [Entered: 12/05/2022 11:01 AM] |
| 01/11/2023 | | [10968528] Brief Concerning Replies received from Mr. Carlos Velasquez but not filed. [22-4098] [Entered: 01/11/2023 11:26 AM] |
| 01/11/2023 | | [10968682] Appellant's Brief Concerning Replies, construed as a supplement to the opening brief filed by Mr. Carlos Velasquez. Original and 7 copies. [22-4098] [Entered: 01/11/2023 02:26 PM] |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/09/2023 03:58:04 | | | |
| PACER Login: | admin2246378 | Client Code: | |
| Description: | Case Summary | Search Criteria: | 22-4098 |
| Billable Pages: | 1 | Cost: | 0.10 |

7/12/25, 3:31 PM                    Gmail - Case 20230303-629980: Acknowledgement of Receipt of Complaint [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

 Gmail

**EXHIBIT**

**18**

Carlos <cfv1983@gmail.com>

## Case 20230303-629980: Acknowledgement of Receipt of Complaint [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

2 messages

**Exact HR** <hr@exact.hr.amazon.dev>                                    Fri, Mar 3, 2023 at 7:14 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

# 20230303-629980

Dear Carlos,

We have received the concerns that you raised. We have a process in place to carefully review all concerns raised to our attention. Part of this process may include having someone contact you personally to gather additional information, if necessary.

Again, thank you for taking the time to contact us.

Thank you,
CI

ref:_00D3t2mKvO._5003t1g95Nc:ref

**Carlos** <cfv1983@gmail.com>                                    Fri, Mar 3, 2023 at 8:21 AM
To: Exact HR <hr@exact.hr.amazon.dev>

Greetings @ CI,

Thanks for the notice.
I will wait for any reply.

-CV
[Quoted text hidden]

3/3/23, 11:56 AM                          Gmail - Meet to Speak [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

**EXHIBIT**

**19**

 Gmail

Carlos <cfv1983@gmail.com>

## Meet to Speak [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

**Exact HR** <hr@exact.hr.amazon.dev>                          Fri, Mar 3, 2023 at 8:30 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

3/3/2023

Dear Carlos,

My name Is Jerry Yeung, HR Investigator from Amazon. I am currently looking into the confidential concern that was raised to our attention.

I would like to speak with you to discuss further on Tuesday, 3/7/2023 **at** 2:00 pm (MST).

If this time does not work for you, please feel free to suggest an alternate date and time.

If this time work for you, please reply to all to this email for your confirmation. Once a date and time are confirmed, I will call you at 801-671-0361 unless you provide another number you prefer me to contact you on.

I look forward to speaking with you.

Jerry Yeung
Amazon HR Investigator

ref:_00D3t2mKvO._5003t1g95Nc:ref

8/20/23, 11:52 AM                          Gmail - Individual Misrepresentation (Fraud)/Incomplete Investigation

**M** Gmail                                                              Carlos <cfv1983@gmail.com>

---

**Individual Misrepresentation (Fraud)/Incomplete Investigation**       **EXHIBIT**
1 message                                                               **20**

**Carlos** <cfv1983@gmail.com>                                          Tue, Mar 7, 2023 at 2:23 PM
To: jerryeun@amazon.com

This was originally a Character Assn. Compl.
In which Kerri Alger failed to recognize questions of fraud, and did not reply to a request (for any unknown reason) for further escalation, though she did offer it.

-CV

---

**3 attachments**

📄 **EthicsPoint2 - orig. compl..pdf**
   98K

📄 **Gmail - (no subject) - keri algr.pdf**
   102K

📄 **EthicsPoint4-general report.pdf**
   106K

8/20/23, 11:50 AM                        Gmail - Case 20230304-630632: Closure Notification [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

 Gmail

**EXHIBIT**

**21**

Carlos <cfv1983@gmail.com>

## Case 20230304-630632: Closure Notification [ ref:_00D3t2mKvO._5003t1g96p1:ref ]

1 message

**Exact HR** <hr@exact.hr.amazon.dev>                                                        Fri, Mar 10, 2023 at 10:58 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

3/10/2023

Dear Carlos,

On 3/3/2023 you made Amazon aware of your intention to file an appeal of your employment Final Written Warning through the Amazon Appeals Process.
Your appeal was heard on 3/10/2023.

You attended the appeal meeting and had the opportunity to explain why you disagreed with the decision of a Final Written Warning. Thank you for giving
us the opportunity to hear your concerns, which were considered along with other available information.

The decision on your appeal is that the policy was not applied properly or consistently in your situation and, as such, your appeal has been granted. Your
local HR team will be in contact with you for the next steps in the process.

Best regards,
Appeals Team

ref:_00D3t2mKvO._5003t1g96p1:ref

Acknowledged by associate on March 15, 2023, 12:36:00 PM - Delivered by Lerne,Celestia (brownice)

**Supportive Feedback Document**
**Behavioral - First Written**



**EXHIBIT**
**22**

amazon.com

**Associate Name:** Velasquez,Carlos (velaca)
**Manager Name:** Wayman,Margarita (NA5-0120)
**Created On:** March 15, 2023, 12:36:00 PM

## Summary

Your recent job performance is not meeting Behavioral expectations. Meeting performance standards is a critical component of your job. This document provides specific details about your performance and how you are not meeting expectations. In addition, this document describes the steps you and your manager will take to assist you in improving your performance. As a part of this conversation we are interested in understanding what barriers you think need to be removed, or what improvements can be made which would potentially assist you in improving your performance.

## Communication History

The following is a summary of your behavioral feedback:

| Level | Count | Most Recent |
|---|---|---|
| Documented Coaching | 2 | June 28, 2022, 6:10:19 AM |
| First Written | 2 | December 13, 2022, 7:50:48 AM |

## Details of Current Incident/Specific Concerns

DETAILS OF CURRENT INCIDENT/SPECIFIC CONDITIONS On 2/19/2023 you failed to follow appropriate standard work practices. Specifically, you failed to correctly code AA to their assigned functions. 8 AA were coded into Induct Unload when the shift plan called for 4 AA in this function. This error in coding affected shift TPH by 6 during the first 2 hours of Sort. A seek to understand conversation took place with you on 2/19/2023 to which you stated: I don't know what happened. There must have been a cognitive disfunction. This is a cognitive issue not a cost issue and cannot be held accountable for this issue.

## Areas of Improvement Required by Associate

AREAS OF IMPROVEMENT REQUIRED BY ASSOCIATE As detailed above, you have failed to meet Amazon's Standards of Conduct and behavioral expectations. Amazon expects associates to adhere to standard operating procedures with regards to processing orders in each function within the delivery station. Failure to adhere to standard work guidelines includes, but is not limited to, any action that artificially inflates an individual's rate (i.e. double-scanning, machine-gunning), dishonest behavior or discriminatory work selection that directly or indirectly hinders others' performance (i.e. cherry picking), knowingly causing a virtual/physical mismatch, or circumventing critical steps in a process/PMV. Failure to meet these expectations and/or future violations of these guidelines may result in additional discipline, up to and including termination.

## Associate Comments

I was asked to recognize this ADAPT process is NOT an exception or a accommodation for any kind Standard Process, and I fully agree and will work to maintain more perfect standard for staffing process in general. Pursuing this, I did use some sensitive language above, in the previous discussion on this subject, and all that I can disclose is that I was under some more high-level stress which may have contributed to the oversight. I am a little concerned the ADAPT is postured liberally without regard for the scope of the error, which is stress related, and is difficult to anticipate. Meaning, the ADAPT could be used to define an issue at any point without very constructive discussion. In this instance, I attempted to communicate how this issue was not entirely avoidable and found the L4 was in a posture unable to hear exactly how. This seems to be in line with the policy discussion regarding retraction of a Final Written Warning, that the issue cannot repeat over 30 days. A more complex discussion would have originally framed this issue efficiently.

**Associate Signature:** Acknowledged by Velasquez,Carlos (BadgeID: 11759273)    **Date:** March 15, 2023, 12:36:00 PM

**Manager Signature:** Acknowledged by Lerne,Celestia (BadgeID: 12079647)    **Date:** March 15, 2023, 12:36:00 PM

7/12/25, 3:32 PM                Gmail - Re: Case 20230303-629980: Closure NotificationClarification Requested [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

 Gmail

**EXHIBIT 23**

Carlos <cfv1983@gmail.com>

## Re: Case 20230303-629980: Closure NotificationClarification Requested [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

2 messages

**Exact HR** <hr@exact.hr.amazon.dev>                              Mon, Mar 20, 2023 at 6:55 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

Hello Carlos,

Due to confidentiality reasons, I am not able to share that information. What I can share is that the case was fully investigated and closed.

Thank you,

Jerry Yeung
HR Investigator

------------- Original Message -------------
**From:** Carlos V [cfv1983@gmail.com]
**Sent:** 3/17/2023, 5:31 PM
**To:** hr@exact.hr.amazon.dev
**Type:** Re: Case 20230303-629980: Closure Notification [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]Clarification Requested

Greetings Mr Yeung,

I have a few follow up questions, if you dont mind.

1. What exactly did you investigate?

1. Did you investigate my wuestions rel. jammcgae?
2. What Amazonian policy level violations did you investigate?
3. Where precisely did you recognize I had violated a company policy?
4. Were you able to delineate between actions taken by an L4 manager, and coercion expressed by an L6 manager?

We discussed a fair bit of material verbally, but I know what I experienced was coercion of false statements in a management report.

The level of hostility I am afraid I will experience from these managers may well be be beyond the confidence you express.

You need not disclose individual respioses etc. I am not invested in retributive behavior. I am however interested to know what you investigated.

7/12/25, 3:32 PM                Gmail - Re: Case 20230303-829980: Closure NotificationClarification Requested [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

Without stating that, you do damage to an individual wronged by fraud and mismanagement over his/her person.

Moreover these are real allegations and your responses are not substantive to a question interpersonal abuse and disfavor, character assassination, fraud, false statements and misleading statements in a management report.

Thank you for your diligence.

Sincerely,

-velaca@amazon.com

Sent from my iPhone

> On Mar 17, 2023, at 1:35 PM, Exact HR <hr@exact.hr.amazon.dev> wrote:

?

Dear Carlos,

On 2/25/2023, you raised concerns to our team. Amazon takes concerns of this nature very seriously and has a process in place to investigate. My role in this process was to be a fair and objective fact finder and to conduct and complete a thorough investigation. As part of this process, I spoke with relevant parties and reviewed relevant documentation.

I completed a thorough investigation and did not find a violation of Amazon policy or standards of conduct.

As a reminder, Amazon has a policy prohibiting retaliation against anyone who has raised a complaint or who has participated in an investigation. Amazon expects that anyone who participates in an investigation will not engage in any retaliatory behavior – this applies to and has been discussed with all the parties in the investigation.

Thank you again for raising your concerns and for your cooperation.

Thank you,

Jerry Yeung
HR Investigator

ref:_00D3t2mKvO._5003t1g95Nc:ref

**Carlos V** <cfv1983@gmail.com>                                                Mon, Mar 20, 2023 at 1:08 PM
To: Exact HR <hr@exact.hr.amazon.dev>

Thanks again Jerry,

that is very disappointing news. If the associate who could clarify that information could not recall or did not recount those steps I took to ensure her safety and comfort while at work then I can hardly recognize the conversation.

Thenk you for reply.

-cv

Sent from my iPhone

7/12/25, 3:32 PM                    Gmail - Re: Case 20230303-629980: Closure NotificationClarification Requested [ ref:_00D3t2mKvO._5003t1g95Nc:ref ]

On Mar 20, 2023, at 6:55 AM, Exact HR <hr@exact.hr.amazon.dev> wrote:


Hello Carlos,

[Quoted text hidden]

```
EXHIBIT
23
```

7/12/25, 3:34 PM                                Gmail - Disciplinary Complaint from velaca@amazon.com

 Gmail

EXHIBIT
24

Carlos <cfv1983@gmail.com>

## Disciplinary Complaint from velaca@amazon.com

3 messages

**Carlos** <cfv1983@gmail.com>                                      Sat, May 6, 2023 at 9:34 AM
To: sargkevi@amazon.com, joshelha@amazon.com, brownklq@amazon.com

Greetings to Human Resources and DUT7 Leadership,

Presented here is a written complaint against several named members of the management team.
It is a lengthy and complicated question demanding critical disciplinary action and expungement of my disciplinary record because we
can prove a whole system of communication has been corrupted by intentional mismanagement, and intentional misrepresentation
before AMAZON LLC.

I have attempted to complain about this in the past, but the complaints themselves were only intended to broach the issues now
presented. I had hoped to avoid actually having to present this complaint because this object has legal ramifications and parameters.

It comes forward now in  part because I have enough time and energy to have written it, and also because the previous complaint
process did not resolve any of these questions! Moreover, I worry management behavior has become worse since the closures.

This is sent to all HR representatives who were present when I first disclosed an intent to issue, and this is also sent to the site leader,
with whom I have discussed this matter more cursorily.

This is sent from off-site via my personal email, is a significant complaint which relates to some specific ADAPTS documents
available to Human Resources and Leadership.

Please advise, and please take seriously.

Cheers,
Carlos Velasquez/
velaca@amazon.com
cfv1983@gmail.com
801.671.0361

  **cpl_amzl_velaca.pdf**
344K

**Brown, Katy** <brownklq@amazon.com>                              Wed, May 10, 2023 at 4:39 AM
To: Carlos <cfv1983@gmail.com>, "Sargent, Kevin" <sargkevi@amazon.com>, "Shelhamer, Josh" <joshelha@amazon.com>

Carlos,

I appreciate the time you've taken into providing this information. I will be partnering up with our centralized investigations
team to investigate all claims presented. They will likely be reaching out in the next few days to conduct a phone
interview. If you have any questions or concerns during the process, feel free to reach out.

Best,

**Katy Brown | HR Business Partner II**

7/12/25, 3:34 PM                                    Gmail - Disciplinary Complaint from velaca@amazon.com

**Amazon Logistics**

⬦ DUT7 – North Salt Lake, UT

☏ (206) 926-7665 ext. 1110605

✉ brownklq@amazon.com



**WORK HARD. ★ HAVE FUN. ★ MAKE HISTORY.**

Need HR Help? Click here!

Employee Resource Center (ERC): 1-(888) 892-7180

Employee Assistance Program (EAP): 1-(855) 435-4333

---

**From:** Carlos <cfv1983@gmail.com>
**Sent:** Saturday, May 6, 2023 9:34 AM
**To:** Sargent, Kevin <sargkevi@amazon.com>; Shelhamer, Josh <joshelha@amazon.com>; Brown, Katy <brownklq@amazon.com>
**Subject:** [EXTERNAL] Disciplinary Complaint from velaca@amazon.com

┌─────────────────────────────────────────────────────────────────────────────┐
│ **CAUTION**: This email originated from outside of the organization. Do not click links or open attachments unless you can │
│ confirm the sender and know the content is safe. │
└─────────────────────────────────────────────────────────────────────────────┘

[Quoted text hidden]

---

**Carlos** <cfv1983@gmail.com>                              Thu, May 11, 2023 at 12:16 AM
To: "Brown, Katy" <brownklq@amazon.com>
Cc: "Sargent, Kevin" <sargkevi@amazon.com>, "Shelhamer, Josh" <joshelha@amazon.com>

Thank you for your response.

[Quoted text hidden]

8/20/23, 2:39 PM                                        EthicsPoint

≡  **EP** **ETHICSPOINT**®
          Incident Management

ISSUE TYPE: UNFAIR EMPLOYMENT PRACTICES

```
┌─────────────────┐
│    EXHIBIT       │
│      25          │
└─────────────────┘
```

Questions and Comments

Add Follow-Up Notes

Upload Files

Report Details

Print My Report

**REPORT DETAILS**

**Report Submission Date**
5/10/2023

**Reported Company/Branch Information**
Location DUT7
City/State/Zip: North Salt Lake, UT, 84054, United States )

**Amazon Site Code**
DUT7

**Please identify the person(s) engaged in this behavior:**
adrian caldera - operations - L6
kerri alger - human resources
HUMAN RESOURCES

**Do you suspect or know that a supervisor or management is involved?**
Yes

**If yes, then who?**
see above

**Is management aware of this problem?**
Yes

**What is the general nature of this matter?**
Intentional Management
False Statements and Representation
Whimsical and Frivolous Representation
Stalking and Harassment

**Where did this incident or violation occur?**
Incidence here is rel. to an internally escalated complaint.

**Please provide the specific or approximate time this incident occurred:**
5/10/23 it was announced after a "Shelter-In-Place" exercise the subject of complaint was being granted a favorable
reccommendation on departure from the company.

The announcement has the potential to render disciplinary expression within Amazon LLC less valuable, and may be part of
a design of Inentional Mismanagement.

This complaint constitutes an express of a change of circumstance.

**How long do you think this problem has been going on?**
More than a year

**How did you become aware of this violation?**
It happened to me

**Please identify any persons who have attempted to conceal this problem and the steps they took to conceal it:**
DUT7 management team including Human Resources managers have been aware of a pending grievance here involving
Intentional Mismanagement since early this year.

I have also previously complained on this subject, and not found clarification.

I spoke with Kevin Sargeant on this subject and he advised he would speak with the team, and I have seen some better
flexibility on their part - however I am not certain 'Intentional Mismanagement' quite reached him.

I spoke with Katy Brown and Josh Shelhammer on the subject, primarily at an instance where I felt I was being bullied at the
team not informing me of major changes which were incoming.

Katy Brown has currently escalated an original complaint, and so this complaint will have to be networked.

**Details**
FOLLOW-UP TO A PENDING COMPLAINT

STATEMENT
My approach to behavioral and disciplinary questions is very much "Live and Let Live", so I complain at this time because I
see behavior which constitutes criminal abuse of authority, and is at least civilly prosecutable, and may be criminally
prosecutable if Amazon LLC is prejudiced.

EthicsPoint

No Associate should suffer personal liability of frivolous, false, and whimsical disciplinary complaints.

No Leader or Manager should expressly lie to or about his subordinates in a manner to discourage their person and or talents.

NEW ISSUE #1
It has come to my attention an individual who is subject of a serious Intentional Mismanagement Complaint is being offered a reccomendation from Amazon LLC, the individual admitted this in confidence to the team, on terms for for happy departure from the company.

Rel. to a Complaint I have been advised was escalated by site HR, brownklq@amazon.com, and is being actively processed but I have not received any notice; the individual subject (adcald@amazon.com) should not be allowed a reccomendation.

The extent of 'Intentional Mismanagement' is sufficient to constitute 'Stalking' under Utah law, and whether Amazon LLC will file a sufficient legal complaint is a relevant question. (See Note)

That is, the individual has dispositioned numerous very close working relationships, has damaged the integrity of several managers

New incidence arise where the team openly discloses his impending departure.

For example, adcald now exchanges personal contact information with oladavi@amazon.com who is a reliable member of the management team, and may maintain destructive influence thereby while oladavi may be unwitting. (Incidence 5/10/23, this may constitute cause of action at Ut. Code § 76-5-106.5 (4))

For example, adcald may also maintain personal contacts with numerous members of leadership and management, who may be more or less under his most direct influence incl.:
pablavar@amazon.com;
mmwayma@amazon.com;
washanes@amazon.com;


RELIEF
I understand Amazon LLC may not have jurisdiction to govern whether individuals maintain friendly or professional relationships beyond the workplace.

However, adcald is complained against because his behavior is repeatedly wrongful and is intentionally harmful in a manner which may also intend to leave Amazon LLC legally liable for his abuses.

Another team member in a rel. complaint made the same decision, Jonathan Cowan, and was also granted a Reccomendation on his departure.

Both of these actors seek to depart the company in a posture to further harm and humiliate their victim; their personal knowledge of this disposition may have been intuitive, conscionable, and a partial or direct cause for their interest to leave.

The company must consider to HOLD its reccomendation pending an investigation. The individual leaves on poor terms.

ISSUE#2
Human Resources manager Kerri Alger is the subject of the complaint as well, her Amazon alias may be mistated on the complaint.

keralger@amazon.com

I attempted to raise this issue late last year, just as Jonathan Cowan was departing.

keralger objected at my complaint that it was not more timely, and then refused to recognize what 'fraud' in such an instance misrepresentation of a behavioral issue could be.

At the time of the discussion she stated, "I don't see any fraud on the Adapt."

I carefully explained a statement was taken out of context for which the author manager, devlen (also terminated for relevant misbehavior), had been a direct cause of the complaint.

At the time I had not realized managers had developed an understated policy of aggressive disfavor here, one they have not been able to advise, and one they have not forgiven in what may be a long standing act of stalking.

keralger's lack of insight compares intentional neglect to further magnify harm, in this instance she may be allowing adcald the opportunity to get away with, and further glamorize, his own criminal mystique.

RELIEF
keralger protects and promotes a destructive management culture.

keralger should be critically disciplined and/or terminated.

No Associate should suffer personal liability of frivolous, false, and whimsical disciplinary complaints.

CONCLUSION
Please review in light of a pending complaint, I am not yet advised.

8/20/23, 2:39 PM                                                    EthicsPoint

Sincerely,
s/Carlos Velasquez
velaca@amazon.com
AMZL-DUT7-L3

> **EXHIBIT**
>
> **25**

NOTE:
Harassment and Stalking are both relevant terminologies here. Ut. Code § 76-5-106.5 (2) "An actor commits stalking if the actor intentionally or knowingly (a) engages in conduct directed at a specific individual and knows or should know that the course of conduct would cause a reasonable person: (i) to fear for the individual's own safety or the safety of a third individual; or (ii) to suffer other emotional distress."

Part (4) same section states, "In a prosecution under this section, it is not a defense that the actor: (a) was not given notice that the course of conduct was unwanted; or (b) did not intend to cause the victim fear or other emotional distress."

**Follow-Up Notes**
There are no additional notes for this report.

**Follow-Up Questions/Comments**
There are no questions asked or comments from the organization.

**Chat Transcripts**
There are no chat transcripts for this incident.

 

Privacy Statement | Terms Of Use | Cookie Statement | About
© NAVEX Global 2023. All rights reserved.

7/27/25, 9:11 PM                                Gmail - Resources for Living

 Gmail

| EXHIBIT |
|:---:|
| **26** |

Carlos <cfv1983@gmail.com>

## Resources for Living
1 message

**Nally, Amy** <awwashle@amazon.com>                                Fri, Jun 2, 2023 at 4:48 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

Hi Carlos – Thank you for your time today. As promised, here is some additional information on Resources for the Living. Resources for Living is the place to start when you need mental health care or help with everyday life. It's free, confidential, and available 24 hours a day, 7 days a week, to all Amazon employees, their families, and household members.

> ⚠️ **Important:** If you have any thoughts of self-harm or harm to others, contact Resources for Living 24 hours a day, 7 days a week, at 1-833-721-2323, or call the National Suicide Prevention Lifeline at 988.

## Everyday support and mental health resources

Resources for Living offers

- On-demand support: When you're in crisis or just need to talk, Care Partners are there for you, 24/7, so you never have to go it alone. Each person gets three free counseling sessions - virtual or in person - per issue per year.
- Resources for everyday living: Care Partners will help you find child and elder care, yard helpers, dog walkers, house cleaners, and other personal services (referrals are free; you pay for the services). They'll even schedule free phone consultations for legal or financial matters.
- Self-guided digital mental health support – You also have access to the Twill Therapeutics app and platform, a self-guided digital mental health solution that includes science-backed activities, personalization, coaching, and more. Visit Twill Therapeutics for more information. (Use access code: Amazon)

Get help 24 hours a day, 7 days a week

Go to Resource for Living anytime to:

- Chat live with a Care Partner, or call 1-833-721-2323.
- Get self-paced support through the Twill Therapeutics app. (Use access code: Amazon)
- Register for access to self-assessment tools, a stress resource center, crisis resources, and more.

Amy Nally | Sr HR Manager

 amazon

7/27/25, 9:12 PM                    Gmail - Case 20230511-685473: Closure Notification [ ref:_00D3t2mKvO._5003t1hMMXj:ref ]

 Gmail                                                    Carlos <cfv1983@gmail.com>

## Case 20230511-685473: Closure Notification [ ref:_00D3t2mKvO._5003t1hMMXj:ref ]
2 messages

**Exact HR** <hr@exact.hr.amazon.dev>                                      Tue, Jun 13, 2023 at 2:40 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>
Cc: "awwashle@amazon.com" <awwashle@amazon.com>

Dear Carlos,

On 5/6/2023, 12:00 PM you raised concerns to our team. Amazon takes concerns of this nature very seriously and has a process in place to investigate. My role in this process was to be a fair and objective fact finder and to conduct and complete a thorough investigation. As part of this process, I spoke with relevant parties and reviewed relevant documentation.

I completed a thorough investigation and did not find a violation of Amazon policy or standards of conduct.

As a reminder, Amazon has a policy prohibiting retaliation against anyone who has raised a complaint or who has participated in an investigation. Amazon expects that anyone who participates in an investigation will not engage in any retaliatory behavior – this applies to and has been discussed with all the parties in the investigation.

Thank you again for raising your concerns and for your cooperation. If you have any questions now or in the future, please let me know.

Thank you,
Amy Nally


ref:_00D3t2mKvO._5003t1hMMXj:ref


**Carlos** <cfv1983@gmail.com>                                            Tue, Jun 13, 2023 at 7:44 PM
To: Exact HR <hr@exact.hr.amazon.dev>

Ms Nally,

I have a number of follow-up questions.
These are questions of political conscience in the work place, with team members more or less directly misinforming the company. It took place over a year and a half, and my concern is that Amazon is doing damage control and is not really penetrating the veneer of manager expressions - that is, my real concern is that Human Resources is not really willing to protect the rights of Amazon Associates when it comes to challenging the authoritative word.

Human Resources absolutely has a legal and contractual obligation to maintain not only Amazon's most general work standards, but also to define our work tenets as well.

(1) You have stated boilerplate, Amazon "did not find a violation of Amazon policy or standards of conduct.," but you have not addressed my questions; I asked whether you recognized a terminology for criminal Stalking when a manager lies about, or misleads the company concerning individual conduct. By what means did you resolve that my several named managers did not mislead the company?

(2) I asked the company to expunge a record of my misconducts because I claimed the record could not be grounded in fact. How did you evaluate the factuality of several ADAPTS I referred to in affidavits? Did you read those ADAPTS, were you able to identify those documents? Did you discuss those ADAPTS with managers, and were they forthcoming, and what disagreements
did we have?

(3) I asked Amazon to evaluate terminating managers for maintenance of a false standard of management conduct. How did you respect that complaint, did you review management records of performance? Did you simply discuss the issue, or did you allow the manager to maintain more confidence than my complaint or my question?

It is a matter of legal and civil right, to pre-empt false standards of conduct; the line I drew between favoritism and disfavor leaves a lot of opportunity for the manager to behave cruelly and with abandon - the expressions in these ADAPTS *guided* a culture of misconduct based directly within the expression of disfavor, so that literally every management engagement here relating to Adrian Caldera was corrupted, and this includes all of his direct report managers.

Without being able to answer these questions you cannot provide that you have upheld my contract, and you cannot provide that these questions had any specific standard of review. How does a person aggrieved find resolution to questions in a culture which does not actually answer questions of misconduct?

Please reply as courteously as possible. I have been with company for a number of years, and am politically vulnerable to this abuse. I will not be able to work with my previous team members, and you sided with their opportunity to *force* attrition by destroying my image and reputation. Literally, there is nothing reported here which can have resolved my complaint, or allowed me to find ethical ground to have clarified it.

The response received is simply not sufficient, and is politically inefficient -- there is nothing you have provided which does not respect criminal intent of a long term stalking exercise.

Sincerely,
Carlos Velasquez
velaca@amazon.com
cfv1983@gmail.com
801.671.0361

[Quoted text hidden]

7/27/25, 9:12 PM                          Gmail - Follow-Up, Consider to Re-Open your Investigation

 Gmail                                           Carlos <cfv1983@gmail.com>

## Follow-Up, Consider to Re-Open your Investigation
1 message

**Carlos** <cfv1983@gmail.com>                                      Thu, Jun 15, 2023 at 9:29 AM
To: "Nally, Amy" <awwashle@amazon.com>

Greetings Ms. Nally,

I feel my question itself falls beneath recognizability, and that it has not really been drawn out.

The Human Resources team MUST consider how *unjustified* the language used in the ADAPT process is, and *then* must evaluate whether *any* authentic disciplinary program was ever in place at the time these ADAPTS issued, to justify an *indefinite* suspension of trust in Velaca.

I am firmly the management team I referred to herein can be discredited of the *order* and *substance* of its claims.

The leading argument here is that the team did not ever do sufficient diligence to maintain their ADAPTS language, and in fact pressed *velaca ad hominem* without developing a great coaching dialogue; they in turn sought to see that negative effect put upon the Associates *velaca* interacted with on a daily basis - their behavior was routine, caustic and avoidant, misleading. Literally every step of their behavior was under a serious disposition after June 2022, and only escalated under Caldera's direction.

Again, I have to state how critically disappointed I am - these teams are smart enough to know how to use and manipulate the Human Resources apparatus in the company; even a partial violation will allow the manager to state whatever he or she wants - to vent - and that is a problem, because some errors are not to the dignity of the individual or the organization, and in this instance there is obviously a broad dignitary objection being *fabricated* into organizational policy - a *false legend* - that is the term I used on the phone to respect how they have treated me.

Without care and concern for the dignity of the associate *under* management practices,DUT7 does not have a high level of ethical credibility, nor has *any* standard of credibility been expressed to *velaca* outside the instant of these dispositions to maintain that the organization is in good faith.

FOLLOWING UP
That is, I provided a partial criminal complaint because I had to advise the management team at DUT7 was conducting *stalking* by misrepresenting my behavior; across several ADAPTS I was literally *portrayed* as "unbecoming" to management authority, and beyond that my Performance Reviews were more or less suffocated.

These images of me took place in confidence to the management team, and I protested at each instance.

I feel like I have to clarify, these are NOT instances where my language needed to be adjusted -- that is not the scope of the ADAPT, and the insinuation operates to *harm* me where the management team really needed to speak me with more constructively about developing a plan. Hindsight, conversely the management team may really have treated this situation as highly extreme without a genuine cause, in attempt to cause extreme aggravation. Their portrayal is a person who is highly unstable.

Resp. Pablavar, an ADAPT you should have read which issued late in 2021 evaluated how I was *unbecoming* to a management position based primarily in a question of whether I was following management instructions; whether his extended absences at the dock were intentional, since he reports on that affidavit 3 repeat instances where I was either being *insubordinate* or generating an *unsafe* work space, that I persisted in a trailer-unloading process in standard work terms primarily because I found there was sufficient 5S space for carts. That is, there was sufficient safe space so that when I did seek to clarify pablavar's request for us to have stopped trailer-unload, he was not available via radio in all three instances. Further, that when I tried to advise him of this information at the ADAPT delivery, even that I gone so far as to clarify with WHS, he refused to hear that and amend the ADAPT. The team then engaged 3 v. 1 beligerently to directly silence me, and even call into question my memory of the events before their corrupt mistreatment. --

Resp. Resp. mmwayma, was she asked WHY she did not immediately discuss a behavioral problem, as to *why* it was not until late in 2022 the management team became OPEN about their reservations against Velaca, as whether it was based in any of the ADAPTS reviewed?

7/27/25, 9:12 PM                          Gmail - Follow-Up, Consider to Re-Open your Investigation

Was she asked if she was *motivated* to terminate Velaca at a freak coding error in Nov.2022 and Feb.2023, as whether that was urged by Adrian Caldera, there are two subsequent *failed* FINAL WRITTEN WARNINGS which issued from those two team members in 2023. The matter compared *irresponsible* use of equipment, and it was an instance of a stress related oversight; we saw a repeat of the instance in the new year.

The Human Resources team MUST have evaluated whether mmwayma and adcald's treatment of *velaca pre-peak* and post-2022 Peak was unjustified; *velaca* had been attempting to raise awareness of false manager claims against him, and the failure of Human Resources to be able to resolve these outside of the confidence of *managers'* false narrative was becoming highly damaging. The associate suffering major transgressions on-site cannot confide in those transgressors - the Human Resources mechanism is NOT serious over protecting the lives and interests of the Associate *before* it has prioritized *confidence* in management; that is unjustifiable.

Did Human Resources review prior *complaints* by velaca, regarding aggressive and improper, and *disinformative* misconduct? Such as an instance wherein Caldera actively manipulated every Standard Work Element as a microaggression against velaca before *booting* from the gatekeep role? This was yet another instance wherein he favored a Process Assistant who expressed *distrust* that an associate would attempt self-harm in order to find accomodation by working too hard in a Full-Route Pick and Stage process? Has the team evaluated whether there is repeated behavior here *designed* to inflict harm to *velaca,* because this dialogue over the standard work processes at Amazon LLC does not engage behavioral corruption?


CLOSING
Instead DUT7 has let my whole career slip through the cracks of their sloppy statements and misrepresentations of incidence; each one of those ADAPTS is literally a transgression. It is an irreparable insult, and it is stalking with the intent to coerce resignation, or even to coerce aggravation of some other kind of crime.

The present disposition compares and magnifies it; the team in its progress to management status, generates a psychological image by which they communicate, and in this instance they have intentionally abused that image to do a lot of harm, and we now experience inappropriate prejudice, like a psychological threat warning us not to ask questions. Or perhaps only warning *me.*

Please re-open your investigation and evaluate your methodology *beyond* the affidavits of managers; they have not found, formed, nor tried to form, *true consensus* (Advocative Theory of Consensus) and they do not behave to demonstrate an *active* plan to eliminate tangible problems which suggests the burdens they generated on *my* performance reviews are *fraudulent.*

A serious team will *terminate* an aggravated, hostile, or unstable individual. One who *does not* make intentional improvements when we can state *confidently* and not merely *instantially* that there was a transgression. They were stringing me along through their socially-engineered abuse, and without expunging those ADAPTS Amazon LLC is *deceived* by complex failures in their disciplinary apparatus.

Sincerely,
Carlos Velasquez
velaca@amazon.com
801.671.0361
cfv1983@gmail.com

7/15/25, 4:34 PM                                 Gmail - Follow up from 6/2

 Gmail

**EXHIBIT**

**27**

Carlos <cfv1983@gmail.com>

## Follow up from 6/2
3 messages

**Carlos** <cfv1983@gmail.com>                                    Wed, Jun 7, 2023 at 4:27 AM
To: awwashle@amazon.com

Greetings Ms. Nally,

We spoke last weekend on some critical behavior issues, and I have provided here for you a follow-up statement as promised.

The statement goes over a couple of related issues, and also defines a sort of business culture question as to whether or not the site tolerates misconduct in light of competition.

Also, if you would provide a contact point for legal that would be helpful.

Thanks!


s/Carlos Velasquez

velaca@amazon.com

AMZL-DUT7-L3


**Nally, Amy** <awwashle@amazon.com>                              Mon, Jun 12, 2023 at 9:59 PM
To: Carlos <cfv1983@gmail.com>

Hi Carlos,


Thanks for the additional follow up.  Here is the contact information for our legal department.


Amazon.com, Inc. c/o Corporation Service Company

300 Deschutes Way, SW Suite 304

Tumwater, WA 98501

Attn: Legal Department



Thanks,

Amy

**From:** Carlos <cfv1983@gmail.com>
**Sent:** Wednesday, June 7, 2023 3:28 AM

7/15/25, 4:34 PM                                    Gmail - Follow up from 6/2

**To:** Nally, Amy <awwashle@amazon.com>
**Subject:** [EXTERNAL] Follow up from 6/2

> **CAUTION**: This email originated from outside of the organization. Do not click links or open attachments unless you can confirm the sender and know the content is safe.

[Quoted text hidden]

---

**Carlos V** <cfv1983@gmail.com>                         Tue, Jun 13, 2023 at 6:29 AM
To: "Nally, Amy" <awwashle@amazon.com>

Thanks for the info Amy.

Currently any legal documents will go through me.
At my residential address on file, ot through this email.

Carlos V.
801.671.0361
cfv1983@gmail.com

Sent from my iPhone

On Jun 12, 2023, at 9:59 PM, Nally, Amy <awwashle@amazon.com> wrote:

[Quoted text hidden]

7/12/25, 3:25 PM                          Gmail - FW: NOTICE OF LEGAL INTENT - PLEASE REVIEW

 Gmail

| EXHIBIT |
| 28 |

Carlos <cfv1983@gmail.com>

## FW: NOTICE OF LEGAL INTENT - PLEASE REVIEW

1 message

**Velasquez, Carlos** <velaca@amazon.com>                          Tue, Jul 11, 2023 at 11:29 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

**From:** Velasquez, Carlos
**Sent:** Monday, July 10, 2023 12:01 PM
**To:** Alger, Kerri <keralger@amazon.com>; Brown, Katy <brownklq@amazon.com>; Sargent, Kevin
<sargkevi@amazon.com>; Soliz, Vicky <vssoliz@amazon.com>; Alvarez, Pablo <pabalvar@amazon.com>; Wayman,
Margarita <mwwayma@amazon.com>; Hanks, Dalton <dalhanks@amazon.com>; Henry, Emily
<emihenrr@amazon.com>; Walters, Shanese <washanes@amazon.com>
**Subject:** NOTICE OF LEGAL INTENT - PLEASE REVIEW

Greetings to AMAZON.COM LLC at DUT7 from CARLOS VELASQUEZ

Please be apprised of an informal document defined to be a Notice of Legal Intent.

Please review the document at your leisure and reply accordingly.

In the near future you may be subject to service of a complaint or subpoena for information.

Your cooperation will be most respected!

Sincerely,

Carlos Velasquez

velaca@amazon.com

cfv1983@gmail.com

 **Legal Notice of Intent_velaca.pdf**
380K

EXHIBIT
**28**

NOTICE OF INTENT TO FILE A CIVIL CLAIM

NOTICE OF INTENT TO FILE A CRIMINAL CLAIM

NOTICE AND REQUEST FOR RESIGNATIONS

EARLY DISCOVERY REQUESTS

POSSIBLE SETTLEMENT TERMS

This document is distributed by and behalf of the following Amazon associate who complains of organized Management Stalking and Breach of Contract:

Carlos Velasquez

velaca@amazon.com

cfv1983@gmail.com

801.671.0361


s/Carlos Velasquez

RESPONDENT STATUS

**EXHIBIT 28**

This document is sent internally via email to the following:

Regional Human Resources (Pioneer) – Kerri Alger – keralger@amazon.com

DUT7 Human Resources – Katy Brown – brownklq@amazon.com

DUT7 Site Leadership – Kevin Sargent – sargkevi@amazon.com

DUT7 L6 Leadership – Vicki Soliz – vssoliz@amazon.com

DUT7 L5 Leadership – Pablo Alvarez – pabalvar@amazon.com

DUT7 L5 Leadership – Margarita Wayman – mwwayma@amazon.com

DUT7 L4 Leadership – Dalton Hanks – dalhanks@amazon.com

DUT7 L4 Leadership – Emily Henry – emihenrr@amazon.com

DUT7 L3 Leadership – Shanese Walters – washanes@amazon.com

If you are receiving this document you may be served civil filings to answer questions; please take the time to reply with a Point of Contact where you can receive mail or email.


This document is also forwarded *by mail* to Amazon LLC Legal:

AMAZON.COM LEGAL DEPARTMENT

ATTN: CIVL AND CRIMINAL MATTERS

ATTN: HUMAN RESOURCES MATTERS

410 TERRY AVE NORTH

SEATTLE WA, 98109

| EXHIBIT |
|:---:|
| **28** |

Contents

NOTICE AND REQUEST FOR RESIGNATIONS............................................................... 1

STATEMENT OF CAUSE ................................................................................................. 3

BREACH OF CONTRACT ................................................................................................ 6

PERSONAL LIABILITY OF SPECIFIC MANAGERS ......................................................... 9

LIABILITY OF AMAZON LLC ........................................................................................ 10

REQUEST FOR CONTACT INFORMATION ................................................................... 12

FIRST DISCOVERY REQUEST ...................................................................................... 13

SECOND DISCOVERY REQUEST ................................................................................. 14

THIRD DISCOVERY REQUEST...................................................................................... 15

FOURTH DISCOVERY REQUEST ................................................................................. 16

FIFTH DISCOVERY REQUEST...................................................................................... 17

POTENTIAL CONDITIONS OF SETTLEMENT OF THESE CLAIMS ............................... 18

NOTICE AND REQUEST FOR RESIGNATIONS

We have a MAJOR disagreement concerning this L3 Associate Carlos Velasquez, (velaca@amazon.com); the leadership team at Amazon DUT7 is hereby given notice and this document may constitute an Open Request for their Resignations.

**Kerri Alger; Pablo Alvarez; Margarita Wayman; Shanese Walters**

Additionally, Velaca sought through Human Resources action to expunge a false and unverifiable record of misconduct. The Human Resources team has refused to see the reasonability of this course of action, and perhaps site leadership will attempt

1

to demand that Human Resources may purge or expunge unverifiable claims which have been used to suppress and oppress, and false separate, Velaca from the usual course of his duties.

The rule of defamation claims generally is to prove false statements, or to prove false intent, while the rule of Fraud is to prove intent to mislead, and in business to do such to another individual may also be a form of Stalking and Harassment.

Be advised, this is not a legal complaint; this is notice of Legal Intent, and neither constitutes the full extent of the complaint, nor makes final claims of any person's legal liability; this document does however provoke the real knowledge of misconduct and the honor of on-site associates and leadership who persist at Amazon LLC knowing they have committed extreme violations of its behavioral and disciplinary policy, their successful and extended attempt to do most serious harm to Carlos Velasquez, and their capacity to do serious harm to any associate.

2

<div style="text-align:right">

**EXHIBIT**
**28**

</div>

STATEMENT OF CAUSE

These statements relate ADAPTS records in the company's keeping which are *open* to managers and Human Resources.

Starting late in 2021 **Pablo Alvarez**, **Johnathan Cowan**, and **Adrian Caldera** engaged in a conspiracy to issue *false statement* respecting Velaca conduct in written disciplinary forms, in the course of that conduct the trio refused to hear facts about the incidence which would have adjusted their reporting.

In coercing false statements, they generated a social precedence for another Manager, **Devlen Bridges**, who under coercion from **Adrian Caldera**, and **Johnathan Cowan** issued yet another false and misleading discussion of Velaca's conduct. At delivery they refused to hear facts and discussion which would have adjusted or pre-empted the issue.

After **Devlen Bridges'** termination, **Margarita Wayman** was either improperly influenced by those ADAPTS, and later directly influenced by **Adrian Caldera** to build a false standard which arrested competent reporting and discussion of Velaca' performance.

**Adrian Caldera** and **Margarita Wayman** kept secret their disciplinary reservations against velaca from the time when **Margarita Wayman** took a promotion to Level 4, until around September-October 2022 when **Adrian Caldera** demanded that velaca, who continued to insist the statements were false, communicate with Level 1 associates who may or may not have had something to say about velaca's performance as a Process Assistant.

**Margarita Wayman** in March 2023 revealed to velaca that she continued to hold the same disregard for velaca's objections, and made the same demand of him to speak to Level 1 associates for suggestions.

We allege **Adrian Caldera** was in close communication with associates who were interested to gain a promotion, who had perhaps closed and even unprofessional conversations with those associates about velaca, that both **Margarita Wayman** and **Adrian Caldera** were attempting to send a message to encourage those associates at furtherance of their conspiracy endeavor.

They attempted to compel Velaca in an attempt to humiliate him, and further to glamorize the intentional misconducts of **Pablo Alvarez** and **Devlen Bridges**, an

<div style="text-align:center">3</div>

attempt to affirm and cement *false consensus* as rule of social and political authority.

**Shanese Walters** was a knowing and willing accomplice to their criminal conspiracy, stands to be directly and wrongfully enriched by it, and participated in numerous minute schemes to aggravate the disposition which **Adrian Caldera** primarily spearheaded in secret. **Shanese Walters** does not filter misconduct, does not report even plausible misconduct if she stands to benefit, and is a willing beneficiary to complex criminal misconduct.

**Kerri Alger** is a Senior Regional Human Resources manager in the Pioneer Region, with responsibility for care over the conduct and well-being of Amazon Associates; she received an explicit complaint and failed to resolve the principle questions in the complaint in a manner (a) timely to discipline and punish wrong action by those persons named; (b) capable to resolve the political impact of their false and unproven dispositions.

That is, she treated an allegation of Fraud and Harassment as incompatible with reviewing disciplinary reports against managers, failing to recognize HOW Fraud might work when concerning false disciplinary statements, failing to respect the scope of intentional misconduct and, like those Managers, seeks even now to have intentionally misled Amazon LLC about velaca's conduct.

**Kerri Alger** apparently saw an opportunity to aggressively and even fatally disadvantage velaca in terms of on-site standing, and enabled a series of partially documented harassments by **Margarita Wayman** and **Adrian Caldera** at the beginning of 2023 which were apparently motivated of their knowing misconducts.

**Kerri Alger's** failure at intervention granted high-level corporate *consent* to whatever the management team's tacit scheme was, opting primarily to confidence the authority of the written management statement and aiding their scheme of self-aggrandizement.

Velaca's complaint to **Kerri Alger**, and a subsequent complaint *against* **Kerri Alger** for failure to review was addressed by **Jerry Yeung**, were pending from late summer 2022 into the first weeks of the New Year 2023.

During that time **Margarita Wayman, Adrian Caldera,** and **Shanese Walters** retaliated against velaca for the complaints he had issued against the two Managers

4

> **EXHIBIT**
> **28**

between September and January by (a) withholding crucial information about the team strategy for onboarding **Emily Henry** and conducting aggressive favoritism against velaca; (b) failing to set reasonable standards and goals regarding performance reviews incl. demanding velaca seek out L1 associate input into his performance; (c) failing to support velaca while he was under extreme duress rel. to those complaints, and relating to other matters which were a source of high anxiety, incl. at least two attempts to issue final written warnings which were unwarranted and based in their false precedences for disciplinary standards.

The plot engaged by **Adrian Caldera** and **Margarita Wayman** was to elaborate their own *conflicts of interest* into causes for termination; principally velaca can substantiate the disciplinary ADAPTS issued were directly related to stress and anxiety of a work environment made toxic by Human Resources inaction and bad Management practices.

**Margarita Wayman** failed to conduct in-dept STU's on a subject rel. to inordinate job stress, and failed to admit or disclose her own biases regarding velaca, and failed to build a constructive dialogue which would pre-empt stress related issues; the Leadership team therein sought to exaggerate harm of undue stress and retaliated against velaca repeatedly until **Adrian Caldera's** departure from the company.

In failing build appropriate limits, **Margarita Wayman** fell under **Adrian Caldera**'s corrupt influence, the same as **Devlen Bridges** and **Pablo Alvarez**, each of whom had refused to admit false statements and errors in their disciplinary reports, and subsequently generated a permanent *state of separation* against velaca which was both harmful and wrongful.

THEREFORE, those managers and site leaders boldly conspired against, and stalked Carlos Velasquez in an attempt to coerce resignation at the expense of the credibility of AMAZON LLC, the biases of its Human Resources agency, and *exploited* gullibility and impressionability of those Associates who were either misled, or made complicit in their personal quests for attention and promotion.

IT IS REASONABLE TO REQUEST RESIGNATION of those managers and leaders who are *knowing* conspiracy because their BUSINESS ETHICS are questionable, and they have actively wrongfully discredited Carlos Velasquez by disrupting  his high-quality of work, and disinforming him of their needs, and maintaining a criminal business culture.

5

BREACH OF CONTRACT

Amazon Human Resources lacks the necessary transparency to mitigate Criminal Harassment and Stalking[1] at the scale of contemptuous disfavor, criminal defamation, and fraud in business statements.

There is literally no inherent mechanism to prevent abusive management practices, and the simplicity with which Human Resources renders an opaque disciplinary discourse undermines the inherent confidence of true and conscionable disciplinary questions, so that a reasonable associate encountering a criminal behavioral plot cannot take confidence that the effects of that plot, such as false statements in ADAPTS, will be pre-empted, or even reasonably discussed.

Statements issued by **Pablo Alvarez** were made while a team of three managers aggressively overrode the factual account of incidence presented by velaca which sought to strategically exclude the manager's absence from the account as directly contributory, and [2] further exclude relevant information reg. velaca's discretion in that instance. Instead, they were motivated by an internal complaint that velaca had missed taking lunch breaks and used that precedence to build a false and compound statement of insubordination. The management was never careful velaca's conduct rel. to his lunch breaks.

That incidence was coerced and reported by all but the very highest levels of site leadership, and the experience created a social gateway for **Devlen Bridges** who was the direct report manager for velaca to later issue similar false statements in

---

[1] Ut. Code § 76-5-106.5 (2) "An actor commits stalking if the actor intentionally or knowingly (a) engages in conducted directed at a specific individual and knows or should know that the course of conduct would cause a reasonable person; (i) to fear for the individual's own safety or the safety of a third individual; or (b) to suffer other emotional distress.

Part (4), "In a prosecution under this section, it is not a defense that the actor: (a) was not given notice that the course of conduct was unwanted; or (b) did not intend to cause the victim fear or other emotional distress."

[2] This ADAPT referred has since deprecated and cannot be easily requested from on-site Human Resources. A copy of the document is requested on this packet.

EXHIBIT
**28**

an ADAPT report which went on to generate a culture in Breach of Confidence against velaca.

The defining characteristic of these ADAPTS were characterizations and depictions of velaca's conduct inherent which were irrequisite to any kind of disciplinary discussion; that is, they served as a tacit promise to demote and harass velaca and did not serve constructive coaching question.

In tandem with the facts of disciplinary complaint being out of order, the statements inherent were unfounded and used to generate continuous suppression of Carlos Velasquez real character and performance.

The disciplinary evaluation process engaged *guarantees* that Amazon LLC tenets are substantive, interpretable, flexible, and high functioning and holds that Harassment and even low level Social Engineering (wherein false information becomes centralized to mislead others in order to damage the character or reputation of an individual) and otherwise interprets radical deviations from solid Business Ethics to be points of discretionary termination.

In literally every reported instance the Management Team failed to tell the truth, and failed to do diligence; that is, every disciplinary record Velaca has was subjective action of fraud and stalking, and supported by Human Resources agents more prejudiced to close the case.

This included a tacit *freeze* on constructive Progress Reports;

This includes knowing false attempts at termination, and failure to do diligence;

This includes granting favorable recommendations for Managers who were the subject of these very serious complaints;

This includes unreasonable treatment of disciplinary complaints;

This includes validation of frivolous complaints;

Amazon LLC holds out a capricious contract terminology which limits the forum and nature of individual engagement as 'Associates,' the elements which underpin this contract are a Business Need terminology which places certain narrow and mandatory demands on individual employees including attendance, comportment, and compliance with disciplinary terms.

7

The Human Resources agency lacked the instruction to limit statements of dignitary form where unwarranted, so that false and misleading statements were allowed into a disciplinary dialogue repeatedly with a subtle quality of *force majeur* intent to override more interested scrutiny and to damage the tangible confidence of the victim.

Literally, most of these complaints of irrational and hostile behavior would have been mitigated with better dignitary standards for disciplinary review; conditions beyond *repeat* actions, such as:

(1) Disciplinary Plans, not sketchy deliveries;
(2) Screening of *ad hominem* terms unless very clearly defined;
(3) Definite Seek-to-Understand discussions with a full-breadth of real interest, not pseudo-legal citations;

Essentially, on-site Human Resources and later off-site Human Resources were allowed to collude and conspire with Direct-Report Managers to allow them to bypass actual consideration of the stuff written in the report, whether it was actually constructive to policy and behavior.

These disciplinary discussions and deliveries were essentially bullying sessions where two to three managers improperly filtered information, conducted political separation without disclosure or real terms, and otherwise proved they were hostile to the development of the associate.

The team fails to become diverse in having conducted stalking and harassment against Carlos Velasquez, and fails to appreciate actual Amazon LLC standards, Have Backbone, Disagree and Commit,[3] is in their shadow a policy to Disagree Without Listening.

They fail to maintain Business Needs and are in Breach of Contract terms for Managers at Amazon LLC who are charged with the very same standards as their subordinates; the team provokes their personal liability, and also provokes the liability of Amazon LLC.

---

[3] This was posted as Velaca's tenet in the hallway at DUT7.

8

EXHIBIT
28

PERSONAL LIABILITY OF SPECIFIC MANAGERS

Amazon Leadership is not always encouraged to keep strict records of disciplinary questions and considerations, that is the fear of retaliation is used to sensitize the corporate construction of behavioral policy *toward* work and *away* from litigation of *any* kind.

The individual has personal liability for Criminal Misconduct anywhere his or her statements submitted to the company, or held in secret, were used to actively do or plan harm.

The individual personal liability for Civil Misconduct at any time he or she chose to make false statements or unfounded statements may have been more or less related to ongoing Stalking and Harassment.

Anytime a reasonable actor in the same circumstance would have made a critically different choice, we can begin to demonstrate the personal liability of the individual Corporate Officer.

We can demonstrate the Management Team in engaging stalking, fraud, and harassment has to some extent *litigated* wrongful terms within the scope of its implicit and corrupt rationale for issue; that is, they actively use a litigious *abuse of discretion* standard which compares *legal* and *civil* than *disciplinary* forum, and they feel *falsely* entitled to say *anything* without respect for the damage unprincipled statements do to Coaching and Disciplinary conditions.

Managers can literally bully associates out of the worksite simply by not listening to their needs, and when that process accompanies hard-boiled lies and half-truths about disciplinary conditions, the nature of the Business Needs contract becomes vague indeed so that all we have to do is prove the manager's conduct was (a) *not defined*, and (b) was *misleading*.

Literally every single ADAPT since the late part of 2021 against Velaca has been a politically motivated assault which Human Resources genuflected and enhanced.

In failing to build constructive discourse, the team was persistent and active in a prolonged narrative disseminating false ideas about velaca's conduct to other members of the leadership team, and to associates who were vulnerable to their authority.

9

LIABILITY OF AMAZON LLC

Unnecessary and insubstantial statements may be defamatory; and they may have been used to communicate with other team members *who* the team dislikes, or disfavors, or is willing to harm.

A system biased for OPACITY cannot clarify the conscience of people wronged, Amazon's use and maintenance of proscription against *retaliation* in the work place begins to include forms of legal remedy, and so AMAZON LLC in failing to maintain true disciplinary screening at things such as disciplinary records which are shared may be in BREACH OF CONTRACT perpetually.

The reality is the Management Team has been on 1 ½ year campaign of retaliation against Velaca for their own failures at diligence, and Amazon LLC Human Resources *does not filter* the kind and quality of statements made once the Manager and Human Resources team decide there is some factual consensus.

The leadership in 2021 knew this fact of the business, and proceeded to violate what amount to Due Process rights for workers within a working organization.

**Johnathan Cowan** was a site leader and may have colluded/conspired with **Adrian Caldera** multiple times to suppress and harm velaca; when a complaint went against **Pablo Alvarez** he improperly *deflected* the issue and generated a perpetual confrontation which **Adrian Caldera** was inspired by, and could not be diverted for about a year and a half.

The DUT7 site leadership exploits labor in this way, and they lie to one another in order to maintain the appearance of good standing and credibility, in order to psyche themselves up while they are engaged in harming their peer, and in misrepresenting the intent and the orientation of the organization.

We can hereon begin to prove AMAZON LLC does not have truth-telling in reporting procedures in place, and does not have fact-construction procedures in place when issuing disciplinary reports – the DUT7 Team breached confidence egregiously to do intentional harm to velaca, and enrich those person willing to engage in the same kind of dialogue themselves.

10

EXHIBIT
**28**

2.

Human Resources agency at Amazon LLC has failed to state any reason it will not have already made a Criminal Report of Management stalking within its facility, this communicates that the organization prefers them on a loose disciplinary leash out of an Earn Trust[4] work ethic.

In tandem, the Human Resources team has not been able to carry a reasonable argument for/against expungement of the disciplinary record, even while it has not recognized a lack of factuality in those reports, this shows again they utilize a litigious logic and not the quality of reasoning required to Insist on the Highest Standards.

There was action due as long ago as September 2022, and **Kerri Alger** and subsequent Human Resources agents failed to respect the seriousness of the claim, a year and a half of a management stalking the Process Assistant to compel him to resign for the harm they did.

Additionally they allowed some of those individual to take favorable recommendations when they left the company, it seems likely to this party that they left because they knew complaint was imminent.

Even now the Leadership Team improperly manipulates this discussion out of contempt for AMAZON LLC, contempt for associates and workers everywhere.

---

[4] Earn Trust is an Amazon tenet.

11

REQUEST FOR CONTACT INFORMATION

Amazon LLC is hereby requested provide a Point of Contact for legal Service of Process, the following individuals:

**Possible Defendants**

Kerri Alger

Pablo Alvarez

Adrian Caldera

Johnathan Cowan

Margarita Wayman

Shanese Walters

Devlen Bridges

**Possible Interrogatory Requests**

| | |
|---|---|
| Hayley Barker | Louis Peters |
| Katy Brown | Kevin Sargeant |
| Celestia Browning/Leme | Vicky Soliz |
| Dalton Hanks | Tyson Trevino |
| Emily Henry | Eric Turner |
| Paul Kondrat | Jerry Yeung (Human Resources off-site |
| Amy Nally (Human Resources off-site) | |
| ) | |

12

EXHIBIT

28

FIRST DISCOVERY REQUEST

These requests are made in good faith to aid discussion, conferencing, and trial if necessary.

RECORDS SOUGHT

Comprehensive Disciplinary and Performance records from the following managers, including records over Shanese Walters and Carlos Velasquez.

REASON

Fraud and Intentional Mismanagement are alleged; it is possible review of the relevant records will show imbalanced performance reviews, favoritism, conditions of diligence, failures of diligence.

**Pablo Alvarez**

**Adrian Caldera**

**Devlen Bridges**

**Margarita Wayman**

13

SECOND DISCOVERY REQUEST

These requests are made in good faith to aid discussion, conferencing, and trial if necessary.

RECORDS SOUGHT

Amazon LLC does hold a propriety chat app called "Chime," and comprehensive records communications between the Management Team are requested.

Records sought are those related to communications about Performance and Disciplinary questions rel. to Carlos Velasquez (velaca) and also to Shanese Walters, who worked directly beside and under the Management team led by Adrian Caldera.

REASON

Records are sought to review the extent and quality of communication on the disciplinary and performance review related subjects, records are sought in timing with records of ADAPTS which are complained to hold unsubstantiated, and false statements.

**Pablo Alvarez** (November 2021-January 2022)

**Adrian Caldera** (November 2021-January 2022; May 2022-August 2022; December 2022-May 2023)

**Devlen Bridges** (May 2022-August 2022)

**Margarita Wayman** (November 2022-May 2023)

14

EXHIBIT
**28**

### THIRD DISCOVERY REQUEST

These requests are made in good faith to aid discussion, conferencing, and trial if necessary.

### RECORDS SOUGHT

Additionally, Records from Human Resources discussion are sought precisely to answer of what actual diligence Amazon Human Resources agency did with respect to complaints by velaca.

### REASON

The leading claim here is that the Human Resources agency in fact did not do sufficient diligence to maintain Amazon's tenets, or its code of conduct; that is, there is concern the Human Resources team disqualifies complaints capriciously or on minor contradictions.

Review of these records will clarify diligence done, and aid to resolve the dispute herein.

**Kerri Alger**

**Katy Brown**

**Johnathan Cowan**

**Amy Nally**

**Jerry Yeung**

15

## FOURTH DISCOVERY REQUEST

These requests are made in good faith to aid discussion, conferencing, and trial if necessary.

## RECORDS SOUGHT

Two *Final Written* warnings were deprecated for cause against Velaca, and so they do not appear on the same record which Human Resources has regular access to.

Any and all deprecated, or voided disciplinary complaints which may constitute evidence of intent to commit Stalking/Harassment and Wrongful Termination are necessary.

## REASON

These attempts at disciplinary mark a point of escalation in the strategy to coerce resignation, or have fired velaca. The motives are plausibly wide-ranging, but we generally recognize the Management Team felt vindicated by Human Resources deference and sought to further their knowing and wrongful prejudices.

The documents were also directly *retaliatory*, and constitute a point a direct *separation* between the Management Team and Velaca, a point which they failed to make to the discrimination of the organization, and which Human Resources did not investigate sua sponte at the appearance of misconduct.

16

> **EXHIBIT**
> **28**

FIFTH DISCOVERY REQUEST

These requests are made in good faith to aid discussion, conferencing, and trial if necessary.

RECORDS SOUGHT

The ADAPT created by **Pablo Alvarez** was made with input from **Eric Turner** and **Louis Peters** and was improperly influenced by **Johnathan Cowan** and **Adrian Caldera**, is alleged to misstate the incidence so boldly as to wrongfully call into question the credibility of Velaca, Carlos Velasquez.

REASON

The document has been deprecated from general review by managers, but it is the document which marks intentional mismanagement, false statements, and stalking and harrassment.

The document issued late in 2021.

17

POTENTIAL CONDITIONS OF SETTLEMENT OF THESE CLAIMS

1. TERMINATION/RESIGNATION of those parties named at the start of this document; any willing admission by those parties in light of this document will limit the necessary cause of action whether criminal or civil.

2. DISCLOSURE AND EXPUNGEMENT OF RECORD may limit cause at civil injunction, with the inclusion of a Public statement recognizing the misconducts or plausible misconducts, in apology.

3. Carlos Velasquez, Velaca, is wrongfully deprived of standing, and cannot work under conditions where a false record pursues him, and where a Management Team is a constant and knowing criminal and civil violation, corporate divestment, against the dignity of work, and therefore AMAZON LLC may offer monetary settlement.

4. Carlos Velasquez, velaca, is wrongfully deprived of standing, and cannot promote within a company where he has worked dutifully and critically for five years while a false record is advertent over his incompetence, a letter of recommendation is due.

5. The Human Resources agency in Amazon.com LLC must disclose the depth of its reporting procedures related to velaca's numerous complaints; that is, they must disclose WHAT questions were asked, and HOW they reached their conclusions BECAUSE this was instance where the conviction of Associate is totally definite, so that Human Resources continuously bears the appearance of having engaged conspiracy and collusion; it is unprofessional for Amazon.com LLC to filter complaints for things like competence, or to favor manager discretion.

6. AMAZON LLC may have an obligation to its entire associate base to monitor its disciplinary records more wholesomely. The Human Resources agency can operate completely flippantly, and the Operations Management forum does not have strict reporting standards in terms of facts-based reporting; either the team was misusing the AMAZON LLC disciplinary for and/or the corporate

18

mechanism simply does not have strong enough rules to bear associate confidence.

EXHIBIT
28

19

7/28/25, 10:28 PM                    Gmail - Your leave details and decision - Carlos Velasquez, Employee ID: 103957754, Case 06211350

 **Gmail**

```
EXHIBIT
29
```

Carlos <cfv1983@gmail.com>

## Your leave details and decision - Carlos Velasquez, Employee ID: 103957754, Case 06211350

1 message

amazondls@dali-leave-disability.services.hr.a2z.com <amazondls@dali-leave-disability.services.hr.a2z.com>

Mon, Jul 3, 2023 at 11:13 AM

Hi Carlos Velasquez,

Your leave request was approved. Please see below for details.

**Leave details**

Your request for a Personal Leave of Absence from **06-11-2023** to **07-25-2023** is **approved**.

**Pay during your leave**

**Please know that your leave is unpaid.** You can apply any accrued and available Sick, Personal, Floating Holiday, and/or Vacation time to your unpaid absences through My HR. Use of any paid time off does not extend your leave but allows you to receive pay for some or all of your leave.

**Next steps**

Based on the information you provided, you plan to return to work on **07-26-2023**.

If you need to extend your leave beyond **07-11-2023**, please contact us or submit a request through My HR.

View the following documents to find answers to frequently asked questions, and learn more about your rights and benefits. You can access these links at any time off or on the Amazon network.

Benefits During Leave of Absence Guide

Resources for Living

Amazon offers free, confidential support through the Resources for Living (RFL) program. RFL is available 24 hours a day, 7 days a week to you, your family, and all members of your household. Call a Care Partner at 1-833-721-2323, or register online at ResourcesForLiving.com/Amazon.

If you need help, My HR is the best way to speak to a live support advisor, make a new request, find status information, and upload documents. If you are unable to access My HR, call us Monday to Friday at 1-888-892-7180, option 1.

Thank you,
Amazon DLS

**amazon** | disability &
                  leave services

*Important:* Amazon may require documentation related to this request. You may be asked to provide this documentation before or after you begin your leave. Providing false or misleading information or documentation violates the Amazon Standards of Conduct.

Acknowledged by v1582@amazon.com (Carlos Aguayo @ amazon.com) 6/26/2018 10:16:47 PM

## amazon

<div style="border:1px solid black">

**EXHIBIT**

**31**

</div>

WORKPLACE HARASSMENT & EQUAL EMPLOYMENT OPPORTUNITY POLICY

ACKNOWLEDGMENT FORM

**By clicking "Acknowledge" above, I acknowledge that I have access to a copy of the Workplace Harassment & Equal Employment Opportunity Policy through MyDocs and that I am responsible for reading, understanding, and complying with both policies.**

**By clicking "Acknowledge" above, I also understand the following:**

- I understand that Amazon is an equal opportunity affirmative action employer, and that discrimination or harassment against any employee or applicant for employment on the basis of race, religion, creed, color, national origin, citizenship, marital status, sex, age, sexual orientation, gender identity, veteran status, political ideology, ancestry, the presence of any physical, sensory, or mental disabilities, or other legally protected status will not be tolerated. This policy pertains to all personnel-related activities, including selection, hiring, benefits, work schedules, promotions, demotions, transfers, recruiting, advertising, reductions-in-force, terminations, and all forms of compensation and training. A strong commitment by each employee is necessary to ensure equal employment opportunity for all.

- I understand that if I have any concerns that I am being subjected to any form of discrimination, harassment or retaliation in violation of Amazon's policies, I should immediately bring this to the attention of a human resources representative, my supervisor, any other manager, the Legal Department, or I should call Amazon's Ethics Line through which I can raise an anonymous complaint at any time.

- I understand that I am required to complete training in the first two months of my employment on the Workplace Harassment policy as a condition of my continued employment.

**I understand that I can raise questions or concerns with my manager, human resources representative, or the Employee Resource Center.**

*Last Updated December 27, 2013*

**EXHIBIT 32**

### Code of Business Conduct and Ethics

In performing their job duties, Amazon.com employees should always act lawfully, ethically, and in the best interests of Amazon.com. This Code of Business Conduct and Ethics (the "Code of Conduct") sets out basic guiding principles. Employees who are unsure whether their conduct or the conduct of their coworkers complies with the Code of Conduct should contact their manager or the Legal Department. Employees may also report any suspected noncompliance as provided in the Legal Department's reporting guidelines.

 Employees must follow applicable laws, rules and regulations at all times. Employees with questions about the applicability or interpretation of any law, rule or regulation, should contact the Legal Department.

**Compliance with Laws, Rules and Regulations**

In performing their job duties, employees are expected to use their judgment to act, at all times and in all ways, in the best interests of Amazon.com. A "conflict of interest" exists when an employee's personal interest interferes with the best interests of Amazon.com. For example, a conflict of interest may occur when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com. A conflict of interest may also arise from an employee's business or personal relationship with a customer, supplier, competitor, business partner, or other employee, if that relationship impairs the employee's objective business judgment.

**Conflicts of Interest**

Because an employee's receipt of gifts or services could create a conflict of interest, the Legal Department will develop and maintain guidelines for disclosure of gifts or services received from customers, suppliers, competitors or business partners.

Employees should attempt to avoid conflicts of interest and employees who believe a conflict of interest may exist should promptly notify the Legal Department. The Legal Department will consider the facts and circumstances of the situation to decide whether corrective or mitigating action is appropriate.

**Insider Trading**

Federal and state laws prohibit trading in securities by persons who have material information that is not generally known or available to the public.

Employees of the Company may not a) trade in stock or other securities while in possession of material nonpublic information or b) pass on material nonpublic information to others without express authorization by the Company or recommend to others that they trade in stock or other securities based on material nonpublic information.

The Company has adopted guidelines designed to implement this policy. All employees are expected to review and follow the Amazon.com Insider Trading Guidelines. Certain employees must comply with trading windows and/or preclearance requirements when they trade Amazon.com securities.

**Discrimination and Harassment**

Amazon.com provides equal opportunity in all aspects of employment and will not tolerate any illegal discrimination or harassment of any kind. For more information, see the Amazon.com policies on Equal Employment Opportunity and Workplace Harassment in the Amazon.com Owner's Manual

**Health & Safety**

Amazon.com provides a clean, safe and healthy work environment. Each employee has responsibility for maintaining a safe and healthy workplace by following safety and health rules and practices and reporting accidents, injuries and unsafe conditions, procedures, or behaviors.

Violence and threatening behavior are not permitted. Employees must report to work in a condition to perform their duties, free from the influence of illegal drugs or alcohol.

**Price Fixing**

Employees may not discuss prices or make any formal or informal agreement with any competitor regarding prices, discounts, business terms, or the market segments and channels in which the Company competes, where the purpose or result of such discussion or agreement would be inconsistent with applicable antitrust laws. If you have any questions about this section or the applicable antitrust laws, please contact the Legal Department.

**Bribery, Payments to Government Personnel**

Employees may not bribe anyone for any reason, whether in dealings with governments or the private sector.  The U.S. Foreign Corrupt Practices Act, and similar laws in other countries, prohibit offering or giving anything of value, directly or indirectly, to government officials in order to obtain or retain business. Employees may not make illegal payments to government officials themselves or through a third party. Employees who are conducting business with the government officials of any country must contact the Legal Department for guidance on the law governing payments and gifts to governmental officials.

**Recordkeeping, Reporting, and Financial Integrity**

Amazon.com's books, records, accounts and financial statements must be maintained in appropriate detail, must properly reflect the Company's transactions and must conform both to applicable law and to the Company's system of internal controls. Further, Amazon.com's public financial reports must contain full, fair, accurate, timely and understandable disclosure as required by law. The Company's financial, accounting and legal groups are responsible for procedures designed to assure proper internal and disclosure controls, and all employees should cooperate with these procedures.

**Questions: Reporting Violations**

EXHIBIT
32

Employees should speak with anyone in their management chain or the Legal Department when they have a question about the application of the Code of Conduct or when in doubt about how to properly act in a particular situation.

The Amazon.com Legal Department has developed and maintains reporting guidelines for employees who wish to report violations of the Code of Conduct. These guidelines include information on making reports to the Legal Department and to an independent third party. Please see the reporting guidelines for information and instructions.

Amazon.com will not allow retaliation against an employee for reporting misconduct by others in good faith. Employees must cooperate in internal investigations of potential or alleged misconduct.

Employees who violate the Code of Conduct will be subject to disciplinary action up to and including discharge.

**Periodic Certification**

The Legal Department will designate certain employees who, based on their level of responsibility or the nature of their work, will be required to certify periodically that they have read, understand and complied with the Code of Conduct.

**Board of Directors**

With respect to their service on behalf of the Company, Amazon.com's Board of Directors must comply with the relevant provisions of this Code of Conduct, including conflicts of interest, insider trading and compliance with all applicable laws, rules and regulations.

**Waivers**

Waivers of this Code of Conduct may be made only in a manner permitted by law.

7/30/25, 11:28 AM                Gmail - ATA Application Reminder: Complete Prerequisite Courses 1-4 Now / Technical Assessment due June 22

 **Gmail**                                        Carlos <cfv1983@gmail.com>

> **EXHIBIT 33**

## ATA Application Reminder: Complete Prerequisite Courses 1-4 Now / Technical Assessment due June 22

1 message

**ata-notifications** <ata-notifications@amazon.com>                    Tue, May 10, 2022 at 5:38 PM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

Hi Carlos,

Amazon Technical Academy (ATA) is checking in with reminders for your August 2022 Cohort application:

1. To prepare for the Technical Assessment, ATA strongly encourages applicants to complete the optional 12-week **Prerequisite Courses 1-4**. Links to all prerequisite courses are available here: https://amazontechnicalacademy.com/employee/prereqs. *Prereq courses are free. Courses 1-3 are offered on Coursera; select the 'Audit the course' option to access course content at no charge.*

2. The Technical Assessment must be completed by **June 22, 2022 at 9:00am PT**. There are no exceptions to this deadline. You previously received an email from HackerRank with instructions on taking the assessment. *If you've already completed the Technical Assessment, please disregard this item.*

3. To be eligible to apply to ATA, you must be in good performance standing at the time admissions decisions are made. If you have questions about your performance standing, please speak with your manager or local HR.

ATA's application process is selective, and admission is not guaranteed to all that apply. If you'd like to withdraw your application, you can do so at any time on the ATA Application Portal: https://apply.amazontechnicalacademy.com

If you have questions about the application process, many answers can be found on the ATA website: https://amazontechnicalacademy.com. If your question is not addressed there, please email ata-contact-us@amazon.com.

Best,
Amazon Technical Academy

7/30/25, 11:27 AM                                    Gmail - FW: ATA Application Follow-Up

 Gmail                                    Carlos <cfv1983@gmail.com>

## FW: ATA Application Follow-Up

1 message

**Velasquez, Carlos** <velaca@amazon.com>                    Mon, Jul 10, 2023 at 11:29 AM
To: "cfv1983@gmail.com" <cfv1983@gmail.com>

**From:** noreply@salesforce.com <noreply@salesforce.com> **On Behalf Of** ATA-Contact-Us
**Sent:** Tuesday, July 26, 2022 2:40 PM
**To:** Velasquez, Carlos <velaca@amazon.com>
**Subject:** RE: ATA Application Follow-Up

Hi Carlos,

Thanks for contacting Amazon Technical Academy (ATA). We release admissions decisions on July 6, 2022. Please see
the details below:

**From:** noreply@salesforce.com <noreply@salesforce.com> **On Behalf Of** ATA
**Sent:** Wednesday, July 6, 2022 11:25 AM
**To:** cfv1983@gmail.com
**Subject:** Application Status Update for Amazon Technical Academy



Hi Carlos,

Thank you for applying to Amazon Technical Academy (ATA). After careful
review of applications, we are unable to offer you admission to ATA's 2022
August Cohort.

Information about ATA's future cohorts planned for 2023 will be announced
later this year on ATA's website amazontechnicalacademy.com (please
copy/paste the URL to your web browser). We encourage you to apply
again then. If you reapply, we recommend that you spend additional time
working through the prerequisite courses in preparation for the Technical
Assessment. ATA is unable to share individual test results from your
application.

7/30/25, 11:27 AM                                      Gmail - FW: ATA Application Follow-Up

Amazon also offers other upskilling opportunities for employees. Learn
about more education and career development programs by visiting
Upskilling 2025 (https://www.aboutamazon.com/workplace/upskilling-
commitments).

We understand that you dedicated significant time and effort in your
application and thank you for your interest in ATA. We wish you all the best
in your career endeavors.

Thank you,
Amazon Technical Academy

--------------- Original Message ---------------
From: Velasquez, Carlos [velaca@amazon.com]
Sent: 7/25/2022 10:14 PM
To: ata-contact-us@amazon.com
Subject: ATA Application Follow-Up

Greetings ATA,

I am an applicant for the August 2022 Cohort.
I have not received word on any decision reg. my application.
Any update will be appreciated.

Thank you.

Sincerely,
Carlos Velasquez
velaca@amazon.com<mailto:velaca@amazon.com>
cfv1983@gmail.com<mailto:cfv1983@gmail.com>
801.671.0361

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CARLOS VELASQUEZ,<br><br>                  Plaintiff,<br><br>v.<br><br>AMAZON.COM SERVICES, INC.,<br><br>              Defendant. | **REPORT AND RECOMMENDATION DENYING [3] MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS**<br><br>Case No. 2:25-cv-00674-DAK-CMR<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Cecilia M. Romero |

On August 12, 2025, Plaintiff Carlos Velasquez (Plaintiff) filed his Motion for Leave to Proceed In Forma Pauperis (Motion) (ECF 3). In the Motion, Plaintiff asserts he is without sufficient funds to pay the filing fee and asks the court to waive it. The undersigned submits the following Report and Recommendation and recommends that Plaintiff's Motion be denied. *See Lister v. Dep't of Treasury*, 408 F.3d 1309, 1311 (10th Cir. 2005) (explaining a report and recommendation must be submitted to address this issue).

### REPORT

Under 28 U.S.C. § 1915, a federal court may authorize the commencement of a civil action without payment of the fees for a person who lacks the financial means to pay those fees. 28 U.S.C. § 1915(a)(1). "Section 1915(a) applies to all persons applying for IFP status, and not just to prisoners." *Lister*, 408 F.3d at 1312. Pursuant to the District of Utah's local rules, a party must complete and file a Motion to Proceed In Forma Pauperis to show a financial inability to pay the required fees. *See* DUCivR 3-2(a)(1). The local rules further state that "a party's total monthly income must be equal to or below 200% of the United States poverty guideline as issued each year in the Federal Register by the Department of Health and Human Services for the 48 Contiguous States and the District of Columbia." DUCivR 3-2(a)(1)(A). Proceeding IFP in a civil case "is a

1

privilege, not a right." *White v. Colorado*, 157 F.3d 1226, 1233 (10th Cir. 1998). "The decision to grant or deny in forma pauperis status under § 1915 lies within the sound discretion of the trial court." *Cabrera v. Horgas*, 173 F.3d 863, 863 (10th Cir. 1999).

Based upon the information contained in the Motion, Plaintiff's reported income far exceeds 200% of the federal poverty guideline (ECF 3 at 3). Accordingly, Plaintiff does not qualify as indigent. *See* DUCivR 3-2(a)(1)(A). Furthermore, based on his monthly expenses, as stated in the Motion, it appears that Plaintiff has approximately $575 in excess funds at the end of every month (ECF 3 at 3–6). The undersigned therefore finds that Plaintiff has failed to demonstrate a financial inability to pay the required filing fee, and he has not demonstrated that he qualifies to proceed *in forma pauperis* under 28 U.S.C. § 1915. For those reasons, the undersigned recommends that the Motion be denied.

## RECOMMENDATION

Based upon the foregoing, IT IS HEREBY RECOMMENDED that Plaintiff's Motion be DENIED without prejudice (ECF 3).

IT IS FURTHER RECOMMENDED that Plaintiff prepay the full filing fee of $405 within 30 days for this action to proceed.

IT IS ADDITIONALLY RECOMMENDED that Plaintiff be cautioned that failure to fully pay the filing fee within 30 days after this Report and Recommendation will result in dismissal of this action without prejudice.

## NOTICE

Copies of this Report and Recommendation are being sent to all parties, who are hereby notified of their right to object. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The parties must file any objection to this Report and Recommendation within 14 days after being served with a

2

copy of it. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to object may constitute waiver

of objections upon subsequent review.

DATED this 14 August 2025.

Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah

3

```
MIME-Version:1.0
From:utd_enotice@utd.uscourts.gov
To:ecf_notice@localhost.localdomain
Bcc:
--Case Participants: Carlos Velasquez (cfv1983@gmail.com, huiman57@hotmail.com),
Magistrate Judge Cecilia M. Romero (cecilia_romero@utd.uscourts.gov,
ron_black@utd.uscourts.gov, utdecf_romero@utd.uscourts.gov), Judge Dale A. Kimball
(utdecf_kimball@utd.uscourts.gov)
--Non Case Participants: Chief Deputy, (alison_adams@utd.uscourts.gov)
--No Notice Sent:

Message-Id:6248132@utd.uscourts.gov
Subject:Activity in Case 2:25-cv-00674-DAK-CMR Velasquez v. Amazon.com Services Order
Adopting Report and Recommendations
```
Content–Type: text/html

**<span style="color:red">If you need assistance, call the Help Desk at (801)524–6100.</span>**

## US District Court Electronic Case Filing System

### District of Utah

## Notice of Electronic Filing

The following transaction was entered on 8/19/2025 at 12:14 PM MDT and filed on 8/19/2025

| | |
|---|---|
| **Case Name:** | Velasquez v. Amazon.com Services |
| **Case Number:** | 2:25–cv–00674–DAK–CMR |
| **Filer:** | |
| **Document Number:** | 10(No document attached) |

**Docket Text:**
**<span style="color:red">DOCKET TEXT ORDER ADOPTING [8] REPORT AND RECOMMENDATION denying [3] Motion for Leave to Proceed in forma pauperis. Plaintiff has paid the filing fee in full. No document attached. Signed by Judge Dale A. Kimball on 8/19/2025. (eat)</span>**


**2:25–cv–00674–DAK–CMR Notice has been electronically mailed to:**

Carlos Velasquez    cfv1983@gmail.com, huiman57@hotmail.com

**2:25–cv–00674–DAK–CMR Notice has been delivered by other means to:**