# ADDENDA

## Contents

Order Denying "Motion to Show Cause for Refusal, On Recusal"..........................005

Order Denying Motion to Recuse.................................................................013

Appellant's Trial Affidavit showing Recusal causes, acc. Addenda.......................020

Docket Sheet, *Velasquez v. Utah,* No. 2:20-cv-205/CA No. 20-4087.....................057

Judicial Opinion, *Velasquez v. State of Utah,* 2:20-cv-205/CA10 No. 20-4087.......067

Judicial Memorandum, *Velasquez v. Utah,* 2:20-cv-205/CA10 No. 20-4087..........083

Order and Judgment, *Velasquez v. Utah,* 2:20-cv-205/CA10 No. 20-4087.............089

Order and Judgment, *Velasquez v. Hon. Baldock et al.,* 2:22-cv-0133/CA10 No. 22-4098.................................................................................................103

Opinion of Precedence, *Philadelphia Entertainment Partners v. Commonwealth of Penssylvania, Dept. of Revenue,* CA3 No. 17-1954................................................111

*United States v. Brocato,* CA5 No. 20-40624.......................................................139

---

**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

---

| | |
|---|---|
| CARLOS VELASQUEZ,<br><br>       **Plaintiff,**<br><br>vs.<br><br>**AMAZON.COM SERVICES, INC.,**<br><br>       **Defendant.** | **ORDER DENYING "MOTION TO SHOW CAUSE FOR REFUSAL, ON RECUSAL"**<br><br>**Case No. 2:25CV00674 DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Plaintiff Carlos Velasquez's "Motion To Show Cause for Refusal, on Recusal."[1] Plaintiff requests that another judge determine whether the undersigned judge must recuse under 28 U.S.C. § 144. The court denies Plaintiff's motion.

Section 144 states that when a party "makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."[2] Procedurally, however, the judge against whom an affidavit of bias is filed may determine the affidavit's timeliness and sufficiency.[3] While making an initial determination of the facial sufficiency of the affidavit, the judge must not determine the truth or falsity of the facts stated therein.[4] Here, without

---

[1] ECF No. 19.

[2] 28 U.S.C. § 144.

[3] *See, e.g.*, *Berger v. United States*, 255 U.S. 22, 32–34, (1921); *United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978); *Hall v. Burkett*, 391 F. Supp. 237, 240 (W.D. Okla. 1975).

[4] *United States v. Bennett*, 539 F.2d 45, 51 (10th Cir. 1976); *Azhocar*, 581 F.2d at 738.

considering the truth or falsity of any facts stated in Plaintiff's accompanying "Victim's Affidavit,"[5] the court finds that the affidavit is insufficient to justify having another judge decide the motion.

To demonstrate that a judge should recuse under Section 144, "an affidavit of bias and prejudice must be timely, sufficient, made by a party, and accompanied by a certificate of good faith of counsel."[6] Importantly, "the mere fact that a party has filed a § 144 motion, accompanied by the requisite affidavit and certificate of counsel, does not automatically result in the challenged judge's disqualification."[7] "Rather, the statute only requires recusal upon the filing of a timely and sufficient affidavit."[8]

In this case, Plaintiff has not provided a certification that his accompanying Affidavit and the substantive factual allegations have been filed in good faith.[9] Similarly, in Plaintiff's previously filed "Affidavit on Conditions for Recusal of Members of the United States District Court for the District of Utah: Complaint against Hon. Dale Kimball, Bias of the Judge Against the Law,"[10] he also failed to certify that the substantive factual allegations were filed in good

---

[5] *See* ECF No. 19-1.

[6] *Hinman v. Rogers*, 831 F.2d 937, 938 (10th Cir. 1987) (per curiam).

[7] *Robertson v. Cartinhour*, 691 F. Supp. 2d 65, 77 (D.D.C. 2010); *see also United States v. Bray*, 546 F.2d 851, 857 (10th Cir. 1976).

[8] *Robertson*, 691 F. Supp. 2d at 77 (internal quotation marks omitted).

[9] *Western Watersheds Project v. Interior Board of Land Appeals*, 434 F. Supp. 3d 1257, 1261 (D. Utah 2020).

[10] ECF No. 11. The court construed this "Affidavit" as a motion to recuse and denied it on October 8, 2025. *See* ECF No. 18.

faith. Courts have routinely concluded that failure to comply with this requirement is grounds for denying the motion.[11]

As the court has previously stated, "[a] trial judge has as much obligation not to recuse himself when there is no reason to do so as he does to recuse himself when the converse is true."[12] The undersigned judge will not recuse from this case because there is no valid reason to recuse, and thus there is a duty not to recuse. Any additional motions seeking recusal will be summarily denied.

While not relevant to the instant motion, the court emphasizes, again, that "the mere fact that a judge has previously expressed himself on a particular point of law is not sufficient to show personal bias or prejudice."[13] And adverse rulings by a judge are not grounds for disqualification.[14] Stated another way, a litigant seeking to disqualify a judge must allege personal rather than judicial bias.[15] Moreover, motions alleging bias and prejudice on the part of a judge that establish simply that the affiant does not like a particular judge are not adequate to require recusal.[16]

---

[11] *United States v. Miller*, 355 F. Supp. 2d 404, 405–06 (D.D.C. 2005); *Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 54, 60 (D.D.C. 2010); *Burt v. First Am. Bank*, 490 A.2d 182, 187 (D.C. 1985); *United States v. York*, No. 86-CR-315, 1988 WL 105342, at *1 (N.D. Ill. Sept. 20, 1988).

[12] *United States v. Bray*, 546 F.2d 851, 857 (10th Cir. 1976).

[13] *Id.*

[14] *Id.* at 857-858 (citing *Martin v. United States*, 285 F.2d 150 (10th Cir. 1960), *cert. denied*, 365 U.S. 853 (1961)).

[15] *Id.*

[16] *Id.* (citing *United States v. Goeltz*, 513 F.2d 193 (10th Cir. 1975), *cert. denied*, 423 U.S. 830 (1975)).

Plaintiff had also filed a motion for an extension of time to file a response to Defendant's Motion to Dismiss. On October 21, 2025, Defendant filed a response indicating that it did not oppose Plaintiff's request for an extension.[17] Nevertheless, Plaintiff filed his response on October 23, 2025, so his request for an extension of time is now moot.

Accordingly, IT IS HEREBY ORDERED that Mr. Velasquez's "MOTION TO SHOW CAUSE FOR REFUSAL, ON RECUSAL" [ECF No. 19] is DENIED, and his Motion to Extension of Time to File Response is [ECF No. 21] is DENIED AS MOOT.

DATED this 28th day of October 2025.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[17] ECF No. 25.

012

**THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH**

| | |
|---|---|
| CARLOS VELASQUEZ, <br><br> Plaintiff, <br><br> vs. <br><br> AMAZON.COM SERVICES, INC., <br><br> Defendant. | **ORDER DENYING MOTION TO RECUSE AND "FORMAL REQUEST TO SHOW CAUSE FOR DELAY ON ACTION FOR RECUSAL"** <br><br> Case No. 2:25CV00674 DAK <br><br> Judge Dale A. Kimball |

This matter is before the court on Plaintiff Carlos Velasquez's Motion for Recusal and "Formal Request to Show Cause for Delay on Action for Recusal."[1]

Pursuant to 28 U.S.C. § 455, judicial recusal is required when the judge's "impartiality might reasonably be questioned" or "he has a personal bias or prejudice concerning a party."[2] The inquiry requires consideration of whether "sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality."[3] Under this test, adverse rulings cannot in themselves form the appropriate

---

[1] ECF Nos. 11 & 17. The recusal motion is styled as "Plaintiff's Affidavit on Conditions for Recusal of Members of the United States District Court for the District of Utah: Complaint against Hon. Dale Kimball, Bias of the Judge Against the Law."

[2] 28 U.S.C. § 455

[3] *United States v. Pearson*, 203 F.3d 1243. 1277 (10th Cir. 2000) (citations omitted).

grounds for disqualification."[4] And importantly, "[j]udges not only have a strong duty to recuse when appropriate, but also a strong duty to sit, and the statute 'must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'"[5]

In his Motion for Recusal, Mr. Velasquez has offered no valid justification for recusal. The sole basis for the recusal request appears to be that this court has previously ruled against Mr. Velasquez.[6] It is well settled, however, that adverse rulings do not provide grounds for recusal.[7] Indeed, judges have "a strong duty to sit," and must not so broadly construe the recusal statute "that it becomes, in effect, presumptive, so that recusal is mandated upon the merest

---

[4] *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005) (internal citations, quotation marks, and brackets omitted).

[5] *United States v. Well*, 873 F.3d 1241, 1251 (10th Cir. 2017) (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)).

[6] Mr. Velasquez has previously sought the recusal of—or has filed suit against—judicial officers who rule against him in this court. *See Velasquez v. Baldock et al.*, 2:22cv00133. In that case, a magistrate judge issued a Report and Recommendation ("R&R"), recommending dismissal of the action for a variety of reasons, including failing to state a claim. *Id.* at Docket No. 37.

The district judge adopted the R&R and noted that just two days after the R&R was issued, Mr. Velasquez accused the magistrate judge of criminal misconduct. *Id.* at Docket No. 42. Mr. Velasquez then requested that district judge recuse. *Id.* at Docket Nos. 51 & 63. The judge declined, finding that it is well settled that adverse rulings do not provide grounds for recusal. *Id.* at Docket No. 63 (citing *Glass v. Pfeffer*, 849 F.2d 1261, 1268 (10th Cir. 1988)).

Additionally, in *Velasquez v. State of Utah*, 2:20cv00205, Mr. Velasquez filed a similar recusal motion after the late Judge Benson dismissed his action. *See* Docket No. 20. Judge Benson denied the motion, recognizing that Mr. Velasquez's allegation that the court is not impartial "apparently stems solely from the fact this court decided against Plaintiff in dismissing the underlying action." *See* Docket No. 29 at 2-3.

[7] *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005); *Green v. Branson*, 108 F.3d 1296, 1305 (10th Cir. 1997); *Glass v. Pfeffer*, 849 F.2d 1261, 1268 (10th Cir. 1988); *Willner v. University of Kansas*, 848 F.2d 1023 (10th Cir. 1988).

61

014

unsubstantiated suggestion of personal bias or prejudice."[8] This court has no personal or professional connections that would call its impartiality into question in this matter, and it has issued only one decision in previous case brought by Mr. Velasquez. The decision denied Mr. Velasquez's motion to proceed *in forma pauperis* on appeal, after the Honorable Dee Benson had dismissed Mr. Velasquez's case with prejudice.[9] The Tenth Circuit later affirmed the court's dismissal of Mr. Velasquez's claims.[10] Thus, there is no reason to recuse.

Accordingly, IT IS HEREBY ORDERED that Mr. Velasquez's Motion for Recusal [ECF No. 11] is DENIED, and his "Formal Request to Show Cause for Delay on Action for Recusal" [ECF No. 17] is DENIED AS MOOT.

DATED this 8th day of October 2025.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[8] *United States v. Well*, 873 F.3d 1241, 1251 (10th Cir. 2017) (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995)).

[9] *Velasquez v. State of Utah*, Case No. 2:20cv205, filed on March 26, 2020, Docket No. 40.

[10] *Id.* at Docket No. 45. The United States Supreme Court denied Mr. Velasquez's petition for a writ of certiorari. *Id.* at Docket No. 48.

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| *Carlos Velasquez*, Plaintiff | **Case No. 2:25-cv-00674-DKA-CMR** |
| *v.* | Plaintiff's Affidavit on Conditions for Recusal of Members of the United States District Court for the District of Utah: Complaint against Hon. Dale Kimball, Bias of the Judge Against the Law |
| *Amazon.com Services Inc.*, Defendant | |

Pleading for Honorable Recusal

1. The Constitution of the United States of America is dedicated to *the people* without *exception*, so any of the people have any right not to be intimidated by *perjury*, nor any kind of persistent and applied *threat* to commit perjury. We demonstrate *nul tiel record* Hon. Dale Kimball has made such an implied threat in the past, and cannot preside.

2. 28 U.S. § 144, law states, "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

1

4

3. 28 U.S. § 455(a), "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned."

4. Additionally we show several other jurists in this court *may not preside,* see Grounds below.

GROUNDS

Cause 1

5. Hon. Judge Dale Kimball *will be* obligated to recuse once a new case is filed which involves an allegation of *Fraud on the Court* against Judges in the District of Utah who comitted *perjury* to have protected him; the brief is in its *final production phases.*

6. The Plaintiff has *in production* since April 2024 new *civil action* for *Fraud on the Court* wherein Judge Dale Kimball took *judicial action* to *disfavor the plaintiff* in **Case No. 2:20-cv-205-DAK/DB-PMW,** *Velasquez v. State of Utah;* without grounds in that instance the jurist issued a statement who declared, "The Court certifies the Plaintiff's current appeal is not taken in good faith. Plaintiff failed to plead plausible causes of action against Defendants. Despite filing a lengthy Complaint, Plaintiff's allegations were vague and difficult to decipher. Moreover, his claims were barred by claim preclusion." **See Above Case, <u>Doc. No. 40</u>.**

2

7. The Complaint was an explicit application described in *Saucier v. Katz*, 533 U.S. 194 (2001), with a multi-part *test of process* evaluating *frivolous* and *misapplied* statutes in Utah Division of Aging and Adult Services/Adult Protective Services, an *administrative censure;* it subjected the plaintiff and family to *administrative* and not *civil scrutiny,* and cannot ever be described the way it was described by Hon. Mr. Kimball; Hon. Mr. Nuffer; Hon. Mr. Benson; prejudice of the Circuit Court *notwithstanding.*

8. There was pending an allegation of *Fraud on the Court* against the now deceased Hon. Judge Dee Benson, whom Hon. Mr. Kimball *did not review* at the time of his declaration. **See Addenda. (Note:** A deliberate *malpractice strategy* is evident; *intentional collateral error,* had Hon. Mr. Kimball reviewed the *Fraud on the Court* motion prior to the disposition, considering difficulty of the circumstance of the death of the jurist by a brain tumor, and even carrying the implication of prior such errors on his part; Hon. Mr. Kimball refused the *cause of action* narrative, while the *claim preclusion* issue was at the center of the same question: the plaintiff would have been obligated *to rewrite* the complaint within the dispositive motion and not have *incorporated it by reference,* that is a *collateral error* where *issues orientations* are concerned.)

9. On the death Hon. Mr. Benson the case was stalled on *transfer* to the Circuit Court, the plaintiff filed *Notice* (Id. Doc. No. 38) of the death of the Judicial Officer, and the court immediately reassigned it to Hon. Mr. Kimball, who immediately and without supporting his resolution, declared the plaintiff's application was unwarranted and disfavored the appeal.

3

10. *Disfavor against the appeal* appeared to be a cryptic token for *subornation to commit perjury* in *constructive malpractice;* admitted to the Circuit Court, and admitted as before the District Court: the victim of *malpractice* has a "narrow" opportunity to evade *obstruction of justice,* which includes *enforced recusal* standards which were *disobeyed* and *perjured* against by *all of the jurists* in those relevant cases; the force of contempt under color of skepticism is used to do extreme harm to *the people* who are before them.

11. Restated, the appeal subsequently suffered *Fraud at Determination* while members of the Circuit Court plainly conspired against the Plaintiff and his cause of action, a subject under Family Law and Constitutional Law. **Those papers are within the court's record.**

12. The Hon. Deceased may have been ill at the time, and his disposition of the matter was convoluted and improper; he falsely stated the *supplemental authority* of the Court's jurisdiction wherein the Judiciary had refused to confer sufficient standing upon the Plaintiff, and falsely testified the force of the *Rooker-Feldman* doctrine, the jurist did not resolve a meaningful question of the prejudicial disposition under the Federal and Civil Rights Act Jurisdictions, and were mistaken upon Hon. Judge David Nuffer's declaration against precedence under the jurisdiction of the Administrative Procedures Act; Hon. Mr. Nuffer's opinion improperly and illiberally ruled out statutory action to amend the Jurisdiction of the Complaint and *falsely testified* the authority of said *doctrine.*

13. Hon. Mr. Kimball bears direct and intentional *false testimony* of the case; to improperly have insulated judiciary who were in *strict conference,* and imposed such a *personal*

4

*opinion* against all measure of propriety than *fraud* and *judicial malpractice,* but has risked

*invasion of privilege* on *conspiracy to obstruct Justice* and *violate Civil Rights;* his prior

*ruling* is a veiled threat to *maintain circumstances of perjury against the plaintiff,* and

THEREFORE may *recuse* and be *disqualified,* Hon. Mr. Kimball *may appear to be biased*

*against the law,* moreover he *may not adjudge conditions of his personal and official*

*liability,* when it comes to Pro Se Plaintiff, Carlos Velasquez who at the time had declared

he was a Civil and Bureaucratic Federalist proceeding to vindicate a question of family law

that was wrongfully suppressed, as based in the **Addenda.**

Cause 2

14. The immediate case matter of *constructive termination* shows circumstancial dispositions

in part aggravated by *related* case matters; Hon. Mr. Kimball magnifies the same *threat of*

*perjury* as was aggravated by Hon. Judge Howard Nielson and Hon. Magistrate Jared

Bennet, who *falsely testified* the plaintiff could have *no cause of action* against Hon. Mr.

Kimball for *fraud on the court;* whether they perceived *civil action* against jurists to be

overbearing, or whether the left the entire case construction technically unresolved, they

conspired to commit *perjury* and violate the constitutionality of *declaratory judgment.*

15. **See Exhibit No. 17** (this case) where the Case No. 2:22-cv-00133-HCN (Case No. 22-

4098), *Velasquez v. Hon. Baldock et al.* is featured as a narrative cause related to the

circumstance of the disposition; Hon. Mr. Kimball was *defendant* wrongfully vindicated,

properly served by mail.

5

024

16. The present case is a matter consistent with *stalking;* stalking as a practice engages all kinds of *personal capacities,* some of which are not harmful and confer benefits, and some of which can only do harm; the complaint against Hon. Mr. Kimball is of the latter sort.

17. Restated, the jurist bears any appearance of *intent* to maintain a politicized *stalking culture,* as marked against from District Court, to destroyed Workplace Opportunity, to the University System, and back to the District Court, where all of this began, it is inappropriate for a jurist to demand *cause* and *remedy* from the *victim* without having undergone *rehabilitation* from *malpractice.*

18. These cases are nowhere near resolved; the crime *active* and *ongoing,* while the judiciary remain improperly insulated having breached confidence of the perimeter of their discretion; *perjury, conspiracy,* and *obstruction;* the action that amounts to a format for *political stalking, stalking* as after *the power of the people,* is ongoing, nearto the same disposition, and even the plausible ethos of *workplace stalking* who would know the victim by his disposition are all transferable if *civil integrity* is not maintained.

Cause 3

19. "A Judge should avoid impropriety and the appearance of impropriety in all activities." CJC3.

20. *Fraud on the Court* demands a question of *criminal malpractice*, the even appearance of Hon. Mr. Kimball's name upon the docket has aggravated the open criminal posture of the

6

9

Republican Party, who refuse to admit their own partisans may suffer civil and criminal liability; there is a plain *partisan-conferential conspiracy* playing out in the United States of America, and *the people* have any right not to be governed under *strict conferential* ethics, who refuse standing against some of *the people,* who from time-to-time *falsely testify* in the cause of *personal conference.*

21. Their decision to *falsely testify,* to proceed the government under *strict conference* does rather admit a cause to demand his resignation, or his open opinion *to recant,* confess all the crimes that he knows, and promise theretofore to remain *dedicated to the people without exception* and guarantee the *promissory resolution* of a *beneficent government; rehabilitation.*

22. A decision not to do so may impose an improper *chilling effect* on the party with even a narrow demonstration of related *malpractice, Fraud on the Court;* may constitute *criminal attrition.*

CONCLUDING ARGUMENT

1.

23. The Canon of Judicial Conduct Nos. 2 and 3 prevails on a rational standard to admit not just *very definite* grounds for recusal, but evenly conditions the mere *appearance* of a *conflict of interest* or an *impropriety;* we read Canons 2 and 3 *synthetically* because the standards are interpreted to be designed *to improve confidence* and NOT to impose

7

vexatious standards, nor standards prohibitive to effective litigation and official precedence.

24. In this way, the rule for recusal is non-prejudicial and dignitary; the judiciary refusing does seek a higher standard of review, and does take a *conferential privilege* from the party who makes a showing that would NOT arise to a standard of even low-level *plausibility.*

25. Critically, the District of Utah has one prominent instance of *false testimony* under the 28 U.S. § 455 to which any *refusal to recuse* wherein former Senior Judge Paul Cassell *authorized* Senior Judge Ted Stewart to preside over a case where he had *professional exposure* to circumstances close to the *cause of action,* "[Section] 455(a) does not require recusal based on *unsubstantiated suggestions of personal bias or prejudice.* Rather, the inquiry is *limited to outward manifestations and reasonable inferences drawn therefrom.*" *Salt Lake Tribune v. AT&T Corp.,* 353 F. Supp. 2d, 1160 (2005). A *synthetic* standard is a plain "outward manifestion."

26. *Recusal* is not a dispositive standard, and rejecting a recusal query requires the Judicial Officer to more or less prove it is a *vexatious* application of the statute; *Salt Lake Trib.,* the attorney therein sought the recusal of Judge Ted Stewart because he worked for the Utah Governor's Office at the time the governor had *personal knowledge* of the business deal that threatened propriety of the *Salt Lake Tribune* magazine, it had been inadvertently sold to AT&T and a saving clause had to be enforced confidently through the courts, cost the

8

11

027

magazine's original ownership an excessive amount of money, and postured a "culture war" type of courtroom polemics.

27. Literally, the governor testified on the subject of *recusal* that Hon. Mr. Stewart did not have *personal knowledge* of the subject-matter at the time, and that testimony was treated *putatively* by Hon. Mr. Cassell who apparently *exaggerated* the standard of review to allow Hon. Mr. Stewart to preside then, where he would be engaged with the President of the LDS Church who was subject to some interrogatory, Hon. Mr. Stewart *personally biased,* and held a *personal interest* to be in the presence of an important *religious authority.*

28. It was plain the level of knowledge in the Governor's office could have borne *prejudice* that was damaging either to the public-facing politics of the magazine, or damaging to the confidence of its *ownership* where *confidence* was an issue. Because *confidence* falls into a meaningful question of the *perimeter* of both the Governor's Office and the Hon. Mr. Stewart's precedence there, Hon. Mr. Cassell comitted *perjury* to impose a faulty review standard under Section 455(a); arguably the narrow *perjury* was used to demean the magazine before Party, Church, and Country, and certainly is construed herein to be an informal permission slip.

29. Beyond a persistent appearance of a *conflict of interest,* the standard of *authority* and *credibility* apparently outweighed the civil integrity of the Public Law, so we can argue therefrom, the District Court has a *historical precedence* to *falsely testify* on recusal

9

questions of *polemical* and *political* nature; whenever it may suit the Republican Party, or whenever it would protect the liability of a jurist, it does *take exception.*

30. The cases *in production* show persistent perjuries from those jurists who in-turn conducted the *Fraud on the Court* and related *Recusal* motions improperly; they effectively *avoided* the *Fraud on the Court* precedence, and designed a criminal posture based in the *conferential privilege* of the Republican Party to proceed under *preterition;* restated, they are no longer under oath and have *falsely dedicated* their agency.

31. This same question is persistent, and unresolved *nul tiel record,* and so it is proper for the jurist to have recused while we present a credible allegation how a *Fraud on the Court* question remains unanswered, while the Court's membership have coerced the circumstance of inordinate prejudice their active opinions are untried; we develop litigation even now to expose the truth of the matter, and because that will compromise even in part the precedence of Hon. Mr. Kimball, he may *recuse* himself now, and allow precedence of *disqualification* to begin to impose order upon the court.

2.

32. The opportunity is so proximate to restoration of this party's dignity, and yet the court cannot have secured its opinions in the same breadth where the Plaintiff is pursued by the circumstance of *judicial malpractice.*

10

13

029

33. It compromises the perimeter of official discretion to have *criminally abused procedures; false testimony* to commit *perjury*, 18 U.S. §§ 1001, 1621, the jurist as *biased against the law* when it comes to the efficient Party.

2.

34. The Judiciary in the United States District Court for the District of Utah has *repeatedly* constructed a disposition of malpractice against this plaintiff; Hon. Mr. Nielson and Hon. Mr. Bennet *falsely reported* a cause of *vexatious litigation* against the plaintiff which had *no grounds;* it was rooted in *criminal discrimination* to protect the judiciary from *constitutional resolution*, the absolute *judicial immunity* without a providential standard, even liability for *Fraud on the Court*, and additionally composed black letter construction for *malpractice per se;* their malpractice was to have insulated Hon. Mr. Kimball for this exact instance, to prove the right of *invasion of privilege*, one evenly protected against under the Amended Bill of Rights, and proscribed against by the Public Law.

35. Moreover, the properly *constitutional* format for precedence should unseat an undisciplined Republican Party, and they may be biased to protect the political conference above *the people*.

36. This is a repeated and episodic attempt to have abused procedures to intimidate and destroy the right to petition; even admitting *unsubstantiated abuses of procedures* allows the action under *false testimony* to pass under color, which allows the *criminal tortfeasor* to

11

14

030

repeatedly reassert *criminal authority* over a *traumatic episode; gross criminal malpractice.*

37. The action to impose the *fee* against the plaintiff yet bears the mark against the Plaintiff-Victim, in spite of the Magistrate's non-prejudicial posture on declension of the *in forma pauperis* petition. The fee is presently paid.

38. There are multiple Jurists in this jurisdiction who are subject to the substantiated lawsuit presently *under preparation,* the following:

   1. **D.UT Case No. 2:22-cv-00133-HCN-JCB:** Senior Howard Nielson, Magistrate Judge Jared Bennet, Senior Judge Jill Parrish, Senior Judge Robert Shelby

   2. **D.UT Case No. 2:20-cv-00205-DB: Judge** Dale Kimball, Judge Dee Benson (dec.), Judge Paul Warner (ret.)

   3. **D.UT Case No. 2:18-cv-00728-DN:** Judge David Nuffer, Judge Paul Warner (ret.)

23. Other members of the court will also be made Defendants:

   4. Operations Manager, Jeffery Taylor; Staff Attorney, Tiffany Brown; Intake Supervisor, Amy Faust; all for *tortious interference* and *invasion of privilege, violation of civil rights.*

24. In the public opinion of this Person, Citizen, and Family, those named jurists may resign from their positions because they maintain a suppressive culture consistent with a

bureaucratic degree of *terrorism;* a stalwart culture of *promissory harm,* the persistent threat to commit *perjury* in hardened *black collar ethics,* and have no longer dedicated their agency to *the people.*

25. They have committed those crimes while the Republican Party has socially engineered a genocide in Jerusalem-Gaza, while the Republican Party to have plotted repeatedly to steal the elections, while the Presidency has designed those crimes to bear the appearance of *intentional negligence,* and does expose the Plaintiff and Victim to the overbearing prejudice of *parliamentary review* sub rosa, and does *radicalize* its own posture in *false testimony* of its dedication to *the people,* forever covering up criticism, how the Supreme Court has committed *Perjury* against the Fourteenth Amendment, and the Presidency has become proceeded in a *false* and *threatening* testimonial posture, how the Supreme Court has abandoned constitutional resolution and designed a conferential government apparently dedicated to genocide.

26. For whatever reason, their *political conference* has chosen to enforce an *inferior destiny* and the actions of the Judiciary prejudice an allegation of *criminal contempt* that is literally beyond the United States Department of Justice; they have no confidence in prosecuting *Republican* aligned jurists, nor does our Federal Agency show a consistent interest in doing so; because we can prove there was *perjury* we have a *civil cause of action* against the United States; the judiciary must remain impartial and dedicated to *the people,* and must

13

recuse when they are subjected to an effective *criminal malpractice complaint* in the *civil context.*

27. For the government to *learn* and *integrate* actual *civil intelligence* it cannot proceed by *exception* from the *Public Law,* and cannot violate the law to have harmed the Petitioner, cannot demand *personal, official,* or "sovereign" immunity in contempt of *the people,* not in any way, shape or form; the Public Law is expressly proscriptive and prohibitive to protect *civil integrity* as measured in any of *the people,* and not held as some organic derivative.

28. See Addenda.

29. s/Carlos Velasquez

Carlos Velasquez
Digitally signed by
Carlos Velasquez
Date: 2025.08.25
09:22:12 -06'00'

30. Civil Bureaucratic Federalist

14

# ADDENDA

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.631    Page 1 of 27

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**MAY 0 8 2020**

D. MARK JONES, CLERK

BY_____
          DEPUTY CLERK

Carlos Velasquez, Appellant

1848 Ramona Ave

SLC, UT 84108-3112

PH: 801.671.0361

E: cfv1983@gmail.com

| | |
|---|---|
| Velasquez<br><br>v.<br><br>State of Utah, by & through Utah<br>Legislature including the Utah Office<br>of Legislative Research and General<br>Counsel, The Utah Department of<br>Human Services, Agencies, *et al.* | Case No. 2:20-cv-00205-DB-PWM<br>(Central Dist. of Utah) |

MOTION TO SET ASIDE FOR FRAUD ON THE COURT[1]

PLEASE DO READ!!![2]

CONSCIENCE, CONSTITUTION, MENTAL HEALTH, AND LIVELIHOOD

DEPEND UPON YOUR IMPARTIALITY, URGENCY AND HONESTY!!!

---

[1] Motion is filed pursuant to Rule 12(b), DuCivR 7-1, for any question to the form of the paper.
[2] Notice: Precedence of the Chief Judge is requested to prevent a miscarriage of justice, respectfully found 28 U.S. § 136(b).

1

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.632    Page 2 of 27

## STATEMENT

1. Presented is a Motion to Set aside a judgment for *Fraud on the Court*, with objections to the present order as if by a defensive motion respective Fed. R. Civ. P. 12.

2.  Also entailed are grounds for Recusal of the Judge Benson.

3.  Grounds for new trial, with new time for pre-trial replies.

4.  The decision of Hon. Dee Benson was received 4/29/20, dated 4/27/20. This objection and motion is timely provided from the date of receipt.[3]

5.  There is grounds to state a dual jurisdiction; the Federal Question related to the Older Americans Act as controlling effect interpreting Utah Code § 62A-3-301, *et seq.* where it violates discrete prohibitions of coercion of participation under the OAA, by authorizing an administrative censure for purposes related to Utah Department of Professional Licensing, other agencies

6.  The Civil Rights Act, upon the same violation of the OAA, finds ethical redundancy, frivolousness, and lacking Due Process to be a pervasive bias of covert prosecution under color of questions of protective order and undue expression of administrative privilege.

---

[3] A copy of the order is available upon any entry of Appearance by parties served process, a free copy is available at: https://ecf.utd.uscourts.gov/cgi-bin/DktRpt.pl?119531.

2

20

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.633    Page 3 of 27

7.    The prejudices are complex enough not to restate every element of the case in this objection; it should be sufficient to state that a *Writ of Prohibition* is sought under 42 U.S. § 1988, wherein the Civil Rights Act appears efficient to carry the Federal Question, that this is the pre-trial question which must become answered after sixty days time, and before the commencement of a trial for a punitive fine.

8.    The Complaint is appropriately organized to isolate Jurisdictional claims,[4] the Statement of the Complaint,[5] Facts and Alleged Facts,[6] the Argument,[7] and Relief[8] is in order to isolate a default interest in a *Writ of Prohibition,*[9] and several interrogatory subpenae.[10] Cause of action is defined at Fed. R. Civ. P. 52(c), partial judgment, and requires responsive defenses from State of Utah.

9.    The Statement of the complaint provides insight into the complexity of the question, that it involves several UDHS agencies, and the argument develops the grounds for injunction, fine, is synthetic.

---

[4] ECF No. 4, at Page 22 (1)
[5] *Id.,*, at Page 30 (9)
[6] *Id.,* at Page 27 (6).
[7] *Id.,* at Page 57 (36).
[8] *Id.,* at Page 70 (49).
[9] *Id.,* at Page 71 (50) ¶191.
[10] *Id.,* at Page 89 (68).

3

21

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.634    Page 4 of 27

## OBJECTIONS

### I.

10.　　Two times now, a Judge in this court has dismissed this question without subject-matter basis; the *in forma pauperis* statute has been expressed as jurisdiction *per se*, with a prejudice to preclude the challenge against an unconstitutional statute by *Rooker-Feldman* doctrine, without any express statement of the case to define either deficiency of the subject-matter jurisdiction, or failure of the application.

11.　　Hon. Mr. Benson's opinion lacks subject-matter, is not related to any part of the petitioner's complaint. Hon. David Nuffer's opinion which is critically relevant and controlling to Hon. Mr. Benson's opinion also lacks subject-matter jurisdiction. (Fed. R. Civ. P. 12 (b)(1)). Both opinions as cited in the dispositive order refer only to the IFP statute and make no recognizable claim related to any statement Velasquez actually pleaded.

12.　　Both opinions are provided beside a Supplemental brief of disclosures wherein all prior case process is available.[11]

13.　　The only conclusion the petitioner can reach is that Hon. Mr. Benson has not actually read the Complaint he cites to a deficiency, "[P]laintiff's complaint

---

[11] ECF No. 4-7.

4

22

038

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.635    Page 5 of 27

in this action is generally confusing and difficult to comprehend. As best the court can decipher, it appears that Plaintiff's complaint alleges that his civil rights were violated in the proceedings in the Administrative Case and that certain Utah statutes and legislation are unconstitutional."[12]

14.    Objection finds the above statement is only an allegation of fact which requires some direct trial; on its face, the counterclaim withstanding is that Hon. Mr. Benson has not appreciated the complexity of the plenary claim upon the complaint. It is actionable at present.

15.    The petitioner notified this court beside the disclosure that there are grave deficiencies in what was described, *"Velasquez I,"* primarily that rulings did not comply with *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.* 524 U.S. 280 (2005), given a lack of subject-matter,

> "A Federal Court lacks jurisdiction only if (1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgment; (3) the judgment was rendered before the federal suit was filed; and the plaintiff is inviting the district court to review and reject the state judgment." *In re Philadelphia Entm't Partners* v. *Commonwealth of Pennsylvania Dept. of Revenue,* 569 B.R. 394 (E.D. Pa. 2017), citing *Great Western Mining & Mineral Co.,* v. *Fox Rothschild LLP,* 615 F.3d at 166.[13]

---

[12] ECF No. 18, at Page 6.
[13] ECF NO. 4-7, at Page 12.

5

16.     The Judge has rather expressed the *in forma pauperis* statute as jurisdiction related to Civil Rights Act, and did not address any part of the administrative case, the federal question, or the Federal Administrative Procedures Act. The opinions of any Utah Appellate Court are not cited, and if those were reviewed the Judge would have difficulty finding same grounds for any claim preclusion within *Rooker-Feldman* doctrine.

17.     The IFP statute should be evaluated *under* jurisdiction, and any deficiency from the queried application more specific thereof. Otherwise, the Judge ignores the direct jurisdictional question and falsifies claim preclusion.

18.     Hon. Mr. Benson stated,

> "[u]nder this transactional approach adopted by the Tenth Circuit, the court concludes that of Plaintiff's 'claims or legal theories of recovery' in this action against State Defendants 'arise from the same transaction, event, or occurrence.' *Wilkes* v. *Wyo. Dept. of Empl. Div. of Labor Standards*, 314 F.3d 501, 504 (10th Cir. 2003).[14] Plaintiff's complaint in this action make it clear that, as in *Velasquez I*, all of his claims and legal theories have their genesis in the Administrative case."

19.     *Wilkes* itself is sustained of *King* v. *Union Oil Co.*, 117 F.3d 443 (10th Cir. 1997), a Rule 56(c) standard, that a "[S]ummary Judgment is appropriate if there

---

[14] *Id.* at Page 10 ¶ 2.

6

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.637    Page 7 of 27

is no genuine issue as to any material fact and… the moving party is entitled to judgment as a matter of law."

20.     Hon. Mr. Benson is leaving out an important part of the decision in *Wilkes,* "This court has repeatedly held that 'all claims arising from the same employment relationship constitute the same transaction or series of transactions for claim preclusion purposes." *Wilkes* at 504, citing *Mitchell* v. *City of Moore,* 218 F.3d 1190, 1202 (10th. Cir. 2000).

21.     This is neither a civil cause at action without Federal laws to find a Federal question intervening to action by and under the Civil Rights Act (this is a late pre-emption case), nor is there any subject-matter basis against which a Summary Judgment related to the IFP statute, as should have been found from Hon. David Nuffer, and opinions from Utah Appellate Courts.

22.     It is unclear, in terms of the *transactional approach,* if Hon. Mr. Benson finds that claim preclusion voids new application for original jurisdiction in employment contracts, or criminal IFP filings, and so civil IFP filings, "Under [the transactional] approach, a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred

7

from subsequent litigation." *Wilkes* citing *Nwosun* v. *General Mills Rest., Inc.*, 124 F.3d 1255, 1257 (10th. Cir. 1997).

23.    Hon. Mr. Benson enlarges the comparison by *Wilkes* in order to use the *transactional approach* to disfavor applications of jurisdiction held mitigating *Rooker-Feldman* applications per *Exxon Mobil* as presented of *In re Philadelphia Entm't Partners*.

24.    *Wilkes, transactional approach,* is improperly expressed *pari passu*, to make a deliberate casualty out of the plaintiff's petition against Judicial power to distort a Rule 56 precedence without subject-matter. To preclude the claims in the same expression as *Rooker-Feldman* claims, *transactional* approaches must not only identify the same parties, but they must first find precisely where the plaintiff expresses the same claim upon the Summary Judgment.

25.    It is mandatory to have evaluated the question on the petition against the substance of the Hon. David Nuffer's opinion in order to establish subject-matter relevance. Otherwise, "claim preclusion" interest is only partial to terminate because *King* finds there is obvious dispute of the subject-matter basis as related to the complaint, as should define *Rooker-Feldman* applications when true.

26.    The previous attempt is not recognizable as a resolution for the second attempt under the same jurisdiction. Velasquez declared on the Supplemental Brief

8

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.639    Page 9 of 27

that he held the allegation the previous process was perjured, and was intent upon a new filing to redress that disposition.[15]

27.    Any other rulings expressed are badly placed and do not require deposition while there is lacking subject-matter basis for resolution against applications for jurisdiction.

## II.

28.    The process conducted by the court is insufficient (Fed. R. Civ. P. 12(b)(6)).

29.    Hon. Mr. Benson has issued a dispositive order after service of process, with time for replies, has not notified those parties served, and as stated on objection I, lacks subject-matter jurisdiction to have defined the case question as cited.

30.    Such discomposure is likely a result of assignment of the process to a magistrate under 28 U.S. § 636(b)(1)(B).

31.    The complaint requests magistrate assignment for non-dispositive matters, under 28 U.S. § 636(b)(1)(A); the magistrate assignment was made by a separate clerk than the clerk issuing summons, and a separate clerk from the clerk who made docket corrections.

---

[15] *Id.*, at Page 15 (13) ¶65.

9

32.     A judge or clerk in chambers looking at a petition and attempting to decide whether it were sufficient, or if the magistrate's precedence was due could arbitrarily assign the case to a magistrate for all dispositive matters as a means of conducting frivolous IFP review. A review of the Docket finds the person assigned the case was "reb."

33.     Subsequently, Hon. Mr. Benson presumes state of Utah's position without stating it, and without allowing the State to reply.

34.     It is possible the motion for Reassignment of the Magistrate,[16] which requested assignment per the complaint, would have completely prevented an undue termination.

### III.

35.     Statements regarding Defendants are incorrect, the complaint has not been reviewed, and the Clerk has not informed the judge of the dialogue presented related to original Summons.

36.     The motion at Summons clarifies this.[17] The Administration on Aging, as related to the American Commission on Living, has subject-matter precedence per several statutes as cited from the petition.

---

[16] ECF No. 11.
[17] ECF No. 9, at Page 4 (4).

10

37.     The Operations Manager does not clarify whether the court would allow a non-defendant Respondent agency upon the docket, as summoned to reply, and only removed the named party therefrom leaving the ACL agency upon the docket.[18] The resultant problem is not dispositive to the case, and depends upon whether the Administration on Aging will respond to any independent queries.

38.     If the complaint had not become terminated, any action by Administration on Aging might have clarified it. Otherwise, a motion for a written interrogatory in the same scope of the question could be sufficient.

39.     Either way, the question was not answered, and the rebuke against the petitioner resultant of lacking diligence by the clerk in chambers is not respectful, and also a result of lacking communications between the Operations Manager, the Docketing Clerk, and the Judge and Clerk in Chambers.

CONCLUSIONS

I.

40.     Hon. Mr. Benson is unduly prejudiced to terminate the case and cannot reference any petition or decision to find the exact place where Velasquez' expressions are deficient, or redundant. The fraudulent precedence avoids emphasis

---

[18] Addenda, at Page 4 (4/14/20, Page 4/5).

11

of redundancy, and overrelies upon a negative form of "res judicata," that unmerited expression *pari passu.*

41.    Hon. David Nuffer's position is only speculative and no better, and as stated elsewhere, the Court of Appeals did not recognize any statutory question than declared Velasquez seeks repair against the State court judgment,[19] when it was a plenary challenge against a statute as stated most generally under the statement of jurisdiction.[20] A critical evaluation of instant *Rooker-Feldman* application should have recognized the procedure was fraudulently composed.

42.    Without a statutory basis to preclude any claim, as to find a claim was precluded in Utah Appellate courts, "The Supreme Court has made clear that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights: 'A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S. § 1331 to resolve." *The Wilderness Society* v. *Kate County, Utah* 470 F. Supp. 2d 1300, 1304 (D. Utah 2006) citing *Shaw* v. *Delta Airlines, Inc.,* 463 U.S. 85, 96 n.14 (1983).

---

[19] ECF No. 4-5, at Page 12 (005).
[20] ECF No. 4, at Page 22 (1).

12

30

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.643    Page 13 of 27

43.    The Older Americans Act, as stated in complaint's Jurisdiction, has Federal question jurisdiction as defined both in OAA statutes 42 U.S. § 3027 and 3058i,[21] and Utah Administrative Rule R510-1, which cites the OAA.[22]

44.    The Civil Rights Act may share the same standing in a course of vindication, given precisely that 42 U.S. § 1988, Proceedings in vindication of civil rights, prevails the Federal question when it states, "The jurisdiction in civil and criminal matters conferred on the district courts... shall be exercised in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect[.]"[23]

45.    I do not perceive there to be a controversy of *Exxon Mobil* expressed by Supreme Court, I rather argue the case presents dual jurisdiction of the standing of the Civil Rights Act.

II.

46.    The pre-trial case review is highly-decentralized, apparently speculative to the Judge's opinion, and left highly vulnerable to casualty of process. Any petition with ambiguities/uncertainties about a disposition, whether a judge will

---

[21] ECF No. 4, at Page 34 (13) ¶46.
[22] *Id.,* at Page 29 (8) ¶31.
[23] *Id.,* at Page 23 (2) ¶5.

13

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.644    Page 14 of 27

allow the petition, or about parties named and served, is at risk for partial judgment, not on the merits.

47.    The process is insufficient; State of Utah has not been allowed to plead its cause related to the subject matter, while the standing of the law was in balance upon "claim preclusion," the Summary implicit which neglected jurisdiction. Is also not impartial, than expressed of apparent prejudice to close the matter.

### III.

48.    Problems with American Commission on Living as related to the Administration on Aging, named as a respondent party, and not defensive, are not substantive, and yet require some further pre-trial action to clarify given new information in the appellant's possession.

### IV.

49.    Statements on Motions are premature; without properly establishing subject-matter jurisdiction, literally the question of the subject-matter of the complaint under a qualified and exclusive jurisdiction, where any review of a motion before magistrate assignment, or after having actually read the petition, may have prevented the present circumstance.

50.    All non-dispositive motions are not moot, but due.

14

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.645    Page 15 of 27

## MOTION

51.     "Fraud on the court is a somewhat nebulous concept usually discussed in civil cases. No court system can function without safeguards against actions that interfere with its administration of justice. This concern must be balanced against the necessity for finality of court judgments; thus, only actions that actually subvert the judicial process can be the basis for upsetting otherwise settled decrees.

52.     "Professor Moore's definition is frequently cited[:] Fraud upon the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct[.] *Moore's Federal Practice and Procedure* ¶ *60.33.*" *Demjanjuk* v. *Petrovsky,* 10 F.3d 338, 352 (6th Cir. 1993).

53.     Given there is not subject-matter basis for Hon. Mr. Benson to have discovered in Hon. David Nuffer's opinion found in the Supplemental Brief, that claim preclusion of *Rooker-Feldman* doctrine simply has not accounted for the jurisdictional application on this complaint, just as the original claim did not account for the statements on the original complaint, and that declarations of a confusing complaint are not based on subject-matter than find the IFP statute having subsumed

15

33

the jurisdictional application, are themselves only alleged fact and not substantial fact, that there is referenced on this paper with clarity where the petitioners claims arise and terminate, anticipating a centralizing motion for partial judgment, finding both relevant jurisdictions, can only have concluded the case and complaint must survive any premature *sua sponte* action to dismiss as holding significant defenses under Rule 12, and permit the State of Utah the burden of actually defending a State law against United States, as proceeded by the Appellant.

54.    Rather, the opinion cited expresses the *in forma pauperis* statute as a jurisdictional and appellate qualification to distort the nature of the case; 28 U.S. § 1915, that is as the textual law is applied, a judge may be putting emphasis on a terminology of "appeal" than "civil action," or may have leant Section 1915A to a undue screening treatment by 28 U.S. § 1915(2)(B)(ii), in the same motion that would have already identified an action were frivolous or malicious, or which seeks monetary relief after an evaluation of qualified immunity.

55.    That is, the Judge makes a knowledge claim about the case as to dismiss it, to reduce the time the court works upon it, but covers up the statement that should be relevant as if inappropriate, and rather appears to put himself and Hon. David Nuffer at immediate liability for *conspiracy, contempt, fraud, obstruction,* and *perjury.* There is executed the reverse of the justiciable effect of the stated IFP

16

termination; any wrongful politicization may be a pervasive bias to damage the rights of citizens, IFP petitioners, prisoners, independent petitioners.

56.     The opportunity to appeal the decision, or to amend it, was corrupted beyond recognizability, and the Federal Jurisdiction substantively protects the plaintiff's claims as based in *King*, although at some increased effort in reading the prior process.

57.     The following, as based upon the foregoing, are due:

(1) Hon. Mr. Benson's Order and Judgment are due Set Aside for *Fraud on the Court* (Fed. R. Civ. P. 60(d)(3)).

(2) Notice is due to State of Utah, renewal of time for replies, upon New Trial (Fed. R. Civ. P. 59), renewed the original service of this process dated 4/20/20.[24]

(3) Motions held moot are due; as clarification of summons to Administration on Aging, or whether the party labeled ACL will be removed from the docket entirely; clarification of the jurisdiction of the magistrate is due after a planning meeting.

(4) Hon. Mr. Benson may recuse from this proceeding, 28 U.S. § 455(a); his honor's impartiality is reasonably in question where there lacks any

---

[24] ECF No. 17.

17

Case 2:20-cv-00205-DAK    Document 20    Filed 05/08/20    PageID.648    Page 18 of 27

significant evidence of his reading of the complaint, than any prejudice to terminate a case from the docket, given there is significant grounds for the question that was presented and served.

(5) The court may open a new case for any of the following questions: (a) *contempt of court* 18 U.S. § 401(2) – *perjury* 18 U.S. § 1621; (b) to consolidate a motion to amend a judgment related to *Velasquez* v. *State of Utah, et al.* Case no. 2:18-cv-00728-DN.

(6) A motion to recover costs at frivolous delay, time on the motion against the pre-trial process, against Hon. Mr. Benson, 28 U.S. § 2412, a minimal fine under 42 U.S. § 1983.

Any decision not to Set Aside by the court requires a Hearing (Fed. R. Civ. P. 12(i); it is absolutely unacceptable to have harmed me, or my family, pursuant to any *Fraud* or *Perjury.* I was not allowed any objection to the order just as subject-matter jurisdiction and process are obviously insufficient.

SIGNATURE

s/Carlos Velasquez, Appellant

Civil Bureaucratic Federalist

18

36

052

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,LODGE_DOC,PROSE,SUP_CT

**US District Court Electronic Case Filing System**
**District of Utah (Central)**
**CIVIL DOCKET FOR CASE #: 2:20-cv-00205-DAK**

| | |
|---|---|
| Velasquez v. State of Utah et al | Date Filed: 03/26/2020 |
| Assigned to: Judge Dale A. Kimball | Date Terminated: 04/27/2020 |
| Demand: $112,700,000 | Jury Demand: Plaintiff |
| Case in other court: Supreme Court, 21-05652 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**Carlos Velasquez**                                    represented by **Carlos Velasquez**
1848 RAMONA AVE
SALT LAKE CITY, UT 84108
(801)671-0361
PRO SE

V.

**Defendant**

**State of Utah**
*by & through Utah Legislature including the*
*Utah Office of Legislative Research and*
*General Counsel*

**Defendant**

**Utah Department of Human Services**

**Defendant**

**Utah Division of Aging and Adult**
**Services/APS**

**Defendant**

**Utah Office of Administrative Hearings**

**Defendant**

**Gary R. Herbert**
*Governor*

**Defendant**

**Sean Reyes**
*Utah Attorney General*

**Defendant**

**State of Utah Legislature, The**

247

057

**Defendant**

**Office of Legislative Research and
General Counsel**

**Defendant**

**Thomas R Vaughn**
*Atty of Gnrl Cnsl*

**Defendant**

**Nels Holmgren**
*Division Director DAAS*

**Defendant**

**J. Stephen Mikita**
*Asst. Atty. Gnrl. APS*

**Defendant**

**Sonia Sweeney**
*Division Director*

**Defendant**

**Laura Thompson**
*Asst. Atty. General to DHS*

**Defendant**

**Amanda Slater**
*Divison Director, Office of Licensing*

**Defendant**

**US Administration of Community Living**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/26/2020 | 1 | **SEALED DOCUMENT** MOTION for Leave to Proceed in forma pauperis. Assigned to Magistrate Judge Paul M. Warner for review, case file forwarded to Magistrate Judge. **(Received by the court on: 3/26/2020)** filed by Plaintiff Carlos Velasquez. (nl) (Entered: 03/27/2020) |
| 04/01/2020 | 2 | MOTION for Electronic Service Request filed by Plaintiff Carlos Velasquez. (dla) (Entered: 04/02/2020) |
| 04/03/2020 | 3 | ORDER granting 1 Motion for Leave to Proceed in forma pauperis. Signed by Magistrate Judge Paul M. Warner on 4/3/2020. (nl) (Entered: 04/03/2020) |
| 04/03/2020 | 4 | COMPLAINT against State of Utah, Utah Department of Human Services, Utah Division of Aging and Adult Services/APS, Utah Office of Administrative Hearings **(Originally received by the court on 3/26/2020).** (Fee Status: IFP) filed by Carlos Velasquez. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit B part 2, # 4 Exhibit C, # 5 Exhibit D, # 6 Supplement False Statement, # 7 Supplement Discovery Background, # 8 Civil Cover Sheet 1) Assigned to Judge Dee Benson (nl) (Entered: 04/03/2020) |
| 04/06/2020 | 5 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to State of Utah. Instructions to Counsel: |

| | | |
|---|---|---|
| | | 1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (kn) (Entered: 04/06/2020) |
| 04/06/2020 | 6 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Attorney General.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (kn) (Entered: 04/06/2020) |
| 04/06/2020 | 7 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Division of Aging and Adult Services/APS.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (kn) (Entered: 04/06/2020) |
| 04/06/2020 | 8 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Office of Administrative Hearings.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (kn) (Entered: 04/06/2020) |
| 04/06/2020 | 9 | MOTION for Summons and Memorandum in Support filed by Plaintiff Carlos Velasquez.<br><br>NOTE: email filing is provisionally allowed during the current pandemic crisis and will only continue with an order by the assigned judge once the court returns to normal operations. In addition: filer listed the incorrect case number on the filing. (jds) (Entered: 04/07/2020) |
| 04/08/2020 | 10 | ORDER REFERRING CASE to Magistrate Judge Paul M. Warner under 28:636 (b)(1)(B), Magistrate to handle case up to and including R&R on all dispositive matters. No attached document. Signed by Judge Dee Benson on 4/8/2020. (reb) (Entered: 04/08/2020) |
| 04/09/2020 | 11 | MOTION for Reassignment and Memorandum in Support filed by Plaintiff Carlos Velasquez. Motions referred to Paul M. Warner.(jds) (Entered: 04/09/2020) |
| 04/14/2020 | 12 | Modification of Docket: Error: Parties not added at case opening. Correction: Parties added per complaint pages xii and xiii. re 4 Complaint. (jl) (Entered: 04/14/2020) |
| 04/17/2020 | 13 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Department of Human Services.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (tlh) (Entered: 04/17/2020) |
| 04/17/2020 | 14 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to State of Utah Legislature, The.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (tlh) (Entered: 04/17/2020) |
| 04/17/2020 | 15 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Department of Human Services. |

| | | Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (tlh) (Entered: 04/17/2020) |
|---|---|---|
| 04/17/2020 | 16 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Utah Department of Human Services.<br>Instructions to Counsel:<br>1. Click on the document number.<br>2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF.<br>3. Print the issued summons for service. (tlh) (Entered: 04/17/2020) |
| 04/20/2020 | 17 | CERTIFICATE OF SERVICE by Carlos Velasquez<br>NOTE: email filing is provisionally allowed during the current pandemic crisis and will only continue with an order by the assigned judge once the court returns to normal operations. (jds) (Entered: 04/20/2020) |
| 04/27/2020 | 18 | MEMORANDUM DECISION AND ORDER : All of Plaintiff's motions are MOOT - 2 Motion, 9 Motion, 11 Motion. This action is DISMISSED WITH PREJUDICE under the authority of the IFPStatute. Signed by Judge Dee Benson on 4/24/2020. (jds) (Entered: 04/27/2020) |
| 04/27/2020 | 19 | JUDGMENT - IT IS ORDERED AND ADJUDGED that this action is DISMISSED WITH PREJUDICE under the authority of the IFP Statute. Case Closed. Magistrate Judge Paul M. Warner no longer assigned to case. Signed by Judge Dee Benson on 4/24/2020. (jds) (Entered: 04/27/2020) |
| 05/08/2020 | 20 | MOTION "to Set Aside for Fraud on the Court", Motion to Recuse Judge Dee Benson, filed by Plaintiff Carlos Velasquez. (Attachments: # 1 Exhibit Notice to the Clerk at Filing) (dla) Modified by editing docket text to add Motion to Recuse on 5/15/2020 (dla). (Entered: 05/11/2020) |
| 05/14/2020 | 21 | AFFIDAVIT in Support of 20 Motion to Recuse Judge Dee Benson filed by Plaintiff Carlos Velasquez. (dla) Modified by editing docket text to change name of document to Affidavit in Support of Motion to Recuse on 5/15/2020 (dla). (Entered: 05/14/2020) |
| 05/15/2020 | 22 | Modification of Docket: re 20 MOTION to Set Aside edited to reflect addition of Motion to Recuse Judge Dee Benson, 21 edited to change name of document to Affidavit in Support of 20 Motion to Recuse Judge Dee Benson, motion terminated. (dla) (Entered: 05/15/2020) |
| 05/15/2020 | 23 | CERTIFICATE OF SERVICE by Carlos Velasquez re 20 MOTION to Set Aside (jwt) (Entered: 05/15/2020) |
| 05/27/2020 | 24 | REQUEST to Submit for Decision re 20 Motion to Set Aside, Motion to Recuse filed by Plaintiff Carlos Velasquez. (Attachments: # 1 Text of Proposed Order) (dla) (Entered: 05/27/2020) |
| 06/03/2020 | 25 | MOTION for Reassignment of the Judge filed by Plaintiff Carlos Velasquez. (dla) (Entered: 06/03/2020) |
| 06/22/2020 | 26 | REQUEST to Submit for Decision re 25 Motion for Reassignment filed by Plaintiff Carlos Velasquez. (dla) (Entered: 06/22/2020) |
| 07/02/2020 | 27 | Correspondence from Carlos Velasquez (received by the clerk via email on 7/2/2020) (jwt) (Entered: 07/07/2020) |
| 07/08/2020 | 28 | DOCUMENTS LODGED consisting of Letter to the Judge; Lodge per chambers.<br>Note: attached document lodged for reference purposes only; no response required unless |

250

|  |  | specifically ordered by the court. (Attachments: # 1 Envelope)(kpf) (Entered: 07/08/2020) |
| --- | --- | --- |
| 07/08/2020 | 29 | MEMORANDUM DECISION AND ORDER denying 20 "Motion to Set Aside Fraud on the Court"; denying 25 "Request for Reassignment of the Judge". Signed by Judge Dee Benson on 7/8/20. (dla) (Entered: 07/08/2020) |
| 07/10/2020 | 30 | Correspondence from Carlos Velasquez (received by the clerk's office via email on 7/10/2020). (jwt) (Entered: 07/14/2020) |
| 08/20/2020 | 31 | NOTICE OF APPEAL as to 18 Order on Motion for Miscellaneous Relief, Memorandum Decision, 19 Judgment, filed by Carlos Velasquez. Appeals to the USCA for the 10th Circuit. Fee Status: IFP. Filing fee $ 505. (Attachments: # 1 Cover Letter)(jwt) (Entered: 08/20/2020) |
| 08/20/2020 | 32 | **SEALED DOCUMENT** MOTION for Leave to Appeal in forma pauperis filed by Plaintiff Carlos Velasquez. (jwt) (Entered: 08/20/2020) |
| 08/20/2020 | 33 | Transmission of Preliminary Record to USCA Tenth Circuit re 31 Notice of Appeal. (Attachments: # 1 Appendix)(jwt) (Entered: 08/20/2020) |
| 08/20/2020 | 34 | USCA Case Number Case Appealed to Tenth Circuit Case Number 20-4087 for 31 Notice of Appeal, filed by Carlos Velasquez. (jrj) (Entered: 08/20/2020) |
| 08/24/2020 | 35 | TRANSCRIPT REQUEST FORM filed by Carlos Velasquez re 31 Notice of Appeal, A transcript is not necessary for this appeal (dla) (Entered: 08/25/2020) |
| 08/27/2020 | 36 | CLERK'S CERTIFICATE OF SERVICE re 31 Notice of Appeal per Federal Rule of Appellate Procedure 3 to Defendants Herbert, Reyes, Vaughn, Holmgren, Mikita, Thompson, Sweeney, and Slater. (jwt) (Entered: 08/27/2020) |
| 09/01/2020 | 37 | RECEIPT re: 36 Clerk's Certificate of Service of the Notice of Appeal to Sonia Sweeney. (NOTE: the return receipt was returned to the clerk's office unsigned. The included tracking history notes the document was delivered on 8/31/2020.) (jwt) Modified on 9/2/2020 linked to 36 Clerk's Certificate of Service(jwt). (Entered: 09/02/2020) |
| 09/02/2020 | 38 | RECEIPT re: CLERK'S CERTIFICATE OF SERVICE re 31 Notice of Appeal per Federal Rule of Appellate Procedure 3 to Defendants Herbert, Reyes, Vaughn, Holmgren, Mikita, Thompson, and Slater. (Attachments: # 1 Receipt for Nels Holmgren, # 2 Receipt for J. Stephen Mikita, # 3 Receipt for Sean Reyes, # 4 Receipt for Amanda Slater, # 5 Receipt for Laura Thompson, CWLS, # 6 Receipt for Thomas R. Vaugn) (jwt) (Entered: 09/02/2020) |
| 01/28/2021 | 39 | Case Reassigned to Judge Dale A. Kimball. Judge Dee Benson no longer assigned to the case.<br><br>Case number will now read 2:20-cv-00205-DAK. Please make changes to document captions accordingly. (nl) (Entered: 01/28/2021) |
| 02/01/2021 | 40 | MEMORANDUM DECISION AND ORDER denying 32 Motion for Leave to Appeal in forma pauperis. Signed by Judge Dale A. Kimball on 2/1/2021. (eat) (Entered: 02/01/2021) |
| 02/10/2021 | 41 | NOTICE OF FILING of Statement of Appeal in Good Faith with the Tenth Circuit Court of Appeals filed by Plaintiff Carlos Velasquez. (Attachments: # 1 Envelope) (eat) (Entered: 02/11/2021) |
| 02/12/2021 | 42 | ORDER of USCA Tenth Circuit as to 31 Notice of Appeal, filed by Carlos Velasquez. Order filed by Clerk of the Court. Within 14 days from the date of this order, appellant |

| | | |
|---|---|---|
| | | shall either pay the full filing fee to the district court or file a motion to proceed in forma pauperis on appeal in this court. Fee or IFP forms due by 02/26/2021 for Carlos Velasquez. (jrj) (Entered: 02/22/2021) |
| 05/18/2021 | 43 | MANDATE of USCA as to 31 Notice of Appeal, filed by Carlos Velasquez According to the USCA the Mandate of the USDC for the Dist of UT is Affirmed. Judgment included with mandate: Yes. (Attachments: # 1 Exhibit Mandate Letter) (dla) (Entered: 05/18/2021) |
| 06/04/2021 | 44 | ORDER of USCA 10th Circuit Entered Recalling the mandate as to 31 Notice of Appeal, filed by Carlos Velasquez. Appeal reopened. (dla) (Entered: 06/04/2021) |
| 06/21/2021 | 45 | MANDATE of the USCA for the Tenth Circuit as to 31 Notice of Appeal filed by Carlos Velasquez. According to the USCA the Judgment of the USDC for the Dist of UT is AFFIRMED. Judgment included with mandate: Yes. (Attachments: # 1 Mandate Letter) (eat) (Entered: 06/21/2021) |
| 09/13/2021 | 46 | NOTICE OF FILING of Petition for Writ of Certiorari with appendices received at the Tenth Circuit. (jrj) (Entered: 09/13/2021) |
| 09/15/2021 | 47 | Letter from US Supreme Court re: Notice of Petition for Writ of Certiorari re 31 Notice of Appeal. Supreme Court Case Number 21-5652. (jrj) (Entered: 09/15/2021) |
| 11/08/2021 | 48 | ORDER of Supreme Court Circuit as to 31 Notice of Appeal, filed by Carlos Velasquez. The petition for a writ of certiorari is denied. (jrj) (Entered: 11/09/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/07/2022 07:15:57 | | |
| **PACER Login:** admin2246378 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 2:20-cv-00205-DAK |
| **Billable Pages:** 5 | **Cost:** | 0.50 |

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.618   Page 1 of 12

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CARLOS VELASQUEZ,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF UTAH et al.,<br><br>Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:20-cv-00205-DB-PMW<br><br>District Judge Dee Benson<br><br>Chief Magistrate Judge Paul M. Warner |

Before the court are Plaintiff Carlos Velasquez's ("Plaintiff") complaint[1] and several motions.[2] The court notes that Plaintiff is proceeding pro se in this case. Consequently, the court will construe his pleadings liberally. *See, e.g., Ledbetter v. City of Topeka,* 318 F.3d 1183, 1187 (10th Cir. 2003). The court also notes that Plaintiff has been permitted to proceed in forma pauperis under 28 U.S.C. § 1915 ("IFP Statute").[3] Accordingly, the court will review the sufficiency of Plaintiff's complaint under the authority of the IFP Statute.

### BACKGROUND

On September 18, 2018, Plaintiff filed an action in this court against the State of Utah; the Utah Department of Human Services; the Utah Office of Administrative Hearings; and the Utah Division of Aging and Adult Services, Adult Protective Services. *See Velasquez v. State of*

---

[1] *See* ECF no. 4.

[2] *See* ECF nos. 2, 9, 11.

[3] *See* ECF no. 3.

Case 2:20-cv-00205-DB    Document 18    Filed 04/27/20    PageID.619    Page 2 of 12

*Utah*, 2:18-cv-00728-DN ("*Velasquez I*"). In a memorandum decision and order dated February 25, 2019, District Judge David Nuffer reviewed Plaintiff's complaint in *Velasquez I* under the authority of the IFP Statute.[4]

In that order, Judge Nuffer noted that Plaintiff's complaint in *Velasquez I* was "generally confusing and difficult to decipher."[5] Nevertheless, Judge Nuffer noted that the genesis of *Velasqez I* appeared to be an administrative action that was commenced against Plaintiff by the Utah Division of Aging and Adult Services.[6] In *Velasquez I*, Plaintiff identified that case as "Utah Administrative Case: 2246378"[7] ("Administrative Case"). Plaintiff's complaint in *Velasquez I* detailed "an extensive history of litigating the Administrative Case in Utah administrative agencies, the Utah Third District Court, the Utah Court of Appeals, and the Utah Supreme Court," which included a constitutional claim asserted in *Velasquez I*.[8] Plaintiff's complaint in *Velasquez I* sought (1) a declaration of unconstitutionality with respect to several statutes and regulations; (2) "[f]alsity" of the Administrative Case; (3) "[i]nterest to preference on [*Velasquez I*] case over ordinary civil cases"; (4) "[i]nterest to three applications for extraordinary writ[s], Mandamus, Prohibition, [and] Execution"; and (5) "[i]nterest to generate

---

[4] *See Velasquez I*, ECF no. 27.

[5] *Id.* at 1.

[6] *See id.* at 2.

[7] *See Velasquez I*, ECF no. 3 a 1.

[8] *Id.* at 2.

2

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.620   Page 3 of 12

an effective ruling to prosecute original tortfeasors against a manner of conspiracy."[9]  Plaintiff's

complaint in *Velasquez I* also alleged that Plaintiff had "'a sustained interest to have some more

impartial committee weigh whether' the Utah Supreme Court 'sustained procedural malice to

wrongful decline of interest' when it issued certain orders in the course of his litigation of the

Administrative Case."[10]  The complaint in *Velasquez I* further alleged "that the Utah Supreme

Court 'sustained malice,' 'refused to clarify the constitutional question,' and 'refused to

recognize evidence.'"[11]

After reviewing Plaintiff's complaint in *Velasquez I*, Judge Nuffer concluded that

Plaintiff's action was barred by the *Rooker-Feldman* doctrine.[12]  Judge Nuffer also concluded

that it would be futile to provide Plaintiff with an opportunity to amend his complaint.[13]

Accordingly, Judge Nuffer dismissed *Velasquez I* with prejudice under the authority of the IFP

Statute for failure to state claims upon which relief could be granted.[14]  *See* 28 U.S.C.

§ 1915(e)(2)(B)(ii).

---

[9] *Id.* at 13-52; *see also Velasquez I*, ECF no. 27 at 2.

[10] *Velasquez I*, ECF no. 27 at 2 (quoting, *Velasquez I*, ECF no. 3 at 24-25).

[11] *Id.* (quoting *Velasquez I*, ECF no. 3 at 25)

[12] *See id.* at 4-5.

[13] *See id.* at 5.

[14] *See id.* at 5-6.

3

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.621   Page 4 of 12

On March 8, 2019, Plaintiff filed a motion to reconsider Judge Nuffer's February 25, 2019 memorandum decision and order dismissing *Velasquez I*.[15] Judge Nuffer denied that motion on March 12, 2019, concluding that Plaintiff's arguments were "incorrect and without merit."[16]

On March 20, 2019, Plaintiff filed a notice of appeal in *Velasquez I*.[17] On June 11, 2019, the Tenth Circuit Court of Appeals issued an order and judgment on Plaintiff's appeal. *See Velasquez v. Utah*, 775 F. App'x 420, 421-23 (10th Cir. 2019). In that order and judgment, the Tenth Circuit stated:

> This appeal is the latest skirmish in a long-running legal battle between [Plaintiff] and various agencies and courts of the State of Utah. The saga appears to have begun with administrative law proceedings at the Utah Department of Human Services. After the administrative proceedings concluded, he took his fight to Utah state court, where in addition to his original claims he raised new constitutional claims regarding the fairness of his administrative proceedings and challenging the constitutionality of several Utah statutes and regulations. Unable to find success after exhausting his appeals in Utah state court, he sued the State of Utah and several state agencies in federal district court. In federal court he once again raised his constitutional claims from state court while adding constitutional claims . . . .

*Id.* at 421.

---

[15] *See Velasquez I*, ECF no. 29.

[16] *Velasquez I*, ECF no. 31 at 2.

[17] *See Velasquez I*, ECF no. 33.

4

264

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.622   Page 5 of 12

On October 1, 2019, Plaintiff filed a petition for a writ of certiorari with the United States Supreme Court with respect to *Velasquez I*.[18] On December 9, 2019, the Supreme Court denied Plaintiff's petition.[19]

On April 3, 2020, Plaintiff filed his complaint in the instant action.[20] Plaintiff's 91-page complaint names the following four parties as defendants, all of which were named as defendants in *Velasquez I*: the State of Utah, the Utah Department of Human Services, the Utah Division of Aging and Adult Services/Adult Protective Services, and the Utah Office of Administrative Hearings.[21] Plaintiff also names the following defendants: Utah Governor Gary R. Herbert; Utah Attorney General Sean Reyes; the Utah Legislature; the Utah Office of Legislative Research and General Counsel; Thomas R. Vaughn, Utah Attorney of General Counsel; Nels Holmgren, Utah Division of Aging and Adult Services Division Director; J. Stephen Mikita, Utah Assistant Attorney General (Adult Protective Services); Sonia Sweeney, Utah Office of Administrative Hearings Division Director; Laura Thompson, Utah Assistant Attorney General

---

[18] *See Velasquez I*, ECF no. 50.

[19] *See Velasquez I*, ECF no. 51.

[20] *See* ECF no. 4. The court's citations to Plaintiff's complaint will reference page numbers in sequence, regardless of how they are numbered by Plaintiff.

[21] *See id.* at 1.

5

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.623   Page 6 of 12

(Utah Department of Human Services); Amanda Slater, Utah Office of Licensing Division

Director; and the United States Administration for Community Living.[22]

In the first paragraph of the substantive portion of his complaint, Plaintiff alleges that this

action originates from the Administrative Case.[23]  Plaintiff also details the proceedings related to

the Administrative Case,[24] references the Administrative Case in several other portions of his

complaint,[25] and requests that the Administrative Case "must become voided, 'without merit.'"[26]

Like his complaint in *Velasquez I*, Plaintiff's complaint in this action is generally

confusing and difficult to comprehend.  As best the court can decipher, it appears that Plaintiff's

complaint alleges that his civil rights were violated in the proceedings in the Administrative Case

and that certain Utah statutes and legislation are unconstitutional.

## LEGAL STANDARDS

Whenever the court authorizes a party to proceed without payment of fees under the IFP

Statute, the court is required to "dismiss the case at any time if the court determines that . . . the

action . . . fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

In determining whether a complaint fails to state a claim for relief under the IFP Statute, the

---

[22] *See id.* at 14-15.  Except for the United States Administration for Community Living, all of the defendants named in Plaintiff's complaint in this action will be referred to collectively as the "State Defendants."

[23] *See id.* at 22.

[24] *See id.* at 27-28.

[25] *See id.* at 25, 90.

[26] *Id.* at 90.

6

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.624   Page 7 of 12

court employs the same standard used for analyzing motions to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Kay v. Bemis*, 500 F.3d 1214, 1217-18 (10th Cir. 2007). Under that standard, the court "look[s] for plausibility in th[e] complaint." *Id.* at 1218 (quotations and citations omitted) (second alteration in original). More specifically, the court "look[s] to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief. Rather than adjudging whether a claim is 'improbable,' '[f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)) (other quotations and citation omitted) (second and third alterations in original).

In undertaking that analysis, the court must be mindful that Plaintiff is proceeding pro se and that "[a] pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also, e.g., Ledbetter*, 318 F.3d at 1187. At the same time, however, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant," *Bellmon*, 935 F.2d at 1110, and the court "will not supply additional facts, nor will [it] construct a legal theory for [a pro se] plaintiff that assumes facts that have not been pleaded." *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989) (per curiam). Further,

> [t]he broad reading of [a pro se] plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based .... [C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based. This is so because a pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which

7

267

073

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.625   Page 8 of 12

> relief can be granted.  Moreover, in analyzing the sufficiency of the plaintiff's complaint, the court need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations.

*Bellmon*, 935 F.2d at 1110 (citations omitted).

After reviewing a pro se plaintiff's complaint under the IFP Statute, the court may dismiss the complaint for failure to state a claim "only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *See Kay*, 500 F.3d at 1217 (quotations and citation omitted).

### ANALYSIS

**I.     Claim Preclusion**

"Under res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the prior action." *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1467 (10th Cir. 1993) (quotations and citation omitted).  In the Tenth Circuit, "[c]laim preclusion requires:  (1) a judgment on the merits in the earlier action; (2) identity of the parties or their privies in both suits; and (3) identity of the cause of action in both suits." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999).  In determining the third element, the Tenth Circuit has adopted the transactional approach to a cause of action, defining it to include "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." *Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 504 (10th Cir. 2003).

Based upon the analysis set forth below, and the history of *Velasquez I* set forth above, the court concludes that all three of the above-referenced elements are satisfied in this action as

8

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.626   Page 9 of 12

to the State Defendants Therefore, the court concludes that all of Plaintiff's claims in this action against the State Defendants are barred by the doctrine of claim preclusion.

First, there was a final judgment on the merits in an earlier action. The court previously dismissed *Velasquez I* with prejudice, and that dismissal was affirmed on appeal by the Tenth Circuit.

Second, the court concludes that, as to Plaintiff and the State Defendants, there is identity of the parties or their privies in both this action and *Velasquez I*. As in this action, Plaintiff was the sole named plaintiff in *Velasquez I*. Additionally, as indicated above, Plaintiff has included as named defendants in this action all four of the parties that were named defendants in *Velasquez I*, namely the State of Utah, the Utah Department of Human Services, the Utah Division of Aging and Adult Services/Adult Protective Services, and the Utah Office of Administrative Hearings.

As for the remaining State Defendants, the court concludes that they are in privity with the four defendants named in *Velasquez I*. In determining privity, courts have held that "parties nominally different may be, in legal effect, the same." *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 402 (1940). The Tenth Circuit has held that "[t]he general weight of authority appears to be that . . . government employees are in privity with their employer in their official capacities." *Gonzales v. Hernandez,* 175 F.3d 1202, 1206 (10th Cir. 1999). Furthermore, an action against a government official in his or her official capacity is "simply another way of pleading an action against an entity of which an officer is an agent." *McDonald v. Wise,* 769 F.3d 1202, 1215 (10th Cir. 2014) (quotations and citation omitted); *see also Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official

9

269

075

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.627   Page 10 of 12

capacity is not a suit against the official but rather is a suit against the official's office."); *Baker v. Chisom,* 501 F.3d 920, 925 (8th Cir. 2007) ("[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official. The doctrine of res judicata bars a plaintiff from suing a succession of public officials on the same official-capacity claim.") (quotations and citation omitted) (alteration in original).

Under those principles, the following State Defendants are in privity with the four named defendants in *Velasquez I* as follows: (1) the State of Utah is in privity with Utah Governor Gary R. Herbert; Utah Attorney General Sean Reyes; the Utah Legislature; the Utah Office of Legislative Research and General Counsel; Thomas R. Vaughn, Utah Attorney of General Counsel; and Amanda Slater, Utah Office of Licensing Division Director; (2) the State of Utah and/or the Utah Division of Aging and Adult Services/Adult Protective Services are in privity with Nels Holmgren, Utah Division of Aging and Adult Services Division Director; and J. Stephen Mikita, Utah Assistant Attorney General (Adult Protective Services), (3) the State of Utah and/or the Utah Department of Human Services are in privity with Laura Thompson, Assistant Attorney General (Utah Department of Human Services); and (4) the State of Utah and/or the Utah Office of Administrative Hearings are in privity with Sonia Sweeney, Utah Office of Administrative Hearings Division Director.

Third and finally, under the transactional approach adopted by the Tenth Circuit, the court concludes that all of Plaintiff's "claims or legal theories of recovery" in this action against the State Defendants "arise from the same transaction, event, or occurrence." *Wilkes,* 314 F.3d at 504. Plaintiff's complaint in this action make it clear that, as in *Velasquez I,* all of his claims and

10

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.628   Page 11 of 12

legal theories have their genesis in the Administrative Case. As such, the court concludes that

Plaintiff is attempting to relitigate issues related to the Administrative Case "that were or *could*

*have been* raised" in *Velasquez I*. *Satsky*, 7 F.3d at 1467 (quotations and citation omitted)

(emphasis added).

For those reasons, the court concludes that all of the foregoing elements are satisfied and,

consequently, that all of Plaintiff's claims in this action against the State Defendants are barred

by the doctrine of claim preclusion. Accordingly, the court concludes that Plaintiff has failed to

state any claims upon which relief can be granted against the State Defendants. Therefore, all of

Plaintiff's claims in this action against the State Defendants are dismissed with prejudice under

the authority of the IFP Statute. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

**II.     United States Administration for Community Living**

While Plaintiff has named the United States Administration for Community Living as a

defendant in his complaint, his complaint is entirely devoid of any allegations concerning that

defendant. As such, the court concludes that Plaintiff has failed to state any claims upon which

relief can be granted against that defendant. Accordingly, all of Plaintiff's claims against the

United States Administration for Community Living are dismissed with prejudice under the

authority of the IFP Statute. *See id.*

**III.    Futility of Amendment**

As previously noted, after reviewing a pro se plaintiff's complaint under the IFP Statute,

the court may dismiss the complaint for failure to state a claim "only where it is obvious that the

plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an

11

Case 2:20-cv-00205-DB   Document 18   Filed 04/27/20   PageID.629   Page 12 of 12

opportunity to amend." *See Kay*, 500 F.3d at 1217 (quotations and citation omitted). The court has determined that Plaintiff could not provide any additional, plausible allegations that would save any of his claims from dismissal under the analysis set forth above. Accordingly, the court concludes that it would be futile to provide Plaintiff with an opportunity to amend his complaint.

**IV.     Plaintiff's Motions**

As previously noted, Plaintiff has filed multiple motions in this case. The court has carefully reviewed those motions and determined that none of them has any effect on the analysis set forth above concerning the sufficiency of Plaintiff's complaint this action. Accordingly, the court concludes that all of Plaintiff's motions are moot.

<u>**CONCLUSION AND ORDER**</u>

Based upon the foregoing, IT IS HEREBY ORDERED:

1.     All of Plaintiff's motions[27] are MOOT.

2.     This action is DISMISSED WITH PREJUDICE under the authority of the IFP Statute. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

IT IS SO ORDERED.

DATED this 24th day of April, 2020.

BY THE COURT:

DEE BENSON
United States District Judge

---

[27] *See* ECF nos. 2, 9, 11.

12

272

078

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CARLOS VELASQUEZ, | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO PROCEED IN FORMA PAUPERIS ON APPEAL** |
| Plaintiff, | |
| v. | |
| STATE OF UTAH, ET AL., | **Case No. 2:20-CV-205-DAK** |
| Defendants. | **Judge Dale A. Kimball** |

---

This matter is before the court on Plaintiff's motion for leave to proceed *in forma pauperis* on appeal [ECF No. 32] pursuant to Rule 24 of the Federal Rules of Appellate Procedure. Plaintiff proceeded *in forma pauperis* at the district court level.

Rule 24 provides that "a party who was permitted to proceed in forma pauperis in the district-court action . . . may proceed on appeal in forma pauperis without further authorization, unless: (A) the district court–before or after the notice of appeal is filed–certifies that the appeal is not taken in good faith . . . and states in writing its reasons for the certification." Fed. R. App. P. 24(a)(3)(A).

The court certifies that Plaintiff's current appeal is not taken in good faith. Plaintiff failed to plead plausible causes of action against Defendants. Despite filing a lengthy Complaint, Plaintiff's allegations were vague and difficult to decipher. Moreover, his claims were barred by claim preclusion. Therefore, his appeal lacks merit and his motion to appeal *in forma pauperis* [ECF No. 147] is DENIED. Pursuant to Federal Rule of Appellate Procedure 24(a)(4), the Clerk

Case 2:22-cv-00133-HCN Document 4-1 Filed 03/03/22 Page 99 of 126 PageID 277
Appellate Case: 22-4098 Document: 010110757904 Date Filed: 10/25/2022 Page: 280

Case 2:20-cv-00205-DAK Document 40 Filed 02/01/21 PageID 960 Page 2 of 2
Appellate Case: 20-4087 Document: 010110473915 Date Filed: 02/01/2021 Page: 2

of Court shall immediately notify the Tenth Circuit Court of Appeals of this denial. Plaintiff

should either pay the appellate filing fee or file a motion in the Tenth Circuit Court of Appeals to

proceed *in forma pauperis* pursuant to Rule 24(a)(5) of the Federal Rules of Appellate Procedure.

DATED this 1st day of February, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

280

084

FILED
United States Court of Appeals
Tenth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

April 26, 2021

Christopher M. Wolpert
Clerk of Court

CARLOS VELASQUEZ,

Plaintiff - Appellant,

v.

STATE OF UTAH; UTAH
DEPARTMENT OF HUMAN SERVICES;
UTAH DIVISION OF AGING AND
ADULT SERVICES/APS; UTAH OFFICE
OF ADMINISTRATIVE HEARINGS;
GARY R. HERBERT, Utah Governor;
SEAN REYES, Utah Attorney General;
UTAH LEGISLATURE; UTAH OFFICE
OF LEGISLATIVE RESEARCH AND
GENERAL COUNSEL; THOMAS R.
VAUGHN, Utah Attorney of General
Counsel; NELS HOLMGREN, Utah
Division of Aging and Adult Services
Division Director; J. STEPHEN MIKITA,
Utah Assistant Attorney General (Adult
Protective Services); SONIA SWEENEY,
Utah Office of Administrative Hearings
Division Director; LAURA THOMPSON,
Utah Assistant Attorney General (Utah
Department of Human Services);
AMANDA SLATER, Utah Office of
Licensing Division Director; UNITED
STATES ADMINISTRATION OF
COMMUNITY LIVING,

Defendants - Appellees.

No. 20-4087
(D.C. No. 2:20-CV-00205-DB)
(D. Utah)

**ORDER AND JUDGMENT***

---

* After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of

Before **MORITZ, BALDOCK**, and **EID**, Circuit Judges.

Carlos Velasquez, proceeding pro se, appeals the district court's judgment

dismissing his action for failure to state a claim on which relief may be granted.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's

judgment. As to the dismissal of his claims against certain defendants, we affirm on

the alternative ground that Velasquez's claims are barred by issue preclusion.

### I.    Background

This is the second of two actions that Velasquez has filed in the district court

related to certain administrative law proceedings in Utah. *See Velasquez v. Utah,*

775 F. App'x 420, 421 (10th Cir.) (noting the genesis of his first action), *cert. denied,*

140 S. Ct. 615 (2019). After these administrative law proceedings concluded, he

filed suit in Utah state court asserting his original claims and challenging the fairness

of the administrative law proceedings and the constitutionality of several Utah

statutes and regulations. *See id.* Velasquez's state-court litigation proceeded through

the trial court, the Utah Court of Appeals, and the Utah Supreme Court. *See id.*

> Unable to find success after exhausting his appeals in Utah state court, he
> sued the State of Utah and several state agencies in federal district court. In
> federal court he once again raised his constitutional claims from state court

---

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

2

> while adding constitutional claims that the Utah Supreme Court sustained malice, refused to clarify the constitutional question, and refused to recognize evidence.

*Id.* (citation and internal quotation marks omitted).

The district court dismissed Velasquez's first action (*Velasquez I*) for lack of jurisdiction under the *Rooker-Feldman* doctrine,[1] concluding that Velasquez was asking the court to review decisions rendered in the Utah administrative law proceedings and by the Utah state courts. *See id.* We affirmed the district court's dismissal of *Velasquez I* for lack of jurisdiction, concluding that:

> he appears to challenge decisions by the Utah state courts reviewing his state administrative law appeal. He claims that the Utah state courts violated his constitutional rights in the course of that litigation and seems to seek reversal of decisions he lost on the merits. This is precisely the type of suit that Rooker-Feldman prevents federal district courts from hearing. Having already raised his various objections in state court and failed, [he] has now repaired to federal court to undo the state-court judgment against him.

*Id.* at 422 (brackets and internal quotation marks omitted). The United States Supreme Court denied Velasquez's petition for a writ of certiorari.

Several months later, Velasquez filed this action in the district court against the State of Utah and several state agencies and officials (collectively the State Defendants), and the United States Administration for Community Living (*Velasquez II*). Upon screening the new complaint pursuant to 28 U.S.C. § 1915(e)(2), the district court held it was subject to dismissal under subsection

---

[1] *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

3

287

091

(e)(2)(B)(ii) because it failed to state a claim on which relief may be granted. The court construed the complaint in *Velasquez II* as originating from the same administrative law proceedings as the prior complaint in *Velaquez I* and as seeking to void those proceedings. It stated that "it appears that Plaintiff's complaint alleges that his civil rights were violated in the proceedings in the Administrative Case and that certain Utah statutes and legislation are unconstitutional." R. at 596. The court therefore held that Velasquez's claims against the State Defendants in *Velasquez II* were barred by claim preclusion because (1) there was a final judgment on the merits in *Velasquez I*; (2) the parties in *Velasquez II* were the same as in *Velasquez I* or were in privity with the parties in *Velasquez I*; and (3) the claims or legal theories in *Velasquez II* arose from the same transaction, event, or occurrence as the claims or legal theories in *Velasquez I* and Velasquez was attempting to relitigate issues that were or could have been raised in *Velasquez I*.[2]

Velasquez filed two post-judgment motions. In one motion he cited Federal Rule of Civil Procedure 60(d)(3) and alleged fraud on the court. His second motion sought reassignment of the case to a different district court judge. The district court denied both motions.

---

[2] The district court also dismissed Velasquez's claims against the United States Administration for Community Living for failure to state a claim on which relief may be granted because "his complaint [was] entirely devoid of any allegations concerning that defendant." R. at 601. Velasquez does not challenge that ruling on appeal. Nor does he argue the court erred in holding that amendment of his complaint would be futile.

4

## II.  Discussion

We review de novo a dismissal under § 1915(e)(2)(B)(ii). *See Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007). To the extent that Velasquez raises any claim of error in the district court's denial of his post-judgment motions, we review those rulings for an abuse of discretion. *See United States v. Buck*, 281 F.3d 1336, 1342-43 (10th Cir. 2002) (reviewing denial of relief on ground of fraud on the court for abuse of discretion); *United States v. Mobley*, 971 F.3d 1187, 1195 (10th Cir. 2020) (reviewing denial of motion to recuse for abuse of discretion). Because Velasquez is proceeding pro se, we liberally construe his complaint and his appeal brief. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (complaint); *Cummings v. Evans*, 161 F.3d 610, 613 (10th Cir. 1998) (brief). But we do not act as his advocate. *See Hall*, 935 F.2d at 1110.

"Res judicata, or claim preclusion, precludes a party or its privies from relitigating issues that were or could have been raised in an earlier action, provided that the earlier action proceeded to a final judgment on the merits." *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997). "Claim preclusion requires: (1) a judgment on the merits in the earlier action; (2) identity of the parties or their privies in both suits; and (3) identity of the cause of action in both suits." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999).

Velasquez raises no meritorious claim of error on appeal. It is unclear whether he challenges the district court's holdings on any of the claim preclusion elements,

5

289

093

and if so, what his contentions are.[3] He appears to argue primarily that *Velasquez I* should not have been dismissed on *Rooker-Feldman* grounds. But that issue was conclusively decided by the district court in *Velasquez I* and affirmed on appeal by this court. Moreover, Velasquez's assertions of fraud on the court and judicial bias are patently without merit.

We nonetheless conclude that the district court erred in dismissing *Velasquez II* based upon claim preclusion. Although Velasquez has forfeited review of this error by failing to raise it in his appeal brief, *see Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007), we exercise our discretion to address it, *see United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012).

In holding that the first element of claim preclusion was satisfied, the district court concluded that *Velasquez I* had resulted in "a final judgment on the merits" because that case was dismissed "with prejudice." R. at 599.[4] But the judgment in

---

[3] For example, regarding a judgment on the merits in *Velasquez I*, Velasquez states that the district court "does not develop the first requirement" and he asserts that "[s]aid first requirement is conspicuous against a civil IFP *deficiency* termination." Aplt. Br. at 21. Regarding the "finality of *Velasquez I*," *id.* at 22, he discusses the three strikes provision in 28 U.S.C. § 1915(g), which applies only to dismissals of actions or appeals by prisoners. Although Velasquez mentions privity, he does not develop an argument of error regarding the district court's holding on identity of parties in both actions. And he asserts "there is no original cause to find complete precedence for *transactional* claim preclusion," *id.* at 19, but fails to develop an argument that the district court erred in holding that the claims in both actions arose from the same transaction, event, or occurrence.

[4] The district court purported to dismiss *Velasquez I* with prejudice after holding that amendment of the complaint would be futile. *See* Mem. Decision & Order of Dismissal at 5-6, *Velasquez v. Utah*, No. 2:18-cv-00728-DN (D. Utah Feb. 25, 2019), ECF No. 27. But "[a] denial of leave to amend to repair a jurisdictional

6

*Velasquez I* was not on the merits of Velasquez's claims. Rather, the district court dismissed that action for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. *See Velasquez*, 775 F. App'x at 421-22. And a dismissal for lack of jurisdiction does not have a broad res judicata effect. *See Matosantos Com. Corp. v. Applebee's Int'l, Inc.*, 245 F.3d 1203, 1209 (10th Cir. 2001) ("[A] dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion . . . ." (internal quotation marks omitted)). Thus, the district court erred in applying claim preclusion to dismiss *Velasquez II*.

But a dismissal for lack of jurisdiction still precludes a plaintiff from relitigating that ground for dismissal. *See id.* at 1209-10 (stating "a dismissal for lack of jurisdiction . . . preclude[s] relitigation of the issues determined in ruling on the jurisdiction question," *id.* at 1209 (internal quotation marks omitted)); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (holding the preclusive effect of a dismissal for lack of standing "is one of *issue preclusion* (collateral estoppel) rather than *claim preclusion* (res judicata)"); 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4436 (3d ed., Oct. 2020 update) ("Although a dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion, it does preclude relitigation of the issues determined in ruling on the jurisdiction question unless preclusion is denied for some other

---

defect, even on futility grounds, does not call for a dismissal with prejudice. The two concepts do not overlap in those cases where, although amendment would be futile, a jurisdictional defect calls for a dismissal without prejudice." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

7

reason."). Because issue preclusion bars Velasquez's claims against the State

Defendants in *Velasquez II*, we exercise our discretion to affirm the district court's

dismissal of those claims on an alternative basis.[5]

> The elements of issue preclusion are:
>
> (1) the issue previously decided is identical with the one presented in the
> action in question, (2) the prior action has been finally adjudicated on the
> merits, (3) the party against whom the doctrine is invoked was a party, or in
> privity with a party, to the prior adjudication, and (4) the party against
> whom the doctrine is raised had a full and fair opportunity to litigate the
> issue in the prior action.

*Matosantos Com. Corp.*, 245 F.3d at 1207 (internal quotation marks omitted). All

four elements for the application of issue preclusion are satisfied in this case.

The first element is met because *Velasquez II* raised the same *Rooker-Feldman*

issue as *Velasquez I*. The district court held that both actions originated from the

same administrative law case and subsequent state-court litigation in Utah. Both

complaints also alleged that Velasquez's civil rights had been violated in those prior

proceedings and that certain state statutes were unconstitutional. Further, the court

---

[5] "[W]e treat arguments for *affirming* the district court differently than
arguments for *reversing* it. We have long said that we may affirm on any basis
supported by the record, even if it requires ruling on arguments not reached by the
district court or even presented to us on appeal." *Richison v. Ernest Grp., Inc.*,
634 F.3d 1123, 1130 (10th Cir. 2011). Thus, we must affirm the district court's
judgment "if the result is correct although the lower court relied upon a wrong
ground or gave a wrong reason." *Id.* (internal quotation marks omitted). Moreover,
Velasquez had the opportunity to address claim preclusion in the district court, and
the doctrines of claim preclusion and issue preclusion are "closely related," *SIL-FLO,
Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir. 1990). Finally, issue preclusion
presents a legal question. *See Bell v. Dillard Dep't Stores, Inc.*, 85 F.3d 1451, 1453
(10th Cir. 1996). Thus, the efficient use of judicial resources weighs against a
remand for initial consideration by the district court.

8

292

096

construed the complaint in *Velasquez II* as seeking to void the Utah administrative proceedings. *See* R. at 596. Moreover, consistent with the district court's construction, Velasquez states in his appeal brief that, "if compared, the Opening Complaints from *Velasquez I* to this *Velasquez II* are largely the same question." Aplt. Br. at 17 (internal quotation marks omitted) (italics added).

A dismissal for lack of jurisdiction satisfies the second element—a judgment "on the merits"—if the jurisdictional issue was actually adjudicated in the previous action. *See Matosantos Com. Corp.*, 245 F.3d at 1209-10. As we have noted, the *Rooker-Feldman* issue was actually and finally adjudicated in *Velasquez I*.

The third element is met because Velasquez was the plaintiff in both actions.

And finally, Velasquez had a full and fair opportunity to litigate the *Rooker-Feldman* issue in *Velasquez I*. In particular, he challenged the district court's application of that doctrine in a post-judgment motion and he appealed the judgment to this court. *See Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001) (rejecting a due process challenge to dismissals on screening under § 1915(e)(2) based upon the "adequate procedural safeguards to avoid erroneous dismissals," including "a reasonable post-judgment opportunity to present . . . arguments to the district court and the appellate court"). Nor does Velasquez's disagreement with the *Rooker-Feldman* ruling in *Velasquez I* mean that he was denied a full and fair opportunity to litigate the issue in that case. *See SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990).

9

### III.    Conclusion

The district court's judgment is affirmed.  The court's dismissal of Velasquez's claims against the State Defendants is affirmed on the alternative basis of issue preclusion.  Velasquez's application to proceed on appeal without prepayment of fees and costs is granted.

Entered for the Court

Nancy L. Moritz
Circuit Judge

10

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**June 20, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

CARLOS VELASQUEZ,

Plaintiff - Appellant,

v.

ROBERT BALDOCK; DEE BENSON;
ALLISON EID; PAUL KELLY; DALE
KIMBALL; CAROLYN MCHUGH;
NANCY MORITZ; DAVID NUFFER;
PAUL WARNER,

Defendants - Appellees.

No. 22-4098
(D.C. No. 2:22-CV-00133-HCN)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **TYMKOVICH**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

---

Carlos Velasquez, pro se,[1] filed this appeal from an underlying civil action he

brought against nine district and appellate judges. We dismiss the appeal in part for

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Because Mr. Velasquez is pro se, we construe his arguments liberally, but we
"cannot take on the responsibility of serving as [his] attorney in constructing
arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*,
425 F.3d 836, 840 (10th Cir. 2005).

lack of jurisdiction and, exercising jurisdiction under 28 U.S.C. § 1291, affirm in remaining part.

## BACKGROUND

In two prior actions, Mr. Velasquez brought claims against the State of Utah and various state agencies. The district courts dismissed those actions, this court affirmed the dismissals, and the United States Supreme Court denied Mr. Velasquez's petitions for certiorari and petition for rehearing. *See Velasquez v. Utah* ("*Velasquez I*"), 775 F. App'x 420, 421 (10th Cir.), *cert. denied*, 140 S. Ct. 615 (2019), *reh'g denied*, 140 S. Ct. 1254 (2020); *Velasquez v. Utah* ("*Velasquez II*"), 857 F. App'x 971, 972 (10th Cir.), *cert. denied*, 142 S. Ct. 469 (2021).

In the action underlying this appeal, Mr. Velasquez sued the district and appellate judges in *Velasquez I* and *Velasquez II*. He asserted the adverse decisions the district judges entered in two prior district court cases contained "false conclusion[s]" and constituted "perjury and . . . fraud on the court." R. at 127 (italics omitted). He further asserted the judges from this court who presided over the subsequent appeals had "proven to be opaque and hostile to the questions [he] consistently presented" and that there had been an "absolute avoision [sic] of [his] pleadings," *id.* at 128 (italics omitted). He sought as relief an order setting aside the judgments in both prior cases and reinstating the second case.

On June 2, 2022, the district court dismissed the complaint with prejudice as frivolous and entered judgment the same day. On July 29, 2022, Mr. Velasquez filed a "Motion for Extraordinary Relief and New Trial," in which he requested

2

104

reconsideration of the dismissal and recusal of the district court judge. The district court denied that motion on August 25, 2022, and Mr. Velasquez filed a notice of appeal on October 18, 2022.

## DISCUSSION

We "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," so we "may sua sponte raise the question of whether there is subject matter jurisdiction at any stage in the litigation." *Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (italics and internal quotation marks omitted). "[T]he timely filing of a notice of appeal in a civil case is a jurisdictional requirement." *Bowles v. Russell*, 551 U.S. 205, 214 (2007). Mr. Velasquez filed his "Motion for Extraordinary Relief and New Trial" more than 28 days after the district court entered judgment, so it did not extend the time to file his notice of appeal. *See* Fed. R. App. P. 4(a)(4)(A)(iv)–(vi); Fed. R. Civ. P. 59(b). And because Mr. Velasquez did not file his notice of appeal until 138 days after the underlying dismissal order, we lack jurisdiction to review it. *See* Fed. R. App. P. 4(a)(1)(B)(iii) (allowing 60 days to file notice of appeal where one of the parties is a United States employee). But we have jurisdiction to consider the denial of the motion for a new trial because he filed his notice of appeal within 60 days of the order denying that motion, *see id.*, and orders denying such motions are appealable even where, as here, there is no timely appeal from the underlying ruling, *see Servants of the Paraclete v. Does*, 204 F.3d 1005, 1008 (10th Cir. 2000).

3

We review the denial of the motion for a new trial for abuse of discretion. *See Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005). Mr. Velasquez does not demonstrate the district court abused its discretion when it denied his "Motion for Extraordinary Relief and New Trial." At most, his submissions before this court establish disagreement with the district court's underlying dismissal order, but as set forth above, we do not have jurisdiction to review that order. To the extent Mr. Velasquez articulated that disagreement in his motion for reconsideration and thereby seeks appellate review, "a motion for reconsideration . . . is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Servants of the Paraclete*, 204 F.3d at 1012.

## CONCLUSION

We affirm the denial of Mr. Velasquez's "Motion for Extraordinary Relief and New Trial." We dismiss the remainder of the appeal for lack of jurisdiction. We also deny Mr. Velasquez's

- "Motion for Review En Banc" and
- "Motion for Efficient Review."

Entered for the Court
Per Curiam

4

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-1954

_____

In re: PHILADELPHIA ENTERTAINMENT &
DEVELOPMENT PARTNERS, LP
d/b/a FOXWOODS CASINO PHILADELPHIA,

Debtor

PHILADELPHIA ENTERTAINMENT &
DEVELOPMENT PARTNERS, LP
d/b/a FOXWOODS CASINO PHILADELPHIA

v.

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF REVENUE;
COMMONWEALTH OF PENNSYLVANIA

PERSIL MANGEUR LLC, in its capacity as the trustee of the
Liquidation Trust for the estate of debtor
Philadelphia Entertainment & Development Partners, LP
d/b/a Foxwoods Casino Philadelphia,

Appellant

_____

111

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-16-cv-01992)
Honorable Joseph F. Leeson, Junior, District Judge

———————

Submitted under Third Circuit L.A.R. 34.1(a)
December 12, 2017

BEFORE:  CHAGARES, RESTREPO, and GREENBERG,
<u>Circuit</u> <u>Judges</u>

(Filed: January 11, 2018)

———————

Jared D. Bayer
Stephen A. Cozen
F. Warren Jacoby
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

Jennifer M. McHugh
Cozen O'Connor
200 Four Falls Corporate Center
P.O. Box 800, Suite 400
West Conshohocken, PA 19428

<u>Attorneys for Appellant</u>

2

Richard A. Barkasy
Albert S. Dandridge, III
Bruce P. Merenstein
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

<u>Attorneys for Appellees</u>

---

OPINION

---

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I. INTRODUCTION

Persil Mangeur LLC, ("Persil"), the Trustee of the Liquidation Trust established in debtor Philadelphia Entertainment and Development Partners, LP's ("PEDP"), Chapter 11 plan, appeals from a District Court order affirming a Bankruptcy Court order dismissing PEDP's adversary complaint against the Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Revenue (together "Commonwealth"). We trace this case to 2006 when the Pennsylvania Gaming Control Board (the "Board") awarded a slot machine license to PEDP, which paid a $50 million fee to the Commonwealth for the license. The Board, however, eventually revoked the license when PEDP failed to meet certain of its requirements for its maintenance. PEDP unsuccessfully

3

113

appealed from the revocation order to the Pennsylvania Commonwealth Court, following which the Supreme Court of Pennsylvania denied PEDP's application to review that decision.

After the Pennsylvania courts upheld the revocation, thereby exhausting PEDP's remedies through state procedures to challenge the revocation, it filed a petition in bankruptcy. During the bankruptcy proceedings, it brought an adversary action against the Commonwealth alleging that the license revocation should be avoided because it was a fraudulent transfer under §§ 544 and 548 of the Bankruptcy Code and under Pennsylvania law. Citing the Rooker-Feldman doctrine, the Bankruptcy Court concluded that it lacked subject matter jurisdiction over the fraudulent transfer claims in light of the proceedings in the state courts which had upheld the revocation order. By that time Persil had been appointed Trustee, and it appealed to the District Court which affirmed the Bankruptcy Court order. Persil then appealed to this Court. We will reverse because the Bankruptcy Court erred when it held that the Rooker-Feldman doctrine barred its review of the fraudulent transfer claims. We are satisfied that in a review of those claims the Bankruptcy Court did not need to review or reject the Commonwealth Court's judgment. We, however, do not reach a conclusion on the question of whether any of PEDP's fraudulent transfer claims are meritorious, so our opinion should not be overread as we only address the Rooker-Feldman issue.

## II. BACKGROUND

The Pennsylvania Horse Racing Development and Gaming Act (the "Gaming Act"), provides for slot machine

4

114

gaming in Pennsylvania. 4 Pa. Cons. Stat. § 1102 (2010). The Gaming Act authorizes the Board to issue two slot machine licenses for standalone gaming facilities in Philadelphia. Id. § 1304(b). As a condition for being granted a license, an applicant must pay a one-time license fee of $50 million to the Commonwealth. Id. § 1209(a).

In December 2006, the Board awarded a slot machine license to PEDP. App'x 107 ¶ 14. PEDP paid the $50 million fee in October 2007, and the Board issued the license the next year. App'x 108 ¶¶ 19-22. The Board required PEDP to open its facility and commence operations by May 2009, but PEDP did not meet this deadline and has never opened the facility. App'x 109 ¶¶ 23-24. Nevertheless, the Board extended the deadline for opening the facility to May 2011, provided that PEDP satisfy nine conditions that the Board required it to meet at preset dates during the extension period, App'x 109-10 ¶¶ 25-29. These conditions included requirements that PEDP submit financial and architectural documents and development plans to the Board. App'x 110 ¶ 29. PEDP did not satisfy these conditions and unsuccessfully sought another extension to satisfy the requirements for the license. App'x 110-12 ¶¶ 30-41. In December 2010, the Board entered an order revoking PEDP's slot machine license by reason of PEDP's failure to follow Board orders and demonstrate its financial suitability. App'x 113 ¶ 42, 116 ¶ 60.

PEDP appealed from the revocation order to the Commonwealth Court of Pennsylvania. PEDP argued in the Commonwealth Court that the Board applied the wrong test for determining its financial suitability, the financial suitability requirements were unconstitutionally vague, and the Board denied PEDP due process of law for several reasons, one of

5

115

which was a contention that forfeiture of the license for which PEDP had paid a $50 million fee was an excessive sanction to impose by reason of its failures to satisfy the Board's requirements. App'x 851-52, 914-15. The Commonwealth Court rejected PEDP's appeal and affirmed the Board's revocation decision as it concluded that the Board had authority under the Gaming Act to revoke the license, the Board used the appropriate test under the Gaming Act in reaching its decision, the requirements to show financial suitability were clear, and the Board afforded PEDP due process because, among other things, the revocation was not an unreasonably harsh sanction for PEDP's failure to satisfy the conditions for the license. Phila. Entm't & Dev. Partners, LP v. Pa. Gaming Control Bd., 34 A.3d 261, 268-80 (Pa. Commw. Ct. 2011). The Supreme Court of Pennsylvania denied PEDP's petition for allowance of appeal from the Commonwealth Court's decision on March 29, 2012. Phila. Entm't & Dev. Partners, LP v. Pa. Gaming Control Bd., 41 A.3d 852 (Pa. 2012).

Two years later, on March 31, 2014, PEDP filed a petition in bankruptcy under Chapter 11 of the Bankruptcy Code, App'x 17, and then, two months after it filed the petition, it filed its adversary complaint against the Commonwealth. App'x 103. This appeal now before us centers on counts Two to Four of the adversary complaint. In Counts Two and Three, PEDP asserted claims to avoid what it claimed was a constructively fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(B) and 544(b) and under Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. Cons. Stat. §§ 5101 et seq.[1] Specifically, PEDP claimed that the "revocation of the

_____

[1] Sections 548(a)(1)(B) and 544(b) deal with avoidance of fraudulent transfers. Section 548(a)(1)(B) provides that

6

License was a transfer for which [PEDP] received no value from the Commonwealth. . . ." App'x 123 ¶ 97. Thus, in Count Four, PEDP sought recovery of what it claimed was a fraudulent transfer under 11 U.S.C. §§ 550 and 551. PEDP sought to avoid the transfer and recover payment from the Commonwealth of the full value of the transfer, which PEDP estimated to be $50 million, the amount of the license fee it had paid. App'x 123 ¶¶

[t]he Trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

11 U.S.C. § 548(a)(1)(B).

Section 544(b) permits a trustee to pursue avoidance claims under state law—here, the PUFTA. 11 U.S.C. § 544(b). The main constructive fraud provisions of the PUFTA, §§ 5104 and 5105, are similar to constructive fraud under § 548(a)(1)(B), except that the PUFTA increases the statutory "look back" period from two years to four years. 12 Pa. Cons. Stat. § 5109.

7

**117**

96-104, 125 ¶ 114.

PEDP also asserted separate claims for turnover of the amount of the license fee that the Commonwealth did not return (Count One), for an unconstitutional taking (Count Five), and on theories that the Commonwealth had been unjustly enriched and PEDP was entitled to a recovery on the basis of promissory estoppel (Counts Six and Seven). We, however, are not concerned with counts One, Five, Six, and Seven on this appeal as their dismissal is not presently challenged.

In July 2014, the Bankruptcy Court confirmed PEDP's liquidation plan, which called for the creation of a liquidation trust supervised by Persil. App'x 17-18. Persil as Trustee succeeded to all claims belonging to PEDP. App'x 3; First Modified Chapter 11 Liquidation Plan 21-22, In re Phila. Entm't & Dev. Partners, LP, No. 14-12482, ECF No. 88 (Bankr. E.D. Pa. May 27, 2014).

On April 8, 2016, the Bankruptcy Court dismissed the adversary complaint. In re Phila. Entm't & Dev. Partners, LP, 549 B.R. 103, 110-11 (Bankr. E.D. Pa. 2016). The Bankruptcy Court found that the Rooker-Feldman doctrine divested it of subject matter jurisdiction to consider a claim for the avoidance of the license revocation. Id. at 111, 139. It stated,

> the Rooker-Feldman Doctrine precludes the Trustee from attempting to challenge the prepetition revocation of the License. The Debtor lost in state court. To the extent the Trustee alleges that some interest in the License inured to the benefit of the estate, the Trustee would be complaining of injuries caused by the Revocation Order that was subsequently confirmed by the Commonwealth

8

118

Opinion. The Revocation Order and the Commonwealth Opinion were entered prepetition. Finally, if this Court was to determine that the Debtor held an interest in the License or some right to be compensated for its value, this Court would necessarily be required to review the merits of the earlier state court decisions. Accordingly . . . this Court is thereby prevented from addressing or otherwise modifying the prepetition revocation of the Debtor's interest in the License.

Id. at 139 (emphasis removed).

The Bankruptcy Court then addressed the Trustee's claim for compensation for the value of the license. The Bankruptcy Court stated that a claim to undo the revocation and to obtain compensation for the revocation are "opposite sides of the same coin"; that is, the right to be compensated for the value of the license is the "functional equivalent" of the right to retain the license, a conclusion that led the Court to hold that the Rooker-Feldman doctrine barred any claim for the value of the license. Id. at 140-41.

The Bankruptcy Court also addressed the fraudulent transfer claim by treating the relevant transfer as the Commonwealth's failure to refund the license fee after the revocation rather than the revocation of the license. Id. at 141-42. The Bankruptcy Court declined to decide whether the Rooker-Feldman doctrine barred this alternative reading of the claim because the Commonwealth Court had not explicitly addressed the question of whether PEDP was entitled to a refund of the license fee upon the license revocation. Id. at 142. But what the Bankruptcy Court did hold was that the refund theory failed to state a claim under §§ 544 or 548 of the Bankruptcy

9

119

Code. It concluded that PEDP's payment of the license fee to the Board in October 2007 was not an actionable transfer because PEDP made the payment outside the statutory lookback periods under § 548 and the PUFTA, and the Commonwealth's alleged failure to pay a refund after the revocation was not an actionable omission because nonpayment of property cannot be a transfer of property. Id. at 152-54. The Bankruptcy Court also dismissed the §§ 550 and 551 claims for recovery of the transfer because it believed that the adversary complaint failed to plead any valid avoidance claim under §§ 548 or 544. Id. at 155.[2]

---

[2] The Commonwealth raised an Eleventh Amendment defense in its pleadings which the Bankruptcy Court upheld with respect to state law claims that PEDP advanced in its adversary complaint but with which we are not concerned on this appeal. On the other hand the Court did not consider that defense with respect to the fraudulent transfer claims that we do address. The Commonwealth does not advance an Eleventh Amendment issue on this appeal even though the Eleventh Amendment concerns subject matter jurisdiction as the Commonwealth believes that, inasmuch as the Bankruptcy Court did not consider the defense, the issue had not been preserved for presentation to this Court. While parties cannot by consent vest a court with subject matter jurisdiction and the Eleventh Amendment is jurisdictional, see Blanciak v. Allegheny Ludlam Corp., 77 F.3d 690, 693 n.2 (3d Cir. 1996), we will not address an Eleventh Amendment issue on this appeal as the Commonwealth does not raise it and a party may waive an Eleventh Amendment defense. See In re Hechinger Inv. Corp. v. Hechinger Liquidation Tr., 335 F.3d 243, 249 (3d Cir. 1996). We, however, express no opinion on whether the Commonwealth should be deemed to have waived a possible Eleventh Amendment defense on the remand that will

10

120

PEDP appealed, but the District Court affirmed. It held that the Bankruptcy Court correctly characterized the fraudulent transfer claims "as a challenge to the legitimacy of the revocation of the Debtor's license," and not, as the Trustee claimed, a "challenge only [to] the Commonwealth's failure to return the value of the license after its revocation." In re Phila. Entm't & Dev. Partners, LP, 569 B.R. 394, 399 (E.D. Pa. 2017). Based on that reasoning, the District Court adopted the Bankruptcy Court's Rooker-Feldman doctrine conclusions. Id. at 399-400.

The District Court also held that the Bankruptcy Court correctly dismissed on the merits any part of the fraudulent transfer claim that application of the Rooker-Feldman doctrine did not bar. Id. at 400-01. It held that the Bankruptcy Court correctly determined that PEDP's only two transfers were the license fee payment in 2007 (the claim to repayment that was time-barred) and the loss of the license which it found occurred in 2012 (which claim the Rooker-Feldman doctrine barred from review). Id. at 401. The District Court agreed with the Bankruptcy Court that there had not been a "transfer" based on the Commonwealth's failure to pay PEDP $50 million after the revocation because nonpayment did not constitute a disposing of or parting with property. Id. The District Court entered its judgment on March 28, 2017. The Trustee timely appealed.

## III. STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

follow the proceedings in this Court.

11

121

The Bankruptcy Court had jurisdiction to hear the adversary proceeding under 28 U.S.C. §§ 157(b) and 1334(b). The District Court had jurisdiction to hear the appeal from the Bankruptcy Court's order under 28 U.S.C. § 158(a). We have jurisdiction of the appeal from the District Court's order under 28 U.S.C. §§ 158(d) and 1291. We review the Bankruptcy Court's legal determinations de novo. In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998).

## IV. DISCUSSION

On appeal, the Trustee challenges the Bankruptcy and District Courts' conclusions that the Rooker-Feldman doctrine barred their review of PEDP's fraudulent transfer claims. The Rooker-Feldman doctrine deprives federal district and bankruptcy courts of jurisdiction "over suits that are essentially appeals from state-court judgments. . . ." Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 165 (3d Cir. 2010); see In re Madera, 586 F.3d 228, 232 (3d Cir. 2009). There is some tension between the application of the Rooker-Feldman doctrine and the prosecution of avoidance claims under the Bankruptcy Code as an avoidance of a claim seems to authorize what the Rooker-Feldman doctrine prohibits— appellate review of state court judgments by federal courts other than the Supreme Court. See In re Knapper, 407 F.3d 573, 583 n.22 (3d Cir. 2005) ("In apparent contradiction to Rooker-Feldman theory, bankruptcy courts are empowered to avoid state judgments. . . .") (quoting In re Gruntz, 202 F.3d 1074, 1079 (9th Cir. 2000) (en banc)). But we have noted that the Rooker-Feldman doctrine does not necessarily bar actions that properly are based on the Bankruptcy Code's fraudulent transfer statutes.

12

See id. (rejecting "suggest[ion] that Rooker-Feldman bars an action that is properly based on § 544(b)(1)"). We must decide, then, whether the federal courts had jurisdiction to review the Trustee's fraudulent transfer claims or whether the Rooker-Feldman doctrine barred them from doing so.

Our initial task is to identify the transfer on which the Trustee predicates its §§ 548 and 544 fraudulent transfer claims. The Bankruptcy Court identified three possible transfers: the payment of the license fee, the loss of the license, and the Commonwealth's failure to refund the license fee. But the Trustee contends that the only operative transfer for which it seeks relief is from the loss of the license. Trustee's Opening Br. 26 (identifying PEDP's "transfer of the slot machine license upon revocation" as "the transfer on which the Fraudulent Transfer Claims are based").

The Trustee's position is consistent with the allegations in the adversary complaint that identify the license revocation as the operative transfer. App'x 123 ¶ 97.[3] In particular, the

---

[3] Much of the Bankruptcy and District Courts' conclusions regarding the two other "transfers" accordingly have no bearing on this appeal. We appreciate why the Bankruptcy Court had difficulty pinning down with precision the fraudulent transfer theory of which the Trustee complains. While the adversary complaint is relatively clear in asserting that the relevant transfer was the revocation, the Trustee's briefs and oral arguments before the Bankruptcy and District Courts often conflated the claim with other claims in the adversary complaint that sought a refund of the license fee. See, e.g., App'x 1165 (stating at oral argument that "any fair reading of Count One, Two, Three, and Four is that what we are asking for is a return of the license fee

13

123

Trustee does not contend that the revocation was illegal under the Gaming Act or violated due process of law. Rather, it contends that the Bankruptcy Code's avoidance rules imposed an independent obligation on the Commonwealth to pay some value when it revoked the license. Trustee's Opening Br. 18 ("[T]he federal courts may accept as a matter of fact and law that the License was revoked and is lost to the Debtor; the question here, however, is whether, under fraudulent transfer law, the Commonwealth must, but failed to, pay reasonably equivalent value for the Debtor's property interests which were transferred by way of such revocation. . . ."). But neither the Bankruptcy Court nor the District Court reviewed the merits of that argument as they concluded that the Rooker-Feldman doctrine barred such review. The Trustee argues that both Courts erred and that the Trustee is entitled to a merits determination of its claim that the license revocation was a fraudulent transfer. Accordingly, we turn to an analysis of that contention.

In Exxon Mobil Corp. v. Saudi Basic Industries Corp. the Supreme Court indicated that the federal courts had been

---

that the transfer was the involuntary revocation of the license, but . . . what we're asking to be avoided is the failure of the -- of the Commonwealth to repay the license fee"). And to further complicate the matter, the relief for the fraudulent transfer claims is the value of the license, not a refund of the fee. In theory, the license's value could be measured by an amount differing from the fee. But the Trustee used the $50 million license fee as a proxy for the value of the license. Despite this confusion, we are guided by the allegations in the adversary complaint and will limit our discussion to the transfer as defined in the pleadings.

14

124

applying the Rooker-Feldman doctrine too broadly and consequently it clarified that the doctrine is confined to "limited circumstances" where "state-court losers complain[] of injuries caused by state-court judgments rendered before the district court proceedings commenced and invit[e] district court review and rejection of those judgments." 544 U.S. 280, 284, 291, 125 S.Ct. 1517, 1521-22, 1526 (2005). In Great Western, which we decided after the Supreme Court decided Exxon Mobil, we said the doctrine applies when four requirements are met: (1) the federal plaintiff lost in state court, (2) the plaintiff complains of injuries caused by the state-court judgment, (3) that judgment issued before the federal suit was filed, and (4) the plaintiff invites the district court to review and reject the state-court judgment. Great Western, 615 F.3d at 166. Our analysis focuses on the fourth requirement.[4]

---

[4] The Trustee does not contend that the third requirement for the Rooker-Feldman doctrine to apply was not met, i.e., that the state-court judgment issued before the federal suit was filed, but the Trustee does make glancing arguments with respect to the first requirement. It argues that PEDP, not the Trustee, was the plaintiff who lost in state court because the Trustee joined this case after the bankruptcy began and it acts on behalf of the estate's creditors. Trustee's Opening Br. 20 ("In contesting the revocation of the License, the Debtor was complaining of the injuries it would sustain as a result of the loss of the License. The Trustee, in contrast, is complaining of the injuries sustained by the Debtor's creditors . . . .") (emphasis in original); Reply Br. 8 ("The Trustee does not stand in the pre-petition Debtor's shoes in pursuing the Fraudulent Transfer Claims."). The District Court rejected this argument, App'x 8. But we need not reach this question because we find that the Trustee's claim does

15

125

By asking the Bankruptcy Court to find that the license revocation was an avoidable fraudulent transfer, the Trustee did not invite that Court to "review and reject" the revocation order. See Great Western, 615 F.3d at 166. The "review and reject" requirement concerns whether the federal court must conduct "prohibited appellate review" of state-court decisions. Id. at 169. "Prohibited appellate review" means "a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law." Id. (internal citation and quotation marks omitted).

Such a prohibited review differs from mere "attempts to litigate in federal court a matter previously litigated in state court. . . ." Id. (quoting Exxon Mobil, 544 U.S. at 293, 125 S.Ct. at 1527). When the plaintiff attempts to litigate previously litigated matters, the federal court has jurisdiction "as long as the 'federal plaintiff present[s] some independent claim,' even if that claim denies a legal conclusion reached by the state court." Id. (quoting Exxon Mobil, 544 U.S. at 293, 125 S.Ct. at 1527) (internal quotation marks omitted; alteration in original). In other words, if the federal court's review does not concern "the bona fides of the prior judgment," the federal court "is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment." Id. (internal citation and quotation marks omitted). In that situation, the Rooker-Feldman doctrine would not apply because the plaintiff is not "complaining of legal injury caused by a state court judgment because of a legal error committed by the state court." Id. (internal citation and quotation marks omitted).

---

not come within the fourth requirement for the doctrine to bar this action.

16

126

The Trustee's fraudulent transfer claims did not ask the Bankruptcy Court to make an appellate review of the revocation order. The Commonwealth Court considered whether the Board had authority under the Gaming Act to revoke the slot machine license due to PEDP's noncompliance with the Board's orders, and whether the requirements were sufficiently clear and afforded due process to the licensee during the revocation proceedings. The Bankruptcy Court did not need to consider the bona fides of that decision or review the Commonwealth Court proceedings, and the Trustee does not argue that the Bankruptcy Court should make such a review. Rather, the Bankruptcy Court could have started from the premise that the Board and Commonwealth Court reached the correct result under state law. The Court then could have decided whether that revocation, which occurred because of valid state proceedings, could nonetheless be avoided under the Bankruptcy Code. To decide that question, the Bankruptcy Court should have determined if the revocation of the license was a fraudulent transfer, i.e., it should have considered whether PEDP had an interest in the license, transferred it within the lookback period, became insolvent as a result of the transfer, and did not receive reasonably equivalent value in return for the transfer. See In re Fruehauf Trailer Corp., 444 F.3d 203, 210-11 (3d Cir. 2006) (listing elements of constructive fraudulent transfer claim). The Bankruptcy Court could have answered these questions without rejecting or even reviewing the Commonwealth Court's decision. And, if it accepted the Trustee's argument, the Bankruptcy Court would have concluded that the Bankruptcy Code permitted avoidance of the transfer, not that the Commonwealth Court had committed legal error.[5]

---

[5] When we say that the Bankruptcy Court would have permitted

We recognize, as did the Bankruptcy Court, that the fraudulent transfer claims and the claims before the Commonwealth Court raised overlapping legal issues. But that circumstance did not mean that the Bankruptcy Court was required to reject or even review the Commonwealth's order for the Bankruptcy Court to decide whether the license revocation was a fraudulent transfer. Consider, for example, the overlapping question of interest in the license. In deciding that the Board had authority to revoke the license, the Commonwealth Court considered whether PEDP had an interest in the license of which PEDP could not be deprived without due process of law. Phila. Entm't & Dev. Partners, 34 A.3d at 276. The Bankruptcy Court held, however, that if it "was to determine that the Debtor held an interest in the License . . . this Court would necessarily be required to review the merits of the earlier state court decisions." In re Phila. Entm't & Dev. Partners, 549 B.R. at 139. The Bankruptcy Court, however, did not explain why if it made that determination it would have been required to review the merits of the Commonwealth Court decision, and we see no reason why it would have had to have done so.

The state and federal courts would address the similar question of property interest, but the Bankruptcy Court would not need to review the Commonwealth Court's decision to reach its conclusion. The Bankruptcy Court instead would apply its independent reading of the law governing whether PEDP had an interest in the license. That inquiry would not have implicated

---

avoidance of the transfer we mean only that the Rooker-Feldman doctrine did not bar the Court from finding that there had been a fraudulent transfer. We are not expressing an opinion on the merits of the claim.

18

the Rooker-Feldman doctrine.  As we explained in Great Western, a federal court can address the same issue "and reach[] a conclusion contrary to a judgment by the first court," as long as the federal court does not reconsider the legal conclusion reached by the state court. Great Western, 615 F.3d at 169.

Our above conclusion brings us to the next question, which concerns the relief requested by the Trustee.  In the adversary complaint, PEDP prayed for payment by the Commonwealth of the full value of the transfer.  App'x 123 ¶ 104, 125 ¶ 114.[6]  The Bankruptcy Court held that the Rooker-Feldman doctrine barred review of the fraudulent transfer claim because payment for the value of the license was the functional equivalent to invalidating the state court decision.  We again disagree.  Because the fraudulent transfer claim in the Bankruptcy Court was independent of the Gaming Act and due process claims previously advanced in the state court, it does not matter for Rooker-Feldman doctrine purposes that the relief that

---

[6] The Trustee does not contend that the Board should reissue the slot machine license to PEDP.  The Trustee's sole argument in terms of remedy is that the Commonwealth must pay for the value of the license. See, e.g., Trustee's Opening Br. 4 ("As a result [of the fraudulent transfer], the Trustee is entitled to recover the value of the Debtor's transferred interests in the License for the benefit of the Debtor's creditors."); id. 12 ("[T]he Trustee challenged the dismissal of the Fraudulent Transfer Claims on the basis that the Bankruptcy Court fundamentally misconstrued the Trustee's claims and improperly conflated the state court revocation proceedings with the Trustee's claim that no value was payed [sic] for the Debtor's property interests which were transferred through revocation of the Debtor's License.").

19

129

the Trustee sought, if granted, would frustrate the Commonwealth Court's order. See Great Western, 615 F.3d at 169 (finding the Rooker-Feldman doctrine inapplicable to independent claims "regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment").

In reaching its contrary conclusion, the Bankruptcy Court relied on Maple Lanes, Inc. v. Messer, 186 F.3d 823 (7th Cir. 1999). But we conclude that that case is unpersuasive given the Supreme Court's refinements to the Rooker-Feldman doctrine after the court of appeals decided Maple Lanes. In that case, the plaintiff, Maple Lanes, lost its liquor license after the local sheriff told a newspaper that there had been drug sales in its liquor store. Maple Lanes unsuccessfully challenged the revocation in a state court. Maple Lanes then sued the sheriff in federal court for defamation under 42 U.S.C. § 1983. It alleged that his statement caused the city to revoke its license and it sought as damages the monetary value of the license. The court of appeals dismissed the complaint pursuant to the Rooker-Feldman doctrine as it held that the federal claim was an end-run around the revocation: "In essence, Maple Lanes seeks to undo the effects of the revocation of its liquor license by collecting an amount of damages from [the sheriff] . . . equal to the monetary value of the license." Id. at 825. The court stated that "[i]f a federal court were to award the relief," the "result would effectively reverse the state court judgment upholding the revocation of the liquor license. There is little difference between awarding Maple Lanes the monetary value of the license and the license itself." Id. at 826.

In our view, the result in Maple Lanes does not comport with the Rooker-Feldman doctrine as it now is understood. The

20

130

court of appeals decided Maple Lanes several years before the Supreme Court decided Exxon Mobil and a decade before we decided Great Western. It is clear that both Exxon Mobil and Great Western call the reasoning in Maple Lanes into question.[7] In particular, Maple Lanes focused on the effect of the relief i.e., that damages would functionally "undo the effect of the revocation" even though the revocation order would still be valid, but it did not address whether the federal court in making its adjudication needed to review the state court decision for legal error. The focus, we now know, should be the other way around. That is, the crux of a Rooker-Feldman doctrine inquiry is whether it requires the federal court to look at the "bona fides of the prior judgment," not whether "compliance with the second judgment would make it impossible to comply with the first judgment." Great Western, 615 F.3d at 169. Thus, contrary to Maple Lanes' reasoning, the Rooker-Feldman doctrine does not apply merely because the claim for relief if granted would as a practical matter undermine a valid state court order. Accordingly, we respectfully disagree with the holding in Maple Lanes and so, too, with the Bankruptcy Court's reliance upon it.

The same reasoning undoes the Bankruptcy Court's last conclusion. To support its argument that payment for the value of the license was the functional equivalent of returning the license, the Bankruptcy Court discussed apparently contradictory legal positions in the state and federal proceedings. The Bankruptcy Court noted that the Board and Commonwealth Court accepted PEDP's argument that it would not recoup any money after the revocation; but the Trustee now

---

[7] We are not suggesting that Great Western if decided before Maple Lanes would have been binding on the Maple Lanes court.

21

131

claims a right to payment for the license because of the revocation. In re Phila. Entm't & Dev. Partners, 549 B.R. at 141. The Commonwealth keys in on this point as well, arguing that "it was clear to all involved in those proceedings that revocation of PEDP's license would not entitle PEDP to return of any portion of its $50 million license fee. . . ." Commonwealth's Br. 19. But even if the Trustee has taken inconsistent positions before the different tribunals, "attempts merely to relitigate an issue determined in a state case are properly analyzed under issue or claim preclusion principles rather than Rooker-Feldman." In re Miller, 666 F.3d 1255, 1261 (10th Cir. 2012).

In sum, the Trustee is not "complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment." Exxon Mobil, 544 U.S. at 291, 125 S.Ct. at 1526. The Bankruptcy Court applied the Rooker-Feldman doctrine too broadly in finding that the fraudulent transfer claims require the federal courts to void the state court order. Accordingly, we conclude that the Bankruptcy Court erred in holding that the Rooker-Feldman doctrine barred it from considering the Trustee's fraudulent transfer claims, and we will reverse its grant of dismissal as to Counts Two, Three, and Four of the adversary complaint.[8]

Usually, the final step in a Rooker-Feldman doctrine

---

[8] Because we find that the Rooker-Feldman doctrine does not bar review of the Trustee's claims, we will not reach the Trustee's alternative argument that the doctrine never can apply when the Bankruptcy Court is enforcing substantive provisions of the Bankruptcy Code. Trustee's Opening Br. 21-25.

22

132

analysis is to "apply state law to determine the preclusive effect of the prior state-court judgments." Great Western, 615 F.3d at 173. Although the Commonwealth raised issue preclusion issues before the Bankruptcy Court, that Court did not address the argument and neither party has raised those issues on this appeal. And although the parties have briefed the merits of the fraudulent transfer claims, the Commonwealth focused, as had the Bankruptcy and District Courts, on whether a fraudulent transfer claim arises from the payment of the license fee or the refund, not the revocation of the license itself as urged by the Trustee—a result likely attributable to the unclear nature of the Trustee's claims, as we explained above. It is not surprising, therefore, that we do not have adequate briefing on the preclusion issues. Accordingly, we will remand this matter to the District Court to address inter alia (1) whether claim or issue preclusion bars judicial review of the Trustee's claim that the license revocation was a constructively fraudulent transfer under § 548(a)(1)(B) or § 544(b) and the PUFTA; and if not (2) whether the Trustee has stated a claim that the license revocation constitutes a fraudulent transfer under § 548(a)(1)(B) or § 544(b) and the PUFTA; and (3) whether the Eleventh Amendment bars judicial review of the Trustee's claim that the license revocation was a constructively fraudulent transfer under § 548(a)(1)(B) or § 544(b) and the PUFTA.

## V. CONCLUSION

For the foregoing reasons, we will reverse the District Court's affirmance of the Bankruptcy Court's dismissal of the Trustee's fraudulent transfer claims in Counts Two, Three, and Four of the adversary complaint, which the Bankruptcy Court

23

**133**

134

predicated on its belief that the federal courts lacked subject matter jurisdiction over the claims. We will remand the case for further proceedings to the District Court which, at its option, may decide the remaining issues that come before it on the remand or may, in turn, remand the matter to the Bankruptcy Court for further proceedings.

24

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 9, 2021

Lyle W. Cayce
Clerk

No. 20-40624

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

JUDITH L. BROCATO; DICK BROCATO, JR.,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Eastern Division of Texas
USDC No. 1:19-CR-133

Before KING, DENNIS, and HO, *Circuit Judges.*

PER CURIAM:

Judith and Dick Brocato were convicted by a jury of conspiracy to commit tax fraud, in violation of 18 U.S.C. § 371, and filing false returns, in violation of 26 U.S.C. § 7206(1), and were sentenced to 33 months imprisonment on all counts, to run concurrently. Prior to sentencing, they moved to recuse the district judge who presided over their trial. The motion was denied, and the Brocatos were sentenced. On appeal, they seek recusal of the district judge, vacatur of their sentences, and resentencing by a different judge. Although we think that certain statements of the district court judge were ill-advised and certain actions of her staff were improper,

139

No. 20-40624

we nonetheless AFFIRM because, after a thorough review of the record, we conclude that there was no actual bias or reasonable question as to the judge's impartiality in this case that would require recusal.

## I.

The Brocatos, a married couple, owned a lawn care company, Superior Lawn Service. Judith was the president and bookkeeper of Superior. Over a three-year period, the Brocatos concealed approximately $1.7 million of business income. They were charged with conspiracy to commit tax fraud and multiple counts of filing false tax returns. After a three-day trial, the jury convicted on all counts.

On the second day of trial, Internal Revenue Service (IRS) special agent Regina Kelley testified for the Government. Kelley testified, among other matters, that Judith purchased a Maserati sedan in 2013 and paid part of the down payment with $9,000 in cash. Judith also testified on the second day of trial. She admitted to routinely shredding business documents, including immediately after receiving a records request from the IRS. On direct examination, Judith was also asked about the source of the $9,000 in cash that she used to cover part of the Maserati down payment:

Q. Where did that $9,000 come from?

A. My mother. She passed away.

Q. Okay. And you got that $9,000 from her estate?

A. Yes, sir.

Q. And that's what you used?

A. Yes, sir.

The Government did not attempt to impeach or otherwise contest Judith's testimony about the source of the $9,000.

No. 20-40624

The next day, February 5, 2020, before closing arguments, Judith's testimony was discussed in an unrecorded, in-chambers conference. The district court later recounted that "the court convened a meeting with counsel in chambers to discuss the jury charge, consistent with the court's practice, and merely instructed counsel for the Brocatos not to represent during closing argument that the source of the $9,000.00 cash was the estate of Mrs. Brocato's deceased mother." According to the Brocatos, the judge advised that "her staff had conducted an Internet search and found an obituary" that suggested "Mrs. Brocato could not have obtained the $9,000 from her mother's estate," leading the judge to conclude "that Mrs. Brocato had committed perjury during her testimony."

That same day, after the Brocatos were convicted, the district court outlined the sentencing process to them and addressed the issue of their release pending sentencing. The Government stated it had no objections to the Brocatos "remaining out on bond" and defense counsel proposed "continu[ing] on the same conditions of release," but the court said that it "d[id]n't feel comfortable" with that and would require each defendant to post a $100,000 bond. It gave the following explanation:

> The Court is very troubled about testimony about shredding documents, discarding evidence, and the perjury that occurred in this courtroom about the source of the $9,000 cash where Mrs. Brocato said that it was from her mother's estate. But the transaction with the Maserati occurred in 2013 and it appears from the obituary of her mother that she died in 2015; so, I don't think she would have gotten money in 2013 from her mother's estate. The Court takes a very dim view of perjury in proceedings; so, you need to keep that in mind.

The presentence report (PSR) for each defendant identified a guidelines range of 33 to 41 months in prison based on a criminal history category of I and a total offense level of 20. Although Judith's PSR referred

No. 20-40624

to her testimony about the $9,000 as potential grounds for an obstruction-of-justice enhancement, it deemed the enhancement unwarranted because "the misinformation does not appear purposeful." The probation officer noted that Judith had explained that she received money from her mother before the latter died and that "she was nervous while testifying and any statement suggesting she received the [$9,000] from her mother after her mother's death was simply a mistake." The final PSRs were filed on August 10.

On August 14, the court requested a certified copy of Judith's mother's death certificate from defense counsel. A week later, the Brocatos filed a motion to recuse the district judge. Invoking 28 U.S.C. §§ 144 and 455(a) as well as the Fifth Amendment's Due Process Clause, they argued that the district court's "*sua sponte, ex parte* investigation into Mrs. Brocato's credibility," its accusation of perjury, and its decision to increase both defendants' bond obligations evinced actual or apparent bias warranting recusal. The motion included a certificate of good faith signed by counsel and sworn affirmations by Dick and Judith that "everything contained herein is true and correct." Four exhibits were attached, including the court's request for a certified death certificate; a letter from Judith disclaiming any intent to testify falsely and stating that her mother made gifts of money in the years before she died; and affidavits from Judith's daughter-in-law Amy Brocato and from Lauren Moore, a longtime hairdresser for Judith and her mother, offering support for Judith's statement. In addition, Moore averred that she was present when the district court spoke of Judith committing perjury and that the judge was clearly "angry and upset."

The district court denied the recusal motion on September 2. It acknowledged that "[c]ourt staff discovered that Mrs. Brocato's mother, Verna Jo Carter ('Mrs. Carter'), died in 2015, at least two years after the [Maserati sedan] was purchased." However, the court wrote, "staff was not instructed to investigate any of the parties and did not bring this information

4

142

No. 20-40624

to the judge's attention until after Mrs. Brocato finished testifying and the Government had not cross-examined her on the issue." The district court first determined that the Brocatos' reliance on § 144 was unavailing because the affidavits from Lauren Moore and Amy Brocato failed to show bias. It then concluded that § 455 and the Due Process Clause did not require recusal either.

At sentencing hearings on September 9, the district court adopted both PSRs in full, denied defense requests for an adjustment for acceptance of responsibility or for a downward variance, and sentenced both Judith and Dick at the low-end of the guidelines range to 33-months imprisonment to be followed by one year of supervised release. The district court also imposed $617,762 in restitution. This appeal followed.

## II.

On appeal, the Brocatos do not challenge their convictions or sentences. Rather, they argue that the district court abused its discretion in denying their motion to recuse, and they seek resentencing by a different district judge. In response, the Government asserts that the judge was not required to recuse herself, and that even if it were an abuse of discretion under statutory law not to recuse, any such error was harmless.

We review the denial of recusal motions under 28 U.S.C. § 144 and § 455 for abuse of discretion, with errors subject to harmless-error review. *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 483–85 (5th Cir. 2003). When assessing harmlessness in this particular context, we consider three factors: "(1) the risk of injustice to the parties in the particular case; (2) the risk that denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process." *United States v. Monroe*, 178 F.3d 304, 309 (5th Cir. 1999); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). However, we review alleged due

5

143

No. 20-40624

process violations *de novo*. *See, e.g., United States v. Burns*, 526 F.3d 852, 859 (5th Cir. 2008). If a failure to recuse constitutes a due process violation, such error is not subject to harmless-error review. *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016).

## III.

Two federal statutes govern recusal of district court judges for bias: 28 U.S.C. §§ 144 and 455. *See United States v. Scroggins*, 485 F.3d 824, 829 & n.19 (5th Cir. 2007).

Section 144 requires recusal when a judge "has a personal bias or prejudice" against or in favor of a party. The statute includes a procedure by which a party asserting that a judge is biased shall "make[ ] and file[ ] a timely and sufficient affidavit" that "shall state the facts and the reasons for the belief that bias or prejudice exists[.]" 28 U.S.C. § 144. "A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith." *Id.* The terms of § 144 at first glance appear to make recusal automatic upon filing of an affidavit. *Id.* ("Whenever a party . . . makes and files a timely and sufficient affidavit . . . such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."). However, the statute says that an affidavit must be "sufficient." In reviewing a recusal motion, our caselaw holds that the district judge "must pass on the sufficiency of the affidavit, but may not pass on the truth of the affidavit's allegations." *Patterson*, 335 F.3d at 483. "A legally sufficient affidavit must: (1) state material facts with particularity; (2) state facts that, if true, would convince a reasonable person that a bias exists; and (3) state facts that show the bias is personal, as opposed to judicial, in nature." *Id.*

Section 455(a) sweeps broader than § 144: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any

No. 20-40624

proceeding in which his impartiality might reasonably be questioned." Under § 455(a), "what matters is not the reality of bias or prejudice but its appearance," *Liteky v. United States*, 510 U.S. 540, 548 (1994), because "justice must satisfy the appearance of justice," *In re Murchison*, 349 U.S. 133, 136 (1955). In applying the statute, a court considers "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995) (citing *Liljeberg*, 486 U.S. at 860–61). The objective standard relies on the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003) (quoting *Jordan*, 49 F.3d at 156). Justice Kennedy, concurring in *Liteky*, wrote that "§ 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings," such that recusal was required "if it appears that [the judge] harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." *Liteky*, 510 U.S. at 557–58 (Kennedy, J., concurring).

Of course, not all favorable or unfavorable opinions can be described as bias or partiality within the meaning of §§ 144 and 455(a). Rather, the concept of bias "connote[s] a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Liteky*, 510 U.S. at 550; *see also id.* at 552 (same regarding the concept of "partiality"). Accordingly, a judge is not generally required to recuse for bias, even if the judge is "exceedingly ill disposed towards the defendant," when the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of

No. 20-40624

the proceedings[.]" *Id.* at 550–51. Thus, under either statute, adverse rulings or comments by a judge "will support a claim of bias only if they reveal an opinion based on an extrajudicial source or if they demonstrate such a high degree of antagonism as to make fair judgment impossible." *Scroggins*, 485 F.3d at 830 (citing *Liteky*, 510 U.S. at 555). The existence of an "extrajudicial source" is "a significant (and often determinative) . . . factor" in deciding recusal matters. *Liteky*, 510 U.S. at 555. At the same time, "the presence of extrajudicial facts, without something more, does not suffice to show bias." *Tejero v. Portfolio Recovery Assocs, L.L.C.*, 955 F.3d 453, 463 (5th Cir. 2020).

## A.

First, addressing the distinction between an opinion that derives from an extrajudicial source and an opinion that arises in the context of judicial proceedings, *see Liteky,* 510 U.S. at 554–55, the Brocatos argue that the judge's opinion that Judith committed perjury derived from an extrajudicial source: the online obituary of Mrs. Carter discovered by the judge's staff as a result of an Internet search. In denying the Brocatos' recusal motion, the district court disagreed, writing that the court's notion that Judith committed perjury derived from her testimony itself, and further, that Mrs. Carter's death certificate was a public record properly subject to judicial notice (and, therefore, non-extrajudicial). On appeal, the Government argues likewise that Judith's testimony put the date of her mother's death at issue and led to the judge's opinion that Judith had committed perjury. The Government further argues that the district court learned of and verified the date of Judith's mother's death in a "judicial capacity" and that it was proper for the court to consider the information at sentencing because the probation office had identified and discussed the possibility that Judith's testimony had obstructed justice in her PSR.

8

146

No. 20-40624

The situation presented by this case is not squarely covered by our cases, and, in any event, each recusal case "is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances more than by comparison to situations considered in prior jurisprudence" *Jordan*, 49 F.3d at 157. The Government cites *Tejero* for the proposition that information obtained outside of the courtroom can still be considered non-extrajudicial if a judge learned of the information in his or her "judicial capacity." 955 F.3d at 463–64. In *Tejero*, the knowledge at issue was a list of cases in which certain attorneys had acted as plaintiff's counsel. *Id.* Even though the judge "looked beyond the record" of the instant case in compiling the list, our court held that the knowledge was not "extrajudicial" because the list of cases "was simply a record generated by the ECF system" for the district court, and the judge's "method of compiling the list of cases was evenhanded and well within the normal day-to-day activities of a judge presiding over a similar case" and therefore not "problematic." *Id.*

The Brocatos rely on *Kennedy v. Great Atlantic & Pacific Tea Co., Inc.*, 551 F.2d 593 (5th Cir. 1977). In *Kennedy*, the law clerk for the district judge presiding over a slip-and-fall case decided to visit the scene of the accident. *Id.* at 594. The law clerk then recounted his observations to the judge and eventually the visit was disclosed to counsel, which resulted in the clerk being called as a witness at the subsequent trial. *Id.* at 594–95. On appeal, this court reversed the denial of defense counsel's motion to recuse the trial judge and prevent the law clerk from testifying. *Id.* at 598–99. The court in *Kennedy* characterized "the intervention of a court official in the accumulation of evidence" as "unacceptable" in "our adversary system of justice." *Id.* at 596. We also likened the law clerk's investigation to a prohibited *ex parte* communication and stated that "[i]t was [the law clerk's] duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation." *Id.*; *see also Hall v. Small Bus. Admin.*,

No. 20-40624

695 F.2d 175, 179 (5th Cir. 1983) (describing "law clerks" as "sounding boards for tentative opinions" who are "privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be" such that "the clerk is forbidden to do all that is prohibited to the judge").

We think the circumstances in this case are clearly distinguishable from *Tejero*. The online search that revealed Mrs. Carter's obituary, presumably undertaken to discover additional facts relating to the case, is not "within the normal day-to-day activities of a judge" or her staff. *Tejero*, 955 F.3d at 464. While we acknowledge that the online search in this case was not as disruptive to the proceedings as the law clerk's activities in *Kennedy*— in *Kennedy*, our court had to reverse the judgment entered upon the jury verdict and remand for new proceedings, *see* 551 F.2d at 598–99, while the Brocatos do not challenge their convictions, but only seek resentencing—in both cases judicial staff engaged in independent factual research and, in doing so, discovered and brought to the attention of the judge factual information that had not been introduced into evidence by the parties. This type of factual research is of a different nature than searching the district court's ECF system. *See Tejero*, 955 F.3d at 464; *see also Sovereign Mil. Hospitaller v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1296 (11th Cir. 2012) (criticizing district judge's "extra-record Internet research into similarly named organizations" in a trademark case and cautioning the judge to "limit its analysis to facts in the record").

We think the Brocatos are correct that the judge's opinion was derived from information that came from an extrajudicial source. The online obituary was discovered through an Internet search by the judge's staff. It seems likely that but for the staff's actions in performing the online search and bringing the date of Mrs. Carter's death to the judge's attention, the judge would not have obtained the information nor formulated an opinion that Judith

10

148

No. 20-40624

committed perjury. No evidence was introduced at trial establishing the precise date of Mrs. Carter's death, and Judith's admittedly incorrect testimony—regardless of whether it was willful or an innocent mistake—was not impeached on cross-examination or otherwise disputed by the Government. That Mrs. Carter's death certificate was a document subject to judicial notice does not change the analysis because, even if the information (the date of Mrs. Carter's death) was later *verified* via a "judicial" source, the initial source of the information from which the judicial opinion was *derived* was nonetheless extrajudicial.

### B.

Of course, while an extrajudicial source weighs in favor of recusal, it alone may not be sufficient to find bias or the appearance of partiality. *Liteky*, 510 U.S. at 555; *Tejero*, 955 F.3d at 463. The ultimate standard remains, under § 144, whether the judge has an actual personal bias, and under § 455(a), "whether a reasonable and objective person, knowing all of the facts, would harbor doubts concerning the judge's impartiality." *Jordan*, 49 F.3d at 155 (citing *Liljeberg*, 486 U.S. at 860–61).

The Brocatos argue that the district judge was biased as evinced by her stated opinion that Judith committed perjury and because that opinion was based on an extrajudicial source. They assert that the judge's bias had an effect on sentencing, and that they should have been assessed a lower restitution amount and granted a downward variance. However, as the Government points out, the Brocatos do not challenge their sentences on appeal or identify any specific error made by the district court at sentencing. Rather, the Brocatos merely recite what they consider "valid reasons" that a different judge could rely on to give them a lesser sentence, i.e. one below the guidelines range.

149

No. 20-40624

The Government argues that, even assuming Mrs. Carter's date of death was an extrajudicial fact, there was no appearance of impartiality under § 455(a) based on the judge's reference to "perjury" when setting postconviction bond pending sentencing. For support, the Government cites the following circumstances: (1) the judge did not actively direct her staff to investigate Judith's credibility, but instead was a passive recipient of the information that staff discovered; (2) when she did learn of the information, she informed both parties and ensured that the jury was not affected; (3) the judge made the remark about "perjury" before receiving either the PSR or Judith's attestation that she made an honest mistake in her testimony, and later stated that the inconsistent testimony would "have no effect on the sentencing of the Brocatos"; (4) consistent with the PSR, the judge did not apply an obstruction-of-justice enhancement; and (5) the judge sentenced the Brocatos at the bottom-end of the guidelines range and made no reference to perjury at sentencing.

After a careful review of the record, we conclude that a reasonable and objective observer, aware of all of the facts and circumstances, would not harbor doubts about the judge's impartiality. To start, we do not in any way condone Internet searches concerning a witness's credibility, or any type of similar investigation by court staff into factual matters. This sort of *ex parte* fact-gathering is improper. *See Kennedy*, 551 F.2d at 596; *Sovereign Mil. Hospitaller*, 702 F.3d at 1296. Such activity has the potential to raise reasonable questions concerning impartiality, and it should not occur. We also find the district judge's use of the term "perjury" regrettable in light of the context in which the inconsistent testimony was identified. With that said, however, we think that a review of *all* of the facts and circumstances in this case dispels any reasonable doubts created by staff's improper Internet search or the judge's use of the word "perjury." *See Andrade*, 338 F.3d at 455 ("[R]eview should entail a careful consideration of context, that is, the

12

No. 20-40624

entire course of judicial proceedings, rather than isolated incidents." (citing *Sao Paulo State of Fed. Rep. of Brazil v. Am. Tobacco Co.*, 535 U.S. 229, 232–33 (2002) and *United States v. Avilez-Reyes*, 160 F.3d 258, 259 (5th Cir. 1998))); *see also Liteky*, 510 U.S. at 555 (noting that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases" will not always support a bias or partiality challenge even when an extrajudicial source is involved).

Here, we find it significant that the district court did not apply an obstruction-of-justice enhancement for perjury, but instead adopted the PSR's determination that "misinformation" in Judith's testimony concerning the source of the $9,000 was not "purposeful," and that the district court sentenced both Judith and Dick at the bottom of the guidelines range. Further, the district judge's rulings at sentencing were consistent with the guidelines rather than indicative of bias, the Brocatos do not challenge their sentences on appeal, and we do not think the district judge's denial of the Brocatos' requests for downward variances creates a reasonable appearance of bias. Also, regarding the reasons for setting postconviction bond, the record reflects that the district judge cited "testimony about shredding documents" and "discarding evidence," in addition to "perjury."

Finally, we note that the Brocatos waited more than six months after the judge's remarks were made to move for recusal; the in-chambers conference and setting of postconviction bond both occurred on February 5, but the motion to recuse was not filed until August 21. *See Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994) (stating general rule that "one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification"). However, we also note that on August 14—a week before the motion was filed—the district judge requested a certified copy of Mrs. Carter's death

13

No. 20-40624

certificate.    Altogether, we do not consider the Brocatos' delay as a dispositive fact, but we note it as a relevant circumstance.

Considering all of these facts and circumstances, a reasonable and objective person would not harbor doubts concerning the judge's impartiality or question whether bias affected the Brocatos' sentences.  The Brocatos have not shown an abuse of discretion under § 455(a).

As there was no abuse of discretion under § 455(a), there was no abuse of discretion under § 144 because "section 455 imposes the stricter standard." *Phillips v. Joint Legis. Comm. on Performance & Expenditure Rev. of State of Miss.*, 637 F.2d 1014, 1019 n.6 (5th Cir. 1981); *see also Liteky*, 510 U.S. at 548 (stating that § 144 "seems to be properly invocable only when § 455(a) can be invoked anyway").[1]

---

[1] The Brocatos due process argument also fails.  Because a "fair trial in a fair tribunal is a basic requirement of due process," a defendant's due process rights are violated when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *Murchison*, 349 U.S. at 136 and *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  "The Due Process Clause demarks only the outer boundaries of judicial disqualifications," however, and its application is thus "confined to rare instances." *Id.* at 889–90.  The pertinent question is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams*, 136 S. Ct. at 1905.  The Supreme Court has emphasized that it requires fairly "extreme facts" to meet this standard. *Caperton*, 556 U.S. at 887.  In *Caperton*, for example, the Supreme Court found a due process violation where a state appellate judge did not recuse himself from an appeal of a $50 million jury verdict against a coal company. *Id.* at 872.  The "extraordinary situation" in that case that warranted recusal, *id.* at 887, was that the CEO of the coal company had spent $3 million to help get the appellate judge elected after the jury verdict at issue but before it was reviewed on appeal, and that $3 million had far exceeded the $1 million spent by the judge's campaign committee. *Id.* at 872–74.  In *Williams*, the Supreme Court held that an unacceptable risk of bias existed when a judge, in his previous job as district attorney, had personally authorized his subordinates to pursue a death sentence against the petitioner. 136 S. Ct. at 1907–09.  And in *Mayberry v. Pennsylvania*, the court held that the Due Process Clause required criminal contempt proceedings to take place

No. 20-40624

## IV.

Because the Brocatos have shown no due process violation or abuse of discretion under either 28 U.S.C. §§ 144 or 455(a) in this case, we AFFIRM the district court's denial of their motion to recuse.

---

before a different judge when the trial judge had been subjected to highly personal attacks by *pro se* prisoner-defendants throughout the entirety of a 21-day jury trial for prison breach. 400 U.S. 455, 455, 465–66 (1971). By comparison, the circumstances in this case simply do not include the type of extreme facts that suggest an objective risk of unconstitutional potential for bias.

15

153

155